# 22-0198

# United States Court of Appeals

*for the*

# Second Circuit

———————◆———————

MARK THOMAS DUBLINO,

*Plaintiff-Appellant,*

— v. —

SGT. JUSTIN BIEGAJ, SGT. ROBERT DEE, DEP. BRIAN THOMPSON,
DEP. FRANK GELSTER, SGT. CROSS, SGT. ROBINSON,
DEPT. P. GIARDINA, DEPT. SHAWN WILSON,

*Defendants-Appellees,*

and

C.O. VINCENT TERRANA,

*Defendant.*

———————————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

## SUPPLEMENTAL APPENDIX FOR
## DEFENDANTS-APPELLEES
## Volume 1 of 2 (Pages SA-1 – SA-292)

ERIE COUNTY DEPARTMENT OF LAW
Erin Molisani, Esq.
*Attorneys for Defendants-Appellees*
95 Franklin Street, Room 1634
Buffalo, New York 14202
(716) 858-2216

i

# TABLE OF CONTENTS

**Page**

District Court Docket Entries ..................................... SA-1

Amended Complaint, filed July 17, 2019 .................. SA-10

Order, filed September 3, 2019.................................. SA-27

Answer to Amended Complaint with Jury Trial
    Demand, filed October 2, 2019............................. SA-32

Notice of Motion by Defendants, for an Order
    Granting Summary Judgment, filed October 8,
    2021 ......................................................................... SA-38

Supporting Declaration of Erin M. Molisani, Esq.,
    for Defendants, in Support of Motion, filed
    October 8, 2021 ...................................................... SA-40

    Exhibit A to Molisani Supporting Declaration -
    Plaintiff's Deposition Testimony, dated June 7,
    2021 ......................................................................... SA-42

    Exhibit B to Molisani Supporting Declaration -
    Video from March 9, 2018 and Affidavits of
    Deputy Brian Thompson and Sergeant Robert
    Dee ........................................................................... SA-105

    Exhibit C to Molisani Supporting Declaration -
    Deputy Brian Thompson's Deposition Testimony,
    dated June 9, 2021 ................................................. SA-109

    Exhibit D to Molisani Supporting Declaration -
    Deputy Frank Gelster's Deposition Testimony,
    dated June 9, 2021 ................................................. SA-146

    Exhibit E to Molisani Supporting Declaration -
    Sergeant Jack Robinson's Deposition Testimony,
    dated June 10, 2021 ............................................... SA-184

ii

**Page**

Exhibit F to Molisani Supporting Declaration -
Deputy Peter Giardina's Deposition Testimony,
dated June 11, 2021.................................................. SA-227

Exhibit G to Molisani Supporting Declaration -
Deputy Shawn Wilson's Deposition Testimony,
dated July 8, 2021 .................................................. SA-259

Exhibit H to Molisani Supporting Declaration -
Sergeant Justin Biegaj's Deposition Testimony,
dated July 8, 2021 .................................................. SA-293

Exhibit I to Molisani Supporting Declaration -
Sergeant Matthew Cross' Deposition Testimony,
dated July 9, 2021 .................................................. SA-331

Exhibit J to Molisani Supporting Declaration -
Sergeant Robert Dee's Deposition Testimony,
dated July 9, 2021 .................................................. SA-360

Exhibit K to Molisani Supporting Declaration -
Request to Admit .................................................. SA-387

Exhibit L to Molisani Supporting Declaration -
Plaintiff's Response to Request to Admit.............. SA-393

Movants' Statement of Material Facts, filed October
8, 2021 .................................................. SA-398

Certificate of Service, filed October 8, 2021 ............ SA-406

Plaintiff's Response to Defendants' Statement of
Material Facts, filed December 15, 2021............... SA-407

Certificate of Service, filed December 15, 2021 ....... SA-412

Attorney Declaration of Erin M. Molisani, Esq., for
Defendants, in Further Support of Motion, filed
December 20, 2021 .................................................. SA-413

iii

|  | Page |
|---|---|
| Decision and Order, filed January 18, 2022 | SA-416 |
| Judgment, filed January 19, 2022 | SA-422 |
| Notice of Appeal, filed January 31, 2022, with Affidavit of Service | SA-423 |

SA-1

APPEAL,CASREF,PRO_BONO,PS−C,ProSe

# U.S. DISTRICT COURT
## U.S. District Court, Western District of New York (Rochester)
## CIVIL DOCKET FOR CASE #: 6:19−cv−06269−DGL−MJP

Dublino v. Biegaj et al
Assigned to: Hon. David G. Larimer
Referred to: Hon. Mark W. Pedersen
Cause: 42:1983 Prisoner Civil Rights

Date Filed: 04/10/2019
Date Terminated: 01/19/2022
Jury Demand: Both
Nature of Suit: 550 Prisoner: Civil Rights
Jurisdiction: Federal Question

**Plaintiff**

**Mark Thomas Dublino**

represented by **Mark Thomas Dublino**
18−B−0793
WENDE CORRECTIONAL FACILITY
Box 1187
Alden, NY 14004−1187
PRO SE

**Steven V. Modica**
Modica & Associates
2430 Ridgeway Avenue
Rochester, NY 14626
585−227−2070
Fax: 585−227−2306
Email: steve@ModicaLawFirm.com
*TERMINATED: 01/20/2022*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Sgt. Justin Biegaj**

represented by **Erin Elizabeth Molisani**
Erie County Department of Law
95 Franklin Street
16th Floor
Buffalo, NY 14202
716−858−2208
Fax: 716−858−2281
Email: erin.molisani@erie.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Thomas J. Navarro**
Erie County Department of Law
95 Franklin Street
16th Floor
Buffalo, NY 14202
716−858−2243
Fax: 716−858−2281
Email: thomas.navarro@erie.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Sgt. Robert Dee**

represented by **Erin Elizabeth Molisani**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

SA-2

Thomas J. Navarro
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Dep. Brian Thompson**                    represented by    **Erin Elizabeth Molisani**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Thomas J. Navarro
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Dep. Frank Gelster**                      represented by    **Erin Elizabeth Molisani**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Thomas J. Navarro
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**C.O. Vincent Terrana**
*TERMINATED: 09/04/2019*

**Defendant**

**Sgt. Cross**                              represented by    **Erin Elizabeth Molisani**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Thomas J. Navarro
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Sgt. Robinson**                           represented by    **Erin Elizabeth Molisani**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Thomas J. Navarro
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Dep. P. Giardina**                        represented by    **Erin Elizabeth Molisani**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Thomas J. Navarro
(See above for address)

SA-3

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Dep. Shawn Wilson**                  represented by  **Erin Elizabeth Molisani**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Thomas J. Navarro**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 04/10/2019 | 1 | COMPLAINT against All Defendants, filed by Mark Thomas Dublino. (BK) (Entered: 04/11/2019) |
| 04/10/2019 | 2 | MOTION for Leave to Proceed in forma pauperis by Mark Thomas Dublino. (BK) (Entered: 04/11/2019) |
| 04/10/2019 |  | Notice of Availability of Magistrate Judge: A United States Magistrate of this Court is available to conduct all proceedings in this civil action in accordance with 28 U.S.C. 636c and FRCP 73. The Notice, Consent, and Reference of a Civil Action to a Magistrate Judge form (AO−85) is available for download at http://www.uscourts.gov/services−forms/forms. The Pro Se Packet including: the Privacy Notice, Consent to Proceed before a Magistrate Judge and the Civil Case Timeline have been mailed to the Plaintiff. (BK) (BK) (Entered: 04/11/2019) |
| 05/20/2019 | 3 | Letter Request from Mark Dublino, dated 5/16/2019. (BK) (Entered: 05/22/2019) |
| 06/06/2019 | 4 | ORDER granting 2 Motion for Leave to Proceed in forma pauperis. Signed by Hon. David G. Larimer on 6/4/2019. Plaintiff has 45 days from the date of this order to file an amended complaint. A copy of this order, a copy of the original complaint, a blank § 1983 complaint form, and the instructions for filing an amended complaint have been mailed to the Plaintiff at Auburn Correctional. (BK) (Entered: 06/06/2019) |
| 06/11/2019 | 5 | Pro se Office Letter Response to Plaintiff Mark T. Dublino. (JHF) (Entered: 06/12/2019) |
| 06/17/2019 | 6 | Letter from NYS Correction and Community Supervision, dated 6/14/19, to Judge Payson. (JHF) (Entered: 06/18/2019) |
| 07/11/2019 | 7 | Letter Request from Mark Dublino, dated 7/3/2019. (Attachments: # 1 Envelope) (BK) (Entered: 07/12/2019) |
| 07/17/2019 | 8 | AMENDED COMPLAINT against All Defendants, filed by Mark Thomas Dublino. (BK) (Entered: 07/19/2019) |
| 07/22/2019 | 9 | MOTION to Appoint Counsel by Mark Thomas Dublino. (BK) (Entered: 07/24/2019) |
| 09/03/2019 | 10 | ORDER that the Clerk of Court is directed to cause the United States Marshal Service to serve copies of the Summons, Amended Complaint and this Order upon Defendants without Plaintiff's payment therefore, unpaid fees to be recoverable if this action terminates by monetary award in Plaintiff's favor; FURTHER, that pursuant to 42 U.S.C. § 1997e(g), Defendants are directed to respond to the Complaint. SO ORDERED. Signed by Hon. David G. Larimer on 9/3/2019. *(Clerk mailed copy of order to Plaintiff on 9/4/2019.)* (LB) (Entered: 09/04/2019) |
| 09/03/2019 | 11 | DECISION AND ORDER denying 9 Motion to Appoint Counsel without prejudice. Signed by Hon. David G. Larimer on 9/3/2019. *(Clerk mailed copy of order to Plaintiff on 9/4/2019.)* (LB) (Entered: 09/04/2019) |
| 09/04/2019 |  | Summons Issued as to Justin Biegaj, Cross, Robert Dee, Frank Gelster, P. Giardina, Robinson, Brian Thompson, Shawn Wilson. The Clerks Office has forwarded service packets to the US Marshal. (LB) (Entered: 09/04/2019) |

SA-4

| Date | Doc | Description |
|---|---|---|
| 09/16/2019 | 12 | Letter Request from Mark T. Dublino, dated 9/1/2019. (BK) (Entered: 09/19/2019) |
| 10/01/2019 | 14 | Acknowledgment of Service PR by Mark Thomas Dublino. Justin Biegaj served on 9/30/2019, answer due 12/2/2019; Cross served on 9/30/2019, answer due 12/2/2019; Robert Dee served on 9/30/2019, answer due 12/2/2019; Frank Gelster served on 9/30/2019, answer due 12/2/2019; P. Giardina served on 9/30/2019, answer due 12/2/2019; Robinson served on 9/30/2019, answer due 12/2/2019; Brian Thompson served on 9/30/2019, answer due 12/2/2019; Shawn Wilson served on 9/30/2019, answer due 12/2/2019. (BK) (Entered: 10/03/2019) |
| 10/02/2019 | 13 | ANSWER to 8 Amended Complaint by Justin Biegaj, Cross, Robert Dee, Frank Gelster, P. Giardina, Robinson, Brian Thompson, Shawn Wilson.(Molisani, Erin) (Entered: 10/02/2019) |
| 10/04/2019 | 15 | TEXT ORDER REFERRING CASE to Magistrate Judge Hon. Jonathan W. Feldman for all pretrial matters excluding dispositive motions. IT IS SO ORDERED. Signed by Hon. David G. Larimer on 10/4/19. *A copy of this Text Order has been mailed to plaint,f at his address of record.* (PR) (Entered: 10/04/2019) |
| 10/07/2019 | 16 | ORDER: Scheduling Conference set for 11/25/2019 at 02:00 PM before Hon. Jonathan W. Feldman's successor. A copy of this order and the NEF has been mailed to pro se plaintiff. Signed by Hon. Jonathan W. Feldman on 10/7/2019. (SR) (Entered: 10/07/2019) |
| 10/11/2019 | 19 | ORDER granting defense counsel's request to participate by telephone at the Rule 16 Scheduling Conference set for 11/25/2019 at 2:00 pm before Hon. Jonathan W. Feldman's successor. Signed by Hon. Jonathan W. Feldman on 10/11/2019. (copy of this order mailed to pro se plaintiff at address on docket.) (LMD) (Entered: 10/22/2019) |
| 10/15/2019 | 17 | MOTION to Appoint Counsel by Mark Thomas Dublino. (BK) (Entered: 10/16/2019) |
| 10/15/2019 | 18 | NOTICE by Mark Thomas Dublino. (BK) (Entered: 10/16/2019) |
| 10/31/2019 | 20 | NOTICE of Appearance by Thomas J. Navarro on behalf of All Defendants (Navarro, Thomas) (Entered: 10/31/2019) |
| 11/13/2019 | 21 | TEXT ORDER REFERRING CASE to Hon. Hon. Mark W. Pedersen, United States Magistrate Judge for all pretrial matters excluding dispositive motions. Hon. Jonathan W. Feldman no longer assigned to case. Signed by Mary C. Loewenguth, Clerk of Court, on 11/13/2019. (LB) (Entered: 11/13/2019) |
| 11/14/2019 | | Copy of 11/13/19 Text Order Referring Case mailed to pro se parties and any non−electronically registered attorneys. (JHF) (Entered: 11/14/2019) |
| 11/14/2019 | 23 | Letter filed by Robert Dee, Cross, P. Giardina, Justin Biegaj, Robinson, Brian Thompson, Shawn Wilson, Frank Gelster as to Vincent Terrana, Robert Dee, Cross, P. Giardina, Justin Biegaj, Robinson, Brian Thompson, Shawn Wilson, Frank Gelster . (Navarro, Thomas) (Entered: 11/14/2019) |
| 11/15/2019 | | E−Filing Notification: 22 DISCOVERY PLAN. The consent form does not get e−filed. Document removed. Action required: Refile only the Proposed discovery plan. (TF) (Entered: 11/15/2019) |
| 11/15/2019 | | E−Filing Notification: 23 Letter. This document contains a request for relief and should be filed as a motion. ACTION REQUIRED: Re−file document using the motion event. (TF) (Entered: 11/15/2019) |
| 11/15/2019 | 25 | First MOTION to Adjourn scheduling conference by Justin Biegaj, Cross, Robert Dee, Frank Gelster, P. Giardina, Robinson, Brian Thompson, Shawn Wilson.(Navarro, Thomas) (Entered: 11/15/2019) |
| 11/20/2019 | 26 | LETTER ORDER granting 25 Motion to Adjourn Scheduling Conference. Scheduling Conference reset for 12/19/2019 at 2:00PM before Hon. Mark W. Pedersen. Signed by Hon. Mark W. Pedersen on 11/20/2019. (JB) (Entered: 11/20/2019) |
| 11/20/2019 | | Set/Reset Hearings: Scheduling Conference reset for 12/19/2019 at 02:00 PM before Hon. Mark W. Pedersen. (JB) (Entered: 11/20/2019) |

SA-5

| 12/04/2019 | 27 | First MOTION for Leave to Appear by telephone by Justin Biegaj, Cross, Robert Dee, Frank Gelster, P. Giardina, Robinson, Brian Thompson, Shawn Wilson.(Navarro, Thomas) (Entered: 12/04/2019) |
|---|---|---|
| 12/05/2019 | 28 | TEXT ORDER: On 12/4/2019, counsel for the defense filed a motion for leave to appear by telephone for the scheduling conference set for 12/19/2019. Motion for leave to appear by telephone is granted. Counsel is directed to call Court Deputy James Bock at 585−613−4364 prior to the conference for instructions. SO ORDERED. Signed by Hon. Mark W. Pedersen on 12/5/2019. (NJJ) (Entered: 12/05/2019) |
| 12/19/2019 | 29 | Minute Entry for proceedings held before Hon. Mark W. Pedersen: Scheduling Conference held on 12/19/2019. Appearances: Mark T. Dublino, pro se plaintiff by telephone, and Thomas J. Navarro, Esq. for defendant by telephone. Scheduling order to be issued. (Court Reporter FTR Gold.) (JB) (Entered: 12/19/2019) |
| 01/10/2020 | 31 | NOTICE (Produce) by Mark Thomas Dublino. Received for docketing on 1/23/2020. (BK) (Entered: 01/24/2020) |
| 05/04/2020 | 34 | Letter from Mark Dublino, dated 4/27/2020, to Clerk of Court (TF) (Entered: 05/04/2020) |
| 05/11/2020 | 35 | Letter from Mark Dublino, dated 5/8/2020. (Attachments: # 1 Exhibit) (BK) (Entered: 05/11/2020) |
| 06/08/2020 | | A copy of the Pro Se Guidelines and cases Hendricks v Coughlin and Hodge v Police Officers have been mailed to the Plaintiff at Auburn Correctional. (BK) (Entered: 06/08/2020) |
| 06/08/2020 | 37 | SCHEDULING/CASE MANAGEMENT ORDER (Please Note: This docket text may not contain the entire contents of the attached Order. It is your responsibility to read the attached Order and download it for future reference. Direct any questions to the Chambers of the Judge who entered this Order.) Mandatory Disclosures due by 2/29/2020. Motions to Join Parties/Amend Pleadings due by 3/31/2020. Plaintiff Expert Witness ID due by 7/17/2020. Defendant Expert Witness ID due by 8/17/2020. Discovery completed by 10/30/2020. Motions to Compel Discovery due by 11/27/2020. Dispositive Motions due by 12/18/2020.. Signed by Hon. Mark W. Pedersen on 6/8/20. Copy of this NEF and order mailed to pro se plaintiff at Auburn.(KAP) (Entered: 06/08/2020) |
| 06/09/2020 | 38 | ORDER TO PRODUCE PLAINTIFF FOR VIDEO EBT. Signed by Hon. Mark W. Pedersen on 6/9/2020. Copy of NEF and Order mailed to plaintiff.(JB) (Entered: 06/09/2020) |
| 06/10/2020 | 39 | Letter Request from Mark Dublino, dated 6/4/2020. (BK) (Entered: 06/10/2020) |
| 06/23/2020 | 40 | ORDER denying 17 Motion to Appoint Counsel. Signed by Hon. David G. Larimer on 6/23/2020. (BK) (Entered: 06/23/2020) |
| 06/24/2020 | | A copy of 40 Order has been mailed to the Plaintiff at Auburn Correctional. (BK) (Entered: 06/24/2020) |
| 06/26/2020 | 42 | DECISION AND ORDER re ECF No. 39 . Signed by Hon. Mark W. Pedersen on 6/25/2020. Copy of NEF and order mailed to plaintiff. (JB) (Entered: 06/26/2020) |
| 07/15/2020 | 44 | MOTION to Amend 1 Complaint, MOTION for Extension of Time to Complete Discovery by Mark Thomas Dublino. (Attachments: # 1 Envelope)(JLV) (Entered: 07/15/2020) |
| 07/16/2020 | 45 | ORDER: Starting on June 10, 2020, all discovery deadlines are extended by 30 days, to allow Plaintiff to review discovery. Signed by Hon. Mark W. Pedersen on 7/8/2020. (JB) (Entered: 07/16/2020) |
| 08/03/2020 | 46 | Letter Request from Mark Dublino, dated 7/20/2020. (BK) (Entered: 08/03/2020) |
| 08/04/2020 | 47 | TEXT ORDER denying 44 Motion to Amend or Correct; granting 44 Motion for Extension of Time to Complete Discovery. Plaintiff has failed to comply with WDNY Local Rule of Civil Procedure 15 which requires that he attach a proposed amended complaint to his motion to amend. The Court previously granted Plaintiff's motion for an extension of time in an Order entered on July 16, 2020, ECF No. 45 . All discovery |

SA-6

| | | |
|---|---|---|
| | | deadlines, except for Plaintiff's deposition scheduled for August 6, 2020, were extended 30 days from June 10, 2020. Accordingly, discovery ended on July 10, 2020, with the exception of Plaintiff's deposition, scheduled for August 6, 2020. Signed by Hon. Mark W. Pedersen on 8/4/20.(Pedersen, Mark)<br><br>−CLERK TO FOLLOW UP− (Entered: 08/04/2020) |
| 08/04/2020 | 48 | TEXT ORDER: Case Management Teleconference set for 8/12/2020 at 2:00 PM before Hon. Mark W. Pedersen. Parties are directed to call 877−402−9753 from a landline telephone, and enter access code 7137484 at the scheduled date and time. The Court will contact Auburn Correctional Facility to facilitate the phone call with plaintiff. Signed by Hon. Mark W. Pedersen on 8/4/2020. Copy of Order mailed to plaintiff.(JB) (Entered: 08/04/2020) |
| 08/21/2020 | 49 | Letter Request from Mark Dublino, dated 8/12/2020. (BK) (Entered: 08/21/2020) |
| 09/08/2020 | 50 | Letter from Mark Dublino dated 9/2/2020 to Clerk of Court (Attachments: # 1 Envelope) (LMD) (Entered: 09/09/2020) |
| 09/17/2020 | 51 | ORDER: The Court grants Plaintiff's motion for assignment of pro bono counsel (ECF No. 49 ). The Court will seek an attorney to accept a pro bono assignment in this case for the purposes of representing Plaintiff to complete discovery, and respond to any pre−trial motion practice, including dispositive motions, but not for representation at trial. Signed by Hon. Mark W. Pedersen on 9/17/2020. (JB) (Entered: 09/17/2020) |
| 09/17/2020 | | Remark: Copy of ECF 51 mailed to plaintiff (JB) (Entered: 09/17/2020) |
| 09/30/2020 | 52 | First MOTION for Extension of Time to Complete Discovery *and file a dispositive motion* by Justin Biegaj, Cross, Robert Dee, Frank Gelster, P. Giardina, Robinson, Brian Thompson, Shawn Wilson. (Attachments: # 1 Exhibit Transcript)(Molisani, Erin) (Entered: 09/30/2020) |
| 10/07/2020 | 54 | ORDER APPOINTING PRO BONO COUNSEL: It is hereby ordered that Steven V. Modica, Esq., of the Modica Law Firm 2430 Ridgeway Ave., Rochester, NY 14626, is assigned *pro bono*, to represent Mark Dublino faithfully and diligently in this case for the limited purpose of completing discovery and pre−trial motion practice, including response to dispositive motions. (ECF No. 51 ). The Clerk of Court shall send a copy of this Order to Steven V. Modica, along with the Court's Guidelines Governing the Reimbursement from the District Court Fund of Expenses Incurred by Court Appointed Counsel. Signed by Hon. Mark W. Pedersen on 10/5/2020. Copy of NEF and Order mailed to Plaintiff.(JB)<br><br>−CLERK TO FOLLOW UP− (Entered: 10/07/2020) |
| 10/08/2020 | | Copy of Doc. No. 54 Order and Court's Guidelines Governing the Reimbursement from the District Court Fund of Expenses Incurred by Court Appointed Counsel sent to Steven V. Modica, Esq. (JLV) (Entered: 10/08/2020) |
| 10/09/2020 | 55 | SCHEDULING/CASE MANAGEMENT ORDER (Please Note: This docket text may not contain the entire contents of the attached Order. It is your responsibility to read the attached Order and download it for future reference. Direct any questions to the Chambers of the Judge who entered this Order.) Discovery completed by 2/1/2021. Motions to Compel Discovery due by 3/1/2021. Dispositive Motions due by 4/1/2021. Signed by Hon. Mark W. Pedersen on 10/6/2020. (JB) (Main Document 55 replaced on 10/15/2020) (KAP). (Entered: 10/09/2020) |
| 10/09/2020 | | E−Filing Notification: Replaced document with corrected order. 55 SCHEDULING/CASE MANAGEMENT ORDER (KAP) (Entered: 10/15/2020) |
| 11/02/2020 | 56 | Letter from Mark Dublino, dated 10/29/2020, updating his address from Auburn Correctional to Wende Correctional. (BK) (Entered: 11/06/2020) |
| 11/02/2020 | 57 | Letter Request from Mark Dublino, dated 10/26/2020. (BK) (Entered: 11/06/2020) |
| 11/09/2020 | 58 | LETTER AND NOTICE of Change of Address by Mark Dublino. Plaintiff's address changed to: Mark Dublino, 18−B−0793, WENDE CORRECTIONAL FACILITY, Box 1187, Alden, NY 14004−1187. (Attachments: # 1 Envelope) (JHF) (Entered: 11/10/2020) |

SA-7

| 12/03/2020 | 59 | MOTION for Extension of Time to Complete Discovery by Mark Thomas Dublino.(Modica, Steven) (Entered: 12/03/2020) |
|---|---|---|
| 01/12/2021 | 60 | TEXT ORDER granting 59 Motion for Extension of Time to Complete Discovery. Amended Scheduling Order to be issued. Signed by Hon. Mark W. Pedersen on 1/12/2021. (JB) (Entered: 01/12/2021) |
| 01/22/2021 | 61 | AMENDED SCHEDULING/CASE MANAGEMENT ORDER (Please Note: This docket text may not contain the entire contents of the attached Order. It is your responsibility to read the attached Order and download it for future reference. Direct any questions to the Chambers of the Judge who entered this Order.) Discovery completed by 5/1/2021. Motions to Compel Discovery due by 6/1/2021. Dispositive Motions due by 7/1/2021. Signed by Hon. Mark W. Pedersen on 1/22/2021. (JB) (Entered: 01/22/2021) |
| 01/22/2021 | | Remark: ECF 61 mailed to pro se Plaintiff Mark Thomas Dublino at 18−B−0793 WENDE CORRECTIONAL FACILITY Box 1187 Alden, NY 14004−1187 (JB) (Entered: 01/22/2021) |
| 03/04/2021 | 62 | Letter from Mark Thomas Dublino, dated 3/1/21, to Judge Pedersen. (Attachments: # 1 Envelope) (JHF) (Entered: 03/04/2021) |
| 03/08/2021 | 63 | REPLY/RESPONSE to re 62 Letter filed by Mark Thomas Dublino. (Modica, Steven) (Entered: 03/08/2021) |
| 03/11/2021 | 64 | TEXT ORDER: Depositions will be conducted on April 12−15, 2021, and Mr. Dublino should not ask questions or otherwise interrupt the testimony. SO ORDERED. Signed by Hon. Mark W. Pedersen on 3/11/2021. (JB) (Entered: 03/11/2021) |
| 03/11/2021 | 65 | ORDER TO PRODUCE PLAINTIFF FOR VIDEO EBT. Signed by Hon. Mark W. Pedersen on 3/11/2021. (JB) (Entered: 03/11/2021) |
| 03/11/2021 | | Remark: Copies of ECF 64 and 65 mailed to Plaintiff (JB) (Entered: 03/11/2021) |
| 03/15/2021 | 66 | Letter Request from Mark Dublino, dated 3/11/2021. (BK) (Entered: 03/16/2021) |
| 03/31/2021 | 67 | MOTION for Extension of Time to File by Mark Thomas Dublino. (BK) (Entered: 04/02/2021) |
| 04/05/2021 | 68 | Second MOTION for Extension of Time to Complete Discovery by Mark Thomas Dublino.(Modica, Anne) (Entered: 04/05/2021) |
| 04/08/2021 | 69 | TEXT ORDER granting 68 Motion for Extension of Time to Complete Discovery. Amended scheduling order to follow. Signed by Hon. Mark W. Pedersen on 4/8/21. (KAP) (Entered: 04/08/2021) |
| 04/08/2021 | 70 | AMENDED SCHEDULING/CASE MANAGEMENT ORDER (Please Note: This docket text may not contain the entire contents of the attached Order. It is your responsibility to read the attached Order and download it for future reference. Direct any questions to the Chambers of the Judge who entered this Order.) Discovery completed by 7/1/2021. Motions to Compel Discovery due by 8/2/2021. Dispositive Motions due by 9/3/2021.. Signed by Hon. Mark W. Pedersen on 4/8/21. (KAP) (Entered: 04/08/2021) |
| 06/04/2021 | 71 | MOTION for Extension of Time to Complete Discovery by Justin Biegaj, Cross, Robert Dee, Frank Gelster, P. Giardina, Robinson, Brian Thompson, Shawn Wilson.(Molisani, Erin) (Entered: 06/04/2021) |
| 06/10/2021 | 72 | TEXT ORDER granting 71 Motion for Extension of Time to Complete Discovery. Amended scheduling order to follow. Signed by Hon. Mark W. Pedersen on 6/10/21. (KAP) (Entered: 06/10/2021) |
| 06/10/2021 | 73 | AMENDED SCHEDULING/CASE MANAGEMENT ORDER (Please Note: This docket text may not contain the entire contents of the attached Order. It is your responsibility to read the attached Order and download it for future reference. Direct any questions to the Chambers of the Judge who entered this Order.) Discovery completed by 8/2/2021.. Signed by Hon. Mark W. Pedersen on 6/20/21. (KAP) (Entered: 06/10/2021) |

SA-8

| 08/11/2021 | 74 | MOTION for Extension of Time to File *motion to compel and summary judgment* by Justin Biegaj, Cross, Robert Dee, Frank Gelster, P. Giardina, Robinson, Brian Thompson, Shawn Wilson.(Molisani, Erin) (Entered: 08/11/2021) |
|---|---|---|
| 08/11/2021 | 75 | TEXT ORDER granting 74 Motion for Extension of Time to File. Any motion to compel discovery to be filed by 10/1/2021. Dispositive motions due 10/29/2021. SO ORDERED. Signed by Hon. Mark W. Pedersen on 8/11/2021. (JB) (Entered: 08/11/2021) |
| 08/11/2021 | | Set/Reset Scheduling Order Deadlines: Motions to Compel Discovery due by 10/1/2021. Dispositive Motions due by 10/29/2021. (JB) (Entered: 08/11/2021) |
| 09/07/2021 | 76 | DISTRICT COURT FUND REIMBURSEMENT to Steven V. Modica in the amount of $985.50. Signed by Hon. Mark W. Pedersen on 8/12/2021. (LMD) (Entered: 09/07/2021) |
| 10/08/2021 | 77 | MOTION for Summary Judgment by Justin Biegaj, Cross, Robert Dee, Frank Gelster, P. Giardina, Robinson, Brian Thompson, Shawn Wilson. (Attachments: # 1 Declaration, # 2 Exhibit A − plaintiff's deposition transcript, # 3 Exhibit B − video and affidavits of Dee and Thompson, # 4 Exhibit C − Thompson deposition transcript, # 5 Exhibit D − Gelster deposition transcript, # 6 Exhibit E − Robinson deposition transcript, # 7 Exhibit F − Giardina deposition transcript, # 8 Exhibit G − Wilson deposition transcript, # 9 Exhibit H − Biegaj deposition transcript, # 10 Exhibit I − Cross deposition transcript, # 11 Exhibit J − Dee deposition transcript, # 12 Exhibit K − Notice to Admit, # 13 Exhibit L − Response to Notice to Admit, # 14 Statement of Undisputed Facts, # 15 Memorandum in Support, # 16 Certificate of Service)(Molisani, Erin) (Entered: 10/08/2021) |
| 10/13/2021 | 78 | TEXT ORDER re 77 MOTION for Summary Judgment filed by Shawn Wilson, et al. Plaintiff's response due by 11/15/2021; replies due by 11/29/2021. Once the papers are submitted, if the Court requires argument on the motion the parties will be contacted. IT IS SO ORDERED. Signed by Hon. David G. Larimer on 10/13/21. (PR) (Entered: 10/13/2021) |
| 11/10/2021 | 79 | MOTION for Extension of Time to File Response/Reply by Mark Thomas Dublino.(Modica, Anne) (Entered: 11/10/2021) |
| 11/15/2021 | 80 | TEXT ORDER granting 79 Motion for Extension of Time to File Response/Reply re 77 MOTION for Summary Judgment. Responses due by 12/15/2021; Replies due by 12/29/2021. IT IS SO ORDERED. signed by Hon. David G. Larimer on 11/15/21. (PR) (Entered: 11/15/2021) |
| 12/15/2021 | 81 | RESPONSE in Opposition re 77 MOTION for Summary Judgment filed by Mark Thomas Dublino. (Attachments: # 1 Statement of Undisputed Facts, # 2 Certificate of Service)(Modica, Anne) (Entered: 12/15/2021) |
| 12/16/2021 | | E−Filing Notification: 79 Motion and 81 RESPONSE in Opposition, username and signature do not match (refer to Administrative Procedures Guide). In future, please file under correct username. No Action required. (RE) (Entered: 12/16/2021) |
| 12/20/2021 | 82 | REPLY to Response to Motion re 77 MOTION for Summary Judgment filed by Justin Biegaj, Cross, Robert Dee, Frank Gelster, P. Giardina, Robinson, Brian Thompson, Shawn Wilson. (Attachments: # 1 Memorandum in Support)(Molisani, Erin) (Entered: 12/20/2021) |
| 01/18/2022 | 83 | DECISION AND ORDER Defendants' motion for summary judgment 77 is granted, and the complaint is dismissed. Signed by Hon. David G. Larimer on 1/18/2022. (KAH)<br><br>−CLERK TO FOLLOW UP− (Entered: 01/18/2022) |
| 01/18/2022 | | Remark: *A copy of the Court's 1/18/2022 Decision and Order 83 sent by First Class Mail to plaint.ff Mark Thomas Dublino on 1/18/2022 to his address of record.* (KAH) (Entered: 01/18/2022) |
| 01/18/2022 | 84 | MOTION to Withdraw as Attorney *Limited Rep Completed* by Mark Thomas Dublino.(Modica, Steven) (Entered: 01/18/2022) |

SA-9

| 01/19/2022 | 85 | JUDGMENT dismissing the case. Signed by Hon. David G. Larimer on 1/19/22. (RE) (Entered: 01/19/2022) |
|---|---|---|
| 01/20/2022 | 86 | TEXT ORDER granting 84 Motion to Withdraw as Attorney. Attorney Steven V. Modica terminated. IT IS SO ORDERED. Signed by Hon. David G. Larimer on 1/20/22. (PR) (Entered: 01/20/2022) |
| 01/31/2022 | 87 | MOTION for Extension of Time to File Notice of Appeal by Mark Thomas Dublino.(RE) (Entered: 01/31/2022) |
| 01/31/2022 | 88 | NOTICE OF APPEAL. No filing fee received. (RE) (Entered: 01/31/2022) |
| 01/31/2022 | 89 | CLERKS CERTIFICATE/Index filed and electronically sent to Court of Appeals (Attachments: # 1 Index)(RE) (Entered: 01/31/2022) |
| 02/03/2022 | 90 | ORDER Since plaintiff's appeal was timely filed, his motion for an extension of time to file a notice of appeal 87 is denied as moot. Signed by Hon. David G. Larimer on 2/3/2022. *A copy of this Order sent by First Class Mail to plaintiff Mark Thomas Dublino on 2/3/2022 to his address of record.* (KAH) (Entered: 02/03/2022) |

SA-10

Amended Complaint 19-cv-6269L        Dublino v. Biegaj

Revised 03/06 WDNY

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NEW YORK

## FORM TO BE USED IN FILING A COMPLAINT
## UNDER THE CIVIL RIGHTS ACT, 42 U.S.C. § 1983
(Prisoner Complaint Form)

All material filed in this Court is now available via the **INTERNET.** See **Pro Se Privacy Notice** for further information.

## 1. CAPTION OF ACTION

**A.     Full Name And Prisoner Number of Plaintiff: NOTE:** *If more than one plaintiff files this action and seeks in forma pauperis status, each plaintiff must submit an in forma pauperis application and a signed Authorization or the only plaintiff to be considered will be the plaintiff who filed an application and Authorization.*

1.     Mark Thomas Dublino

2.

### -VS-

**B.     Full Name(s) of Defendant(s) NOTE:** *Pursuant to Fed.R.Civ.P. 10(a), the names of all parties must appear in the caption. The court may not consider a claim against anyone not identified in this section as a defendant. If you have more than six defendants, you may continue this section on another sheet of paper if you indicate below that you have done so.*

1. Sgt. Justin Biegaj          4. Sgt. Mr. Cross
2. Sgt. Robert Dee             5. Sgt. Mr. Robinson
3. Deputy Brian Thompson       6. Deputy Mr. P. Giardina
7. Deputy Framk Gelster        8. Deputy Shawn Wilson

## 2. STATEMENT OF JURISDICTION

This is a civil action seeking relief and/or damages to defend and protect the rights guaranteed by the Constitution of the United States. This action is brought pursuant to 42 U.S.C. § 1983. The Court has jurisdiction over the action pursuant to 28 U.S.C. §§ 1331, 1343(3) and (4), and 2201.

## 3. PARTIES TO THIS ACTION

**PLAINTIFF'S INFORMATION  NOTE:** *To list additional plaintiffs, use this format on another sheet of paper.*

Name and Prisoner Number of Plaintiff:   Mark Thoams Dublino   Din.# 18-B-0793

Present Place of Confinement & Address:   135 State Street

Auburn New York 13024

Name and Prisoner Number of Plaintiff:

Present Place of Confinement & Address:

Pg.# 1

**SA-11**

Amended Complaint 19-cv-6269L    Dublino v. Biegaj

**DEFENDANT'S INFORMATION** **NOTE:** *To provide information about more defendants than there is room for here, use this format on another sheet of paper.*

Name of Defendant: Mr. Justin Biegaj

(If applicable) Official Position of Defendant: Sergeant

(If applicable) Defendant is Sued in ___X___ Individual and/or ___X___ Official Capacity

Address of Defendant: Erie County Holding Center

40 Delaware Avenuell Buffalo New York 14202

Name of Defendant: Mr Robert Dee

(If applicable) Official Position of Defendant: Sergeant

(If applicable) Defendant is Sued in ___X___ Individual and/or ___X___ Official Capacity

Address of Defendant: 40 Delaware Avenue Buffalo New York 14202

Erie County Holsing Center

Name of Defendant: Mr. Brian Thompson

(If applicable) Official Position of Defendant: Deputy

(If applicable) Defendant is Sued in ___X___ Individual and/or ___X___ Official Capacity

Address of Defendant: Erie County Holding Center

40 Delaware Avenue Buffalo New York 14202

### 4. PREVIOUS LAWSUITS IN STATE AND FEDERAL COURT

A.     Have you begun any other lawsuits in **state or federal court** dealing with **the same facts involved in this action?**

Yes _X_    No____

**If Yes, complete the next section.** NOTE: *If you have brought more than one lawsuit dealing with the same facts as this action, use this format to describe the other action(s) on another sheet of paper.*

1.     Name(s) of the parties to this other lawsuit:

Plaintiff(s): Mark Dublino

Defendant(s): James Thomas; Deputy Scott Harvey; Deputy Winegarden; Deputy Richeal;

Deputy Thompson; Deputy Bienko; Deputy Quirante

2.     Court (if federal court, name the district; if state court, name the county): U.S. District Court

Western District of New York

3.     Docket or Index Number: 6:18-cv-06010- DGL/MWP

4.     Name of Judge to whom case was assigned: David G. Larimer & Marian W. Payson

5.     Action filed on: January 4th 2018; The Disposition is still Pending.

Pg.# 2

SA-12

AMENDED COMPLAINT 19-CV-06269-DGL Dublino v. Bregaze

DEFENDANTS Information (continued)

Name: Mr. Cross    Official Position: Sergeant    Sue in Official Capacity & Individual Capacity
Address: Erie County Holding Center‖ 40 Delaware Ave, Buffalo, New York 14202

Name: Mr. Robinson    Official Position: Sergeant    Sue in Official Capacity & Individual Capacity
Address: Erie County Holding Center‖ 40 Delaware Ave. Buffalo‖ New York 14202

Name: Mr. P. Giardina   Official Position: Deputy    Sue in Official Capacity & Individual Capacity
Address: Erie County Holding Center, 40 Delaware Ave. Buffalo, New York 14202

Name: Mr. Frank Gelster Official Position: Deputy    Sue in Official Capacity & Individual Capacity
Address: Erie County Holding Center‖ 40 Delaware Ave. Buffalo, New York 14202

Name: Mr. Shawn Wilson  Official Position: Deputy    Sue in Official Capacity & Individual Capacity
Address: Erie County Holding Center, 40 Delaware Ave. Buffalo‖ New York 14202

Previous Lawsuits in State and Federal Court (continued)

B. Have you begun any other lawsuits in Federal Court which relate to your imprisonment ?
   Yes X__ No ___

Plaintiff: Mark Thomas Dublino
Defendant(s): Auburn Correctional Facility Et.Al. Timothy McCarthy, Superintendent Et.Al.
U.S. District Court, Northern District of New York
Docket Number: 9:19-cv-381 (GLS/DJS) Judge Gary L. Sharpe ; Magistrate Judge Daniel J. Stewart
Action filed on April 1st 2019; The Disposition of the case is still pending.
--------------------------------------------------------------------------
Plaintiff: Mark Dublino
Defendants: Wende Correctional Facility Et. Al.
U.S. District Court, Western District of New York (note; transferred from Northern District)
Docket Number: 6:19-cv-06354- (DGL) Judge David G. Larimer
New Action file date: May 14th 2019; The Disposition of the case is still pending
--------------------------------------------------------------------------
Plaintiff: Mark Dublino
Defendant: Anthony J. Annucci, Commissioner of Department of Corrections & Community Supervision
State of New York; County of Cayuga Supreme and County Courts
Index Number: 2019-0687 ;  Justice Thomas G. Leone A.J.S.C.
Disposition to be held August 7th 2019 ; for an Art. 78

Pg.#3

SA-13

Amended Complaint  Case 6-19-cv-06269-DGL  Dublino v. Biegaj

Claim: On March 9th 2018‖ The following defendants were involved
with the description of the incident below:

Sgt. Justin Biegaj; Sgt. Robert Dee; Sgt. Cross; Sgt Robinson; Deputy Brian Thompson;
Deputy Franl Gelster; Deputy P. Giardina; Deputy Shwn Wilson.

1.) Deputy Brian Thompson grabbed plaintiff Mark Dublino as he exited an attorney conference room (plaintiff left the room on his own free will) Deputy Thompson reacted to a remark made by plaintiffs attorney "Kick his f_cking ass"(explicit slang directness) Deputy Thompson ordered plaintiff to the ground; plaintiff followed this order; Then ordered the plaintiff to lie face down on the floor as he began to place handcuffs on the plaintiif; he lost control of the leashed dog which began to bite . . . the plaintiffs legs.(Attach A & B)

2.) Sergeant Justin Biegaj was first additional officer at the scene and began to stomp and step on plaintiff while laying on the ground; targeting head and back area's. Plaintiff continues to hear "Kick his f_cking Ass" (Attachment "C")

3.) Sergeant Robert Dee and Shawn Wilson then grabbed plaintiffs arms and hands bending and twisting them in abnormal positions with extreme pressure.

4.) Sergeant Cross standing directly over plaintiff began stomping and stepping on plaintiff's lower extremities legs; ankles & feet; while plaintiff was lying on the floor.

5.) After restraints were applied plaintiff was unable to breathe due to pressure applied to the back area.

6.) Plaintiff was picked up off the ground by his arms and shoulders and then escorted to the infirmary barely able to walk. . On the outside corridor Sergeant Robinson ordered Deputy Frank Gelster and Deputy P. Giardina to "Wrech Him" The deputies responded by bending the plaintiffs arms and wrists with extreme pressure into the steel handcuffs.(Attach. "D")

7.) One hour later plaintiff continued receiving bending of the arms and wrists into the steel handcuffs "wrenching tatic" under the order of an unidentified officer to Deputies Gelster and Giardina. (In the infirmary) while medical practitioners were conducting only basic tests and vital signs. (Attachments ‖ E " ; " F " & " G " )

8.) Plaintiff was moved to Gulf East Keeplock status without personal property and legal paperwork including the plaintiffs sneakers and documents pertaining to: Dublino v. Terranova; 18-cv-6178-DGL. (Attachments "H"; "I" & "J")

9.) Plaintiff requested several issues to be addressed by staff officers and medical staff. To be taken to an independant hospital for an evaluation and x-rays for injuries to the head; back; shoulders; arms; wrists; legs and feet (ankle) All requests were denied.

10.) While plaintiff was housed in keeplock and constant obsevation; his requests for pen and paper; and a blank grievance form were denied along with personal visits. No disciplinary report or charges were brought against the plaintiff in reference to following direct orders or resisting officers reasonable response. These  acts did not come under the reasonableness of an officials response; and other officers stood near bye and watched; causes a "deliberate indifference" Plaintiff was past pre-trial; yet not sentenced (creates grey area)

11.) Plaintiff was sentenced on March 23rd 2019; and transported immediately out of Erie County from the court room. Bypassing Wende Correctional Facility Reception located in Erie County. Instead plaintiff was moved to Elmira Correctional Facility. Plaintiff never had any opportunity to exhaust administrative remedies. As of today; Plaintiff still suffers from the injuries sustained in the mentioned incident. The officers involved conducted to restore discipline in a maliciously and sadistically approach to cause harm. & Did.

The Constitutional basis for this claim; 5th & 14th Amendment Violation; " Deliberate Indifference" Plaintiff is seeking relief for this claim in the form of compensatory and punitive damages for a total amount of (20) million dollars; for violating the "Due Process Clauses"

Plaintiff wants a Jury Trial. By Demand

I declare under Penalty of Perjury that the Foregoing is True and Correct

_____
Signature   Plaintiff

Executed on JULY 9th 2019

Pg # 4

SA-14

Amended Complaint  Dublino v. Biegaj  6:19-cv-06269-DGL

JS 44 (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

**I. (a) PLAINTIFFS** MARK DUBLINO

**DEFENDANTS** SGT. BIEGAJ, DEP. THOMPSON, SGT. DEE SGT. ROBINSON, SGT. GROSS, DEP. GELSTER DEP. WILSON, DEP. GIARDINA,

**(b)** County of Residence of First Listed Plaintiff  CAYUGA
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant  ERIE
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Attorneys *(If Known)*

**II. BASIS OF JURISDICTION** *(Place an "X" in One Box Only)*

- ☒ 1 U.S. Government Plaintiff
- ☐ 2 U.S. Government Defendant
- ☐ 3 Federal Question *(U.S. Government Not a Party)*
- ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

**III. CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff and One Box for Defendant)* *(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** *(Place an "X" in One Box Only)*   Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Personal Injury Product Liability | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product | | ☐ 820 Copyrights ☐ 830 Patent | ☐ 430 Banks and Banking ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 340 Marine | Liability | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** ☐ 370 Other Fraud | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** ☐ 861 HIA (1395ff) | ☐ 480 Consumer Credit ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 190 Other Contract | ☒ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 720 Labor/Management Relations | ☐ 863 DIWC/DIWW (405(g)) ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 196 Franchise | | | ☐ 751 Family and Medical Leave Act | | ☐ 893 Environmental Matters ☐ 895 Freedom of Information Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement Income Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 550 Civil Rights ☐ 555 Prison Condition ☐ 560 Civil Detainee - Conditions of Confinement | ☐ 465 Other Immigration Actions | | |

**V. ORIGIN** *(Place an "X" in One Box Only)*

- ☐ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

**VI. CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 U.S.C.A § 1983
Brief description of cause:
CONSTITUTIONAL 5TH & 14TH AMENDMENTS "DUE PROCESS CLAUSES"

**VII. REQUESTED IN COMPLAINT:**

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $ $20,000,000.

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

**VIII. RELATED CASE(S) IF ANY**

*(See instructions:)*
JUDGE  DAVID G. LARIMER / MARIAN W. PAYSON
DOCKET NUMBER  6:18-CV-06010

DATE  7/9/19

SIGNATURE OF ATTORNEY OF RECORD  *Pro Se*  MARK DUBLINO

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

Pg. # 5

NOTE : THIS PHOTO REFLECTS ALTERING BY CROPPING AND ZOOMING IN ON SUBJECTS DONE WITH INTENTION TO OMIT DOG FROM SCENE.

MARK DUBLINO

ATTACHMENT "A"

DUBLINO V. BIEGASZ 6:19-CV-06269-DGL ONLY A SELECTED FEW PHOTOS, PRODUCED BY ERIE COUNTY HOLDING CENTER

ATTACHMENT "B" ON OPPOSITE SIDE OF PAGE AMENDED COMPLAINT

SA-16



ATTACHMENT 'A' OPPOSITE SIDE OF PAGE
MARK DUBLINO

DUBLINO v. BIRGAS 6:19-CV-06269-DGL AMENDED COMPLAINT

ONLY A SELECTED FEW PHOTO'S PRODUCED BY ERIE COUNTY HOLDING CENTER

ATTACHMENT 'B'

107

Atty Visit B

10:22:39.153 AM

3/9/2018

NOTE: THIS PHOTO REFLECTS ALTERING BY ZOOMING IN ON SUBJECTS DONE WITH INTENTION TO OMIT DOG FROM SCENE

MARK DUBLINO

SA-17



NOTE: THIS PHOTO REFLECTS ALTERING BY CROPPING AND ZOOMING IN ON SUBJECTS DONE WITH INTENTION TO OMIT ACTION BY OFFICER

MARK DUBLINO

* ONLY A SELECTED FIELD PHOTO'S PRODUCED BY ERIE COUNTY HOLDING CENTER *

DUBLINO V. DIEGAS 6:19-CV-06269-DGL

[ATTACHMENT "C"]

ATTACHMENT "D" ON OPPOSITE SIDE OF PAGE

6:19-CV-06269-DGL AMENDED COMPLAINT

SA-18



( ATTACHMENT "D'

DUBLINO V. SIEGAS 6:19-CV-06269-DGL ATTACHMENT "C" ON OPPOSITE SIDE OF PAGE
AMENDED COMPLAINT      MARK DUBLINO

* ONLY A SELECTED FEW PHOTOS, PRODUCED BY ERIE COUNTY HOLDING CENTER

Atty Visit B

916

10:24:00.139 AM

3/9/2018

NOTE:
ELEVEN OFFICERS IN THIS VIEW.

TWENTY ONE OFFICERS WERE CRAMMED INTO A FIVE FOOT WIDE CORRIDOR WHICH WERE OUT OF VIEW AND OBSTRUCTING VIDEO COVERAGE

NOTE: THIS PHOTO REFLECTS ALTERING BY ZOOMING IN ON SUBJECTS
OFFICERS WHO WERE OBSTRUCTING VIEW
DONE WITH INTENTION TO OMIT

SA-19



VITAL SIGNS

HAND HELD CAMERA - OVER ONE HOUR LATER AT INFIRMARY

MARK DOBLINO

PLAINTIFF & OFFICERS

03.09.2018 11:37

ATTACHMENT "E"

DOBLINO V BIEGA

AMENDED COMPLAINT

6:19 - 06 269 - DGL

SEE: ATTACHMENT "F" OPPOSITE SIDE







HAND HELD CAMERA - PLAINTIFFS SNEAKER & DOCUMENTS PERTAINING TO: DUBLINO V TERRANOVA 18-CV-6178-DGL

ATTACHMENT "H"

Case 6:19-cv-06178-DGL-MJP Document 8 Filed 07/17/19 Page 13 of 14

MARK DUBLINO

08.08.2018 12:27



HAND HELD CAMERA - PLAINTIFF'S BROKEN GLASSES & DOCUMENTS TO : DUBINO V TERRANOVA 18-CV- 6178 - DGL

ATTACHMENT ' I ' DUBINO V BIEGAT 6:19-CU-06269-DGL AMENDED COMPLAINT

SEE ATACHMENT 'J' OPPOSITE SIDE

MARK DUBINO

08.09.2018 12:27

HAND HELD CAMERA - ATTORNEY CONFERENCE ROOM #3 OVER TWO HOURS LATER

MARK DUBINO

ATTACHMENT "J."

DUBINO V. BIEGAS 6:19-CV-06 AMENDED COMPLAINT

SEE ATTACHMENT "I" OPPOSITE SIDE

03.09.2018 12:27

SA-25

## AFFIDAVIT OF SERVICE

STATE OF NEW YORK ) ss:
COUNTY OF CAYUGA  )

I Mark Dublino, being duly sworn deposes and says:
That on this date Indicated below of notarization
I served a true copy of:

1.) Information on 42 U.S.C.§ 1983 Case No. 6:19-cv-06269-DGL
    Amended Complaint Dublino v. Biegaj et. al.
 * Cation of Action; * Staement of Jurisdiction; * Parties to this Action;
 * Previous lawsuits;* Additional page for parties of this action;
 * Claim Description; * JS 44 Civil Cover Sheet; *Attachments "A" - "J"

On the following parties:

To: Clerk of Court
    Western District of New York
    111 Kenneth B. Keating
    Federal Building
    100 State Street
    Rochester, New York 14614


By placing said documents in a properly addressed envelope with facility prepaid
postage envelope and inserting in a prison mailbox at
Auburn Correctional Facility.

Date:  July 3rd 2019

Mark Dublino; Din. 18-B-0793
Auburn Correctional Facility
135 State Street
Auburn, New York 13024


Sworn to before me on this
03 day of July , 20 19

Notary

BRENDA J WALSH
Notary Public, State of New York
No. 01WA6286594
Qualified in Tompkins County
Commission Expires July 29, 20 21

AUBURN CORRECTIONAL FACILITY

Clerk of the Court
Western District of New York
U.S. District Court
100 State Street
Rochester New York 14614

US POSTAGE ~ PITNEY BOWES

ZIP 13021
02 1W
0001367039

$ 000.80°

US 2019

PS

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

MARK THOMAS DUBLINO,

                    Plaintiff,

        -v-                                                    19-CV-6269L
                                                               ORDER
Sgt. JUSTIN BIEGAJ, et al.,

                    Defendants.

## INTRODUCTION

Pro se Plaintiff, Mark Thomas Dublino, an inmate incarcerated at the Auburn
Correctional Facility, filed this action seeking relief under 42 U.S.C. § 1983.  Docket Item
1 ("Complaint").  Plaintiff alleges that, during his prior incarceration at the Erie County
Holding Center, Defendants used excessive force in violation of his rights under the
Fourteenth Amendment.  Following review pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and
1915A(a), the Complaint was dismissed but Plaintiff was permitted to amend.  Plaintiff
has now filed an Amended Complaint (Docket Item 8, "Amended Complaint") and for the
reasons below, service is directed.

## DISCUSSION

Under 28 U.S.C. §§ 1915(e)(2)(B) and 1915A(a), this Court must screen this
Complaint.  Section 1915 "provide[s] an efficient means by which a court can screen for
and dismiss legally insufficient claims." *Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007)
(citing *Shakur v. Selsky*, 391 F.3d 106, 112 (2d Cir. 2004)).  The court shall dismiss a
complaint in a civil action in which a prisoner seeks redress from a governmental entity,
or an officer or employee of a governmental entity, if the court determines that the action

1

SA-28

(1) fails to state a claim upon which relief may be granted or (2) seeks monetary relief against a defendant who is immune from such relief.  *See* 28 U.S.C. § 1915A(b)(1)-(2).

**The Amended Complaint**

In evaluating the Amended Complaint, the Court must accept all factual allegations as true and must draw all inferences in Plaintiff's favor.  *See Larkin v. Savage*, 318 F.3d 138, 139 (2d Cir. 2003) (per curiam); *King v. Simpson*, 189 F.3d 284, 287 (2d Cir. 1999). "Specific facts are not necessary," and a plaintiff "need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.' " *Erickson v. Pardus*, 551 U.S. 89, 93, (2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007))[1]; *see also Boykin v. Keycorp*, 521 F.3d 202, 213 (2d Cir. 2008) (discussing pleading standard in pro se cases after *Twombly*: "even after *Twombly*, dismissal of a pro se claim as insufficiently pleaded is appropriate only in the most unsustainable of cases.").  Although "a court is obliged to construe [pro se] pleadings liberally, particularly when they allege civil rights violations," *McEachin v. McGuinnis*, 357 F.3d 197, 200 (2d Cir. 2004), even pleadings submitted pro se must meet the notice requirements of Rule 8 of the Federal Rules of Civil Procedure.  *Wynder v. McMahon*, 360 F.3d 73 (2d Cir. 2004).

**I.  Section 1983 Claims**

"To state a valid claim under 42 U.S.C. § 1983, the plaintiff must allege that the challenged conduct (1) was attributable to a person acting under color of state law, and (2) deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States." *Whalen v. County of Fulton*, 126 F.3d 400, 405 (2d Cir. 1997) (citing *Eagleston v. Guido*, 41 F.3d 865, 875-76 (2d Cir. 1994)).  "Section 1983 itself

---

[1] Unless otherwise indicated, case quotations omit all internal quotation marks, alterations, footnotes, and citations.

2

creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993) (citing *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985)).

To establish liability against an official under § 1983, a plaintiff must allege that individual's personal involvement in the alleged constitutional violation; it is not enough to assert that the defendant is a link in the chain of command. *See McKenna v. Wright*, 386 F.3d 432, 437 (2d Cir. 2004); *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995). Moreover, the theory of *respondeat superior* is not available in a § 1983 action. *See Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003). But a supervisory official can be found to be personally involved in an alleged constitutional violation in one of several ways:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon*, 58 F.3d at 873 (citing *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994)).

## II.   Plaintiff's Allegations

Plaintiff's factual allegations, presumed true at this stage of the proceedings, tell the following story. On March 9, 2018, Plaintiff exited the attorney conference room and Defendant Thompson ordered him to the ground and Plaintiff complied. Amended Complaint at 4. Thompson handcuffed Plaintiff and "lost control of the leashed dog which began to bite the plaintiff's legs." *Id.* Defendant Biegaj began to stomp Plaintiff's head and back. *Id.* Defendants Dee and Wilson began to stretch Plaintiff's arms "in abnormal

3

positions with extreme pressure." *Id.* Sergeant Cross stomped on Plaintiff's legs, ankles and feet as he continued to lay on the floor. *Id.* The pressure applied to Plaintiff made him "unable to breathe." *Id.* One hour later, Sergeant Robinson ordered Defendants Gelster and Giardina "to 'wrench him' [and the] deputies responded by bending the plaintiff's arms and wrists with extreme pressure into the steel handcuffs." *Id.* Plaintiff was a non-sentenced prisoner at the time of the incident and was not sentenced until March 23, 2019. *Id.*

### III.   Analysis

#### A. Excessive Force Claims

Plaintiff alleges that Defendants used excessive force in violation of the Fourteenth Amendment. The standard for determining whether prison officials have used excessive physical force, in an Eighth Amendment context, was clarified by the United States Supreme Court in *Hudson v. McMillian*, 503 U.S. 1 (1992). According to *Hudson*, "the core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Id.*, 503 U.S. at 7. To assess a constitutional claim, the Court must consider both the subjective and the objective components of the alleged violations. *Davidson v. Flynn*, 32 F.3d 27, 29 (2d Cir. 1994).

"A pretrial detainee's claims of unconstitutional conditions of confinement are governed by the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishments Clause of the Eight Amendment." *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017). Under either standard, the objective component considers the "seriousness of the injury." *Id.* The subjective component addresses whether the

4

SA-31

defendant possessed the requisite state of mind while engaging in the use of force (*id.*, 503 U.S. at 6-7) and "an objective standard is appropriate in the context of excessive force claims brought by pretrial detainees pursuant to the Fourteenth Amendment." *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2476 (2015).   Under the lesser, objective, Fourteenth Amendment standard, Plaintiff's allegations are sufficient at this early stage to warrant service and an answer.[2]

## **ORDER**

IT HEREBY IS ORDERED, that the Clerk of Court is directed to cause the United States Marshal Service to serve copies of the Summons, Amended Complaint and this Order upon Defendants without Plaintiff's payment therefor, unpaid fees to be recoverable if this action terminates by monetary award in Plaintiff's favor;

FURTHER, that pursuant to 42 U.S.C. § 1997e(g), Defendants are directed to respond to the Complaint.

SO ORDERED.

DATED: _September 3_, 2019
           Rochester, NY

_____
David G. Larimer
United States District Judge

---

[2] In allowing these claims to proceed and directing a response to them, the Court expresses no opinion as to whether Plaintiff's claims can withstand a properly filed motion to dismiss or for summary judgment.

5

SA-32

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

MARK DUBLINO,

<em>Plaint₁f,</em>

     v.

SGT. JUSTIN BIEGAJ, SGT. ROBERT DEE, DEPUTY
BRIAN THOMPSON, DEPUTY FRANK GELSTER,
SGT. MR. CROSS, SGT. MR. ROBINSON, DEPUTY
MR. P. GIARDINA, DEPUTY SHAWN WILSON,

<em>Defendants.</em>

_____

**ANSWER TO AMENDED**
**COMPLAINT WITH**
**JURY TRIAL DEMAND**

Case No. 6:19-cv-6269-DGL

     Defendants SGT. JUSTIN BIEGAJ, SGT. ROBERT DEE, DEPUTY BRIAN THOMPSON, DEPUTY FRANK GELSTER, SGT. MR. CROSS, SGT. MR. ROBINSON, DEPUTY MR. P. GIARDINA, DEPUTY SHAWN WILSON, by their attorney, MICHAEL A. SIRAGUSA, ESQ, Erie County Attorney, by Erin E. Molisani, Esq., Assistant County Attorney, of Counsel, answer plaintiff's Amended Complaint as follows:

     1.     Answering paragraph 1 of the Amended Complaint, defendants deny the allegations contained therein.

     2.     Answering paragraph 2 of the Amended Complaint, defendants deny the allegations contained therein.

     3.     Answering paragraph 3 of the Amended Complaint, defendants deny the allegations contained therein.

     4.     Answering paragraph 4 of the Amended Complaint, defendants deny the allegations contained therein.

     5.     Answering paragraph 5 of the Amended Complaint, defendants deny the allegations contained therein.

SA-33

6.      Answering paragraph 6 of the Amended Complaint, defendants deny the allegations contained therein.

7.      Answering paragraph 7 of the Amended Complaint, defendants deny the allegations contained therein.

8.      Answering paragraph 8 of the Amended Complaint, defendants admit that plaintiff was moved to keeplock, and deny knowledge or information sufficient to form a belief as to the remaining allegations contained in paragraph 8.

9.      Answering paragraph 9 of the Amended Complaint, defendants deny knowledge or information sufficient to form a belief as to the remaining allegations contained in paragraph 9.

10.      Answering paragraph 10 of the Amended Complaint, defendants are unable to comment on the portions of the allegations which contain legal conclusions; to the extent a response is required, defendants deny them. As to the remaining allegations in paragraph 10 of the Amended Complaint, defendants deny them.

11.      Answering paragraph 11 of the Amended Complaint, defendants deny knowledge or information sufficient to form a belief as to the first two sentences of paragraph 11. As to the last two sentences of paragraph 11, defendants deny the allegations contained therein.

12.      Answering the unnumbered paragraph underneath paragraph 11, defendants submit that these are legal conclusions and/or a demand for relief not requiring a response; to the extent a response is required, defendants deny them.

## AS AND FOR A FIRST AFFIRMATIVE DEFENSE

13.      Each of the causes of action fail to state of cause of action upon which relief can be granted.

## AS AND FOR A SECOND AFFIRMATIVE DEFENSE

14.     Each of the causes of action are time barred in whole or in part by the applicable statute of limitations and/or filing deadlines.

## AS AND FOR A THIRD AFFIRMATIVE DEFENSE

15.     Plaintiff has failed to exhaust his administrative remedies.

## AS AND FOR A FOURTH AFFIRMATIVE DEFENSE

16.     If these answering defendants are found to liable to the plaintiff for damages, their liability will be 50% or less of the total liability assigned to all persons liable.

## AS AND FOR A FIFTH AFFIRMATIVE DEFENSE

17.     Upon information and belief, any injuries or damages sustained by plaintiff as alleged in the Amended Complaint were caused or contributed to by the negligence, carelessness or other culpable conduct of the plaintiff. Accordingly, plaintiff should be barred from recovery if his injuries and damages were caused entirely by reason of the culpable conduct on the part of the plaintiff or, in the event that plaintiff is entitled to recover, the amount of damages otherwise recoverable should be diminished by the proportion which the culpable conduct attributable to the plaintiff bears to the culpable conduct which caused or contributed to said injuries and damages.

## AS AND FOR A SIXTH AFFIRMATIVE DEFENSE

18.     These answering defendants are immune from the instant suit and immune from any liability to plaintiff for damages, since the answering defendants acted towards plaintiff in good faith and with objectively reasonable belief that their actions were lawful and not in violation of any of plaintiff's constitutional rights. Consequently, plaintiff's claims must be dismissed.

SA-35

### AS AND FOR A SEVENTH AFFIRMATIVE DEFENSE

19.    Upon information and belief, some or all of the damages alleged in plaintiff's Complaint are barred or subject to the qualifications and limitations of the provisions of both Federal and State Law.

### AS AND FOR AN EIGHTH AFFIRMATIVE DEFENSE

20.    Plaintiff's recoverable damages, if any, should be reduced by reason of plaintiff's failure to mitigate his damages.

### AS AND FOR A NINTH AFFIRMATIVE DEFENSE

21.    The alleged conduct as set for in plaintiff's Amended Complaint, in whole or in part, was properly within the discretionary authority committed to the answering defendants to perform their official functions and the relief prayed for would constitute an improper intrusion by the federal judiciary into said discretionary authority.

### AS AND FOR A TENTH AFFIRMATIVE DEFENSE

22.    Defendants have at all times acted in conformity with all Federal and State constitutional statutory and/or regulatory provisions.

### AS AND FOR AN ELEVENTH AFFIRMATIVE DEFENSE

23.    Defendants at all times relevant hereto, acted without malice and under the reasonable belief that their actions were proper and in accordance with existing law. At all times relevant hereto, defendants acted in good-faith in the lawful exercise of the discretion committed to them under Federal and/or State law and are immune from liability. Furthermore, defendants did not violate any clearly established statutory or constitutional rights of plaintiff which a reasonable person would have known, and therefore are entitled to qualified immunity.

SA-36

## AS AND FOR A TWELFTH AFFIRMATIVE DEFENSE

24.     Plaintiff's claims are barred by the doctrines of laches, collateral estoppel and/or *res judicata*.

## AS AND FOR A THIRTEENTH AFFIRMATIVE DEFENSE

25.     That any force used upon plaintiff was applied in a good-faith effort to maintain or restore discipline.

## DEMAND FOR JURY TRIAL

26.     A trial by jury is hereby demanded on all issues in this matter.

**WHEREFORE**, defendants demand judgment as follows: (1) dismissing the Amended Complaint herein; (2) directing that plaintiff's damages, in the event that plaintiff is entitled to recover, be diminished by the proportion which the culpable conduct of plaintiff bears to the culpable conduct which caused or contributed to said damages; (3) granting such other and further relief in favor of defendants as the Court deems just and proper, together with the costs and disbursements of this action.

DATED:     Buffalo, New York
           October 2, 2019            **MICHAEL A. SIRAGUSA**
                                      *Erie County Attorney*

                                      By: */s/ Erin Molisani*
                                      Erin E. Molisani, Esq.
                                      Assistant County Attorney
                                      95 Franklin Street, Room 1634
                                      Buffalo, New York 14202
                                      Telephone: (716) 858-2216
                                      Email: erin.molisani@erie.gov

## CERTIFICATE OF SERVICE

I hereby certify that on October 2, 2019, I electronically filed the foregoing with the clerk of the District Court using its CM/ECF system, and on the same date I mailed the foregoing, by the United States Postal Service, to the following non-CM/ECF participant at the following address, which is his last known address:

Mark T. Dublino
18-B-0793
Auburn Correctional Facility
PO Box 618
Auburn, New York 13021

Mark T. Dublino
18-B-0793
Wende Correctional Facility
3040 Wende Road
Alden, New York 14004

DATED:    Buffalo, New York
          October 2, 2019          **MICHAEL A. SIRAGUSA, ESQ.**
                                   *Erie County Attorney*

                                   By: */s/ Erin Molisani*
                                   Erin E. Molisani, Esq.
                                   Assistant County Attorney, of Counsel
                                   Erie County Department of Law
                                   95 Franklin Street, Room 1634
                                   Buffalo, New York 14202
                                   Telephone: (716) 858-2216
                                   Email: erin.molisani@erie.gov

**SA-38**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

MARK T. DUBLINO,

<i>Plaintiff,</i>

    v.

SGT. JUSTIN BIEGAJ, SGT. ROBERT DEE,
DEPUTY BRIAN THOMPSON,
DEPUTY FRANK GELSTER,
SGT. MR. CROSS, SGT. MR. ROBINSON,
DEPUTY MR. P. GIARDINA, and
DEPUTY SHAWN WILSON,

<i>Defendants.</i>

**NOTICE OF MOTION**

Case No.:  19-CV-6269

---

| | |
|---|---|
| **NATURE OF ACTION:** | 42 U.S.C. §1983 |
| **MOVING PARTIES:** | Defendants Biegaj, Dee, Thompson, Gelster, Cross, Robinson, Giardina, and Wilson, by their attorney, Michael A. Siragusa, Esq., Erie County Attorney, by Erin E. Molisani, Esq., of counsel |
| **RELIEF REQUESTED:** | An Order granting defendants summary judgment and dismissing the Amended Complaint, together with such other and further relief as to this Court may seem necessary and just |
| **DATE, TIME & PLACE:** | As directed by the Court, Hon. David G. Larimer, United States District Court Judge, Western District of New York, 100 State Street, Rochester, New York 14614 |
| **SUPPORTING PAPERS:** | Supporting Declaration of Erin E. Molisani, Esq. sworn to October 8, 2021, with Exhibits A through L; Movants' Statement of Material Facts Pursuant to Local R. 56 by Assistant Erie County Attorney Erin E. Molisani, dated October 8, 2021; and |

Memorandum of Law dated October 8, 2021

**REPLY PAPERS:**                    These moving defendants intend, if need be, to file and serve reply papers, which are to be filed in accordance with the Court's briefing schedule

**GROUNDS FOR RELIEF REQUESTED:**   Fed. R. Civ. P. 56, Local R. Civ. P. 56, and authority cited herein

**ORAL ARGUMENT:**                   As directed by the Court

Dated:        Buffalo, New York
              October 8, 2021

**MICHAEL A. SIRAGUSA**
*Erie County Attorney*


s/ *Erin E. Molisani*
Erin E. Molisani, Esq.
Assistant County Attorney
95 Franklin Street, Room 1634
Buffalo, New York 14202
Telephone: (716) 858-2216
Email: Erin.Molisani@erie.gov

SA-40

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

MARK T. DUBLINO,

                   *Plaintiff*,

   v.

SGT. JUSTIN BIEGAJ, SGT. ROBERT DEE,
DEPUTY BRIAN THOMPSON,
DEPUTY FRANK GELSTER,
SGT. MR. CROSS, SGT. MR. ROBINSON,
DEPUTY MR. P. GIARDINA, and
DEPUTY SHAWN WILSON,

                 *Defendants*.

**SUPPORTING
DECLARATION**

Case No.: 19-cv-6269

| | |
|---|---|
| STATE OF NEW YORK | ) |
| COUNTY OF ERIE | ) ss |
| CITY OF BUFFALO | ) |

Erin E. Molisani, being first duly sworn, deposes and says under penalty of perjury and pursuant to 28 U.S.C. §1746 that the following is true and correct:

1.     I am an attorney at law admitted to practice before this Court and am an Assistant County Attorney to Michael A. Siragusa, Esq., Erie County Attorney and counsel for defendants Biegaj, Dee, Thompson, Gelster, Cross, Robinson, Giardina, and Wilson (hereinafter "defendants"). In this capacity, I am fully familiar with the facts and circumstances of this litigation.

2.     I offer this Supporting Declaration in support of defendants' motion for summary judgment seeking dismissal of plaintiff's Amended Complaint (Dkt. No. 8).

3.     Previously, this Court screened plaintiff's Amended Complaint pursuant to 28 U.S.C. §§ 1915(e)(2)(8) and 1915A(a) and directed the matter to proceed to service (Dkt. No. 10).

4.     Defendants served their Answer on October 2, 2019 (Dkt. No. 13).

5.      Defendants filed their Rule 26 disclosures on February 5, 2020 (Dkt. No. 32), which included a certified copy of plaintiff's medical records from the date of the subject incident until his transfer out of the facility (Dkt. No. 32-6).

6.      In addition to the docket filings referenced with this motion, defendants rely on the following exhibits in support of their motion:

| | |
|---|---|
| **Exhibit A**: | Plaintiff's deposition testimony dated June 7, 2021 |
| **Exhibit B**: | Video from March 9, 2018 and Affidavits of Deputy Brian Thompson and Sergeant Robert Dee |
| **Exhibit C**: | Deputy Brian Thompson's deposition testimony dated June 9, 2021 |
| **Exhibit D**: | Deputy Frank Gelster's deposition testimony dated June 9, 2021 |
| **Exhibit E**: | Sergeant Jack Robinson's deposition testimony dated June 10, 2021 |
| **Exhibit F**: | Deputy Peter Giardina's deposition testimony dated June 11, 2021 |
| **Exhibit G**: | Deputy Shawn Wilson's deposition testimony dated July 8, 2021 |
| **Exhibit H**: | Sergeant Justin Biegaj's deposition testimony dated July 8, 2021 |
| **Exhibit I**: | Sergeant Matthew Cross' deposition testimony dated July 9, 2021 |
| **Exhibit J**: | Sergeant Robert Dee's deposition testimony dated July 9, 2021 |
| **Exhibit K**: | Defendants' Notice to Admit |
| **Exhibit L**: | Plaintiff's Response to Notice to Admit |

7.      Defendants submit that there are no triable issues of fact and summary judgment is appropriate.

DATED:      Buffalo, New York
            October 8, 2021

**MICHAEL A. SIRAGUSA**
*Erie County Attorney*

By: */s/ Erin Molisani*
Erin E. Molisani, Esq.
Assistant County Attorney
95 Franklin Street, Room 1634
Buffalo, New York 14202
Telephone: (716) 858-2216
Email: erin.molisani@erie.gov

SA-42

# EXHIBIT A

SA-43

1

1  UNITED STATES DISTRICT COURT

2  WESTERN DISTRICT OF NEW YORK

3  ------------------------------------------------

4  **MARK T. DUBLINO,**

5            Plaintiff,

6     -vs-              **Case No: 19-CV-6269**

7  **SGT. JUSTIN BIEGAJ, SGT. ROBERT DEE,**
   **DEPUTY BRIAN THOMPSON, DEPUTY FRANK GELSTER,**
8  **SGT. MR. CROSS, SGT. MR. ROBINSON,**
   **DEPUTY MR. P. GIARDINA, DEPUTY SHAWN WILSON.**

9            Defendants.

10 ------------------------------------------------

11

12        Virtual Examination Before Trial of

13 **MARK T. DUBLINO,** held pursuant to Article 31 of the

14 Civil Practice Law and Rules, commencing on Monday,

15 June 7th, 2021 at 10:00 A.M., before Denise C.

16 Burger, Notary Public.

17

18

19

20

21

22

23

**MCCANN & MCCANN REPORTING**

SA-44

2

```
 1   APPEARANCES:  MODICA LAW FIRM:
                   BY: STEVEN V. MODICA, ESQ.,
 2                 2430 Ridgeway Avenue,
                   Suite 1,
 3                 Rochester, New York 14626,
                   (585) 368-1111
 4                 e-mail: Steve@ModicaLawFirm.com,
                   Attorneys for Mark Dublino.
 5
                   MICHAEL A. SIRAGUSA, ESQ,
 6                 ERIE COUNTY ATTORNEY
                   BY: ERIN E. MOLISANI, ESQ.,
 7                 ASSISTANT COUNTY ATTORNEY,
                   95 Franklin Street,
 8                 Room 1634,
                   Buffalo, New York 14202,
 9                 (716) 858-2216,
                   e-mail: Erin.Molisani@erie.gov,
10                 Attorneys for the Defendants.

11

12

13

14

15

16

17

18

19

20

21

22

23
```

**MCCANN & MCCANN REPORTING**

SA-45

3

1                      **E X H I B I T S**

2 **EXHIBIT NO:**                                    **PAGE**

3 1. Disciplinary Report.                            4

4 2. Medical records.                                4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

**MCCANN & MCCANN REPORTING**

SA-46

4

1        (The following were marked for identification)

2                    Exhibits 1 & 2.

3

4    The following stipulations were entered into by

5    counsel:

6

7        It is hereby stipulated by and between the

8    attorneys for the respective parties hereto that

9    the oath of the Referee is waived, that signing,

10   filing and certification of the transcript are

11   waived and that all objections, except as to the

12   form of the questions, are to be reserved until the

13   time of trial.

14

15            M A R K   D U B L I N O,

16        having been first duly sworn, was examined

17   and testified as follows:

18

19        THE REPORTER:  Can you state your name for

20   the record, please.

21        THE WITNESS:  Mark Dublino.

22

23

SA-47

*MR. DUBLINO    -    MS. MOLISANI    -    6/7/2021*

5

1    **EXAMINATION BY MS. MOLISANI:**

2        **Q.**    Good morning, Mr. Dublino, how are you?

3        **A.**    Good morning.

4        **Q.**    We have met before, but for the record,

5    my name is Erin Molisani and I represent the

6    deputies and sergeants that you started a claim

7    against.

8        So as you know, we're here today to discuss

9    an incident that occurred on March 9th, 2018 and

10    ask you some questions.  So I think -- just let me

11    know when you're ready.

12        **A.**    Yes, go ahead.

13        **Q.**    Okay, just the noises, it makes it sort

14    of difficult, so -- is there anyone else in the

15    room with you presently?

16

17            (Technical difficulties.)

18        (Whereupon, a short recess was taken.)

19

20    **BY MS. MOLISANI:**

21        **Q.**    Mr. Dublino, can you just repeat the

22    answer that you said that the court reporter wasn't

23    able to catch, about whether --

**MCCANN & MCCANN REPORTING**

*MR. DUBLINO   -   MS. MOLISANI   -   6/7/2021*

6

1        A.    I am sorry, you want me to repeat the

2    question?

3        Q.    I will just repeat the question.  Is

4    there anyone in the room with you presently?

5        A.    Yes, my counselor, Ms. Cabrerra.

6    Officer Ers.  And Officer Ers.  Ms. Ers and Ms.

7    Cabrerra.

8        Q.    Okay, thank you.  And you have a number

9    of documents in front of you presently, are those

10   pleadings related to this lawsuit?

11       A.    I am sorry?

12       Q.    You have a number of documents and

13   materials in front of you, are those pleadings

14   related to this lawsuit?

15       A.    Pleadings?

16       Q.    Yes.

17       A.    No, they're not pleadings.

18       Q.    Okay.  What is in front of you?

19       A.    I -- just names.  Names of the

20   officers.

21       Q.    Okay, it looks like --

22       A.    The officers.

23       Q.    Okay, the officers involved in this

**MCCANN & MCCANN REPORTING**

*MR. DUBLINO   -   MS. MOLISANI   -   6/7/2021*

7

1  incident?

2       **A.**   Yeah, I have the names of the officers

3  in case I need that, you know, to remember a name,

4  you know, because it's been so long, but I have a

5  pretty good grasp of everything.  Go ahead.

6       **Q.**   All right, it looks to me you have two

7  to three separate stacks of papers, so can you

8  elaborate on what you're looking at?

9       **A.**   Well, one is a sick call request.  One

10  are felony complaints.  One is the letter to Modica

11  Law Firm.  One is the letter from the Modica's Law

12  Firm confirming the depositions that are scheduled

13  for the rest of the week that I am going to be

14  excluded on.  I don't know why I would be excluded,

15  but I am being excluded.  And something about

16  justification.

17       **Q.**   Okay.  Would you just do me a favor and

18  if you need to look at the documents in front of

19  you, would you let me know that you intend to do

20  that?

21       **A.**   Okay, very good.

22       **Q.**   Thank you.  And you're presently

23  incarcerated; is that correct?

**MCCANN & MCCANN REPORTING**

*MR. DUBLINO   -   MS. MOLISANI   -   6/7/2021*

8

```
 1          A.    Yes, I am.

 2          Q.    And you're at Wende?

 3          A.    I am at Wende Correctional Facility.

 4          Q.    Okay.  I know you have been through a

 5   couple of depositions.  We have been through a

 6   couple depositions together, but allow me, if you

 7   would, to just remind you of a couple of

 8   suggestions to hopefully make things go smoothly

 9   from here on out, okay?  Yes?

10          A.    Yes.

11          Q.    That's one of them, is if you could do

12   a verbal response, because a head shake isn't going

13   to be able to be transcribed, okay?

14          A.    Correct.

15          Q.    Great.  I'll try to do my best,

16   particularly since we're proceeding on Webex, to

17   wait until the end of your response before I give

18   you a question.  If you could do your best to wait

19   until the end of my question before you give an

20   answer, okay?

21          A.    Very good.

22          Q.    Are you -- can you hear me okay?

23          A.    I am -- that's better.
```

**MCCANN & MCCANN REPORTING**

SA-51

*MR. DUBLINO   -   MS. MOLISANI   -   6/7/2021*

9

```
 1        Q.    All right.  I will try to speak up, but
 2  please, obviously let me know if you can't hear my
 3  question, okay?
 4        A.    In fact, if I don't understand it, I'll
 5  ask you to repeat it.
 6        Q.    And if you can't hear me.
 7        A.    Right.  Right.
 8        Q.    Okay.  So I previously deposed you
 9  relative to the lawsuit against Mr. Thomas, so I
10  have the benefit of having gone through some of the
11  background information with you about marital
12  status and things like that, so I am going to skip
13  over most of that and just kind of update things
14  since the last time I took that deposition, which I
15  think was the fall of 2019, does that sound right
16  to you?
17        A.    August '19?
18        Q.    I said fall 2019?
19        A.    2018 August is the last time you
20  deposed me?
21        Q.    No, I said the fall of 2019; is that
22  your recollection?
23        A.    Fall of 2019 what?
```

**MCCANN & MCCANN REPORTING**

*MR. DUBLINO   -   MS. MOLISANI   -   6/7/2021*

10

1        **Q.**    Was the last time that I took your

2    deposition relative to the Dublino versus Thomas

3    lawsuit?

4        **A.**    I don't recall, but I remember we did

5    depositions on that particular occasion.

6        **Q.**    All right.  Well, I guess since then

7    have you been -- have you gotten married?

8        **A.**    I have not.

9        **Q.**    Have you obtained any additional

10   education since then in October 2019?

11       **A.**    No, just normal law library access to

12   learning the -- learning about litigation.

13       **Q.**    Okay.  And you were reconvicted in

14   April of 2021 after a bench trial in Erie County;

15   is that correct?

16       **A.**    That is correct.

17       **Q.**    All right.  And what were the specific

18   crimes that you were convicted of?

19       **A.**    I was -- I was convicted of Penal Law

20   120.05-7.

21       **Q.**    Do you know what the name of that,

22   what the charge was?

23       **A.**    It is assault -- assault in the -- in a

**MCCANN & MCCANN REPORTING**

*MR. DUBLINO   -   MS. MOLISANI   -   6/7/2021*

                                                        11

1    correctional facility.

2         Q.    Do you intend to appeal that

3    conviction?

4         A.    I am working on it, that's CPL 333

5    right now, to set it aside based on legal

6    insufficiency and the other, which is just

7    referring to that, it's not only was legal

8    insufficiency, but the evidence was -- I guess the

9    weight of the evidence.

10        Q.    Okay.  What was the document you looked

11   at just now?

12        A.    I just looked at a case cite, Jennifer

13   Marshan, which outlines that as a case that was

14   determined over here on the Fourth Department.

15        Q.    Okay.  And that conviction was the

16   result of an assault on Joe Terranova on March 9th,

17   2018; is that correct?

18        A.    Yes, it is.

19        Q.    Since the last time you were deposed in

20   October 2019, have you been convicted of any other

21   crimes?

22        A.    No, I have not.

23        Q.    And have you been exclusively

*MR. DUBLINO   -   MS. MOLISANI   -   6/7/2021*

12

1   incarcerated at Wende and Auburn since October

2   2019?

3         **A.**   I -- my incarceration was started in

4   March of 2018 at Elmira Correctional Facility.  In

5   April I went to Auburn Correctional Facility of

6   2018, and I stayed there until October 29th of 2018

7   at Auburn and then I was transferred over to

8   Wende --

9         **Q.**   Okay.

10        **A.**   -- in 2020.

11        **Q.**   Are you currently working at Wende in

12   any capacity?

13        **A.**   I have hall squad duty.

14        **Q.**   What is it?

15        **A.**   Hall squad duty is what my job

16   classification is.  When they call me.

17        **Q.**   So what do you do?

18        **A.**   It's just a basic maintenance type of

19   stuff that's done on the company that you're at,

20   like garbage and making sure everything is clean.

21   Clean and tidy.

22        **Q.**   Okay.  When you were housed at the Erie

23   County Correctional Facility, did you receive a

**MCCANN & MCCANN REPORTING**

*MR. DUBLINO   -   MS. MOLISANI   -   6/7/2021*

13

1   copy of the inmate handbook?

2        A.   At the Erie County Holding Center?

3        Q.   Yes.

4        A.   I received a copy of the inmate

5   handbook, yes.

6        Q.   So turning to the incident that brings

7   us together here, it's my understanding that it

8   happened on March 9, 2018 at approximately 10:20 in

9   the morning; is that accurate?

10        A.   Approximately at 10:20, yes.

11        Q.   Okay.   And what -- and it occurred in

12   or around an attorney-conference room; is that

13   right?

14        A.   That is correct, attorney-conference

15   room 3.

16        Q.   Can you describe the room for me,

17   please?

18        A.   The room was a little bit larger than

19   seven-by-seven.   Seven feet by seven feet.

20        Q.   Okay.   And what's inside --

21        A.   Seven-and-a-half-feet by

22   seven-and-a-half-feet.

23        Q.   And what's inside the room?

**MCCANN & MCCANN REPORTING**

SA-56

*MR. DUBLINO   -   MS. MOLISANI   -   6/7/2021*

14

1        **A.**    A table and three chairs.

2        **Q.**    And what's the door set -- excuse me,

3    the door setup for the attorney-conference room?

4        **A.**    Well, how could I explain this.  You

5    had one door entering and exiting from the corridor

6    from the -- hold on one second, there's a phone

7    ringing here on my end.

8        **Q.**    Okay.

9

10        (Whereupon, a short recess was taken.)

11

12    **BY MS. MOLISANI:**

13        **Q.**    I think when the phone rang you were

14    describing the doors that are in the

15    attorney-conference room?

16        **A.**    Okay, the -- it's a seven by -- a

17    little more than seven-and-a-half by

18    seven-and-a-half attorney room and they have two

19    doors, one that enters from the corridor from the

20    person who is being held in custody, and then

21    there's a door that enters and exits from the

22    attorney entrance.

23        **Q.**    Okay.

**MCCANN & MCCANN REPORTING**

*MR. DUBLINO   -   MS. MOLISANI   -   6/7/2021*
                                                                    15

1          A.     They're approximately three feet wide.

2          Q.     All right.  So the claim of excessive

3    force that you made against --

4          A.     I'm sorry.

5          Q.     The claim of excessive force that you

6    have made against deputies and sergeants in this

7    case, did that occur on the attorney side door or

8    the inmate side door?

9          A.     It happened on the -- the person held

10   in custody, on that corridor side, which was my

11   side.

12         Q.     The inmate side?

13         A.     Where I enter and where I exit.

14         Q.     Great.  Okay, and am I correct, if

15   you're inside the room, you cannot open the door

16   yourself, is that right, you have to be let out

17   from someone in such control?

18         A.     Yes, there is an electronic release

19   that's controlled by the control room officer.

20         Q.     Okay.

21         A.     That's correct.

22         Q.     And are those rooms exclusively for

23   meeting with attorneys, to your knowledge?

**MCCANN & MCCANN REPORTING**

*MR. DUBLINO   -   MS. MOLISANI   -   6/7/2021*

16

1       **A.**    They are exclusively for attorneys from

2   my knowledge.

3       **Q.**    Are there rules governing your conduct

4   in those rooms, to your knowledge?

5       **A.**    No, I have never saw any rules for

6   conduct.

7       **Q.**    So on March 9, 2018, you were meeting

8   with the attorney that had been representing you

9   for some underlying criminal charges, Joe

10  Terranova; is that right?

11      **A.**    What was the date, because I did not

12  hear the date?

13      **Q.**    March 9, 2018.

14      **A.**    That's correct, I was meeting with my

15  attorney, Joseph Terranova.

16      **Q.**    And you had recently been convicted of

17  some crimes that Mr. Terranova had been

18  representing you for?

19      **A.**    Yeah.  Well, you already asked me that

20  question, I gave you the charge and it had to do

21  with Mr. Terranova, yes.

22      **Q.**    Well, I am not talking about the most

23  recent criminal conviction, I am asking about the

*MR. DUBLINO   -   MS. MOLISANI   -   6/7/2021*

17

1   charges that Mr. Terranova had been representing

2   you for, the trial that was in front of Judge

3   Haendiges?

4        **A.**   Okay, yes, sorry.  You didn't specify

5   that.  Okay.

6        **Q.**   Okay, so am I correct --

7        **A.**   What was the question again?

8        **Q.**   Sure.  Mr. Terranova had been

9   representing you for some charges that you were

10  recently convicted of in March 2018; is that right?

11       **A.**   That is correct.

12       **Q.**   Okay.  And how long had you been

13  meeting with Mr. Terranova that day before the

14  assault occurred?

15       **A.**   We were in the room for 40 minutes

16  together --

17       **Q.**   Okay.

18       **A.**   -- approximately, but --

19       **Q.**   Up until the point that you assaulted

20  him, had you, those 40 minutes, been contentious in

21  any way?

22       MR. MODICA:  Form.

23       THE WITNESS:  I didn't assault him, I want

**MCCANN & MCCANN REPORTING**

*MR. DUBLINO   -   MS. MOLISANI   -   6/7/2021*

18

1  to correct that.  I defended myself and basically I

2  want to stipulate that.  And what's the next part

3  of that question?

4

5  **BY MS. MOLISANI:**

6       Q.   Was there any conflict with him that

7  day, in those 40 minutes that you were meeting with

8  him?

9       A.   Yes, there was a conflict.

10      MS. MOLISANI:  And Steve, I don't know what

11 your position is on me asking about that, because I

12 don't know if it's privileged, but if you don't

13 want me to ask him that, that's fine.

14      MR. MODICA:  Yeah, I think because that

15 other charge is still in appeal, I am going to

16 direct the witness not to answer those questions,

17 and obviously the events of this case occurred

18 after that interaction, whatever that interaction

19 was, so on that end, I'd be grateful for that.

20      MS. MOLISANI:  Sure.

21      MR. MODICA:  Thanks.

22

23 **BY MS. MOLISANI:**

**MCCANN & MCCANN REPORTING**

SA-61

*MR. DUBLINO   -   MS. MOLISANI   -   6/7/2021*

19

1        Q.    And am I right that about nine days

2   after the incident on March 9, 2018 -- excuse me,

3   strike that.  You had sued Mr. Terranova about nine

4   days before the March 9, 2018 incident; is that

5   right?

6        A.    I -- I missed the question.  I pursued

7   him?

8        Q.    Sued him.  You made a lawsuit, filed a

9   lawsuit against him?

10       A.    Is that what your question is?

11       Q.    Yes.

12       A.    I didn't hear the question.

13       Q.    Okay.

14       A.    I put a federal lawsuit against Mr.

15  Terranova, correct.  Out of the -- out of the

16  district court, the Western District Court for an

17  issue that took place within the courtroom of

18  Deborah Haendiges.  There was five claims in this

19  suit.  He is -- his issue was one of them --

20       Q.    Okay.

21       A.    -- along with four other claims in that

22  suit.

23       Q.    I am sorry, I thought you were done.

**MCCANN & MCCANN REPORTING**

MR. DUBLINO  -  MS. MOLISANI  -  6/7/2021

20

1        A.    The claim against Mr. Terranova was

2   that he threatened me inside the courtroom and I

3   objected to it when he did that and the

4   stenographer failed to record that information on

5   my objection, they haven't represented me as an

6   attorney.  This was before the voir dire on January

7   17th, 2018.

8        Q.    All right.

9        THE WITNESS:  I'm sorry, Steve, did you say

10  something?

11       MR. MODICA:  I did not.

12       THE WITNESS:  Okay, so January 17th, 2018 he

13  threatened me inside the courtroom and basically I

14  made an objection to the -- to the judge, who was

15  right in front of it while he did this and

16  basically I made an objection to replacing him

17  right there, the stenographer was in the room, and

18  they failed to place my motion on the record.  Do

19  you need to have the information that transpired?

20

21  BY MS. MOLISANI:

22       Q.    No.  Thank you.

23       A.    Okay.

MCCANN & MCCANN REPORTING

SA-63

*MR. DUBLINO   -   MS. MOLISANI   -   6/7/2021*

21

1        **Q.**    Going back to the morning of March 9,

2  2018, did there come a time in the

3  attorney-conference room where your body came into

4  contact with his?

5        **A.**    Oh, God, it's so hard to hear you.  Go

6  ahead with the question again.  I am trying to

7  concentrate.  Are you turning it up?  Okay.

8        **Q.**    Okay.

9        **A.**    Go ahead.

10        **Q.**    I said going back to the morning of

11  March 9, 2018, did there come a time where your

12  body came into contact with Mr. Terranova's?

13        **A.**    Before March 9th?

14        **Q.**    The morning of March 9th.

15        **A.**    Before the actual alleged incident?

16        **Q.**    No.  Well, I guess I am not sure what

17  you mean by alleged incident.  I just generally

18  want to know on March 9, 2018, did there come a

19  time where your body came into contact with Mr.

20  Terranova's?

21        **A.**    Yes, approximately -- approximately

22  10:20 a.m.

23        **Q.**    Did you strike Mr. Terranova?

**MCCANN & MCCANN REPORTING**

*MR. DUBLINO   -   MS. MOLISANI   -   6/7/2021*

22

1           THE WITNESS:  Okay, Steve, I thought we

2      weren't going to go into that issue.  Are we -- are

3      we going forward with this?

4           MR. MODICA:  Well, again, you can choose not

5      to answer, you know.  Obviously I don't think

6      there's a dispute that there was physical contact

7      between you and Mr. Terranova.  The issue in your

8      criminal case is whether your physical -- your

9      physical conduct was justified.  So that's why I

10     didn't object to that particular question, but the

11     other questions I might object to, but --

12          THE WITNESS:  Okay, repeat the question

13     then, Ms. Molisani.

14

15     BY MS. MOLISANI:

16          Q.   Did you strike Mr. Terranova?

17          A.   I defended myself after he struck me.

18          Q.   Right.  And in defending yourself, did

19     you strike Mr. Terranova?

20          A.   I did not strike him, no.

21          Q.   In what manner did your body come into

22     contact with his?

23          A.   I basically grabbed his arm when he

**MCCANN & MCCANN REPORTING**

*MR. DUBLINO   -   MS. MOLISANI   -   6/7/2021*

23

1    jabbed his pen in me, at my hand and poked my hand,

2    and then after he hit me on the side of the head

3    twice with his left arm, I basically defended

4    myself.  I got up and I was blocking myself, and as

5    I was blocking myself, I was pushing him up against

6    the wall and I put my fingers into his eyes to

7    defend myself, disarming him of his pen.

8         Q.    Did you put your fingers in his eyes

9    just once?

10        A.    I kept pressure on -- with my hands

11   over his face and over his eyes as we fell towards

12   the wall where the emergency -- not the emergency,

13   where the notification button is to the -- to the

14   tower.

15        Q.    Okay.  Did any -- at any point that

16   morning did any deputies enter the attorney

17   conference room?

18        A.    No.

19        Q.    All right.  So according to your

20   complaint, you say that Deputy Thompson arrived

21   first at -- in the inmate side of the hall; is that

22   correct?

23        A.    Yes, the first officer with his K-9.

**MCCANN & MCCANN REPORTING**

*MR. DUBLINO   -   MS. MOLISANI   -   6/7/2021*

24

1        **Q.**    Can you describe for me what he did

2   when he arrived?

3        **A.**    I was standing at the door ready to

4   walk out, waiting for the door to open up.  Once it

5   clicked, they open it up and I walked towards the

6   door and he grabbed me by my shirt, but he didn't

7   pull me out, I walked out on my own will, own

8   free-will.  He basically had ahold of my shirt.

9   That's pretty much as I exited.

10       **Q.**    Can you describe for me what actions

11  Mr. Thompson took that I guess formed the basis of

12  your complaint against him?

13       **A.**    I am sorry?

14       **Q.**    Can you describe for me what actions

15  Deputy Thompson took that form the basis of the

16  complaint against him?

17       **A.**    Yeah, basically, there's a -- there's a

18  few things.  I followed his order to sit down on

19  the ground.  That's what -- that's what his first

20  order was, so I sat down on the ground.  And then

21  he immediately said no, I want you facedown on the

22  ground in a prone position.  He was cursing while

23  he was doing this.  And at me to do it, get down on

**MCCANN & MCCANN REPORTING**

*MR. DUBLINO   -   MS. MOLISANI   -   6/7/2021*

25

1    the fucking ground, and I did all of those things.

2    I conceded and did not resist.  He testified to

3    that.  You were there in the courtroom when he

4    testified to that.

5         **Q.**   Did Deputy Thompson use force against

6    you?

7         **A.**   Did he use force against me?

8         **Q.**   Yes.

9         **A.**    Well, what -- what he did was, he was

10   concentrating on my upper body and he lost control

11   of his dog.  His dog was biting at my leg. His K-9

12   dog was biting at my leg and I ended up trying to

13   protect my leg because he was up on my upper back

14   now, I am protecting my leg with my right hand

15   while he was biting at my leg. The dog ended up

16   biting my hand, my right hand.

17        **Q.**   I am sorry, the dog bit your right hand

18   or your leg or both?

19        **A.**   My right hand.  My right hand.

20        **Q.**   So the dog did not bite either of your

21   legs?

22        **A.**   He was biting at my leg.  He was biting

23   at my leg, at my upper thigh and at my buttocks.

*MR. DUBLINO   -   MS. MOLISANI   -   6/7/2021*

26

1   My -- and then that's where my hand was, so I put

2   my hand there, you know, to shoo him away and then

3   he bit my hand too.  The officer was pressing down

4   on my back, okay.  He was -- he didn't try to

5   handcuff me at all and basically he was using extra

6   force on my back.

7        Q.    Can you describe what he was doing on

8   your back?

9        A.    Leaning on my back.  I don't know, I

10  was facedown, but my back -- he was on my upper

11  part of my body.

12       Q.    And you described trying to shoo the

13  dog away, so were you moving as Deputy Thompson was

14  leaning on your back?

15       A.    I'm sorry?

16       Q.    You have described that you were trying

17  to shoo the dog away, so I am asking if you were

18  moving as Deputy Thompson was leaning on your back?

19       A.    I was like -- I was facedown.  They

20  just -- I just explained it to you, the dog was

21  biting at my leg and --

22       THE WITNESS:  Go ahead, Steve what did you

23  say?

*MR. DUBLINO  -  MS. MOLISANI  -  6/7/2021*

27

```
 1          MR. MODICA:  No, so Mark, if I mute or
 2  unmute, you're going to hear a little beep, so I am
 3  trying to stay muted so that I am not adding extra
 4  noise back here, so if you hear that, that's not me
 5  saying anything, that's just the muting mechanism,
 6  all right.  I will certainly speak up when I need
 7  to, all right?
 8          THE WITNESS:  Very good.
 9          MR. MODICA:  Okay.
10
11  BY MS. MOLISANI:
12          Q.   So is it accurate you were moving as
13  Deputy Thompson was leaning on your back?
14          A.   I was laying down facedown.  I wasn't
15  moving anywhere.  I was moving my arm to protect --
16  I was just basically, it's a natural reaction to,
17  just to push away, and he was on my back, so I am
18  just showing you so you can see, so if I am
19  facedown, I am shooing away.  You can't see my arm,
20  but basically it was down by my buttocks where my
21  arms are.  The length of my arm.
22          Q.   All right, so you just put your arm
23  straight back, almost as if -- it looks like you
```

**MCCANN & MCCANN REPORTING**

*MR. DUBLINO   -   MS. MOLISANI   -   6/7/2021*

28

1  were maybe partway to a position you would take to

2  be handcuffed behind your back, is that an accurate

3  description of what you just did with your body?

4        A.    Correct, if your hands are to the side,

5  you know, and then eventually you're going to be

6  handcuffed, you know, so they're going -- only

7  going to go a short distance from where they are on

8  the side.

9        Q.    Okay.  The dog was leashed; is that

10  correct?

11        A.    Yes, he was.

12        Q.    Did there come a time where Deputy

13  Thompson did not have -- was not holding the leash?

14        A.    It didn't appear.  He had to have the

15  leash, because the dog was not in the camera, not

16  in the surveillance.  He wasn't in the surveillance

17  camera, but the dog is there because you see him

18  running.  You see him running.

19        Q.    I guess --

20        A.    I don't know what's going on.  Am I

21  getting back -- back noise?  He was running down

22  the hallway with the dog, so we know the dog is

23  there, but the camera, surveillance camera doesn't

**MCCANN & MCCANN REPORTING**

*MR. DUBLINO   -   MS. MOLISANI   -   6/7/2021*
                                                           29

1  cover the entire view of the corridor.  For some

2  reason this is two to three feet from the ground

3  up, so you don't see the dog and that's why you

4  don't see the dog in the photos, but you see the

5  dog in the video until he's out of the -- out of

6  the video screen.

7       **Q.**   I understand that.  I guess what I am

8  trying to get from you is whether, if you know, the

9  dog, if the dog leash was ever out of Deputy

10  Thompson's hands?  And if you don't know, that's

11  fine too.

12      **A.**   Oh, I don't know.

13      **Q.**   Okay.  You're not claiming that the dog

14  was instructed to bite you, are you?

15      **A.**   No.

16      **Q.**   Did Deputy Thompson handcuff you?

17      **A.**   I -- I don't know, I was facedown.

18      **Q.**   And what's your recollection of how

19  many times you were bitten by the dog?

20      **A.**    He was biting at my leg and he bit my

21  hand the one time and then -- and then the other

22  officers got there, they were grabbing my hand and

23  arms, bending my arms behind my back, so I don't

**MCCANN & MCCANN REPORTING**

*MR. DUBLINO  -  MS. MOLISANI  -  6/7/2021*
                                                              30

1   know after that point.  There was additional

2   officers that were on the scene now.

3        Where the excessive force is, is that Deputy

4   Thompson had control of me down on the ground.  He

5   could have called off the dog, no pun intended, off

6   the dogs that were running down on me, which was

7   about six, six or seven deputies and he didn't do

8   any of that.

9        Q.    Just to clarify, when you say call off

10  the dogs, you're not talking about the narcotic

11  dog, you're talk about the other deputies?

12       A.    That's correct.

13       Q.    Okay.

14       A.    They were running, they ran down the

15  hall.  It's in the video.  And basically they ran

16  down on the hall out of control, jumping on me and

17  doing whatever.  I don't know who had my arms or

18  who didn't have my arms, but there was six officers

19  on top of me because they're on the screen, there's

20  nowhere else they could be but on the top of me,

21  because the camera has a full view of the room, of

22  the hallway, excuse me, the four foot wide hallway,

23  except for two to three feet, so everybody had to

**MCCANN & MCCANN REPORTING**

MR. DUBLINO   -   MS. MOLISANI   -   6/7/2021

31

1  be on top of me at some part of my body.

2       Q.   Okay.  The next person that I want to

3  talk about is Sergeant Biegaj?

4       A.   That's correct.  Yeah.

5       Q.   Can you describe for me what he did?

6       A.   Well, just from reviewing the video,

7  and this is how I can recollect, that he came -- he

8  was the first officer to arrive after Deputy

9  Thompson and he went down on his knees on my back

10  and one of his knees must have struck the floor.

11       Q.   Went down on his knees, did you say on

12  your back?

13       A.   Yes.

14       Q.   Do you know which of his knees was on

15  your back or was it both?

16       A.   I was facedown, I don't know.  I am

17  only going by with the film, what's in the film and

18  on the film.  He was jumping.  You could see he was

19  jumping and then a couple minutes later, a couple

20  seconds, not minutes, a couple seconds later he's

21  -- he's hopping around down the hallway supposedly

22  with some type of injury from -- from falling on

23  his knee.

*MR. DUBLINO  -  MS. MOLISANI  -  6/7/2021*

32

1      **Q.**    Okay.  And you were facedown when this

2  occurred; is that right?

3      **A.**    That is correct.

4      **Q.**    Okay.  And so how was it that you know

5  that it was Sergeant Biegaj who did this?

6      **A.**    The film.  I watched the video.  I put

7  together twelve felony complaints and I submitted

8  it to the district attorney's office of what they

9  did, because I was already in the prone position

10  and he certainly wasn't reaching down to handcuff

11  me.  He was -- he's jumping down.  You can see he's

12  running down on me.

13      **Q.**    Did you know Sergeant Biegaj before

14  March 9, 2018?

15      **A.**    I certainly did.

16      **Q.**    What about Deputy Tompson, did you know

17  him before the date of this incident?

18      **A.**    Deputy who?

19      **Q.**    Thompson.

20      **A.**    Did not.  Never interacted with Deputy

21  Thompson.

22      **Q.**    And have you described everything that

23  Sergeant Biegaj did that you claim was excessive

**MCCANN & MCCANN REPORTING**

*MR. DUBLINO   -   MS. MOLISANI   -   6/7/2021*
33

1  force?

2       A.     Yeah, he put his knee on my back when I

3  was in a prone position.

4       Q.     Your complaint then says that Deputy

5  Shawn Wilson and Sergeant Dee grabbed your hands

6  and arms and were bending and twisting them in an

7  abnormal fashion; is that accurate?

8       A.     Yeah.

9       Q.     Okay.  Did you know Deputy Wilson and

10 Sergeant Dee before the date of this accident -- or

11 excuse, me incident?

12      A.     I knew Sergeant Dee.  I also knew

13 Deputy Wilson, but no interaction.  But I had

14 interactions with Sergeant Dee.

15      Q.     Okay, can you break it down for me

16 between those two individuals, who did what?

17      A.     I was facedown.  They were -- they were

18 part of the report, the report that I read for the

19 disturbance.  They were saying that they were

20 grabbing my arms.  Only takes about, if you're in a

21 prone position and your hands are behind the back,

22 you only need to put the handcuffs on, it takes

23 about five seconds to put the handcuffs on you and

**MCCANN & MCCANN REPORTING**

*MR. DUBLINO  -  MS. MOLISANI  -  6/7/2021*

34

1  then pick you up.  I was down on the ground for a

2  minute, 20 seconds facing down.

3        **Q.**    What report are you talking about?

4        **A.**    I'm sorry?

5        **Q.**    What report are you talking about?  You

6  said that it was in the report?

7        **A.**    The -- Sergeant Smaziak, he's the

8  investigative reporter, he did a report on -- on

9  each one person and who grabbed what and how they

10  grabbed my arms and, you know, how they picked me

11  up.  It was in -- it's in his report.

12        **Q.**    Are you talking about the Erie County

13  Sheriff's Office Inmate -- or excuse me, Incident

14  Report?

15        **A.**    It's an incident report, yeah.  I mean,

16  again, like I said, I don't have that in front of

17  me --

18        **Q.**    I understand.

19        **A.**    -- but I know that Sergeant Smaziak put

20  it together.

21        **Q.**    All right.  And does -- well, strike

22  that.  Can you describe for me what Shawn Wilson

23  did that twisted your arms in an abnormal fashion?

**MCCANN & MCCANN REPORTING**

*MR. DUBLINO  -  MS. MOLISANI  -  6/7/2021*
                                                           35

 1        A.    Again, the handcuffs were -- were not

 2   put on me right away, then they put them on me,

 3   okay, and then they said take them off, put them on

 4   the other arm.  So not only did they put the

 5   handcuffs on me, but they twisted the arms around,

 6   okay, and did them the opposite direction bending

 7   my shoulders back, which forces you in another

 8   position.

 9        Now, while this is all happening, they're on

10   top of me, and if you can picture this, okay,

11   because I'll never forget it, is that you're in a

12   prone position, you're down and there's about six

13   guys who weigh about 200 plus, 220 pounds each on

14   average, and I can't breath while this is all

15   happening, and I know what they're doing and I am

16   saying, I can't breath, I can't breath, you have

17   got to get off of me, okay, and they're doing this

18   and they put the handcuffs on and I hear someone

19   say, take them off, put them on again, put them on

20   the opposite way, and that's what they did, they

21   put them on the opposite way.  That's how I ended

22   up with the markings on the opposite side of my

23   wrists.

SA-78

*MR. DUBLINO   -   MS. MOLISANI   -   6/7/2021*

36

1     **Q.**   What do you mean, put them on the

2  opposite way?

3     **A.**   Well, if your hands are behind your

4  back in a normal position, your palms will be

5  facing out in a normal, behind you.  If you put

6  your hands behind your back, you'll see what I am

7  talking about.  Put -- why don't you try it.

8     **Q.**   No, thank you.

9     **A.**   Put your -- you don't want to, okay,

10  yeah, because it's uncomfortable.

11     **Q.**   I understand what you're saying.

12     **A.**   Now -- now I want you, if you could do

13  it, put your hands, now your hands are against your

14  back, your palms are now not out anymore, facing

15  out, they're facing in.  That's means they're

16  reversed, okay, that's what I'm talking about.  So

17  they reversed the hands and the arms.  They twisted

18  them out.  They twisted them around.

19     **Q.**   Okay, so did they remove all the

20  handcuffs and then the reapplication, did that

21  occur in that minute and a half that you said that

22  you were on the ground?

23     **A.**   That is correct.

**MCCANN & MCCANN REPORTING**

*MR. DUBLINO  -  MS. MOLISANI  -  6/7/2021*

37

1        **Q.**   Okay.  And the abnormal fashion, you're

2   -- you're talking about flipping your hands in the

3   opposite direction that they had been?

4        **A.**   As I just said, the palms, your natural

5   motion with your arms behind your back, your palms

6   are out, okay.  And if you flip your hands, and now

7   your hands are behind your back, you'll see that

8   the -- it's not normal and basically that's the

9   reason why they did it is because now they can --

10  they had the pressure of the handcuffs against the

11  bone of my wrists.

12       **Q.**   Okay.  Do you know who instructed the

13  handcuffs to be flipped around?

14       **A.**   I -- I know his voice, you know, there

15  was plenty of thing going on, but I am almost very,

16  very certain that it was Sergeant Robinson.

17  Sergeant Robinson is the person who said take the

18  cuffs off, put them on the other way.

19       **Q.**   Okay.

20       **A.**   And I know his voice because I have

21  heard Sergeant Robinson many times.  Many, many

22  times.

23       **Q.**   And so who took the cuffs off and put

**MCCANN & MCCANN REPORTING**

*MR. DUBLINO   -   MS. MOLISANI   -   6/7/2021*

38

1  them on the opposite way?

2        A.    I don't know, my face was facedown.  I

3  don't know.

4        Q.    Well, what I am trying to get at is,

5  what the claims against Shawn Wilson and Sergeant

6  Dee are, and you have described bending and

7  twisting your arms in an abnormal fashion in the

8  complaint, and so I want to get the information

9  about what the claims are against those two

10  individuals?

11        A.    I just said.  I just said, I'm in a

12  prone position for a minute and 20 seconds.  It

13  takes five to ten seconds at the most to put

14  handcuffs on, okay, and if that's the case, then

15  what were you doing for a minute and 20 seconds

16  while -- while the defendant is defenseless.  While

17  the, excuse me, the plaintiff is defenseless.

18  Myself as being the plaintiff.  Defenseless and

19  they're putting the cuffs on and taking them off

20  and they're bending the arms back.  That's all I

21  can tell you.

22        Q.    And that was Shawn Wilson and Sergeant

23  Dee that did that?

**MCCANN & MCCANN REPORTING**

MR. DUBLINO   -   MS. MOLISANI   -   6/7/2021

39

```
 1        A.    The officers that were in the screen
 2  that were on top of me and then disappear, were
 3  Deputy Thompson, Deputy Biegaj, Sergeant Dee,
 4  Deputy Wilson, Sergeant Robinson and Deputy
 5  Scarpace, which should have been listed, but I
 6  didn't have his name at the time.  Those people
 7  were -- there were six individuals on top of me.
 8        Q.    All right, so it sounds like you did
 9  like a process of elimination and went by the video
10  and who was off camera at the time that you were
11  -- that you believe that you were handcuffed based
12  on the cameras; is that right?
13        A.    It has to be.  They were there and then
14  they were -- then they weren't there.  They didn't
15  run down the hall because the camera would have
16  picked them up in the hall.  They had the view of
17  the camera -- the view of the cameras shows the
18  length view of the hallway, so -- and it has two
19  cameras going and coming.  They're not inside --
20  they're not -- they're not down the hall.  They're
21  not running down the hall.  They have to be on top
22  of me where the camera is completely shielded for
23  that two to three feet section of the four foot
```

**MCCANN & MCCANN REPORTING**

SA-82

MR. DUBLINO   -   MS. MOLISANI   -   6/7/2021
40

1   area.

2        Q.   Regarding Sergeant Cross, you claim he

3   was stomping on your feet and legs; is that

4   correct?

5        A.   Based on the camera.  Based on the

6   camera view, you can see Sergeant Cross rocking.

7   He's not standing there watching, he's actually

8   rocking.  You can see him moving side to side,

9   okay.  Somebody was stepping on my feet.  He was by

10  my feet.  Later he decides to move in on top of me

11  too and then he disappears.  He's six foot six and

12  he completely disappears.  Again, he's not running

13  down the hall, he's not walking down the hall, he's

14  on top of me doing something.  I don't know, I'm

15  facedown.

16       Q.   Okay.  You say in the complaint that

17  after the restraints were applied, you couldn't

18  breath due to pressure on your back.  Do you --

19  restraints, meaning handcuffs, just to be clear

20  about that?

21       A.   I'm sorry?

22       Q.   The restraints, referring to handcuffs;

23  is that correct?

**MCCANN & MCCANN REPORTING**

*MR. DUBLINO  -  MS. MOLISANI  -  6/7/2021*

41

1        A.    They're handcuffs.

2        Q.    I just want to make sure we're clear,

3    restraints, that I knew what you were talking

4    about?

5        A.    Restraints are handcuffs.  That's what

6    they put on my wrists.

7        Q.    All right.

8        A.    Metal handcuffs.

9        Q.    And was it just Justin Biegaj that was

10    putting the pressure on your back?

11        A.    No, Justin Biegaj, he jumped on me with

12    his knee.  With his knees.  He was the one who came

13    down first on my knees.  He ended up -- this is how

14    I know, he's the one that ends up walking down the

15    hallway away from me jumping up and down,

16    supposedly he twisted his knee or banged his knee

17    against the tile when his -- one of his knees hit

18    the tile.  He stated that on his testimony too.

19        Q.    But I want to know who was putting the

20    pressure on your back?

21        A.    Thompson.  Deputy Thompson, Sergeant

22    Dee, Sergeant Robinson, Sergeant -- or Deputy

23    Scarpace, Deputy Wilson.

**MCCANN & MCCANN REPORTING**

SA-84

*MR. DUBLINO    -    MS. MOLISANI    -    6/7/2021*

42

1      **Q.**    And is that -- that's, again, based on

2    the video and seeing them outside of the camera

3    view; is that correct?

4      **A.**    Yeah, if the cameras were positioned

5    better, there would be better transparency.

6    There's no transparency.  The cameras were not in

7    position to pick up all of the activity for

8    whatever reason.  The cameras are there for a

9    reason and they didn't -- they did not pick up the

10   entire action.  It's almost like they -- that's a

11   practice, if all the cameras are all filmed, but

12   you don't -- you always have an area where there's

13   nothing, and if you are facedown, you can't be

14   picked up.  There's no camera.  If that's their

15   procedure, that could be considered deliberate,

16   because if I didn't resist, all they had to do was

17   turn me around put my handcuffs on.

18      **Q.**    How long was there pressure on your

19   back for?

20      **A.**    How long were they on for?

21      **Q.**    How long was the pressure on your back?

22      **A.**    How long what?

23      **Q.**    Was the pressure on your back?

**MCCANN & MCCANN REPORTING**

*MR. DUBLINO    -    MS. MOLISANI    -    6/7/2021*
43

1          A.    How long was the pressure.  I was --

2     they -- I had complete pressure.  I couldn't even

3     breath.

4          Q.    My question was how long?

5          A.    I was gasping for air.  How long?

6          Q.    Yes.

7          A.    Up until I was picked up.  They finally

8     picked me up.  They had pressure on my back the

9     entire time, a minute and 20 seconds.

10         Q.    You then talked in your complaint about

11    an hour later your arms were wrenched?

12         A.    Again, because I was speaking to -- I

13    spoke to Sergeant Robinson many times through my

14    custody there, I could hear him, wrench him, wrench

15    him, which is a wrenching tactic to bend the cuffs

16    and the hands and the arms into the cuffs, by

17    bending the wrists, you're bending them into the

18    cuffs.

19         Q.    And where was it that that happened?

20         A.    It happened throughout -- it happened

21    throughout the corridors all the way over to the

22    infirmary, and then in the infirmary they did it

23    again in front of the nurses.

**MCCANN & MCCANN REPORTING**

SA-86

*MR. DUBLINO   -   MS. MOLISANI   -   6/7/2021*
                                                                    44

```
 1       Q.   And did you sustain any injuries in the
 2  incident on March 9, 2018?
 3       A.   I did have injuries.  I was never -- I
 4  was never examined by the facility.  Everything was
 5  kept in-house.  I had been taken take Erie County
 6  Medical Center before and they would not take me to
 7  the Erie County Medical Center to put a cross
 8  complaint in and to be evaluated on what they just
 9  did.
10       Q.   When you say you were never examined at
11  the facility, what facility are you talking about,
12  ECMC?
13       A.   Erie County -- Erie County Holding
14  Center was -- they had a nurse practitioner there
15  who all she did was take my blood pressure.  And
16  actually, one of the photos shows the blood
17  pressure, what my blood pressure was.  There was --
18  one of the photos actually shows what my blood
19  pressure was.  I can pull it out and tell you what
20  it was after being pressed down on the ground
21  because it's right on the printout.
22       Q.   I am sorry, we skipped over a couple of
23  people.  You have a claim against Mr. -- Deputy
```

**MCCANN & MCCANN REPORTING**

MR. DUBLINO   -   MS. MOLISANI   -   6/7/2021

45

1   Gelster.  Can you describe for me what he did that

2   you're claiming as excessive force?

3        A.    Deputy Gelster was -- in the infirmary,

4   he seemed to be escorting me with Deputy Peter

5   Giardina and they basically were behind me on the

6   photos that were taken of me while they were taking

7   photos of my face and side views, right and left

8   side views, along with my hands, and while they

9   were doing this, they were being instructed by

10  Sergeant Robinson to wrench him, and that's why I

11  reacted in pain again, because they were -- they

12  were bending the wrists into the cuffs, and they

13  did so, and you can see their eyes in the photo,

14  it's very clear that they're looking off while

15  they're -- while this is happening.  And it was

16  coming from -- it was from Sergeant Robinson, who

17  was out of the photo picture, off adjacent to where

18  I was sitting.

19        Q.    After the handcuffs were -- were

20  removed and then put back on in the more

21  uncomfortable position that you described, at any

22  point were they flipped back to the more

23  comfortable way with your palms up?

**MCCANN & MCCANN REPORTING**

*MR. DUBLINO   -   MS. MOLISANI   -   6/7/2021*
46

1      A.   They took them off only to take

2  pictures of my hands and then they put them back on

3  the same way, in the reversed -- in the reversed

4  opposite direction of what your -- what would be

5  normal.  Meaning, reversed that your palms are

6  facing out.  Excuse me, palms are facing in.  Palms

7  are facing in in the unnatural position versus the

8  natural position where your hands are facing out.

9  They cuffed them back with the palms facing in

10  towards your buttocks.

11      Q.   You have described for me that you were

12  not examined at ECMC as you wanted to be and I

13  guess I want to go back to that line of questioning

14  and ask you, irrespective of where you were seen,

15  did you sustain any injuries in this --

16      A.   Yes.

17      Q.   Let me just finish the question.

18      A.   Yes, I did have injuries.  I put in --

19  I put in medical -- I put in medical slips.  They

20  would not take me to Erie County Medical Center.

21  They wanted to keep it in-house.

22      Q.   What I want to know is what your

23  injuries are?

**MCCANN & MCCANN REPORTING**

MR. DUBLINO   -   MS. MOLISANI   -   6/7/2021

47

1      A.    My injuries were to my wrists, to my

2  arms, to my back, to my shoulders.

3      Q.    Can you describe those injuries,

4  please?

5      A.    Well, the wrists were -- were totally

6  -- they were almost in a sprain.  I don't even

7  know, there might have been a small fracture, I

8  have no idea.  No X-rays were ever taken.  But my

9  wrists, I could barely move my wrists when they put

10 me in the holding cell in Gulf East.  And my arms,

11 I couldn't even move my arms.  And my shoulder, I

12 still have pain in my shoulder.  My deltoid muscle

13 still is in pain from that day.  I can't -- I don't

14 have any hardly strength to lift my arm up.  I can

15 barely lift it up without pain in the deltoid.

16      You know, my back, you know, my back was in

17 bad shape.  I had no medical.  They did no medical

18 examination, okay, of me.  So there's no way to

19 know whether or not I was hurt.  They did not do a

20 medical evaluation of me.  They did not take my

21 clothes off and take pictures with me naked.  They

22 didn't do anything.  They put me -- they put me

23 back into a cell and they would not allow me to go

*MR. DUBLINO   -   MS. MOLISANI   -   6/7/2021*

48

1   to the Erie County Medical Center, which is over on

2   Grider Street.

3          They took me over there before when I was

4   attacked by another inmate on October 29th.  So

5   they kept it in-house.  They would not take me out

6   of the facility.  And they did not take X-rays.

7   They did not provide ice for me.  I asked for ice

8   for the swelling.

9          Q.    Where was your swelling?

10         A.    I don't know what else to say.  Huh?

11         Q.    Where was your swelling?

12         A.    Where is my stomach?

13         Q.    Where was the swelling?

14         A.    The swelling.  The swelling was in my

15   wrist.  In my wrist.  In my wrist.  And the pain

16   was in my back and shoulders.

17         Q.    And you have been incarcerated now

18   three different places since the Erie County

19   Holding Center; is that correct?

20         A.    I was incarcerated there 21 months.  Is

21   that your question?

22         Q.    No, my question is, since March 9,

23   2018, you have been incarcerated at three different

**MCCANN & MCCANN REPORTING**

*MR. DUBLINO   -   MS. MOLISANI   -   6/7/2021*

49

1   locations since the holding center, correct?

2         A.   Yes.   And a few days over at Attica.

3         Q.   So at any point since March 9, 2018,

4   have you received medical treatment for your

5   wrists, arms, back or shoulders at any of the

6   facilities that you have been incarcerated at?

7         A.   No, I haven't.   Everything healed the

8   way -- the way it was.   I was at the Erie County

9   Holding Center for two weeks by the way, and they

10  did not take me to the hospital for two weeks,

11  until I was removed.   So the incident happened on

12  the 9th and I stayed in the holding cell until the

13  23rd when I was sentenced and then they drove me

14  out, drove me to Elmira.

15        Q.   I am going to show you -- all right, I

16  am going to show you what we have marked as Exhibit

17  2 --

18        A.   Yeah.

19        Q.   -- with today's date on the top right

20  corner, can you see what I am showing you?

21        A.   It's today's date, 6/7/21.

22        Q.   But can you see what I am showing you?

23        A.   Yes.

**MCCANN & MCCANN REPORTING**

*MR. DUBLINO   -   MS. MOLISANI   -   6/7/2021*

50

1        **Q.**   All right.  And does this first page of

2    Exhibit 2 appear to be a medical note signed by

3    Hend Habir, H-A-B-I-R?

4        **A.**   Yeah.

5        **Q.**   All right.  And it looks like it's an

6    examination that you were seen for complaints of

7    pain in your bilateral hands, right hand middle

8    knuckle slightly swollen with erythema.  Inmate

9    able to make fist, able to move fingers, capillary

10   refill less than two seconds.  Left hand slightly

11   swollen around knuckles with erythema, able to move

12   fingers and close fist.  Capillary refill less than

13   two seconds.  No other injuries noted to hands.  Do

14   you see that?

15       **A.**   Well, I don't see the -- exactly the

16   writing, but you're reading it to me.

17       **Q.**   Okay.  I mean, have you seen a note

18   that sounds like what I just read to you?

19       **A.**   Okay, but the pain in the hands, right

20   hand middle knuckle slightly swollen with -- okay.

21   Able to make a fist.  Able to move fingers.  Less

22   than two seconds.  Left hand slightly swollen,

23   okay.  Able to move fingers.  Close fist.  Other

**MCCANN & MCCANN REPORTING**

SA-93

*MR. DUBLINO  -  MS. MOLISANI  -  6/7/2021*

51

1  injuries noted to hands.  Also mid to lower back.

2  Right side pain.  Say skins -- skin -- okay, no

3  injury noted to entire back/side/ chest.  Clear.

4       Okay.  All right, so you're saying that that

5  was his report.  I am saying that -- I am saying

6  that the report is false.  That's what I'm telling

7  you.

8       **Q.**   Okay.  And just for purposes of the

9  record, this is dated 3/9/18 at 7:52 p.m.; is that

10  something you can see?

11       **A.**   I can see it, yeah.  Yeah.

12       **Q.**   Okay.  And are you saying you weren't

13  examined at that time or the contents are false?

14       **A.**   I am saying -- I am saying that, I am

15  telling you right now, that all they did was they

16  talked to me, they never examined me.  And that's

17  on film, where they had me at the holding cell in

18  Gulf East and that footage should have been saved

19  and it wasn't.

20       **Q.**   Okay, so you're saying that you did

21  meet with somebody, but just the contents of --

22       **A.**   Yeah, I --

23       **Q.**   Mr. Dublino, let me finish.  You need

**MCCANN & MCCANN REPORTING**

MR. DUBLINO   -   MS. MOLISANI   -   6/7/2021

52

 1   to let me finish the question, please.

 2        A.    Okay, go ahead.

 3        Q.    Thank you.  So you're saying, am I

 4   paraphrasing this correctly, that you were seen by

 5   an RN at that point, but the contents of there

 6   being an examination as contained in Exhibit 2 is

 7   not accurate, do I have that right?

 8        A.    Yeah, because I remained handcuffed.

 9   When they walked me to -- there was like a little

10   room in Gulf East where they put everybody in keep

11   lock over at the Erie County Holding Center, they

12   walk you over there handcuffed and you stay

13   handcuffed and I was -- they -- nobody examined me

14   at all.  I stayed handcuffed.  I never -- I never

15   left the call un-handcuffed.

16        Q.    Do you see --

17        A.    They never examined me.

18        Q.    Do you see on Exhibit 2 where it says

19   IM offered no other complaints?

20        A.    Like I said, I -- I put in three

21   medical sick requests and they never examined me

22   and they never gave me X-rays.

23        Q.    My question is, do you see on here

**MCCANN & MCCANN REPORTING**

MR. DUBLINO   -   MS. MOLISANI   -   6/7/2021

53

1   where it says IM offers no other complaints?

2        A.   Inmate offers no other complaints,

3   yeah.

4        Q.   Yes, you see that?

5        A.   I never -- yes, I do.  Yeah.

6        Q.   Did you complain at that time about the

7   injuries you described to me, in the wrists, arms,

8   back, was obviously covered in this, and shoulders?

9        A.   Yes, I did.

10       Q.   Okay.  I will show you page 2 of

11  Exhibit 2, which is a Refusal of Recommended

12  Medical Care dated 3/10/18.  Do you see what I am

13  showing you on my screen?

14       A.   Yeah.  Yeah, I see.  I wrote at the

15  top, and you can see how I couldn't even barely

16  hold a pen, I am not refusing medical care.  I am

17  being denied a visit to the hospital.  Medical

18  exams already were done and I had stated, take me

19  to the hospital.  The medical exams were visual.

20  That's the exam they gave me.  Now they're saying I

21  -- inmate refused to get out of bed for assessment

22  on the housing unit.  The reason being he did not

23  want to get out of bed to be seen.  Yesterday he is

**MCCANN & MCCANN REPORTING**

MR. DUBLINO   -   MS. MOLISANI   -   6/7/2021

54

1   -- he should -- so he wants to go to the hospital.

2   I think it says he should go to the hospital.

3   Sergeant Weber present for assessment of attempt,

4   instead wrote no, refused to sign the refusal form.

5        Q.   All right, so on Exhibit 2, page 2

6   where -- is this your handwriting that says medical

7   exams were already done and I stated take me to the

8   hospital?

9        A.   Yeah.

10       Q.   Is that your handwriting?

11       A.   That's my writing too, yes.

12       Q.   Okay.  So as of March 10th, 2018,

13  medical exams were already done; is that correct?

14       A.   Medical exams were visual.  I am

15  telling you what the exam was, was visual.

16       Q.   I am asking you, as of March 10th,

17  2018, you wrote medical exams already done, were

18  already done; isn't that true?

19       A.   It says medical exams already were done

20  and I stated, take me to the hospital, okay.  I

21  told you what their exam was, is that they took my

22  blood pressure, okay, and they took photos of me.

23  That was their exam.  That's it.

**MCCANN & MCCANN REPORTING**

*MR. DUBLINO   -   MS. MOLISANI   -   6/7/2021*

55

1          Q.    And I'm showing you page 3 of Exhibit 2

2    in which you wanted to go to the hospital, an

3    independent hospital visit.  Do you see that first

4    line here on page 3 of Exhibit 2?

5          A.    Right, that's 3/11, yes.  That's 3/11.

6    I am just making sure I have the right one.  I had

7    to rewrite it.  These sick call requests that were

8    -- were given to me by another inmate.  They had to

9    slide it under the door.  They wouldn't give me a

10   sick request.  This is why I was able to write

11   this.

12         Q.    Okay.

13         A.    They weren't giving me pens.  There's

14   three of them actually.  That's -- that's 3/11 at

15   11:45.

16         Q.    And you were in keep lock at that

17   point?

18         A.    Placed three of them.  I was in keep

19   lock, correct.

20         Q.    And you were in keep lock relative to

21   the incident on March 9, 2018; is that right?

22         A.    I'm sorry.

23         Q.    You were in keep lock relative to the

**MCCANN & MCCANN REPORTING**

MR. DUBLINO   -   MS. MOLISANI   -   6/7/2021

56

```
 1  incident on March 9, 2018; is that right?

 2         A.    That's correct, yes.

 3         Q.    I am going to show you what has been

 4  marked as Exhibit 1 with today's date on the

 5  exhibit sticker, and --

 6         A.    Yes.

 7         Q.    -- that document is entitled Erie

 8  County Sheriff's Office Administrative Segregation

 9  Order Keep Lock Pending Discipline Hearing.  Do you

10  see this?

11         A.    Yes.

12         Q.    And then there's a box checked, you

13  have been classified as a security risk, do you see

14  that?

15         A.    Yeah.  Yes.

16         Q.    And this is signed by Chief Kuppel on

17  March 9, 2018; is that right?

18         A.    That's correct, pending a disciplinary

19  hearing, so while you're on that document, no

20  disciplinary hearing was ever conducted.

21         Q.    Okay.  The second page of Exhibit 1 is

22  a document entitled Erie County Sheriff's Office

23  Jail Management Disciplinary Report, do you see
```

**MCCANN & MCCANN REPORTING**

MR. DUBLINO   -   MS. MOLISANI   -   6/7/2021

57

1   that?

2          A.    Yes.  Yes, I do.

3          Q.    And this report is dated 3/9/18 and it

4   appears that it was -- that the box checked here is

5   Forward to the Disciplinary Committee.  Do you see

6   that?

7          A.    Yes.

8          Q.    Okay.  And you're saying that there was

9   no -- nothing ever came of this disciplinary

10  report?

11         A.    Yeah.  Why don't you slide it up again.

12  Let's zero in and blow it up where it shows you

13  where the inmates are supposed to sign.  Go back to

14  the disciplinary report and blow it up right there,

15  inmate's receipt.

16         Q.    I can see there's no signature there.

17         A.    Yeah, do you see there where it says if

18  you refuse witness statement.

19         Q.    Yep, and you did not sign it; is that

20  right?

21         A.    Right, because it was never presented

22  to me.

23         Q.    Okay.

SA-100

*MR. DUBLINO   -   MS. MOLISANI   -   6/7/2021*
58

1        **A.**    When you refuse something, they usually

2    have a witness saying that you refused.

3        **Q.**    I understand.

4        **A.**    Okay.

5        **Q.**    All right, and you were transferred out

6    of the Erie County Holding Center when?

7        **A.**    I'm sorry?

8        **Q.**    You were transferred out of the Erie

9    County Holding Center when?

10       **A.**    I was transferred out of the Erie

11   County Holding Center on March 23, 2018.

12       **Q.**    Okay.  So approximately two weeks

13   later, after this incident?

14       **A.**    Two weeks later exactly, yep.

15       **Q.**    So we know from the sick call requests

16   that even in keep lock you had a pen; is that

17   correct?

18       **A.**    They would not give me a pen or the

19   medical slips.  As I said, in Gulf East they have

20   cameras and the cells are, I was in a corner cell

21   and the inmate that was over at this corner cell

22   (indicating) asked for sick call slips, sick call

23   requests, and he slid them over to me and slid his

**MCCANN & MCCANN REPORTING**

SA-101

*MR. DUBLINO   -   MS. MOLISANI   -   6/7/2021*

59

1   pen over to my cell, sliding it over.  That's the

2   only reason why I was able get a pen, otherwise

3   would have never had sick call requests made.

4       Now they told me after, I wanted to fill out

5   additional slips and grievances and they would not

6   allow him to give me any more pens.  They said do

7   not slide him any more pens.  They didn't even give

8   me a grievance form.

9       **Q.**   Did you file a grievance against any of

10  the deputies involved in this incident?

11      **A.**   They never would give me a grievance

12  form.

13      **Q.**   When did you ask for a grievance form?

14      **A.**   Immediately.

15      **Q.**   On March 9, 2018 or some point after

16  that?

17      **A.**   The 9th, when I first -- when they

18  first threw me into keep lock I was asking the

19  officers that were working the floor to get me a

20  grievance and they didn't.

21      **Q.**   You were aware of the grievance

22  procedure; is that correct?

23      **A.**   I'm sorry?

**MCCANN & MCCANN REPORTING**

MR. DUBLINO   -   MS. MOLISANI   -   6/7/2021

60

1        Q.   You were aware of the grievance

2    procedure; is that correct?

3        A.   Oh, yes.  Yes.  Yes.

4        Q.   At any point after March 9, 2018, but

5    before you were transferred, in those two weeks you

6    were still at the holding center, did you file any

7    grievances for any issues?

8        A.   As I said, they would not give me a

9    pen.  I had to borrow the pen.  They would not give

10   me a grievance form.  I had no paperwork.  They

11   didn't even give me my legal material for about

12   almost a week.  They -- they gave me nothing.  I

13   had nothing.  Nothing.

14       Q.   My question is, did you --

15       A.   Like I said --

16       Q.   My question is, the two weeks after

17   this incident, but before you were transferred, did

18   you file a grievance for any issue at the holding

19   center?

20       A.   They wouldn't -- I was not -- they did

21   not give me the paperwork to provide for

22   grievances.

23       Q.   So your answer is no?

**MCCANN & MCCANN REPORTING**

SA-103

61

1        **A.**    That's correct, no, I did not.  They

2    didn't provide it for you.  When you're in keep

3    lock, you don't have free movement.  You have to be

4    provided the form and that's under camera too.

5    That's all surveillance footage.

6        MS. MOLISANI:  All right, I am all set.

7    Thank you for your time.

8        THE WITNESS:  All right.

9        MR. MODICA:  Thank you, Erin.

10       MS. MOLISANI:  Thank you.

11

12   (Whereupon, the deposition concluded at 11:22 a.m.)

13              *         *         *

14

15

16

17

18

19

20

21

22

23

62

```
 1   STATE OF NEW YORK)

 2                      )  ss.

 3   COUNTY OF ERIE   )

 4

 5
         I, Denise C. Burger, Notary Public, in and
 6   for the County of Erie, State of New York, do
     hereby certify:
 7

 8       That the witness whose testimony appears
     hereinbefore was, before the commencement of their
 9   testimony, duly sworn to testify the truth, the
     whole truth and nothing but the truth; that said
10   testimony was taken pursuant to notice at the time
     and place as herein set forth; that said testimony
11   was taken down by me and thereafter transcribed
     into typewriting, and I hereby certify the
12   foregoing testimony is a full, true and correct
     transcription of my shorthand notes so taken.
13

14       I further certify that I am neither counsel
     for nor related to any party to said action, nor in
15   any way interested in the outcome thereof.

16

17       IN WITNESS WHEREOF, I have hereunto
     subscribed my name and affixed my seal this _____
18   day of _____, 2021.

19

     ----------------------------
20   Denise C. Burger,
     Notary Public,
21   State of New York, County of Erie
     My commission expires 7/25/23
22

23
```

SA-105

# EXHIBIT B

SA-106



VIDEO FOOTAGE


PHYSICAL COPY OF CD TO BE SUBMITTED TO THE COURT WITH
COPY TO PLAINTIFF'S COUNSEL

SA-107

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

MARK T. DUBLINO,

              *Plaintiff,*

    v.

SGT. JUSTIN BIEGAJ, SGT. ROBERT DEE,
DEPUTY BRIAN THOMPSON,
DEPUTY FRANK GELSTER,
SGT. MR. CROSS, SGT. MR. ROBINSON,
DEPUTY MR. P. GIARDINA, and
DEPUTY SHAWN WILSON,

              *Defendants.*

**AFFIDAVIT**

Case No.: 19-CV-6269

STATE OF NEW YORK    )
COUNTY OF ERIE      )
CITY OF BUFFALO     )

      BRIAN THOMPSON, being first duly sworn, deposes, and says under the pains and penalties of perjury:

      1.    I offer this Affidavit for the purposes of authenticating the file marked "HC-18-124" on Exhibit B.

      2.    I was involved in and witnessed the events outside of attorney conference room number 3 at the Erie County Holding Center on March 9, 2018 at approximately 10:20 a.m.

      3.    I have reviewed the video marked as HC-18-124 and contained on Exhibit B.

      4.    HC-18-124 on Exhibit B shows the views of security cameras in and around attorney conference room number 3 at the Erie County Holding Center on March 9, 2018 at approximately 10:20 a.m.

      5.    The file marked HC-18-124 on Exhibit B is a fair and accurate depiction of the events I witnessed from the vantage point of the cameras.

Dated:      October 8, 2021
            Buffalo, New York

                                  / Brian Thompson
                                  Brian Thompson

Sworn before me this 8
day of October 2021

Notary Public

CARA NADROWSKI
COMMISSIONER OF DEEDS
In and For the City of Buffalo, Erie County, NY
My Commission Expires Dec. 31, 20__

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

MARK T. DUBLINO,

           *Plaintiff,*

    v.

SGT. JUSTIN BIEGAJ, SGT. ROBERT DEE,
DEPUTY BRIAN THOMPSON,
DEPUTY FRANK GELSTER,
SGT. MR. CROSS, SGT. MR. ROBINSON,
DEPUTY MR. P. GIARDINA, and
DEPUTY SHAWN WILSON,

           *Defendants.*

**AFFIDAVIT**

Case No.: 19-CV-6269

STATE OF NEW YORK    )
COUNTY OF ERIE    )
CITY OF BUFFALO    )

    ROBERT DEE, being first duly sworn, deposes, and says under the pains and penalties of perjury:

    1.    I offer this Affidavit for the purposes of authenticating the file marked "HC-18-124" on Exhibit B.

    2.    I was involved in and witnessed the events outside of attorney conference room number 3 at the Erie County Holding Center on March 9, 2018 at approximately 10:20 a.m.

    3.    I have reviewed the video marked as HC-18-124 and contained on Exhibit B.

    4.    HC-18-124 on Exhibit B shows the views of security cameras in and around attorney conference room number 3 at the Erie County Holding Center on March 9, 2018 at approximately 10:20 a.m.

    5.    The file marked HC-18-124 on Exhibit B is a fair and accurate depiction of the events I witnessed from the vantage point of the cameras.

Dated:    October 07, 2021
        Buffalo, New York

                        Robert Dee

Sworn before me this 7TH
day of October, 2021

Notary Public

**PAUL ROTT**
**COMMISSIONER OF DEEDS**
**In and For the City of Buffalo, Erie County, NY**
**My Commission Expires Dec. 31, 20__**

SA-109

# EXHIBIT C

SA-110

1

2    UNITED STATES DISTRICT COURT        ORIGINAL

3    WESTERN DISTRICT OF NEW YORK

4    - - - - - - - - - - - - - - - - - - - - - - - x

     MARK T. DUBLINO

5         Plaintiff

          -vs-

6    SGT. JUSTIN BIEGAJ, SGT. ROBERT DEE,

     DEPUTY BRIAN THOMPSON, DEPUTY FRANK

7    GELSTER, SGT. MR. CROSS, SGT. MR. ROBINSON,

     DEPUTY MR. P. GIARDINA, DEPUTY SHAWN WILSON

8         Defendants

     - - - - - - - - - - - - - - - - - - - - - - - x

9         Civil Action No. 6:19-cv-6269-DGL

10

11

12

13        Deposition of Brian Thompson taken pursuant to

14   notice via videoconference on Wednesday, June 9, 2021

15   commencing at 10:08 a.m.

16

17

18

19

20

21   Reported by:

22   COMPUTER REPORTING SERVICE

23   Shari L. Vitalone

24   16 East Main Street, Suite 7

25   Rochester, New York  14614       (585) 325-3170

2

2   APPEARANCES:

3       MODICA LAW FIRM

4       By:  STEVEN V. MODICA, Esq.

5       2430 Ridgeway Avenue

6       Rochester, New York  14626

7       Attorneys for plaintiff

8

9       ERIE COUNTY DEPARTMENT OF LAW

10      By:  ERIN MOLISANI, Esq.

11      95 Franklin Street, Suite 1634

12      Buffalo, New York  14202

13      Attorneys for defendants.

14

15

16

17

18

19

20

21

22

23

24

25

SA-112

3

2                            INDEX

3    Brian Thompson

4        Examination by Mr. Modica               4 - 33

5

6

7    Reporter Certificate                          34

8    Witness Certificate                           35

9    Errata Sheet                                  36

10

11    (No exhibits marked.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SA-113

4

```
 1          B. Thompson - Examination by Mr. Modica
 2                    BRIAN THOMPSON
 3       called herein as a witness, being duly sworn,
 4                 testified as follows:
 5   EXAMINATION BY MR. MODICA:
 6       Q.    Good morning.  As I indicated earlier, my
 7   name is Steve Modica.  I am the pro bono counsel for
 8   Mark Thomas Dublino who has brought an action against
 9   you and several of your colleagues at the Erie County
10   Holding Center.
11       I'm going to ask you a series of questions.  I'm
12   going to ask that you answer them to the best of your
13   ability.
14       If you don't understand the questions it's
15   perfectly okay to ask me to rephrase them.  I'd be
16   happy to do that.
17       This meeting is a little difficult.  It's very
18   important we speak one at a time.  So I'm going to be
19   careful about waiting until you're done before I ask
20   the next question and I will ask you to do the same
21   thing.
22       Okay?
23       A.    Sounds good.
24       Q.    Is it correct you are currently employed at
25   the Erie County Holding Center in the jail management
```

COMPUTER REPORTING SERVICE
(585) 325-3170

SA-114

5

1          B. Thompson - Examination by Mr. Modica

2     division?

3     A.     Correct.

4     Q.     How long have you worked for them?

5     A.     I'm starting my fourteenth year right now.

6     This past May I'm going into my fourteenth year.

7     Q.     And during 2018 were you working for them?

8     A.     Yes.

9     Q.     And where were you performing your work in

10    2018 for them?

11    A.     Within the jail management division within

12    the holding center.

13    Q.     Where is the Erie County Holding Center

14    located?

15    A.     40 Delaware, Buffalo, New York, 14202.

16    Q.     Were you working at the Erie County Holding

17    Center on the morning of March 9 of 2018?

18    A.     Yes.

19    Q.     What was your job assignment that day?

20    A.     K-9.

21    Q.     And would you describe generally what your

22    responsibilities were performing K-9 work at the

23    holding center?

24    A.     On a daily basis my job is to search the

25    incoming visitors for the presence of narcotic odor

COMPUTER REPORTING SERVICE
(585) 325-3170

SA-115

6

1          B. Thompson - Examination by Mr. Modica

2   with the dog prior to them entering the main visit room

3   for a contact visit.

4       Q.    What was your shift that day if you remember,

5   again, March 9th, 2018?

6       A.    Day shift, seven to three.

7       Q.    Seven a.m. to three p.m., correct?

8       A.    Correct, yes.  I'm sorry.

9       Q.    That's okay.  Were you handling a particular

10  K-9 on that day, again, March 9th, 2018?

11      A.    I was.  Bili.

12      Q.    Is Bili a male or female?

13      A.    He's a male German shorthaired pointer.

14      Q.    And if you recall about how long before

15  March 9th of 2018 had you been handling Bili?

16      A.    Six, seven years.

17      Q.    Tell me if you could if you recall Bili's

18  demeanor as of March 9th of 2018.  What kind of dog was

19  he at that point if you remember?

20      A.    Very calm, great demeanor, very -- not a

21  single thing bothers him.

22      He's just a very calm, cool, collected dog.  He

23  doesn't have a care in the world.

24      Q.    Okay.  Do you recall whether you interacted

25  with Mark Dublino at any point before March 9th of

COMPUTER REPORTING SERVICE
(585) 325-3170

SA-116

7

1      B. Thompson - Examination by Mr. Modica

2   2018?

3      A.    Not really, no.  I might have seen him in the

4   visit room prior a few times, but nothing that I could

5   say, yes, I had conversations with him or anything.

6      I've seen him in the visit room before prior.

7      Q.    Okay.  And certainly you interacted with him

8   on March 9th of 2018; is that correct?

9      A.    Correct.

10     Q.    And there's a video at least of part of your

11  interaction with Mr. Dublino on that day that I want to

12  show you, give you an opportunity to take a look at it.

13  I don't know if you've seen it.

14     Let me share my screen, and if you have any

15  difficulty seeing this -- do you mind if I call you

16  Deputy Thompson; is that okay?

17     A.    Yeah, that's fine.

18     Q.    Okay.  So I'm going to -- can you see the

19  screen I've tried to share here?

20     A.    I did for a second, but now it looks like --

21     Q.    You know what?  I moved it.  That's my bad.

22     How's that?

23     A.    Got it.

24     Q.    Terrific.  All right.  So I'll represent to

25  you that this is a video that was produced by the

SA-117

8

1          B. Thompson - Examination by Mr. Modica

2    County about this incident.

3      First let me start with, have you ever seen this

4    video before today?

5      A.    I did, yes.

6      Q.    Okay.  And I'm not going to go through it in

7    a lot of detail now, but if at any point during your

8    testimony you want to refer to it it's perfectly okay.

9      Just let me know.  I'll bring it up and we can play

10   it.

11     A.    Okay.

12     Q.    If you look at the screen it looks like

13   there's four boxes of videos so to speak.  The upper

14   left says alpha hallway.

15     Can you tell me what that is?

16     A.    The alpha hallway is the hallway that leads

17   from central control into that hallway.

18     On the left hand side of that screen there's the

19   elevators that take you to the different levels of the

20   jail.

21     Q.    Terrific.  Okay.  And below that you see the

22   screen that seems to be designated Attorney Visit Sally

23   Port.  Do you see that?

24     A.    I do.

25     Q.    Can you tell me what that depicts?

9

1    B. Thompson - Examination by Mr. Modica

2    A.    So when an inmate has a visit with their

3    counsel, with their attorney, they're going to come in

4    through that hallway, come in through that door.

5    That sally port leads to the second door that you

6    can kind of see to the bottom right.  That leads you to

7    the inmate side of the attorney room -- I'm sorry.

8    That would be the deputy side of the attorney room --

9    or I'm sorry.  That's the inmate side.

10    That is the inmate side.  I'm looking at it

11    backwards.  That's the inmate side where they would go

12    in and come out.

13    Q.    And then if you look at the top right part of

14    the screen there's a box entitled Attorney Visit A.

15    What does that show?

16    A.    So attorney room A, what you're looking at -

17    that door - if you refer back to the attorney visit

18    sally port, that door on the bottom right, that's the

19    same door.

20    So the inmate would come in through that door and

21    going back to attorney visit A, the rooms on the right

22    hand side, those are all attorney rooms that the

23    inmates would come in to see their attorney.

24    Q.    And, again, what we're looking at in this

25    corner attorney visit A is the inmate side not the

SA-119

10

1          B. Thompson - Examination by Mr. Modica

2    attorney side, correct?

3        A.    True.  That would be where the inmates come

4    in and out of the alpha hallway.

5        Q.    I note at this moment the attorney visit A

6    screen has nothing displayed, but when I move that up a

7    little bit, if you could generally tell me what that

8    shows.

9        Well, just wait until something comes up on the

10   screen there.  I'm sorry.

11       A.    No problem.

12       Q.    So I paused it.  So, again, the top right

13   attorney visit A you described that and what does the

14   bottom right attorney visit B show?

15       A.    That's the same hallway.  That's just a

16   camera further down the hallway it looks like, but that

17   would be the same hallway.

18       Visit room A would be I guess closer towards that

19   door.  Visit room B would be closer towards the back --

20   the back side.

21       It's the same camera just a different angle.

22       Q.    Same hallway, same inmate side of that room,

23   but just different views?

24       A.    Correct, yeah.

25       Q.    All right.  So I'm going to start from the

SA-120

11

1          B. Thompson - Examination by Mr. Modica

2     beginning and just show it to you.

3        I won't comment on it, but again, if at any point

4     you want to refer to this video please feel free to do

5     that.  It's about three minutes long.

6        So I'm going to just shut up and play it.

7     (Deposition Exhibit A played.)

8        Q.    Okay.  So I'll note for the record that the

9     video stopped.

10       At this point, Deputy Thompson, were you able to

11    see the video?

12       A.    I was, yes.

13       Q.    Perfect.  Okay.  Is that video best as you

14    know complete as far as you know?

15       A.    As far as I know, yes.

16       Q.    And I recognize that you had left the scene

17    as depicted in the video for a period of time, but at

18    least as far as you can recall it's pretty complete?

19       A.    Yes.

20       Q.    Did you also prepare a memorandum about this

21    incident?

22       A.    Yeah.  I did, yes.  A pink sheet, yes.

23       Q.    Sure.  All right.  I want to show you what

24    has been marked as Deposition Exhibit B, and do you

25    recognize this document?

COMPUTER REPORTING SERVICE
(585) 325-3170

**SA-121**

12

1        B. Thompson - Examination by Mr. Modica

2     A.     All I have is like an email in front of me.

3     Q.     I'm sorry.  There we go.

4     A.     Yup, I got it.

5     Q.     I apologize.  I will get this right at some

6  point.

7        Do you recognize Deposition Exhibit B?

8     A.     I do.

9     Q.     Did you prepare that document?

10     A.     I did.

11     Q.     And is that document complete the best that

12  you know?

13     A.     Yes.

14     Q.     And why did you prepare the document?

15     A.     I was the first one to respond to it.  So I

16  knew I was going to have to have some kind of

17  documentation.  So I prepared -- of what I witnessed

18  and so I wrote that up.

19     Q.     Okay.  And when did you prepare it if you

20  recall?

21     A.     I don't recall.  Fairly soon after this had

22  happened.  It wasn't very long after this had happened.

23     I had put the dog downstairs and got started on

24  this basically.

25     Q.     And it's dated March 9th of 2018.  Would that

13

```
 1          B. Thompson - Examination by Mr. Modica
 2    indicate to you that you actually prepared it on that
 3    date?
 4        A.    It was, correct.
 5        Q.    And, again, if at any point you want to refer
 6    to this document I'll make it available to you.
 7        A.    Okay.  Thank you.
 8        Q.    Did you also prepare a Use of Force report
 9    about this incident?
10        A.    I did, yes.
11        Q.    Okay.  I want to show you what has been
12    marked as Deposition Exhibit C.  Do you recognize that
13    document?
14        A.    I do.
15        Q.    What is it?
16        A.    That is my Use of Force pertaining to myself
17    personally.
18        Q.    And if you recall about when did you prepare
19    this?
20        A.    That would have been done after I did my pink
21    sheet or my memorandum.
22        Q.    So generally the memo was done first and the
23    Use of Force report was done second?
24        A.    I believe so.  Yes, I believe so.
25        Q.    Why did you prepare that Use of Force report?
```

SA-123

14

1       B. Thompson - Examination by Mr. Modica

2       A.      Because I had to physically grab Mr. Dublino

3   out of the room.  So I just assumed a Use of Force was

4   going to have to be done.

5       Q.      Tell me about that.  Is it your understanding

6   if a deputy has any physical contact with an inmate

7   that that's something they need to report in some

8   fashion?

9       A.      That I don't know.  I don't -- I just knew

10  that this particular incident I was going to have to --

11  I was going to have to fill one out.  So --

12      Q.      All right.  What is a 10-99 called?

13      A.      It's an officer needs assistance.

14      Q.      To your knowledge what are the

15  responsibilities of deputies, for example, if they get

16  a 10-99 call?

17      A.      To respond to that location who is available.

18      Q.      And I think you said 10-99 is an officer is

19  in distress; is that correct?

20      A.      Correct.

21      Q.      Is there a code for an altercation between a

22  person in custody and their lawyer, for example?

23      A.      Not that I know of, no.

24      Q.      How were you informed of the 10-99 call on

25  March 9th, 2018?

COMPUTER REPORTING SERVICE
(585) 325-3170

SA-124

15

1       B. Thompson - Examination by Mr. Modica

2       A.    If I remember correctly, it was broadcast

3   over the PA system and it was also broadcast via a

4   radio.

5       Q.    And "a radio" meaning a radio that was on

6   your body?

7       A.    Yeah, a radio that we carry.  I'm sorry.

8       Q.    And the PA system is available in a broader

9   sense in the building itself?

10      A.    Through every speaker in the building.  It's

11  what they call an all call.

12      Q.    Where were you when you got the call on the

13  morning of March 9th?

14      A.    I had literally just taken Bili outside to

15  give him a break, take him outside.

16      I was approaching the central sally port door when

17  it was called on the radio.  So from the central sally

18  port door to the visit room was not very far.

19      So I responded because I was right there.

20      Q.    And Bili you said was with you when you got

21  the 10-99 call on March 9th, correct?

22      A.    Correct.

23      Q.    And where did that call direct you to go?

24      A.    To attorney room B.

25      Q.    And what action if any did you take after you

COMPUTER REPORTING SERVICE
(585) 325-3170

16

B. Thompson - Examination by Mr. Modica

2  got the call?

3      A.    I just immediately ran down the alpha hallway

4  and went to that door and walked through the doors.

5      Q.    And I think if I recall at least the video

6  depicted shows you kind of running down the hallway

7  with Bili approaching the sally port door; is that

8  accurate?

9      A.    Correct.

10     Q.    And then after you got through the sally port

11  door toward the attorney conference room area you were

12  on the inmate side, correct?

13     A.    Correct.  Where the inmates would come

14  through, yes.

15     Q.    And it looks to me from the video that you

16  were the first person to arrive at the attorney

17  conference room.

18     A.    Correct.

19     Q.    And what did you see when you got there?

20     A.    When I approached attorney room 3

21  Mr. Terranova had made a statement, "I was just

22  assaulted by inmate Dublino.  I want to press charges."

23     His face was visibly swelled.  It almost looked

24  like he'd been pepper sprayed.  That's the only way I

25  could describe it.

SA-126

17

1          B. Thompson - Examination by Mr. Modica

2      His eyes were already welling up and his face was

3  swollen.

4      Q.    So that's what you at least heard from

5  Mr. Terranova and what you saw of him.

6      Did you hear or see anything of Mr. Dublino at that

7  point when you first arrived?

8      A.    No.

9      Q.    And do you recall whether you said anything

10  when you first arrived?

11      A.    I don't know.  I don't recall.

12      Q.    I'll represent to you that there's at least

13  some statement by a witness that alleges that you said,

14  "What the fuck are you doing" and that you yelled

15  repeatedly to Dublino, "Get on the fucking ground.  Get

16  on your stomach."

17      First, I apologize for the language, but I want to

18  ask you, do you recall making any statements of that

19  nature?

20      A.    When I grabbed him out of the room I told him

21  to get on his knees first which he complied and then to

22  get on his stomach.

23      I don't recall saying anything prior to him, no.

24      Q.    Let's just talk about your physical contact

25  with him which you identify in your report.

COMPUTER REPORTING SERVICE
(585) 325-3170

SA-127

18

1          B. Thompson - Examination by Mr. Modica

2      If I understand it, initially once you arrived you

3  took your right hand and you grabbed Mr. Dublino by his

4  shirt and pulled him out of the room.

5      Is that accurate?

6      A.    Correct.

7      Q.    And tell me about your left hand.  What was

8  going on with your left hand at that point?

9      A.    I had my dog Bili's leash in my left hand.

10      Q.    And I believe your testimony was you ordered

11  him to sit down.  Did he comply with that --

12      A.    He did.

13      Q.    -- order?

14      A.    He did.

15      Q.    And then I believe you said you ordered him

16  to lay face down; is that correct?

17      A.    Correct.

18      Q.    Did he comply with that order?

19      A.    He did.

20      Q.    And then if I understood correctly, you used

21  your right hand to apply pressure until the response

22  team arrived; is that correct?

23      A.    Correct.

24      Q.    And tell me where did you place your right

25  hand on Mr. Dublino's body?

**COMPUTER REPORTING SERVICE**
**(585) 325-3170**

SA-128

19

1          B. Thompson - Examination by Mr. Modica

2     A.     I want to say the middle of his back.  I

3   don't recall, but I want to say the middle of his back.

4     Q.     While you're having this physical contact

5   with Mr. Dublino does he say anything to you?

6     A.     I don't recall.  I don't believe so.

7     Q.     And when he was laying face down and you had

8   your hands on his back did he resist at all?

9     A.     Not with me, no.

10    Q.     Did Mr. Dublino at any point while you had

11  physical contact with him complain that he was unable

12  to breathe?

13    A.     No.

14    Q.     Now, at some point Mr. Dublino was put in

15  handcuffs.  Were you present when that happened?

16    A.     I was not, no.

17    Q.     I accept that testimony.  I have some general

18  questions about when people are handcuffed that if you

19  can answer, great.  If you can't, that's fine.

20    Is there a way - a specific way - that people are

21  supposed to be handcuffed?

22    A.     I mean, I guess in a perfect world you would

23  want the key holes facing out, but -- I mean, I guess

24  there's probably no exact way or perfect way to

25  handcuff somebody.

SA-129

20

B. Thompson - Examination by Mr. Modica

1  
2      I personally myself don't carry handcuffs on me so  
3  I don't know who handcuffed inmate Dublino.  How it was  
4  done, you know, that I don't know.  
5      But I guess to answer your question there's  
6  probably no perfect way of doing it.  
7      Q.     When you say, "keyholes out" -- first of all,  
8  is someone typically handcuffed with their hands in  
9  front of them or behind them?  
10     A.     Typically here we try to cuff everybody from  
11 behind.  
12     There are -- inmates that go to court, for  
13 instance, are cuffed in the front.  That's just -- I  
14 don't know if every place is different, but the  
15 keyholes I'm talking about, when you have your cuff  
16 key, the key holes facing out so you're not having to  
17 dig around to try to find the keyhole to uncuff  
18 someone.  
19     Q.     So would that typically mean -- a person  
20 being handcuffed behind their back, would their palms  
21 be facing away from the center of their body or towards  
22 the center of their body?  
23     I apologize if I'm not explaining that very well.  
24 Do you understand what I'm saying?  
25     A.     Yeah.  So it would be away from them.

COMPUTER REPORTING SERVICE
(585) 325-3170

SA-130

21

1       B. Thompson - Examination by Mr. Modica

2       Q.     Okay.  Ordinarily they would be cuffed with

3   their hands behind their back, but their palms would be

4   facing away from the center of their body?

5       A.     Correct.

6       Q.     And I think if I understood you correctly the

7   handcuffs -- the keyhole so that you can release them

8   ultimately from those handcuffs would be on the outside

9   for easier access?

10      A.     Correct.

11      Q.     All right.  Thank you.  Can you explain to

12  me, Deputy Thompson, why did you use force on Mr.

13  Dublino on March 9th, 2018?

14      A.     When I approached the door, Mr. Terranova's

15  face was visibly swollen.  So it was my recollection

16  that an assault had taken place and I was further

17  trying to prevent something else from possibly

18  happening.

19      Q.     And that was initially in grabbing him,

20  ultimately in holding him down.  What was the purpose

21  of the force you used in holding him down until

22  the response team arrived?

23      A.     Just simply that because I knew a response

24  team was coming.

25      At the end of the day I have one hand tied up with

22

B. Thompson - Examination by Mr. Modica

the dog.  So if something happens and he gets up and

comes after me, I literally have one hand to defend

myself.

Q.    And is Bili trained to protect you?

So let's say, for example, the interaction with

Mr. Dublino did not go the way it did and let's say he

started to strike you.

Is Bili trained to attack someone who is attacking

you?

A.    No, no.

He's retired now.  He was a single purpose

narcotics detection dog.  His only job was to sniff

narcotics.

He was not done on handler protection.  He wasn't

done on tracking.  He had one job and that was to sniff

out narcotics.

Q.    Now, some of Bili's interaction or presence

is depicted in the video, but some is not so I'll ask

you some questions about that.

It looked to me like you continued to hold Bili in

your left hand throughout this whole interaction with

Mr. Dublino; is that correct?

A.    Correct.

Q.    How did Bili react while you were having this

23

B. Thompson - Examination by Mr. Modica

1

2    interaction with Dublino -- or did he react I guess is

3    the question.

4        A.    He really didn't react.  When I pulled inmate

5    Dublino out of the room the dog was standing there.

6        He didn't do anything.  He didn't bark.  He didn't

7    do anything.

8        Q.    At any point in your presence did Bili bite

9    Mr. Dublino?

10       A.    No.

11       Q.    At any point in your presence did Bili

12   scratch Mr. Dublino?

13       A.    No.

14       Q.    At any point did you see Bili have any

15   physical contact with Mr. Dublino?

16       A.    No.

17       Q.    At any point during your interaction with Mr.

18   Dublino that morning did you lose control of your

19   leash?

20       A.    Never, no.

21       Q.    Now, from the time you arrived at the

22   attorney conference room until Dublino was removed by

23   the response team, did you hear Mr. Terranova say

24   anything other than what you told us earlier?

25       A.    I did not, no.

SA-133

24

1        B. Thompson - Examination by Mr. Modica

2    Q.    There was some report he said -- told

3  someone - Mr. Terranova that is - "Kick his ass."

4    A.    I don't recall that, no.

5    Q.    There was a period of time when you had Mr.

6  Dublino down.  You had your hands on his back before

7  the response team came.

8    Did you give any thought to radioing people and

9  saying, "You know, I've got this under control.  Things

10 are good" or what were your thoughts at that point if

11 anything?

12   A.    No.

13   Our policy - I don't know if it's per a state

14 policy - when a 10-99 is called a sergeant is asked to

15 radio central control that either, one, it's a false

16 alarm, or two, you know, clear movement or -- I don't

17 have the authorization to say, "Hey, I'm all set, I

18 don't need help."

19   That's for a sergeant or higher.

20   Q.    I'm somewhat familiar with the levels of

21 authority, but it's fair to say that sergeants at least

22 hold a higher rank than you do as a deputy; is that

23 fair?

24   A.    Correct, yeah.

25   Q.    The response team then removed inmate Dublino

COMPUTER REPORTING SERVICE
(585) 325-3170

25

        B. Thompson - Examination by Mr. Modica

1   from the attorney conference room area.  Where did they
2   take him if you know?
3       A.    I don't know.  I would assume medical, but I
4   don't know.
5       Q.    And what did you do after the response team
6   arrived?
7       A.    After the response team arrived, if you can
8   remember the video, I backed out of it within twenty,
9   twenty-five seconds, thirty seconds.
10      There was more than enough people there.  I just
11  backed out and that was it.
12      Q.    And if you recall, where did you go after you
13  backed out?
14      It does show you walking back out the alpha
15  hallway, but it doesn't show where you went from there.
16      A.    I walked out the alpha hallway, walked into
17  central control and came back out into the alpha
18  hallway in case there was something they needed from
19  me, and I was intercepted by another deputy as you can
20  see on the video and I put Bili downstairs and started
21  my paperwork and that's it.
22      Q.    I want to ask you about some of the members
23  of the response team and whether you saw any of their
24  actions during it and a lot of this is based on

SA-135

26

1          B. Thompson - Examination by Mr. Modica

2    allegations that my client has made.  So if you know

3    about them, great.  If you don't know about them,

4    great.

5       I think it might be helpful to bring the video up

6    so you can identify if you're able to who those

7    deputies are.  So I'm going to bring the video up.

8       All right.  Are you able to see the screen again?

9       A.    I am, yes.

10      Q.    All right.  So first let me ask you about

11   Sergeant Justin Biegaj and I may be mispronouncing his

12   name.

13      A.    Biegaj, yes.

14      Q.    First of all, is he depicted in any way on

15   the video?

16      A.    Right now, no.

17   Are you playing it?

18      Q.    I'm not playing it now, but generally in your

19   recollection from watching the video is he depicted in

20   it?

21      A.    I believe so, yes.

22      Q.    All right.  So I'm going to play the video

23   and if you could tell me when he first comes into the

24   screen that would be helpful to me.

25      I'll start it now.

COMPUTER REPORTING SERVICE
(585) 325-3170

SA-136

27

```
 1          B. Thompson - Examination by Mr. Modica

 2     (Deposition Exhibit A played.)

 3       A.     Stop it right there.  That's Sergeant Biegaj

 4     right there.  If you back it up the first one through

 5     the door would be Sergeant Biegaj.

 6       Q.     So the first one through the door?

 7       A.     Right there.

 8       Q.     The gentleman I'm circling right here; is

 9     that correct?

10       A.     Correct.

11       Q.     Okay.  Thanks.  And, again, if you want me to

12     show you more of the video I'd be happy to.  I just

13     want to know who he is.

14          Mr. Dublino alleged that Sergeant Biegaj stomped

15     and stepped on him while he was on the ground targeting

16     his head and back.

17          First of all, did you observe Sergeant Biegaj's

18     conduct when the response team arrived?

19       A.     I did not, no.

20       Q.     All right.  And Mr. Dublino also alleges that

21     Sergeant Biegaj put his knee on Mr. Dublino's back.  Is

22     that something you saw in any way, shape or form?

23       A.     I did not, no.

24       Q.     And the video - and I'll run it through  - it

25     doesn't obviously depict all the behavior, all of the
```

COMPUTER REPORTING SERVICE
(585) 325-3170

SA-137

28

```
 1          B. Thompson - Examination by Mr. Modica
 2    actions in that hallway at the time; is that fair?
 3        A.    I mean, the video showed what happened.  I
 4    don't control the video so I don't know what more can
 5    be shown I guess.
 6        Q.    I guess what I'm asking you -- let me run it
 7    up and I can give you a better example.
 8    (Deposition Exhibit A played.)
 9        Q.    Let me pause for a second.  Is this Sergeant
10    Biegaj right here?
11        A.    No.  That's Sergeant McLoud.  I don't know
12    where -- I don't know if you -- attorney room visit B
13    you see me on the right hand side?
14        Q.    This is you right here, correct?
15        A.    Only because I'm bald and I know that.
16    Across from me that looks like Sergeant Biegaj right
17    there.
18        Q.    Right there?
19        A.    I believe so.
20        If you let it play I could probably see the face,
21    but it kind of looks like Sergeant Biegaj right there.
22        Q.    Right now we're at the video of 10:23 a.m.
23    and 2.877 seconds.
24        Is it fair to say that -- well, let me ask you
25    this:  Based on you looking at this still at the
```

SA-138

29

```
 1        B. Thompson - Examination by Mr. Modica
 2   moment, where is Mr. Dublino?
 3        A.    He would be probably just below me or
 4   somewhere in that area I would guess.
 5        Q.    And the video unfortunately just does not
 6   show him, correct?
 7        A.    Correct.
 8        Q.    And I think that was my point earlier that
 9   the video, although helpful, doesn't show every angle
10   or exactly where Mr. Dublino was and everyone else in
11   that interaction.  Fair?
12        A.    Yeah.  I see what you're talking about now.
13   Yeah.
14        Q.    Let me ask you about Sergeant Robert Dee and
15   Deputy Shawn Wilson in what I've stopped right now.
16   Can you see their faces?
17        A.    I cannot see their faces, no.
18        Q.    Why don't I run --
19        A.    The alpha hallway video, that first video if
20   I remember correctly, Sergeant Dee would have been the
21   second person behind Sergeant Biegaj.
22        Q.    All right.  Let's run it back.  I'm
23   restarting it and you tell me when you'd like me to
24   stop.
25   (Deposition Exhibit A played.)
```

SA-139

30

1          B. Thompson - Examination by Mr. Modica

2          Q.     While we're here I'm looking at the alpha

3    hallway at 10:22:31.122 seconds.  Who is this

4    gentleman?

5          A.     That is Captain Galinski I believe.

6          Q.     Thank you.

7    (Deposition Exhibit A played.)

8          A.     Okay.  Stop it.  Let it play a couple of

9    seconds or a couple -- yeah.

10         Okay.  So the first one at the door is Sergeant

11   Biegaj.  Behind him would be Sergeant Dee and then

12   behind Sergeant Dee that looks like Deputy Wilson.

13         Q.     Is this Sergeant Dee right here?

14         A.     Yeah.  It looks like Sergeant Dee.  I'm just

15   waiting to see the chevron on the side of his arm.  If

16   there's A Chevron that's Sergeant Dee.

17         Q.     This gentleman right here?

18         A.     Correct, yeah.  I believe that's Deputy

19   Wilson.

20         Q.     Deputy Shawn Wilson?

21         A.     Correct.

22         Q.     I will play it forward.

23         A.     No.  That's correct, those are -- that's the

24   three.

25         Q.     I want to ask you about Sergeant Dee and

SA-140

31

1          B. Thompson - Examination by Mr. Modica

2    Deputy Wilson.

3      Mr. Dublino alleges that they grabbed his arms and

4    his hands and they bent and twisted them in abnormal

5    positions with extreme pressure I think related to the

6    handcuffs.

7      You testified earlier you were not present when

8    anyone from the response team handcuffed him; is that

9    right?

10     A.    Yeah.  I'm a hundred percent sure I was not

11   present during the handcuffing.

12     I know I didn't handcuff him.  I'm pretty sure I

13   was not there when they handcuffed him.

14     Q.    And I'll represent to you - and we can play

15   it if you'd like - in the video it looks like from the

16   time you bring Mr. Dublino to the ground until he is

17   lifted up by the response team it's about a minute and

18   twenty seconds.

19     Can you tell me if you know roughly how long does

20   it take to put handcuffs on someone who's not

21   resisting?

22     Is it more or less time do you think?

23     A.    I mean, my guess would be less time, but I

24   don't know.

25     Q.    And, again, I think your testimony was you

SA-141

32

1          B. Thompson - Examination by Mr. Modica

2    weren't present when anyone handcuffed him anyway,

3    correct?

4          A.     Correct.  I believe so, yes.

5          Q.     So tell me about Sergeant Cross.  That would

6    be Sergeant Matthew Cross, correct?

7          A.     Correct.  He would be in that first video in

8    the alpha hallway.  He's the person to the far left.

9          Q.     This gentleman right here?

10         A.     Correct.

11         Q.     So --

12         A.     I believe he's with Buffalo PD now.

13         Q.     All right.  So your understanding is that

14   he's a member of the Buffalo Police Department.  He's

15   not a member of the Erie County Sheriff's Office?

16         A.     He's definitely not with us any more.  I'm

17   fairly sure he's with Buffalo, but I could be wrong.

18         Q.     Do you know if he was employed with the Erie

19   County Sheriff's Office on March 9th of 2018?

20         A.     I would assume he was, yes.

21         Q.     And did you have the opportunity to observe

22   Sergeant Cross in his interactions with Dublino in that

23   hallway on March 9th of 2018?

24         A.     I did not, no.

25         Q.     I want to ask you about any interactions

SA-142

33

1        B. Thompson - Examination by Mr. Modica

2   between Deputy Frank Gelster, Sergeant Jack Robinson

3   and Deputy Peter Giardina and Mr. Dublino.

4       Did you observe any interactions between them and

5   my client in the hallway on March 9th of 2018?

6       A.    I did not, no.

7       Q.    Now, did there come a time when you took some

8   pictures of Mr. Dublino after this incident?

9       A.    Not me personally, no.

10      Q.    Okay.  Do you know who took those pictures?

11      A.    I don't know.

12            MR. MODICA:  I just want to take a break for

13  one moment and see if there's anything else I need to

14  cover and I'll be done.  So thanks for your patience.

15            THE WITNESS:  No problem.

16  (Recess taken.)

17      Q.    At any point, Deputy Thompson, did Mr.

18  Dublino complain of pain in your presence?

19      A.    No.

20            MR. MODICA:  All right.  I have no further

21  questions.  I appreciate your coming in today and

22  unless Erin has anything, you're excused.

23            THE WITNESS:  Thank you.  I appreciate it.

24            MS. MOLISANI:  Have a nice day.

25            MR. MODICA:  Be well.  Thanks.

COMPUTER REPORTING SERVICE
(585) 325-3170

SA-143

34

1          B. Thompson - Examination by Mr. Modica

2                    *        *        *

3

4                    REPORTER CERTIFICATE

5

6      I, Shari L. Vitalone, do hereby certify that I did

7  report in stenotype machine shorthand the proceedings

8  held in the above-entitled matter;

9      Further, that the foregoing transcript is a true

10  and accurate transcription of my said stenographic

11  notes taken at the time and place hereinbefore set

12  forth.

13

14  Dated 7/6/2021

15  at Rochester, New York

16

17

18                          s/ Shari L. Vitalone

19                    _____

20                          Shari L. Vitalone

21

22

23

24

25

COMPUTER REPORTING SERVICE
(585) 325-3170

35

B. Thompson - Examination by Mr. Modica

WITNESS CERTIFICATE

ORIGINAL

STATE OF                    )

COUNTY OF                   )


    I, Brian Thompson, do hereby certify that I have

read the transcript of my testimony as taken under oath

on Wednesday, June 9, 2021, and that said transcript is

a true, complete and correct record of what was asked,

answered and said during said deposition, and that the

answers on record therein, and as may be modified in

conformity with the attached errata sheet, are true and

correct.








                         _____



Subscribed and sworn to before me

this _____ day of _____, 2021

Notary Public




COMPUTER REPORTING SERVICE
(585) 325-3170

```
                                                                    36
  1            B. Thompson - Examination by Mr. Modica
  2    In the Matter of:
       MARK T. DUBLINO                              ORIGINAL
  3          Plaintiff
             -vs-
  4    SGT. JUSTIN BIEGAJ, SGT. ROBERT DEE,
       DEPUTY BRIAN THOMPSON, DEPUTY FRANK
  5    GELSTER, SGT. MR. CROSS, SGT. MR. ROBINSON,
       DEPUTY MR. P. GIARDINA, DEPUTY SHAWN WILSON
  6          Defendants
             Civil Action No. 6:19-cv-6269-DGL
  7
  8    Errata sheet for the deposition of Brian Thompson taken
  9    on Wednesday, June 9, 2021
 10    PAGE         LINE         REASON FOR CHANGE
 11    _____        _____        _____
 12    _____        _____        _____
 13    _____        _____        _____
 14    _____        _____        _____
 15    _____        _____        _____
 16    _____        _____        _____
 17    _____        _____        _____
 18    _____        _____        _____
 19    _____        _____        _____
 20    _____        _____        _____
 21    _____        _____        _____
 22    _____        _____        _____
 23    _____        _____        _____
 24    _____        _____        _____
 25    _____        _____        _____
```

COMPUTER REPORTING SERVICE
(585) 325-3170

SA-146

# EXHIBIT D

```
                                                                   1
 2   UNITED STATES DISTRICT COURT                ORIGINAL

 3   WESTERN DISTRICT OF NEW YORK

 4   - - - - - - - - - - - - - - - - - - - - - - x

     MARK T. DUBLINO

 5        Plaintiff

          -vs-

 6   SGT. JUSTIN BIEGAJ, SGT. ROBERT DEE,

     DEPUTY BRIAN THOMPSON, DEPUTY FRANK

 7   GELSTER, SGT. MR. CROSS, SGT. MR. ROBINSON,

     DEPUTY MR. P. GIARDINA, DEPUTY SHAWN WILSON

 8        Defendants

     - - - - - - - - - - - - - - - - - - - - - - x

 9        Civil Action No. 6:19-cv-6269-DGL

10

11

12

13        Deposition of FRANK GELSTER taken pursuant to

14   notice via videoconference on Wednesday, June 9, 2021

15   commencing at 11:29 a.m.

16

17

18

19

20

21   Reported by:

22   COMPUTER REPORTING SERVICE

23   Shari L. Vitalone

24   16 East Main Street, Suite 7

25   Rochester, New York  14614        (585) 325-3170
```

SA-148

2

2    APPEARANCES:

3        MODICA LAW FIRM

4        By:  STEVEN V. MODICA, Esq.

5        2430 Ridgeway Avenue

6        Rochester, New York  14626

7        Attorneys for plaintiff.

8

9

10       ERIE COUNTY DEPARTMENT OF LAW

11       By:  ERIN MOLISANI, Esq.

12       95 Franklin Street, Suite 1634

13       Buffalo, New York  14202

14       Attorneys for defendants.

15

16

17

18

19

20

21

22

23

24

25

COMPUTER REPORTING SERVICE
(585) 325-3170

3

2                              INDEX

3    Frank Gelster

4         Examination by Mr. Modica                    4 - 34

5

6

7    Reporter Certificate                              35

8    Witness Certificate                               36

9    Errata Sheet                                      37

10

11

12    (No exhibits marked.)

13

14

15

16

17

18

19

20

21

22

23

24

25

SA-150

4

1          F. Gelster - Examination by Mr. Modica

2                    FRANK GELSTER

3      called herein as a witness, being duly sworn,

4               testified as follows:

5    EXAMINATION BY MR. MODICA:

6      Q.    Good morning, Deputy Gelster.  My name is

7    Steve Modica.  I am the pro bono counsel for Mark

8    Dublino.  I appreciate your appearance here today.

9      I'm going to ask you some questions.  Please answer

10   those questions to the best of your ability.

11     If you don't understand those questions certainly

12   feel free to ask me to rephrase it, and because we're

13   doing this virtually it's really important that we wait

14   until each other is finished before speaking again.

15     So I'm going to try to be real patient and not

16   interrupt you and I'm hoping you will do the same.

17     Is that okay?

18     A.    Okay.

19     Q.    All right.  So you're currently employed in

20   the jail management division?

21     A.    I am.

22     Q.    How long have you worked for them?

23     A.    Approximately fifteen years.

24     Q.    If you can keep your voice up a little bit,

25   I'm having a little bit of trouble.

SA-151

5

```
 1          F. Gelster - Examination by Mr. Modica
 2      All right.  And during 2018 did you work for them?
 3      A.    I did.
 4      Q.    And where were you doing your work at that
 5  point?
 6      A.    I want to say -- I believe I was still in the
 7  visiting platoon at that time.
 8      Q.    In kind of broader terms you were working at
 9  the Erie County Holding Center?
10      A.    Yeah, holding center.  I'm sorry.
11      Q.    Were you working at the Erie County Holding
12  Center on March 9th of 2018?
13      A.    I was.
14      Q.    What was your job or assignment that day if
15  you recall?
16      A.    Escort I believe.  It was a while ago.  I've
17  had a lot of jobs since then.
18      Q.    I can represent to you that the documents do
19  indicate you being an escort at the time.  So let's
20  assume that.
21      Describe for me what your duties were as an escort.
22      A.    General duties every day are the same for
23  that job, escort inmates to medical, to visitation, to
24  other areas of the jail.
25      In normal matters, just an escort, and some of them
```

COMPUTER REPORTING SERVICE
(585) 325-3170

SA-152

6

1          F. Gelster - Examination by Mr. Modica

2     are handcuffed so -- it depends on the inmate, but in

3     general you're part of a response team if something

4     goes down as well and to escort inmates throughout the

5     jail.

6          Q.    Do you recall any interactions with inmate

7     Dublino before March of 2018?

8          A.    Nothing.  I mean, I knew who he was, but

9     nothing of consistence, nothing of -- what's the word

10    I'm looking for?

11         I didn't really know him.  I just knew him from

12    being in jail.

13         Q.    So nothing stood out in your mind -- any

14    interactions with him positive or negative, nothing

15    stands out in your mind before March of 2018?

16         A.    No, not that I can recall.

17         Q.    We know you did have some interactions with

18    him on March 9th of 2018 which is the basis for this

19    case.

20         Are you aware that there's a video that shows at

21    least part of your interactions with him?

22         A.    I've been unable to see the video so I'm not

23    sure what's in it, but yes, I know there was videotape

24    because there's video in that hallway down there.

25         Q.    Actually, I have the video so I'm going to

COMPUTER REPORTING SERVICE
(585) 325-3170

SA-153

7

F. Gelster - Examination by Mr. Modica

1

2    share the screen and have you take a look at the video,

3    and if you want me to move any part of it or anything

4    like that -- I'll show it straight through and then if

5    you want to refer to any parts of it during your

6    testimony, that would be fine.

7       It's only about three minutes long so it will be a

8    little quiet here.

9       A.    Okay.

10      Q.    First of all, are you able to see the screen

11   I've shared?

12      A.    I am.

13      Q.    This is at the beginning of the video.  I'm

14   going to hit play and I will be quiet for the next

15   three minutes or so.

16   (Deposition Exhibit A played.)

17       Okay.  That's the complete video, Deputy Gelster.

18   Were you able to see that?

19      A.    Yeah.

20      Q.    Great.  Okay.  And would you say that does

21   depict at least part of your interaction with Mr.

22   Dublino on March 9th of 2018?

23      A.    Yes.

24      Q.    Did there come a time when you prepared a

25   memorandum about this incident?

COMPUTER REPORTING SERVICE
(585) 325-3170

SA-154

8

1            F. Gelster - Examination by Mr. Modica

2       A.     What do you mean?

3       Q.     Did you put anything in writing about your

4  role in this incident?

5       A.     Oh, I would have had to fill out a pink sheet

6  and likely a Use of Force form.

7       Q.     And by "pink sheet," can you describe what

8  you mean by that?

9       A.     It's a form we fill out where you describe

10 basically what your interaction was in the incident.

11      Q.     And I'm sorry if I didn't note it earlier for

12 the record.  The video we showed Deputy Gelster was

13 Deposition Exhibit A.

14      So I'm going to show you now what we've marked as

15 Deposition Exhibit H.  Do you recognize that document?

16      A.     Yes.

17      Q.     Is that the pink sheet so to speak that you

18 referred to?

19      A.     Yes.

20      Q.     And do you recall about when you prepared

21 this document?

22      A.     It would have been later that day at some

23 point.  I'm not sure exactly.

24      Q.     And why did you prepare that document?

25      A.     We do it to document things.  So, for

COMPUTER REPORTING SERVICE
(585) 325-3170

SA-155

9

```
1          F. Gelster - Examination by Mr. Modica
2    instance, such as this to state what has happened.
3          Q.    And did you also prepare a Use of Force
4    report with respect to this incident?
5          A.    I cannot recall.
6          Q.    I'm showing you what we've marked as
7    Deposition Exhibit I.
8          A.    Then yes, I did.
9          Q.    Do you recognize that document?
10         A.    Correct.
11         Q.    Is that a Use of Force report regarding the
12   incident with Mr. Dublino on March 9th of 2018?
13         A.    Yes.
14         Q.    And why did you prepare Deposition Exhibit I?
15         A.    That's part of our orders as well.  The pink
16   sheet and whenever mechanical restraints or contact is
17   made the Use of Force is filled out as well.
18         Q.    And the memo, Deposition Exhibit H, and the
19   Use of Force report, those complete your documents as
20   best as you recall?
21         A.    Yes.
22         Q.    What is a 10-99?
23         A.    A 10-99 is a staff incident where a staff is
24   in trouble whether it be with an inmate or otherwise.
25         Q.    And is there a policy as far as you know as
```

COMPUTER REPORTING SERVICE
(585) 325-3170

SA-156

10

1          F. Gelster - Examination by Mr. Modica

2     to what you or anybody in the facility is supposed to

3     do when you get a 10-99 call?

4          A.    As far as an actual policy, I don't know I'm

5     versed in it.  I'm sure there is one.

6          As an escort I was primarily responsible for any

7     incident in the jail.

8          Q.    Whether or not there's a written policy, what

9     did you understand at that point was your

10    responsibility if any when you get a 10-99 call?

11         A.    To respond and stop whatever -- you know,

12    protect whatever is happening, to stop it from

13    happening - that being in whatever manner needed.

14         Q.    In March of 2018 if you know was there a code

15    that dealt with interactions between -- or altercations

16    between a person in custody and their lawyer?

17         A.    I believe it would still be called a 10-99 as

18    far as any kind of like staff or visitor per se.

19         Q.    All right.  And on March 9, 2018 how did you

20    get the 10-99 call?

21         A.    Over the radio.

22         Q.    And when you say "Over the radio," was that

23    the radio you wore on your body or the PA system or

24    both?

25         A.    It may have been both, but definitely on the

SA-157

11

1          F. Gelster - Examination by Mr. Modica

2    radio.

3          Q.     If you recall where were you at the time you

4    got that 10-99 call on March 9th, 2018?

5          A.     I cannot recall.

6          Q.     Do you remember where the call directed you

7    to go?

8          A.     To the attorney visiting area.

9          Q.     And what if anything did you do?

10         A.     When I responded?

11         Q.     As soon as you got that call that tells you

12   to go to the attorney conference room, what do you do?

13         A.     I head towards the call.

14         Q.     In the part we reviewed you earlier, does

15   that depict you responding in some way to this call?

16         A.     It would, yes.

17         Q.     Do you recall when you watched the video

18   seeing yourself on the video?

19         A.     I do.

20         Q.     When you began to go toward attorney

21   conference room 3, when you arrived there what did you

22   see?

23         A.     I had seen the people ahead of me more than

24   anything.

25         Inmate Dublino was laying on the ground, but he was

COMPUTER REPORTING SERVICE
(585) 325-3170

SA-158

12

F. Gelster - Examination by Mr. Modica

1          F. Gelster - Examination by Mr. Modica
2   surrounded by a lot of people.  So as far as what was
3   going on there, I can't speak to that.
4      So when I got there he was laying on the ground.  I
5   honestly at this point in time cannot recall what he
6   was saying or -- as far as that goes.
7      Q.   So let me take it back for a second.
8      When you saw him on the ground was he face up, face
9   down or sitting down?
10     What was he doing?
11     A.   I believe he was face down.
12     Q.   Was there anybody else with him when you saw
13   him first?
14     A.   Well, there was at least ten other people I
15   have to say around him.  So, again, I don't know.
16     Q.   When you first saw inmate Dublino I think --
17   so I'm going to bring you back because I know these
18   events occurred some time ago.
19     So I'm going to bring you back to your memo,
20   Deposition Exhibit H.  The second sentence reads, "Upon
21   arrival I did observe inmate Mark Dublino" - and it
22   lists his number, inmate number - "on the ground being
23   given verbal orders by Deputy Thompson to place his
24   hands behind his back."
25     First, did I read that properly?

SA-159

13

1          F. Gelster - Examination by Mr. Modica

2      A.     You did.

3      Q.     Does that refresh your recollection as to

4   what you saw when you first arrived?

5      A.     It does, yes.

6      Q.     And when Deputy Thompson gave him that order

7   did you -- did Mr. Dublino comply with that order?

8      A.     I cannot recall.

9      Q.     And then continuing with your memo it says,

10  "Deputy Wilson and I then took control of inmate

11  Dublino's right arm with both hands and then I

12  proceeded to place mechanical restraints on inmate

13  Dublino's right wrist."

14      Did I read that correctly?

15      A.     You did.

16      Q.     Is that your recollection of what happened?

17      A.     It is.

18      Q.     And it then goes on to say, "I then placed

19  mechanical restraints on inmate Dublino's left wrist

20  which was being secured by Sergeant Dee."

21      Did I read that properly?

22      A.     You did.

23      Q.     Is that consistent with your recollection?

24      A.     Yes.

25      Q.     And then the last sentence says, "Sergeant

14

1              F. Gelster - Examination by Mr. Modica

2      Dee and I assisted inmate Dublino to his feet and he

3      was escorted to the infirmary for evaluation."

4          Did I read that correctly?

5          A.    You did.

6          Q.    Is that consistent with your recollection of

7      what occurred?

8          A.    It is.

9          Q.    Did inmate Dublino say anything during your

10     interaction with him at that point, again, when you

11     first got to the hallway with the rest of the folks?

12         A.    I cannot recall.

13         Q.    Do you recall him saying at any point that he

14     was having difficulty breathing?

15         A.    I do not recall that, no.

16         Q.    In the interactions you had -- the physical

17     interactions you had with inmate Dublino in securing

18     restraints on his arms, his wrists, did he resist you

19     in any way?

20         A.    If what I remember is correct we did have to

21     forcefully put his hands behind his back.

22         Q.    What makes you remember that you had to

23     exercise force to put the cuffs on him?

24         A.    When I read my pink sheet there, the way that

25     it's written it would have meant that I had to take his

SA-161

15

```
 1          F. Gelster - Examination by Mr. Modica
 2   hand and place it behind his back.
 3       Q.    So I don't want to put words in your mouth,
 4   but the language that you took control of his right
 5   hand, is that the language that indicates to you he did
 6   not voluntarily put his hands behind his back?
 7       A.    Correct.
 8       Q.    Can you explain to me your understanding of
 9   how folks that are in custody are supposed to be
10   handcuffed?
11       Is there a preferred way?
12       A.    In a perfect setting, yes.  It would be palms
13   facing out, back of the hands together with the cuffs
14   on.
15       Q.    Just so I understand, hands would be cuffed
16   behind the person's back?
17       A.    Right.
18       Q.    And palms facing outward or away from the
19   center of their body?
20       A.    Correct.
21       Q.    And are there times when people in custody
22   are cuffed differently?
23       So, for example, there was some testimony earlier
24   this week about what was called reverse cuffing where
25   actually instead of the person's palms facing away from
```

COMPUTER REPORTING SERVICE
(585) 325-3170

SA-162

16

1          F. Gelster - Examination by Mr. Modica

2     the center of their body, they're actually facing

3     towards the center of their body.

4          A.    Yes, there would be.

5          Q.    Okay.  So help me understand why -- what

6     circumstances would there be that would warrant that

7     reverse handcuffing?

8          A.    Well, sometimes if the cuffs are being placed

9     in an emergency situation such as that they're placed

10    on for immediate safety of everybody involved.

11         Q.    So to be done quickly you might do it that

12    way versus if you had more time or less resistance?

13         A.    Right.

14         Q.    Can you explain to me why did you use force

15    on Mr. Dublino in the manner in which you did?

16         A.    To the best of my knowledge it would be

17    because he was not complying with orders.

18         Q.    Now, from the time that you initially arrived

19    at the attorney conference area until Mr. Dublino was

20    subdued and removed from the area did you hear

21    Mr. Terranova say anything?

22         A.    I cannot recall.

23         Q.    I'll ask you specifically -- there was some

24    indication at some point Mr.  Terranova said to either

25    you or some other folks there, "Kick his ass" - being

COMPUTER REPORTING SERVICE
(585) 325-3170

SA-163

```
                                                            17

 1        F. Gelster - Examination by Mr. Modica

 2   Dublino's ass.

 3        Do you recall anything like that going on?

 4        A.     There was a lot going on.  I can't recall.

 5   There was a lot of things said.  It was quite some time

 6   ago.

 7        Q.     Understood.

 8        A.     Nothing that sticks out in my head.

 9        Q.     So I also understood that at some point you

10   escorted inmate Dublino after he was handcuffed from

11   the attorney conference area to the infirmary; is that

12   correct?

13        A.     Correct.

14        Q.     And did inmate Dublino say anything to you

15   that you can recall asking to be transported to the

16   infirmary?  Escorted is a better word.

17        A.     Not anything that sticks out in my head that

18   I can recall, no.

19        Q.     So I want to go back to the video and just

20   kind of focus really on you for a moment so I

21   understand it.

22        Okay.  I'm sharing the screen again.  Are you able

23   to see that, Deputy Gelster?

24        A.     Yes.

25        Q.     All right.  So I'm going to start the video
```

SA-164

18

1          F. Gelster - Examination by Mr. Modica

2     and would you let me know as far as when you come into

3     our vision.  Okay?

4          A.     Sure.

5          Q.     Great.

6     (Deposition Exhibit A played.)

7          Are you in the picture yet, Deputy?

8          A.     I am, yes.

9          Q.     And is it correct that you're on the left

10    side of the screen or is that someone else?

11         A.     It would appear to be me, yeah.

12         Q.     Okay.  So I'm looking -- I stopped at

13    10:22:45.136 seconds and you would say that that would

14    be you on the left side of the screen.

15         Okay.  Is this consistent with your recollection

16    that you came down the alpha hallway headed toward

17    responding to this event?

18         A.     It would be, yes.

19         Q.     I'm going to continue it through.

20    (Deposition Exhibit A played.)

21         Q.     Now, I stopped it again at 10:22:50.952.  Is

22    that you on the far right?

23         A.     It would appear to be, yeah.

24         Q.     And this box where -- in the attorney visit

25    room A, is that you?

COMPUTER REPORTING SERVICE
(585) 325-3170

SA-165

19

F. Gelster - Examination by Mr. Modica

1

2    A.    Correct.

3    Q.    I'm going to start it again and I believe

4    that's you.

5    A.    It would appear so, yes.

6    Q.    And now it would appear you've gone down to

7    the ground, but we can't see you in the frame, and

8    again, I'm looking at the attorney visit room A frame,

9    top right hand side of the video at the time sequence

10   of 10:22 a.m. and 54.055 seconds.

11   Is that a fair statement?

12   A.    It is.

13   Q.    And is there any way from you looking at this

14   still right now to know what you were doing when you

15   went out of the frame there?

16   A.    From that picture there, nothing.

17   Q.    And then there are other members of the

18   response team that are visible to us in that frame.

19   Again, we're still looking at attorney visit room A.

20   So tell me -- at some point the next time you

21   emerge where we can see you, tell me to stop.

22   A.    Okay.

23   (Deposition Exhibit A played.)

24   A.    There I am.

25   Q.    Is that you right in the front here?  So at

COMPUTER REPORTING SERVICE
(585) 325-3170

SA-166

20

1          F. Gelster - Examination by Mr. Modica

2     10:23:53.917 seconds that's you at the front of the

3     picture?

4          A.    It would appear to be, yes.

5          Q.    And, again, do you remember what you were

6     doing at that point when you emerged back into the

7     screen?

8          A.    I believe preparing to stand inmate Dublino

9     up after he was securely handcuffed.

10         Q.    And if I were to represent to you - and I'll

11    keep running the video - that it appears that inmate

12    Dublino is on the ground from the time that Deputy

13    Thompson brings him in until he rises for about a

14    minute and twenty seconds, do you recall of that time

15    how much time you spent handcuffing him or trying to

16    handcuff him?

17         A.    I cannot recall.

18         Q.    Is there a typical amount of time that you

19    would say that it would take to handcuff someone?

20         A.    Every situation differs.  There's no way I

21    could put a time on it, I mean, especially in an

22    emergency situation.

23         Q.    And that could depend, of course, if a person

24    is resisting it might take longer, right?

25         A.    Correct.

SA-167

21

1        F. Gelster - Examination by Mr. Modica

2     Q.    I restarted the tape.

3 (Deposition Exhibit A played.)

4     Q.    Now, it looks to me like you're walking away

5 from the area.  Is this you right here the best that

6 you can tell?

7     A.    No.

8     Q.    That's not.  This is you?

9     A.    It would appear so, yeah.

10    Q.    So, again, we stopped it at 10:24:02.228

11 seconds and it would appear that you're on inmate

12 Dublino's right side; is that fair?

13    A.    It would appear so, yes.

14    Q.    And is there anyone on his left side that is

15 similarly holding him or is it just you?

16    A.    It would appear somebody is there.  I cannot

17 tell who that is at this time by looking at the

18 picture.

19    Q.    Understood.  Okay.  And then it appears like

20 you're walking with inmate Dublino away from the

21 attorney conference area headed toward the sally port;

22 is that correct?

23    A.    Correct.

24    Q.    And if you look at the picture on the bottom

25 left it appears like there is something open, the sally

SA-168

22

1          F. Gelster - Examination by Mr. Modica

2    port door.

3         Okay.  I stopped it.

4         It appears to show at 10:24:35.842 bottom left side

5    of the screen in the sally port area you to the right

6    of inmate Dublino; is that correct?

7         A.    It would appear so, yes.

8         Q.    Could you tell me if you know, Deputy

9    Gelster, who is behind -- who is the other gentleman

10   behind inmate Dublino?  This gentleman right here.

11        A.    I do not know from this picture.

12        Q.    I'm going to rerun it.  If you're able to

13   tell who that is I'd appreciate it.

14   (Deposition Exhibit A played.)

15        Q.    So it does appear to me - you let me know if

16   you think differently - you're certainly holding inmate

17   Dublino.

18        He's handcuffed at the time, correct?

19        A.    Correct.

20        Q.    And there's at least one other deputy holding

21   him, but we're not exactly sure who that is?

22        A.    Right.

23        Q.    Can you tell from the pictures does it appear

24   like anybody else is holding him?

25        A.    Does not appear so, no.

23

1          F. Gelster - Examination by Mr. Modica

2     Q.     And at this point when you're going out of

3 the alpha hallway, what is your recollection as to

4 where you were going with inmate Dublino?

5     A.     To the jail infirmary to have him evaluated.

6     Q.     Did someone direct you to do that?

7     A.     Generally it would be the sergeant's

8 direction, but usually it's standard procedure to take

9 them and have them evaluated.

10    Q.     And when you visually saw inmate Dublino,

11 cuffed him and then started walking did you observe him

12 to have any injuries?

13    A.     Not to my recollection, no, but I don't know.

14    Q.     To the best of your recollection did he

15 complain of pain in any part of his body, again, from

16 the time you first interact with him until you were

17 walking him to the infirmary?

18    A.     That, I cannot recall.

19    Q.     Okay.  And then best I can tell by 10:24:58

20 or 59 or so you're out of the picture.  So the rest

21 doesn't relate to you; is that fair?

22    A.     Fair.

23    Q.     There are a number of other defendants in

24 this case, as you probably know.  So I'm going to ask

25 you about those folks and what if anything you know

24

1          F. Gelster - Examination by Mr. Modica

2    about their participation in the events of March 9th of

3    2018.

4        So let's start with Deputy Thompson.  What if

5    anything did you observe Deputy Thompson doing on March

6    9th of 2018 in that hallway outside the attorney

7    conference room?

8        A.    Honestly, I can't recall.

9        I know he was there, but what he was doing -- I was

10   focusing more on what the inmate was doing to make sure

11   he wasn't going to get up or do anything like that.

12       So I don't really focus on what the other deputies

13   are doing.  I'm more focused on what I have to do.

14       Q.    Understood.  Is it correct that Deputy

15   Thompson in March of 2018 was responsible for a K-9,

16   specifically a K-9 named Bili?

17       A.    I believe that's his name, yes.

18       Q.    Do you recall whether Bili was in there?

19       A.    As far as my recollection.

20       Q.    Did you notice anything about Bili's

21   interaction with inmate Dublino?

22       A.    I did not.

23       Q.    Inmate Dublino alleged that Bili either

24   scratched him or bit him.  Did you see anything like

25   that?

SA-171

25

1          F. Gelster - Examination by Mr. Modica

2     A.     To my knowledge, no, I did not see anything

3  like that.

4     Q.     And the response team I believe also included

5  Sergeant Justin Biegaj.

6     A.     I would assume so, yes.  Again, I don't know

7  everybody who was there.  So --

8     Q.     When you watched the video earlier did you

9  notice him?

10     A.     I was not looking for him.  So he may have

11  been in there, but I wasn't looking for him while you

12  were asking about myself.

13     Again, I remember certain people, Thompson, Deputy

14  Wilson, Sergeant Dee, Sergeant Robinson.  So if he was

15  there I cannot say right now.

16     Q.     I'm just asking for what you remember.  Thank

17  you.

18     So inmate Dublino alleges regarding Sergeant Biegaj

19  that he stomped and stepped on him while he was on the

20  ground, that he was targeting his head and back and

21  also put his knee on Mr. Dublino's back.

22     So let me ask you, did you see at any point anyone

23  stomping on inmate Dublino while he was on the ground

24  or putting his knee on his back?

25     A.     I do not recall any stomping, hitting,

SA-172

                                                                    26

1          F. Gelster - Examination by Mr. Modica

2    punching, anything like that.

3      Q.    I'm going to ask you about Sergeant Robert

4    Dee and Shawn Wilson.

5      Mr. Dublino has alleged that they grabbed his arms

6    and hands and bent them in an abnormal position using

7    extreme pressure.

8      Can you tell me did you witness anything like that?

9      A.    I did not.

10     I know Deputy Wilson and I were attempting to place

11   his arm behind his back.  We're not really -- I don't

12   remember any like retching.

13     I just know when somebody is fighting you it's more

14   work to get it back there.  So --

15     Q.    Do you recall how initially -- well, first of

16   all, when you arrived do you recall initially how

17   inmate Dublino was handcuffed?

18     A.    I do not.

19     Q.    Okay.  Do you recall if the handcuffs were

20   removed and changed at any point before you left the

21   hallway outside the attorney conference room?

22     A.    Before he was escorted to the infirmary?

23     Q.    Yes.

24     A.    I cannot recall if they were adjusted or not.

25     It's not SOP to adjust the cuffs.  I know before

COMPUTER REPORTING SERVICE
(585) 325-3170

SA-173

27

F. Gelster - Examination by Mr. Modica

1
2   getting up there until he's evaluated in medical they
3   come off or after the inmate calms down.
4       Q.     And, again, just for purposes of the record
5   SOP means standard operating procedure, correct?
6       A.     Yes.
7       Q.     Sergeant Matthew Cross, do you recall whether
8   he was among the group that responded?
9       A.     Only because I did remember seeing him on the
10  video.
11      Q.     And inmate Dublino alleges that Sergeant
12  Cross stood directly over him and began stomping on his
13  legs, ankles and his feet.
14      Did you see anything that looked like that?
15      A.     Again, I don't recall any stomping, striking.
16      Q.     Inmate Dublino also makes some allegations
17  regarding Sergeant Jack Robinson and Deputy Pete
18  Giardina as it relates in part to you.  So let me
19  explain that a little bit.
20      At some point did Sergeant Robinson tell you to
21  retch inmate Dublino's arms in some way?
22      A.     Not that I recall, no.
23      Q.     Now, did there come a time when pictures of
24  inmate Dublino were taken soon after the altercation on
25  March 9th of 2018?

COMPUTER REPORTING SERVICE
(585) 325-3170

SA-174

28

F. Gelster - Examination by Mr. Modica

1

2    A.    I do believe, yes.  They do take pictures in

3    medical.  So if I remember correctly there were

4    pictures taken.

5    Q.    Were you the person who took the photos?

6    A.    No.

7    Q.    But were you present when the photos were

8    taken?

9    A.    As the escort I probably would have been

10   present, yes.

11   Q.    All right.  So I want to show you a few

12   photos on the share screen.

13   All right.  I want to show you what was marked as

14   Deposition Exhibit D.  First of all, can I ask you, do

15   you recognize this photo?

16   A.    I don't have a photo up yet.

17   Q.    I'm going to get this right on the eighth

18   deposition.  Poor Erin has been very patient with me.

19   I apologize, Deputy.

20   So now you're able to see Exhibit D, correct?

21   A.    Yes.

22   Q.    So fair to say in the center of the photo is

23   inmate Dublino?

24   A.    Correct.

25   Q.    And is that you on the left side of the

COMPUTER REPORTING SERVICE
(585) 325-3170

SA-175

29

1              F. Gelster - Examination by Mr. Modica

2    photo?

3         A.    It would appear to be, yes.

4         Q.    And who is on the right side of the photo?

5         A.    That is Deputy Giardina.

6         Q.    And do you know who took this photo?

7         A.    I do not recall.  I know more than likely it

8    would have been a sergeant.

9         Q.    And do you know whether inmate Dublino's

10   hands were handcuffed when this photo was taken?

11        A.    They were.

12        Q.    And, again, do you recall whether the

13   handcuffs had been changed at all from the time he was

14   subdued outside of the attorney conference room until

15   the time this photo was taken?

16        A.    That I do not recall.

17        Q.    There appears to be a timestamp on this photo

18   if I'm reading correctly 3/9, 11:37.  Do you see that?

19        A.    I do.

20        Q.    Do you have an understanding of whether that

21   is an accurate timestamp as to when this photo was

22   taken?

23        A.    Honestly, I do not.

24        Q.    I'm going to show you what we've marked as

25   Deposition Exhibit E.  Do you see that photograph?

COMPUTER REPORTING SERVICE
(585) 325-3170

SA-176

30

1          F. Gelster - Examination by Mr. Modica

2     A.    I do.

3     Q.    And does it also appear to have you in the

4  photo toward the left?

5     A.    It would appear so, yes.

6     Q.    And does it also appear to have Deputy

7  Giardina on the right?

8     A.    It would.

9     Q.    In the middle appears to be a left sided

10  profile of inmate Dublino.  Is that fair?

11     A.    It would be, yes.

12     Q.    And it would appear to me at least that he's

13  making some type of face.

14     Do you recall whether he was complaining of pain or

15  any of the circumstances as to why he had that face on

16  when that photo was taken?

17     A.    I do not recall, no.

18     Q.    And at least as far as location, both of

19  these photos, do you know where those photos were

20  taken?

21     A.    That would be the infirmary.

22     Q.    I want to show you what we've marked as

23  Deposition Exhibit F.  Can you see that exhibit?

24     A.    I can.

25     Q.    And, again, does it show you on the left side

COMPUTER REPORTING SERVICE
(585) 325-3170

31

F. Gelster - Examination by Mr. Modica

2  of the picture?

3       A.    It would appear so, yes.

4       Q.    And Deputy Giardina on the right side of the

5  picture?

6       A.    Correct.

7       Q.    And inmate Dublino in the middle, correct?

8       A.    Correct.

9       Q.    And it appears to show the profile of the

10  right side of his face.  Any recollection about this

11  picture?

12       A.    As a point of reference, no, I do not.  I

13  remember there being pictures taken, but of what and

14  how many I don't remember.

15       Q.    What is the purpose of taking pictures in

16  circumstances like that?

17       A.    As far as I remember it's to document any

18  injuries or lack thereof.

19       Q.    Again, did you observe any injuries on inmate

20  Dublino from the time you responded to the call through

21  and including the time these pictures were taken?

22       A.    Not that I recall, no.

23       Q.    Do you recall if inmate Dublino complained of

24  any pain in any part of his body?

25       A.    I cannot recall any specific thing that he

32

1          F. Gelster - Examination by Mr. Modica

2     said, no.

3          Q.    I'm going to show you the last picture which

4     is what we've identified as Deposition Exhibit G.  Can

5     you tell me what this picture is if you know?

6          A.    That would appear to be inmate Dublino's

7     hand.

8          Q.    And in part we know that -- is there

9     something that helps you know that that is his hand?

10         What is this on his left wrist?

11         A.    His wristband, but I cannot make out what

12    that says.

13         Q.    I would represent to you it has inmate

14    Dublino's picture and his name on it, but I know it's

15    hard for you to see that.

16         Did he complain, again if you know, of any injuries

17    to his hands?

18         A.    To the best of my knowledge I do not recall.

19         Q.    And do you see what is on his right hand what

20    appears to be a darker spot maybe?

21         A.    I do see that, yes.

22         Q.    Any indication as to how that was sustained?

23         A.    I have no idea.

24         Q.    Same thing with his left hand.  There appears

25    to be a couple marks in the middle towards the palm

33

1          F. Gelster - Examination by Mr. Modica

2    over his middle finger and index finger.

3        Any indication as to how those injuries were

4    sustained?

5        A.    I have no idea.

6        Q.    Okay.  Now, after these photos were taken

7    what if anything did you do regarding inmate Dublino?

8        A.    I do not recall.

9        If anything he would have been -- whether I did it

10   or not, again I don't remember.  It was quite some time

11   ago.

12       He would have been escorted to more than likely an

13   isolation cell until the investigation was over or back

14   to his cell - I honestly cannot remember - after

15   medical.

16       Q.    Again, you don't recall after those photos

17   were taken whether you did anything relative to the

18   handcuffs, take them off?

19       A.    I don't remember.  They may have been removed

20   and replaced properly or more comfortable.  I don't

21   know.

22       After medical it's not uncommon to remove them or

23   remove them and replace them on.

24       Q.    In a situation where -- is it so that an

25   examination can be done or it just depends?

34

F. Gelster - Examination by Mr. Modica

2     A.     It would be.  And it would appear in that
3  picture that that happened as his hands were in front
4  of him uncuffed.

5     Q.     Do you recall whether he engaged in any
6  threatening behavior towards you once the cuffs were
7  taken off?

8     A.     That I do not recall.

9     Q.     Do you recall if there was a report you filed
10 about him using force against you?

11    A.     Not that I know of.

12           MR. MODICA:  If I could just take a minute or
13 two break and then we can finish up.

14           MS. MOLISANI:  Sure.

15           MR. MODICA:  Thanks.

16 (Recess taken.)

17           MR. MODICA:  I don't have anything else.  I
18 appreciate your cooperation.

19           THE WITNESS:  Okay.

20           MR. MODICA:  Erin, do you have anything?

21           MS. MOLISANI:  No, I don't, but thanks for
22 coming in early.  I appreciate it.

23           MR. MODICA:  Okay.  You're excused.  I
24 appreciate it.

25                 *        *        *

35

1              F. Gelster - Examination by Mr. Modica

2                      REPORTER CERTIFICATE

3

4         I, Shari L. Vitalone, do hereby certify that I did

5    report in stenotype machine shorthand the proceedings

6    held in the above-entitled matter;

7         Further, that the foregoing transcript is a true

8    and accurate transcription of my said stenographic

9    notes taken at the time and place hereinbefore set

10   forth.

11

12   Dated 7/6/2021

13   at Rochester, New York

14

15                              s/ Shari L. Vitalone

16                         _____

17                              Shari L. Vitalone

18

19

20

21

22

23

24

25

COMPUTER REPORTING SERVICE
(585) 325-3170

```
                                                                    36
 1           F. Gelster - Examination by Mr. Modica

 2                     WITNESS CERTIFICATE

 3                                          ORIGINAL

 4     STATE OF            )

 5     COUNTY OF           )

 6

 7       I, Frank Gelster, do hereby certify that I have

 8     read the transcript of my testimony as taken under oath

 9     on Wednesday, June 9, 2021, and that said transcript is

10     a true, complete and correct record of what was asked,

11     answered and said during said deposition, and that the

12     answers on record therein, and as may be modified in

13     conformity with the attached errata sheet, are true and

14     correct.

15

16

17

18                              _____

19

20

21     Subscribed and sworn to before me

22     this _____ day of _____, 2021

23     Notary Public

24

25
```

COMPUTER REPORTING SERVICE
(585) 325-3170

37

1          F. Gelster - Examination by Mr. Modica

2    In the Matter of:

     MARK T. DUBLINO                         ORIGINAL

3          Plaintiff

           -vs-

4    SGT. JUSTIN BIEGAJ, SGT. ROBERT DEE,

     DEPUTY BRIAN THOMPSON, DEPUTY FRANK

5    GELSTER, SGT. MR. CROSS, SGT. MR. ROBINSON,

     DEPUTY MR. P. GIARDINA, DEPUTY SHAWN WILSON

6          Defendants

           Civil Action No. 6:19-cv-6269-DGL

7

8    Errata sheet for the deposition of Frank Gelster taken

9    on Wednesday, June 9, 2021

10   PAGE         LINE         REASON FOR CHANGE

11   ____         ____         _____

12   ____         ____         _____

13   ____         ____         _____

14   ____         ____         _____

15   ____         ____         _____

16   ____         ____         _____

17   ____         ____         _____

18   ____         ____         _____

19   ____         ____         _____

20   ____         ____         _____

21   ____         ____         _____

22   ____         ____         _____

23   ____         ____         _____

24   ____         ____         _____

25   ____         ____         _____

COMPUTER REPORTING SERVICE
(585) 325-3170

SA-184

# EXHIBIT E

1

2    UNITED STATES DISTRICT COURT

3    WESTERN DISTRICT OF NEW YORK

4    - - - - - - - - - - - - - - - - - - - - - - X

5    MARK T. DUBLINO,

6         Plaintiff

7         -vs-

8    SGT. JUSTIN BIEGAJ, SGT. ROBERT DEE, DEPUTY

9    BRIAN THOMPSON, DEPUTY FRANK GELSTER,

10   SGT. MR. CROSS, SGT. MR. ROBINSON,

11   DEPUTY MR. P. GIARDINA, & DEPUTY SHAWN WILSON,

12        Defendants

13   - - - - - - - - - - - - - - - - - - - - - - X

14             Case No. 19-CV-6269-DGL-MJP

15

16        Deposition of JACK ROBINSON taken remotely

17   pursuant to notice on Thursday, June 10, 2021,

18   commencing at 1:04 p.m.

19

20

21   Reported by:

22   COMPUTER REPORTING SERVICE

23   Brittany Needham

24   16 East Main Street, Suite 7

25   Rochester, New York 14614          (585) 325-3170

2

2   APPEARANCES:

3       MODICA LAW FIRM

4       By:  STEVEN V. MODICA, Esq.

5       2430 Ridgeway Avenue

6       Rochester, New York 14626

7       Attorneys for Plaintiff.

8

9       ERIE COUNTY DEPARTMENT OF LAW

10      By:  ERIN MOLISANI, Esq.

11      Edward A. Rath County Office Building

12      95 Franklin Street, Room 1634

13      Buffalo, New York 14202

14      Attorneys for Defendants.

15

16

17

18

19

20

21

22

23

24

25

**COMPUTER REPORTING SERVICE**
**(585) 325-3170**

```
                                                            3
 2                      INDEX

 3   Jack Robinson

 4        Examination by Mr. Modica              4 - 39

 5

 6   Reporter Certificate                          40

 7   Witness Certificate                           41

 8   Errata Sheet                                  42

 9

10   (No exhibits marked.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

SA-188

4

1          J. Robinson - Examination by Mr. Modica

2                      JACK ROBINSON

3      called herein as a witness, being duly sworn,

4                  testified as follows:

5    EXAMINATION BY MR. MODICA:

6        Q      Good afternoon, Sergeant Robinson.  My name

7    is Steve Modica.  I'm the pro bono counsel appointed to

8    represent Mark Dublino in connection with an action

9    he's brought against you and several other folks.

10       I'm going to ask you a series of questions.  I'll

11   ask you to answer them to the best of your ability.  If

12   you don't understand my question please feel free to

13   ask me to rephrase it and I certainly will do that.

14       We're conducting this deposition by Zoom which is

15   always a little bit more complicated and awkward, so I

16   ask that you wait to respond until my question is done

17   and I'll do my best and wait until you've completed

18   your answer before I speak again.

19       Is that acceptable to you?

20       A      Sure.

21       Q      Sure.  Okay.  And, Sergeant Robinson, are you

22   currently employed by the Jail Management Division of

23   the Erie County Sheriff's Department?

24       A      Yes.

25       Q      And how long have you worked for them?

COMPUTER REPORTING SERVICE
(585) 325-3170

SA-189

5

1          J. Robinson - Examination by Mr. Modica

2     A     Twenty-three years.

3     Q     And during 2018 were you working for them?

4     A     Yes.

5     Q     And where were you performing your work at

6  that time?

7     A     I was assigned to training.

8     Q     But physically were you working at the Erie

9  County Holding Center?

10    A     Correct.

11    Q     And were you working at the Erie County

12 Holding Center on the morning of March 9th of 2018?

13    A     Yes.

14    Q     And what was your job assignment that day?

15    A     Training.

16    Q     And would you describe for me generally what

17 your responsibilities were doing training on that day?

18    A     Oh, I can't recall.  I'm assigned to the

19 training aspect.  I do all the training for the Erie

20 County Sheriff's Office out of the Jail Management

21 Division and I also am an instructor at the Police

22 Academy.  So I have a various functions each day:

23 Setting up people to go to training, attending

24 training, putting together classroom training for all

25 the officers, and I also do the peace officer training.

SA-190

6

1          J. Robinson - Examination by Mr. Modica

2     So I have a full plate.

3          Q     Does the training that you provide or

4     provided in 2018 include training about how to handcuff

5     someone?

6          A     Yes.

7          Q     All right.  We'll talk more about that later

8     certainly.

9          Do you recall did you have any interactions with

10    Mark Dublino before March 9th of 2018?

11         A     Yes.

12         Q     Okay.  Tell us about that.  What do you

13    recall about any of those interactions before March 9th

14    of 2018?

15         A     Prior to taking over the job as the training

16    sergeant I was in charge of classification and that was

17    the area that assigns all the inmates to their level

18    due to their -- there's a series of factors that give

19    them a level of classification.  We try to keep apples

20    with apples, oranges with oranges.

21         One night I was supervising a unit Mark Dublino was

22    involved in a fight and then a few other times being in

23    charge of classification I also did the disciplinary

24    hearings so he came to me for maybe one or two

25    disciplinary issues that he had in the facility.

COMPUTER REPORTING SERVICE
(585) 325-3170

7

J. Robinson - Examination by Mr. Modica

Q     Anything about those disciplinary hearings stand out in your mind either in the content, the way he acted, anything like that?

A     Well, the one he actually left our facility, went to Niagara County. He had something going on a case in Niagara County. He came back maybe two, three days -- I don't know the extent how long he was out of the building, but when he returned all the inmates that return to our facility get physically searched and in his shoe they found a shank made out of a plastic bowl. So he was written up for that and he came in front of me because I'm the disciplinary officer and he told me his story very agitated saying it wasn't his, but a day later in his property we found a bowl that had a crack in it that was exactly the shape of the shank he had in his sneaker or footwear.

Q     And just so I understand better, when you say shank, what do you mean by that?

A     It is an improvised or homemade weapon, say Tupperware bowl that he cracked a piece of plastic off almost to make it -- it had a very pointed edge. It's not going to slice anybody, but you can puncture somebody with the point that it had on it.

Q     Do you recall whether you or anyone on behalf

SA-192

8

1          J. Robinson - Examination by Mr. Modica

2    of the County imposed any discipline for him regarding

3    the shank episode?

4          A     Oh, I'm sure I did.  So --

5          Q     Any recollection as you sit here as to what

6    that was?

7          A     He definitely got an order of SHU or keep

8    lock unit.  He would have done time up there.  Without

9    these records in front of me I don't know the amount of

10   time he got.

11         Q     And by SHU --

12         A     Something like that --

13         Q     Go ahead.  I'm sorry.

14         A     That is special housing unit.

15         Q     Does that generally mean isolation of some

16   sort?

17         A     Yes.

18         Q     Okay.  So is it correct that you had some

19   interaction with Inmate Dublino on March 9th of 2018?

20         A     I arrived at the incident.  I'm not sure --

21   it's been so long.  I'm not really sure what my -- I

22   don't believe I -- other than supervising what was

23   going on that was about it.  I don't believe I had any

24   contact with him.

25         Q     I'll ask you a little bit more about that in

COMPUTER REPORTING SERVICE
(585) 325-3170

SA-193

9

```
 1          J. Robinson - Examination by Mr. Modica
 2    a moment, but are you aware or have you ever seen a
 3    video that shows at least part of the interaction
 4    between perhaps you and others in this case and
 5    Mr. Dublino outside the attorney conference room on
 6    March 9th of 2018?
 7          A     Yes.
 8          Q     And what I'd like to do is I'm going to show
 9    that video to you and what I'd ask you to do is if you
10    see yourself at all in the course of the video if you
11    could tell me so I could stop the video that would be
12    very helpful just so I can identify you and your
13    movement at least as shown in the video.
14          Is that acceptable to you?
15          A     Yes.
16          Q     All right.  So -- all right.  So, Sergeant
17    Robinson, first of all, can you see the screen that
18    I've shared?
19          A     Yes.
20          Q     Okay.  And I'm going to hit the play button
21    in just a second, but just for purposes of the record
22    I'm showing you what's been marked in this case as
23    Deposition Exhibit A.
24          MS. MOLISANI:  I'm sorry.  Are you able to
25    make it any bigger, Steve?
```

COMPUTER REPORTING SERVICE
(585) 325-3170

SA-194

10

1        J. Robinson - Examination by Mr. Modica

2    BY MR. MODICA:

3        Q    You know, why don't I do this.  Let me --

4    yeah, because I want you to be able to see it.  That's

5    obviously important.  So let me do this.  Is that

6    better?

7        A    Yes.

8        Q    Okay.  Great.  All right.  So just for

9    purposes of the record is it correct to say that this

10   video that I'm showing you consists of four separate

11   boxes so to speak?

12       Top left showing what's demarcated as the Alpha

13   Hallway - first let's start with that - is that

14   correct?

15       A    Yes.

16       Q    And then the box below it is designated as

17   Attorney Visit Sallyport.  Do you see that?

18       A    Yes.

19       Q    And across on the right side at the top of

20   the screen a demarcation of Attorney Visit A, do you

21   see that?

22       A    Yes.

23       Q    And then finally although no picture in that

24   frame yet at the bottom right it's indicated that it's

25   Attorney Visit B.  Do you see that?

COMPUTER REPORTING SERVICE
(585) 325-3170

SA-195

11

          J. Robinson - Examination by Mr. Modica

1

2       A     Yes.

3       Q     Terrific.  Okay.  So I'm going to hit play.

4  If you could let me know as soon as you see yourself, I

5  would appreciate that.  All right.

6       And I'm going to start playing it now.

7       A     Oh, there I am.

8       Q     Okay.  So I'm going to back up a little bit

9  because I think I didn't stop this as quickly as I

10  should have.

11      So first of all direct me to which of the four

12  windows so to speak did you see yourself?

13      A     I was in the Alpha Hallway the top left and

14  then I'm just going in the door on the bottom left

15  Attorney Visit Sallyport.

16      Q     Okay.  I'm going to back that up because I

17  went a little far.  I apologize for that.

18      So you tell me kind of when --

19      A     Oh --

20      Q     So let me move up a little.

21      A     Okay.  I am right there on the top.

22      Q     Is this you right here?

23      A     Yes.

24      Q     Okay.  So just for purposes of the record,

25  we're looking at the video on the Alpha Hallway screen,

SA-196

12

1          J. Robinson - Examination by Mr. Modica

2     the timestamp on the video is ten twenty-two and

3     forty-nine point three four one seconds a.m. and I

4     believe the witness has indicated that he is present.

5          In this particular frame he is toward the wall

6     about to go through the door, and fair to say, Sergeant

7     Robinson, you are clean-shaven on your head, so is that

8     you?

9          A     Correct.

10         Q     All right.  And I'll continue with it through

11    and if you could just try to trace your actions here

12    that would be helpful.  All right?

13         A     Stop.

14         Q     Okay.

15         A     You've got to back it up.

16         Q     Yep.

17         A     Right there.  Well, right --

18         Q     Yeah.  Sorry.

19         A     You're going too far.

20         Q     All right.  So let's go back.

21         A     That's not me.

22         Q     Oh, that's not you.  Okay.  All right.  So

23    now I stopped it at ten twenty-two -- oh, that's not

24    you, right?

25         The Attorney Sallyport, neither of those gentlemen

SA-197

13

1           J. Robinson - Examination by Mr. Modica

2     depicted there are you, correct?

3         A     Correct.

4         Q     Okay.  Sorry.

5         A     Stop.  You see the big guy in the bottom left

6     coming through?

7         Q     Yes.  This right here?

8         A     Yes.  I'm going to be behind him.

9         Q     You're going to be behind him.  Okay.  All

10    right.  So again we just were looking at the Attorney

11    Visit Sallyport box of the video, correct?

12        A     Yes.

13        Q     Okay.  All right.  I'm going to -- so this is

14    you right here, sir?

15        A     Correct.

16        Q     Okay.  All right.  So that's -- so again for

17    purposes of the record we're focused on the Attorney

18    Visit Sallyport box of the video and the witness has

19    indicated he is coming through the door coming from the

20    Alpha Hallway into the Attorney Visit Sallyport area

21    and we stopped the screen at the time of ten twenty-two

22    and fifty point two three six seconds on that day which

23    is March 9th of 2018; is that correct?

24        A     Correct.

25        Q     All right.  I'm going to continue back and

SA-198

14

J. Robinson - Examination by Mr. Modica

1    feel free to just identify where you go and what you do
2
3    next.  Okay?
4        A    Stop.
5        Q    Okay.  So --
6        A    Upper right -- upper right Attorney Visit A
7    you can see just the top of my head.  I'm behind the
8    guy you have -- there I am right there.
9        Q    Right there.  Okay.  So this is -- all right.
10   So just for purposes of the record we've stopped it on
11   the Attorney Visit A box, we're looking at the pause in
12   the time of ten twenty-two and fifty-five point one
13   five six seconds a.m. on March 9th and the witness has
14   indicated that he is seen to the right of the screen
15   and I'm going to say second row would be a fair way to
16   describe that?
17       A    I'd go third.
18       Q    Third.  Okay.  Yeah, that's probably correct.
19   And again, is it one indication that we can identify
20   that it's him is it appears to be a person with a
21   shaved head.
22       All right.  I'm going to continue to go --
23       A    You don't have to continue.  Before you go
24   on, Attorney Visit B that's the back of my head at ten
25   twenty-two fifty-five in the timestamp.

COMPUTER REPORTING SERVICE
(585) 325-3170

SA-199

15

1        J. Robinson - Examination by Mr. Modica

2        Q      Oh, okay.  So is that right here which I'm

3    circling?

4        A      Correct.

5        Q      You're standing up, right?

6        You're not -- there seems to be another gentleman

7    with a shaved head that appears to be at a lower level.

8    That's not you, correct?

9        A      No, it is not.

10        Q      Okay.  I'm going to hit play again and please

11    stop me as you'd like.

12        A      I'm going to be in the video the rest of the

13    time I would assume.

14        Q      Okay.  And so again --

15        A      There's me the upper right now it looks I

16    guess you could say the first row.

17        Q      Okay.  And again that would be for purposes

18    of the record we're looking at the Attorney Visit A box

19    and the witness has indicated that he is in the first

20    row and we've stopped it at ten twenty-two and

21    fifty-eight point nine six zero seconds.

22        And, Sergeant Robinson, do we also see the back of

23    your head in the Attorney Visit B box?

24        A      I would say it is closest to the door on the

25    left-hand side of that bottom video looking forward.

SA-200

16

J. Robinson - Examination by Mr. Modica

1

2     Q     Correct.  Okay.  Thank you.  And again just

3  for purposes of the record that Attorney Visit B box is

4  at the time of ten twenty-two and fifty-eight point

5  nine seven three seconds a.m. again on March 9th, 2018.

6     Okay.  I'm going to resume again.  Now, it looks

7  like -- I've paused it in the Attorney Visit A box of

8  ten twenty-three and zero point nine six two seconds.

9  Can you tell me are you visible or not visible at this

10  time?

11     A     No.

12     Q     And do you recall what if anything may have

13  made you not visible in the screen at this moment?

14     A     No, not at this point.

15     Q     Is it possible that you went to the floor or

16  went to a lower level for some reason?

17     A     Well, if they asked for handcuffs I may have

18  reached into my back pocket to get my handcuffs so I

19  would have lowered myself to hand them to him, but like

20  I said, I can't recall.

21     Q     Understood.  And also in fairness the cameras

22  that we're looking at now, those shots, there's parts

23  of those that you can't see, you can't see everything

24  from floor to ceiling; is that fair?

25     A     In what I'm looking at now yes.

SA-201

17

1        J. Robinson - Examination by Mr. Modica

2        Q        And as far as you know the cameras, the

3    images that we're seeing are not edited in any way, are

4    they?

5        A        I don't believe so.

6        Q        Okay.  I'm going to continue.  Now I've

7    stopped Attorney Visit A at ten twenty-three and four

8    point nine six six seconds and there's a gentleman with

9    his back to us also with a shaved head.  Can you tell

10   is that you, Sergeant Robinson?

11       A        No, it is not.

12       Q        Okay.  Do you know who that is?

13       A        I believe it was the first officer and he's

14   wearing a sweater.  That might be Deputy Thompson.

15       Q        All right.  And I'm going to play it again

16   and if you can tell me if and when you reemerge at all

17   that would be helpful.

18       A        Stop.  I'm not sure, bottom right the

19   Attorney Visit B that I can't tell, but it could be me.

20   I can't really -- there's -- there was a second officer

21   down there also with I guess a clean-shaven head.

22       Q        Okay.

23       A        I can't see the sleeve if it's me or not.

24       Q        Okay.  And again just for purposes of the

25   record the witness is referring to the box entitled

COMPUTER REPORTING SERVICE
(585) 325-3170

SA-202

18

1          J. Robinson - Examination by Mr. Modica

2   Attorney Visit B and specifically at the time I paused

3   it of ten twenty-three and eleven point nine eight six

4   seconds.

5          And I'll ask you because we had some testimony,

6   Sergeant Robinson, earlier in the case I believe Deputy

7   Gelster was also in the area and I believe respectfully

8   that he is clean-shaven on his head as well.  Do you

9   know whether that's Deputy Gelster?

10         A     I cannot tell.

11         Q     All right.  I'm going to resume again and

12   feel free to stop me.

13         A     Okay.  That's me.

14         Q     Okay.  So since we ran it further you were

15   able to confirm that the person we've been looking at

16   in Attorney Visit B the clean-shaven gentleman is in

17   fact you?

18         A     Correct.

19         Q     And just for purposes of the record, the

20   witness was able to confirm that once we stopped it at

21   the Attorney Visit B window at the time of ten

22   twenty-three and fourteen point seven eight nine

23   seconds.  Thank you for doing that.

24         All right.  I'm going to resume again and then feel

25   free to take me through any of your movements from

COMPUTER REPORTING SERVICE
(585) 325-3170

SA-203

19

1          J. Robinson - Examination by Mr. Modica

2     there.

3          A    I have a question.  If I don't leave the

4     video do you need to keep having me say there I am,

5     there I am, there I am?

6          Q    No.

7          A    Okay.

8          Q    No, I mean, if we can see you.  If you leave

9     the visual I'd like to know, but otherwise if we've

10    identified who you are, that's fine.

11         A    Okay.

12         Q    Okay.  Now I've stopped it at the Attorney

13    Visit B window at ten twenty-three and twenty-four

14    point five zero zero seconds.  It appears to be as if

15    you are bent down in some fashion.  Is that a fair

16    characterization?

17         A    Yes.

18         Q    Okay.  Any recollection as to what you were

19    doing at that point?

20         A    I can't -- again, I don't believe I touched

21    the individual.  So I must just be leaning over to make

22    sure they're doing their job.

23         Q    And can you tell who is to your left also

24    kind of leaning down?

25         A    Not right now.  My head is blocking his face

COMPUTER REPORTING SERVICE
(585) 325-3170

20

1          J. Robinson - Examination by Mr. Modica

2    or her face.

3        Q    Understood.  And again, I don't mean to

4    suggest anything to the witness, but I believe that

5    might be Sergeant Justin Biegaj, but you draw your own

6    conclusion as we run the video forward.

7        A    Okay.

8        Q    But I think based on what we saw earlier it

9    might be him.

10       A    Okay.

11       Q    Okay.  I'm going to resume.

12       A    Yes, that is Sergeant Biegaj.

13       Q    Got it.  I apologize for pronouncing his name

14   improperly.  Thanks.

15       All right.  I'm going to resume.  Again, let's

16   bring it back a bit.  All right.  I have paused the

17   Attorney Visit B window at ten twenty-three and

18   thirty-three point three one two seconds and first I

19   want to just confirm that the gentleman in the middle

20   of the screen with his head shaven clean we believe is

21   you, correct?

22       A    Correct.

23       Q    Okay.  And I would say for the record it

24   appears that your right hand is extended out, but I

25   can't tell what if anything you're doing with your

SA-205

21

1          J. Robinson - Examination by Mr. Modica

2     right hand.  Can you tell?

3          A     It looks like it's resting on the officer's

4     shoulder.

5          Q     And probably fair to say you can't tell which

6     officer that would be?

7          A     Correct.

8          Q     And any sense or any recollection as to why

9     you would put your hand on the officer's shoulder like

10    in that fashion?

11         A     I'm trying to observe what they're doing.

12         Q     And again you feel like that picture shows

13    you resting your hand on the officer, not on the

14    inmate?

15         A     Absolutely.

16         Q     And I don't think -- in fairness I don't

17    think we can see the inmate in this particular still,

18    ten twenty-three thirty-three point three one two; is

19    that correct?

20         A     Correct.

21         Q     Is it fair to assume though that the inmate

22    is somewhere on the ground outside of the view of us in

23    that particular screenshot?

24         A     Yes.

25         Q     Okay.  I have paused the Attorney Visit B

COMPUTER REPORTING SERVICE
(585) 325-3170

SA-206

22

          J. Robinson - Examination by Mr. Modica

1

2    window at ten twenty-three and fifty-eight point two

3    three seven seconds and we see two gentlemen in kind of

4    more of the left side of the screen, left middle if you

5    will, both of whom have shaved heads.  Which one is

6    you?

7        A     I'm the one closest to Sergeant Biegaj.

8        Q     Right there?

9        A     No.  The second one.

10       Q     The second one.  Okay.

11       A     Right there.

12       Q     And who is this gentleman right behind you in

13   the glasses?

14       A     That looks like it's Deputy Wilson.

15       Q     Wilson.  Okay.  All right.  I'm resuming the

16   video.  All right.  So now at this moment again we're

17   looking at Attorney Visit B, ten twenty-four and one

18   point two four zero seconds.  Inmate Dublino is up.

19   There is a deputy -- at least one deputy holding him,

20   another gentleman with a clean-shaven head.  Do you

21   recognize that deputy?

22       A     Well, maybe if he turns a little bit more.

23       Q     Okay.  All right.  We certainly know that's

24   not you, correct?

25       A     Correct.

SA-207

23

1              J. Robinson - Examination by Mr. Modica

2         Q     And I'll represent to you that I believe that

3    that's Deputy Frank Gelster, but obviously you'll draw

4    your own conclusion.

5         All right.  I'm going to resume.  I've stopped it

6    again.  It's ten twenty-four and three seconds -- three

7    point six four two seconds, and in the right side of

8    the Attorney Visit B screen is Inmate Dublino and there

9    is a gentleman directly behind him.  Is that you?

10        A     Correct.

11        Q     Okay.  And any recollection as to what you're

12   doing at that point; are you having any physical

13   contact with Inmate Dublino that you recall?

14        A     Not that I'm aware of.  That's Deputy Gelster

15   in between me and Inmate Dublino.

16        Q     Okay.  And that's who I said a few moments

17   ago I thought that person was that.  You agree with

18   that now?

19        A     Yes.

20        Q     Now it looks to me as if you're walking with

21   the group down the hallway into the Attorney Sallyport

22   area and would you just tell me to stop when you see

23   yourself in the Attorney Sallyport area?

24        A     Sure.

25        Q     Are any of those gentlemen -- obviously I

COMPUTER REPORTING SERVICE
(585) 325-3170

SA-208

24

```
 1          J. Robinson - Examination by Mr. Modica
 2   know we have Deputy Gelster.  Is this you right here?
 3        A     No.
 4        Q     Is this you?
 5        A     No.
 6        Q     Okay.
 7        A     Stop.
 8        Q     Is that you?
 9        A     Yes.
10        Q     Okay.  All right.  So we have paused at the
11   Attorney Visit Sallyport window at ten twenty-four and
12   forty point four four six seconds and the witness has
13   indicated that he is depicted on the bottom right of
14   the screen having already entered the sallyport, not
15   the gentleman in the doorway about to come in; is that
16   fair, sir?
17        A     Correct.
18        Q     And I'm resuming.
19        A     Stop.  Alpha Hallway I guess the center.
20        Q     Is this you?
21        A     No.  Back up.  No.  Back up.  There you go.
22   Right there.
23        Q     Right there.  Okay.  So we've got Alpha
24   Hallway.  Again at that point you look like -- it looks
25   to me as if you're walking by yourself.  It doesn't
```

SA-209

25

```
 1          J. Robinson - Examination by Mr. Modica
 2   look like you have your hands on anybody.
 3       Again, any recollection of where you're going at
 4   that point?
 5       A      They're probably taking him to medical.
 6       Q      Okay.  What makes you think that?
 7       A      Because usually after something like this we
 8   take everyone to medical to be evaluated.
 9       Q      Okay.  All right.  I'm going to continue.
10   And you've just left Alpha Hallway, again recollection
11   is going toward medical?
12       A      Well, that's -- I don't know if I got on the
13   same elevator as he got on, but the elevator Inmate
14   Dublino got on most likely would have been taking him
15   to medical.  The second elevator may have been
16   following him to medical.  I cannot recall.  I do not
17   recall where it went.
18       Q      Okay.  And then I believe that none of the
19   remainder of the video depicts you in any way, but I'll
20   let it run out and if you see anything that you want to
21   tell me about please do that.
22       Okay.  The video is complete so I'm going to stop.
23   Was there anything that you wanted to comment on from
24   the last pause until the end of the video?
25       A      No.
```

SA-210

26

1       J. Robinson - Examination by Mr. Modica

2       Q      All right.  And I thank you for your patience

3   while I was going through that.  I know it's a little

4   tedious.

5       Best that you know is that video complete?

6       A      Yes, to the best that I know.

7       Q      Okay.  Did you prepare any memoranda or use

8   of force report about this incident?

9       A      No.

10      Q      Is there a reason why you didn't?

11      A      Because I did not touch him.

12      Q      And tell me about that generally, is it your

13  understanding or is it the policy of the Erie County

14  Sheriff that if a deputy or a sergeant has physical

15  contact with an inmate that they're required to put

16  something in writing about that?

17      A      Correct.  There will be a report and then a

18  use of force report as well.

19      Q      Tell me originally how were you made aware

20  that there was a need for assistance outside of

21  Attorney Conference Room 3 on March 9th?

22      A      There was a call put out over -- a distress

23  call put out over the radio with the location.

24      Q      And that radio, is that the one that you were

25  wearing on your body at the time?

COMPUTER REPORTING SERVICE
(585) 325-3170

SA-211

```
                                                              27

 1            J. Robinson - Examination by Mr. Modica

 2       A      Yes.

 3       Q      And is that commonly known as a 10-99 call?

 4       A      Yes.

 5       Q      Technically what does that mean?

 6       A      Officer needs assistance.

 7       Q      Does the jail have a code for an altercation

 8  between a person in custody and his lawyer for example?

 9       A      Not that I'm aware of.

10       Q      And if you recall where were you when you got

11  the 10-99 call on March 9th?

12       A      I would assume my office.  I don't know.

13       Q      All right.  And certainly we went through in

14  detail what the video showed relative to your

15  participation so to speak, your presence in the area.

16       At any point did you hear Inmate Dublino say

17  anything, again from when you and the rest of the

18  response team went there until you left his presence?

19       A      I cannot recall.

20       Q      Any indication whether Inmate Dublino

21  resisted any of the orders of the deputies or the

22  sergeants or anyone that gave him an order?

23       A      That again I do not recall.  I believe there

24  was difficulty in handcuffing him because he would not

25  put his hands behind his back, but that's -- you know,
```

SA-212

28

```
1           J. Robinson - Examination by Mr. Modica
2    again, I cannot recall.
3        Q      All right.  So you mentioned earlier that you
4    are responsible for training, doing some training.  So
5    I want to ask you a little bit about that.
6        Is there a standard operating procedure as to how
7    someone in custody is supposed to be handcuffed?
8        A      Yes.
9        Q      Could you explain that to me please?
10       A      Their thumbs up, palms out, knuckles
11   touching.
12       Q      Okay.  So I'm very inexperienced in this
13   area.  So I apologize.  I'm going to ask you some silly
14   questions.
15       But, first of all, is the person generally
16   handcuffed with their hands in front of their body or
17   behind their body?
18       A      Behind their back.
19       Q      Okay.  Behind their back.  And when they are
20   behind their back are their palms facing out meaning
21   away from the center of their body or in toward the
22   center of their body?
23       A      Out away from their body.
24       Q      And is there a particular reason why that's a
25   preferred way to handcuff someone?
```

COMPUTER REPORTING SERVICE
(585) 325-3170

Case 22-198, Document 73, 01/31/2023, 3461535, Page217 of 296

SA-213

29

J. Robinson - Examination by Mr. Modica

1

2    A    So their hands, their palms are not facing

3    each other and they can reach into their waistband or

4    pocket area.

5    Q    So it's in part for the safety hopefully of

6    people like yourself and the other deputies in the

7    jail?

8    A    For all safety even including the I guess

9    we'll call it this time a subject because this is how

10   it's done pretty much across the board in Western New

11   York.

12   Q    Are there times when that preferred method of

13   handcuffing someone isn't possible or isn't done?

14   A    I don't believe so.  Everyone has been

15   trained to do that.  The cuffs may not go on the proper

16   way we'd like them to go on, but that would be about

17   it.

18   Q    Are you familiar with a concept that's called

19   reverse handcuffing?

20   A    No.

21   Q    Okay.  Are you aware of -- have you ever

22   cuffed someone where their palms are facing in?

23   So we described before that it's behind their back,

24   palms facing away from the center of their body.

25   Have you ever cuffed someone where their palms were

SA-214

30

J. Robinson - Examination by Mr. Modica

2  facing toward the center of their body?

3      A    I have not.

4      Q    Okay.  Any indication whether Inmate Dublino

5  was cuffed in different ways during the incident on

6  March 9th of 2018?

7      A    I am not.

8      Q    I think just to confirm, it's your testimony

9  that you had no physical contact with Inmate Dublino on

10  March 9th of 2018; is that correct?

11      A    Yes.

12      Q    All right.  At any point do you recall

13  whether you heard Mr. Terranova who claimed he was

14  assaulted by Inmate Dublino say anything?

15      A    No.

16      Q    There's an allegation that Mr. Terranova said

17  someone kicked his ass, meaning kicked Mr. Dublino's

18  ass.  Any recollection of any comments by Mr. Dublino

19  like that or anything else?

20      A    No.

21      Q    When Inmate Dublino was taken to the

22  infirmary is there a camera set up that would show once

23  he left Alpha Hallway going toward the infirmary, do

24  you know?

25      A    There should be a camera in the hallway, yes.

COMPUTER REPORTING SERVICE
(585) 325-3170

SA-215

31

```
 1              J. Robinson - Examination by Mr. Modica
 2       Q      Now I'm going to ask you about some of the
 3   folks that Mr. Dublino has sued here and recite for you
 4   in part what he's claiming and whether you saw any of
 5   these events as Mr. Dublino claims.
 6       So first with Deputy Thompson, do you recall seeing
 7   him as part of the response team?
 8       A      Yes.
 9       Q      And do you recall whether Deputy Thompson was
10   accompanied by his dog, his canine Billy, at that
11   point?
12       A      Yes.
13       Q      At any point did you see Billy having any
14   physical contact with Mr. Dublino?
15       A      No.
16       Q      What if any physical contact did you see
17   between Deputy Thompson and Inmate Dublino?
18       A      It looked like he grabbed him by the shirt
19   from the video.  I did not physically see it.  I just
20   saw it in the video.
21       Q      And were you able to hear any orders that
22   Deputy Thompson gave to Inmate Dublino?
23       A      When I got there, no.
24       Q      And by the time you got there when you first
25   saw Inmate Dublino what if anything do you remember
```

COMPUTER REPORTING SERVICE
(585) 325-3170

SA-216

32

J. Robinson - Examination by Mr. Modica

1

2   seeing?

3       A     He was lying face down on the ground against

4   the wall.

5       Q     And best that you could tell was he resisting

6   in any way at that point or at any point later?

7       A     I believe that's why I ended up leaning over

8   there because he was resisting to make sure that they

9   were gathering his arm the right way and not putting

10  any undue stress on his shoulder or elbow joint.

11      Q     And at any point did you hear Inmate Dublino

12  complain that he was injured in some fashion?

13      A     No.

14      Q     At any point did you hear Inmate Dublino

15  claim that he was having difficulty breathing?

16      A     No.

17      Q     Now, we observed earlier that the response

18  team included Sergeant Justin Biegaj.  Tell me that

19  again.  I'm going to mess that up ten times.  Sorry.

20      A     Biegaj.

21      Q     Biegaj.  All right.  I have not deposed him

22  yet.  So hopefully I'll get it right by the time I

23  depose him.  So Biegaj.  All right.

24      A     Biegaj.  Say it fast.

25      Q     Biegaj.  All right.  I appreciate that.

COMPUTER REPORTING SERVICE
(585) 325-3170

SA-217

33

1        J. Robinson - Examination by Mr. Modica

2    Thanks for your patience with me.  I appreciate that.

3        A    Uhm-uhm.

4        Q    Mr. Dublino alleges that Sergeant Biegaj

5    stomped and stepped on him while he was on the ground

6    targeting his head and his back.  Did you see any

7    behavior like that?

8        A    No.

9        Q    He also alleges that Sergeant Biegaj put his

10   knee on his back, meaning Dublino's back.  Did you see

11   any contact between Sergeant Biegaj's knee and any part

12   of Mr. Dublino's body?

13       A    No.

14       Q    You identified Deputy Wilson.

15   Do you recall whether you saw Sergeant Robert Dee

16   in the group of folks that responded that day?

17       A    Yes.

18       Q    And can you confirm that he was part of that

19   response team?

20       A    Yes.

21       Q    And Inmate Dublino alleges that Sergeant Dee

22   and Deputy Wilson grabbed his arms and his hands, bent

23   them in abnormal positions with extreme pressure which

24   injured himself.  Any recollection about their behavior

25   and that allegation?

SA-218

34

                    J. Robinson - Examination by Mr. Modica

1

2      A     No.

3      Q     Now I'll represent to you - and I can run the

4  video back if you'd like - that from the time that

5  Deputy Thompson arrived and got Inmate Dublino on the

6  floor until the time that he arose in the manner that

7  we watched earlier it was about a minute and twenty

8  seconds.

9      A     Okay.

10     Q     Can you give me a sense as to how long if at

11 all it typically takes to handcuff someone in a

12 circumstance like that?

13     A     If somebody is actively resisting and the

14 position against the wall that he was in it could be

15 very difficult.  So, I mean, it's -- it's tough to give

16 a time.

17     Q     Is there -- could you give me an estimate of

18 if there was no -- if someone was not resisting how

19 long would you expect it to take to put on handcuffs in

20 the manner we described it earlier, so behind the back,

21 palms facing away from the center of the body, how long

22 would you expect that would take?

23     A     Start to finish less than twenty seconds.

24     Q     All right.  Sergeant Matthew Cross, was he

25 among the folks that participated as the response team?

35

1            J. Robinson - Examination by Mr. Modica

2      A     Yes.

3      Q     And Inmate Dublino alleges that Sergeant

4  Cross stood directly over him and stomped on his legs,

5  his ankles and his feet while he was on the floor.  Did

6  you see any behavior by Sergeant Cross of that nature?

7      A     No.

8      Q     Two deputies as well are named in this

9  lawsuit, Peter Giardina and Deputy Gelster.  I want to

10 ask you a little bit about them.

11     So Inmate Dublino alleges that he was picked off

12 the ground by his arms and his shoulders and escorted

13 to the infirmary by those deputies.  I think in the

14 video we identified Deputy Gelster.

15     Do you remember did you see Dr. Giardina as well?

16     A     Yes.

17     Q     And he alleges that on the way to the

18 infirmary that you ordered them to wrench -- quote,

19 "wrench him," which Inmate Dublino describes as bending

20 his arms and his wrists with pressure into the

21 handcuffs.  So can you address that?  Is that something

22 that you did?

23     A     No.

24     Q     Do you recall giving Deputies Giardina and

25 Gelster any instructions as they accompanied him to the

SA-220

36

1          J. Robinson - Examination by Mr. Modica

2    infirmary relative to Inmate Dublino?

3        A      The only instruction that I gave and I don't

4    know if Officer -- or Deputy Giardina was part of it

5    was, "When you pick him up do not lift him up by the

6    chain."  That was it.

7        Q      And by the chain you're referring to the

8    chain that connects the handcuffs?

9        A      Correct.

10       Q      And why did you give that instruction?

11       A      Because sometimes people get a little wound

12   up and they don't get people up off the ground properly

13   and I'm here to prevent something like this from

14   happening from people getting into trouble.

15       Q      So meaning that the officers and deputies

16   wanted to pick the inmate up correctly so they don't

17   get in trouble but also that they don't injure the

18   inmate I'm assuming --

19       A      Correct.

20       Q      -- or injure themselves?

21       A      Correct.

22       Q      Now do you recall did you accompany Deputies

23   Giardina and Gelster and Inmate Dublino to the

24   infirmary?

25       A      I stated earlier I don't believe I got on the

COMPUTER REPORTING SERVICE
(585) 325-3170

SA-221

37

1          J. Robinson - Examination by Mr. Modica

2     same elevator.  We'll have to watch that end of the

3     video, but I do not recall going to medical.  I could

4     be wrong, but I don't recall accompanying those three

5     to medical.

6          Q     I'll represent to you that there were a

7     number of photos taken of Inmate Dublino after this

8     interaction.  Were you present when those photos were

9     taken?

10         A     I don't believe so.

11         Q     If I showed you the photos would they help

12    you remember whether you were present at all?

13         A     I have no idea.

14         Q     All right.

15         A     You can show them to me.

16         Q     Sure.  It can't hurt.  All right.  So --

17    okay.  Let me show you what has been marked as

18    Deposition Exhibit D.  Can you see that photograph?

19         A     Yes.

20         Q     Does looking at that photograph help you

21    remember whether you were present when this photograph

22    was taken?

23         A     No.

24         Q     And is it correct that depicted in this

25    photograph on the left is Deputy Gelster?

COMPUTER REPORTING SERVICE
(585) 325-3170

SA-222

38

1          J. Robinson - Examination by Mr. Modica

2     A     Correct.

3     Q     And on the right is Deputy Giardina?

4     A     Correct.

5     Q     And Inmate Dublino in the middle?

6     A     Yes.

7     Q     I show you what we've marked as Deposition

8  Exhibit E.  Same question.  Does looking at that photo

9  help you remember whether you were present when it was

10 taken?

11    A     No.

12    Q     Showing you what we've marked as Deposition

13 Exhibit F.  Same question.  Does that help you remember

14 whether you were present when these photos were taken?

15    A     No.

16    Q     And there's only one more.  Showing you

17 what's been marked as Deposition Exhibit G.  Does that

18 photograph help you remember whether you were present

19 when this photograph was taken?

20    A     No.

21    Q     In looking at Deposition Exhibit G it's a

22 photograph of Inmate Dublino -- I'll represent to you

23 it's a photograph of the hands of Inmate Dublino.

24        Did you at any point look at his hands in the

25 altercation in the hallway or at any point later that

SA-223

39

```
 1          J. Robinson - Examination by Mr. Modica
 2    day?
 3         A     No.
 4         Q     Do you know whether after Inmate Dublino was
 5    initially cuffed whether those cuffs were changed in
 6    any way, meaning taken on or off?
 7         A     No.
 8         Q     I'll represent to you that part of the
 9    photographs clearly the last one shows his hands
10    without handcuffs.  Do you know who took the handcuffs
11    off from when he was first subdued until the time the
12    photographs were taken?
13         A     No.
14               MR. MODICA:  Okay.  I do not have anything
15    else, Sergeant.  I appreciate your cooperation and your
16    patience with me.
17               And I don't know if Erin has any questions
18    for you, but if she doesn't we can dismiss you.
19               MS. MOLISANI:  No questions here.  Thank you.
20               MR. MODICA:  Perfect.  Thank you, Sergeant.
21    I appreciate it.
22               THE WITNESS:  You're welcome.
23                    *       *       *
24
25
```

SA-224

```
                                                              40
 1            J. Robinson - Examination by Mr. Modica
 2                      REPORTER CERTIFICATE
 3
 4        I, Brittany Needham, do hereby certify that I did
 5    report in stenotype machine shorthand the proceedings
 6    held in the above-entitled matter;
 7        Further, that the foregoing transcript is a true
 8    and accurate transcription of my said stenographic
 9    notes taken at the time and place hereinbefore set
10    forth.
11
12    Dated  7/12/21
13    At Rochester, New York
14
15                           S/ Brittany Needham
16                           _____
17                           Brittany Needham
18
19
20
21
22
23
24
25
```

COMPUTER REPORTING SERVICE
(585) 325-3170

41

1            J. Robinson - Examination by Mr. Modica

2                     WITNESS CERTIFICATE

3                                                    ORIGINAL

4      STATE OF NEW YORK     )

5      COUNTY OF             )

6

7           I, JACK ROBINSON, do hereby certify that I have

8      read the transcript of my testimony as taken under oath

9      on Thursday, June 10, 2021 and that said transcript is

10     a true, complete and correct record of what was asked,

11     answered and said during said deposition, and that the

12     answers on record therein, and as may be modified in

13     conformity with the attached errata sheet, are true and

14     correct.

15

16

17

18                              _____

19

20

21     Subscribed and sworn to before me

22     this _____ day of _____, 2021

23     Notary Public

24

25

                     COMPUTER REPORTING SERVICE
                        (585) 325-3170

SA-226

42

1          J. Robinson - Examination by Mr. Modica

2   In the Matter of:

    UNITED STATES DISTRICT COURT                    *ORIGINAL*

3   WESTERN DISTRICT OF NEW YORK

    - - - - - - - - - - - - - - - - - - - - - X

4   MARK T. DUBLINO,

         Plaintiff

5        -vs-

    SGT. JUSTIN BIEGAJ, SGT. ROBERT DEE, DEPUTY

6   BRIAN THOMPSON, DEPUTY FRANK GELSTER,

    SGT. MR. CROSS, SGT. MR. ROBINSON,

7   DEPUTY MR. P. GIARDINA, & DEPUTY SHAWN WILSON,

         Defendants

8   - - - - - - - - - - - - - - - - - - - - - X

            Case No. 19-CV-6269-DGL-MJP

9   Errata sheet for the examination before trial of JACK

10  ROBINSON taken on Thursday, June 10, 2021.

11  PAGE        LINE        REMARKS

12  _____       _____       _____

13  _____       _____       _____

14  _____       _____       _____

15  _____       _____       _____

16  _____       _____       _____

17  _____       _____       _____

18  _____       _____       _____

19  _____       _____       _____

20  _____       _____       _____

21  _____       _____       _____

22  _____       _____       _____

23  _____       _____       _____

24

25

COMPUTER REPORTING SERVICE
(585) 325-3170

SA-227

# EXHIBIT F

SA-228

1

2  UNITED STATES DISTRICT COURT                 **ORIGINAL**

3  WESTERN DISTRICT OF NEW YORK

4  - - - - - - - - - - - - - - - - - - - - - - x

   MARK T. DUBLINO

5       Plaintiff

        -vs-

6  SGT. JUSTIN BIEGAJ, SGT. ROBERT DEE,

   DEPUTY BRIAN THOMPSON, DEPUTY FRANK

7  GELSTER, SGT. MR. CROSS, SGT. MR. ROBINSON,

   DEPUTY MR. P. GIARDINA, DEPUTY SHAWN WILSON

8       Defendants

   - - - - - - - - - - - - - - - - - - - - - - x

9       Civil Action No. 6:19-cv-6269-DGL

10

11

12

13      Deposition of PETER GIARDINA taken pursuant to

14  notice via videoconference on Friday, June 11, 2021

15  commencing at 11:29 a.m.

16

17

18

19

20

21  Reported by:

22  COMPUTER REPORTING SERVICE

23  Shari L. Vitalone

24  16 East Main Street, Suite 7

25  Rochester, New York  14614       (585) 325-3170

COMPUTER REPORTING SERVICE
(585) 325-3170

2

2   APPEARANCES:

3        MODICA LAW FIRM

4        By:  STEVEN V. MODICA, Esq.

5        2430 Ridgeway Avenue

6        Rochester, New York  14626

7        Attorneys for plaintiff.

8

9

10        ERIE COUNTY DEPARTMENT OF LAW

11        By:  ERIN MOLISANI, Esq.

12        95 Franklin Street, Suite 1634

13        Buffalo, New York  14202

14        Attorneys for defendants.

15

16

17

18

19

20

21

22

23

24

25

```
                                                                      3

  2                        INDEX

  3    Peter Giardina

  4        Examination by Mr. Modica                    4 - 34

  5

  6

  7    Reporter Certificate                               35

  8    Witness Certificate                                36

  9    Errata Sheet                                       37

 10

 11

 12    (No exhibits marked.)

 13

 14

 15

 16

 17

 18

 19

 20

 21

 22

 23

 24

 25
```

SA-231

4

1            P. Giardina - Examination by Mr. Modica

2                          PETER GIARDINA

3        called herein as a witness, being duly sworn,

4                    testified as follows:

5      EXAMINATION BY MR. MODICA:

6            Q.    Good morning.  As I mentioned, my name is

7      Steve Modica.  I am pro bono counsel for Mr. Dublino.

8            I'm going to ask you a series of questions.  I

9      would please ask you to answer those to the best of

10     your ability.

11           If you don't understand the question please feel

12     free to ask me to rephrase it.

13           Because this medium is a little bit awkward it's

14     real important that I wait until you're done answering

15     before I speak again and visa versa and it usually

16     works out pretty well if we do that.

17           Is that acceptable to you?

18           A.    Yes.

19           Q.    Can you tell me first to start so I pronounce

20     it properly how do you pronounce your last name?

21           A.    Giardina.

22           Q.    And I'm Italian.  I shouldn't have any

23     difficulty with that, but in case I do I apologize.

24           A.    All right.

25           Q.    Deputy Giardina, you are currently employed

COMPUTER REPORTING SERVICE
(585) 325-3170

SA-232

5

```
1           P. Giardina - Examination by Mr. Modica
2    by the Jail Management Division of the Erie County
3    Sheriff's Office?
4         A.    Yes, I am.
5         Q.    How long have you been so employed?
6         A.    It will be six years in September.
7         Q.    During 2018 did you work for them?
8         A.    Yes, I did.
9         Q.    And did you work at the Erie County Holding
10   Center for them in 2018?
11        A.    Yes, I did.
12        Q.    Were you working at the Erie County Holding
13   Center on the morning of March 9th of 2018?
14        A.    Yes, I was.
15        Q.    If you recall what was your assignment that
16   day?
17        A.    I believe I was an escort that day.
18        Q.    And would you tell me generally what is
19   involved as an escort?
20        A.    Yes.   It would be just moving individuals
21   throughout the building to different places throughout
22   the day to visits, to courts, stuff like that.
23        Q.    And, again, this would be escorting inmates
24   or jail personnel or both?
25        A.    Inmates.
```

SA-233

6

        P. Giardina - Examination by Mr. Modica

1

2     Q.     Inmates, okay.

3     As best as you can recall did you have any

4     interactions with inmate Dublino before March 9th of

5     2018?

6     A.     I did work a housing unit he was on multiple

7     times prior to that date.

8     Q.     Any interactions with him that stand out in

9     your head positive or negative, again, before March 9th

10    of 2018?

11    A.     No.

12    Q.     And obviously you had some interaction with

13    him on March 9th of 2018; is that correct?

14    A.     Correct.

15    Q.     And there's a video of at least part of your

16    interaction with inmate Dublino on that day.  Is that a

17    video that you've seen?

18    A.     No, I have not.

19    Q.     So I've got that video here today.  It's

20    marked as Deposition Exhibit A and I'd like to show you

21    that video just so you have an opportunity to take a

22    look at it.

23    Particularly, obviously, I want to focus on you and

24    what would be most helpful once I get it started is if

25    you could stop me as soon as you come into view.

COMPUTER REPORTING SERVICE
(585) 325-3170

SA-234

7

1        P. Giardina - Examination by Mr. Modica

2     Okay?

3     A.    Okay.

4     Q.    All right.  So, Deputy Giardina, do you see

5  on the screen what appears to be a video with four

6  boxes in it?

7     A.    Yes.

8     Q.    And just for some contact detail I'll tell

9  you this was a video produced by the county and as you

10  probably see from the markings it involves a date of

11  March 9th of 2018 at various moments starting with

12  10:22:14.506 seconds that morning.

13     Do you see that?

14     A.    Yes.

15     Q.    Okay.  All right.  So I'm going to play the

16  video.  Again, please stop me if and when you see

17  yourself.

18     Again, is this large enough?  This is as big a

19  screen as I have.  Are you able to see it okay?

20     A.    Yeah.

21     Q.    If you want at any point to move it back,

22  stop it, go forward, don't hesitate just letting me

23  know.

24     Okay.  I'm going to start it now.

25  (Deposition Exhibit A played.)

SA-235

8

1          P. Giardina - Examination by Mr. Modica

2      Q.     Okay.  Have you seen yourself so far?

3      A.     I don't think so.

4      Q.     I didn't think so either, but you know you

5   better than me.

6   (Deposition Exhibit A played.)

7      Q.     All right.  I paused the video.  If you look

8   at the box on the top left entitled Alpha Hallway - I

9   stopped the video at 10:23:44.796 seconds - there's a

10   gentleman -- there appears to be three gentlemen in the

11   hallway.

12      The gentleman on the right with a shaved head, is

13   that you, sir?

14      A.     I believe so, yes.

15      Q.     And I'll continue to play it.  If at any time

16   you see it and you think it's not you, please let me

17   know.

18      It looks to me like it is you, but I'll resume the

19   video.

20      A.     Okay.

21   (Deposition Exhibit A played.)

22      Q.     I stopped it again for a little closer look

23   at 10:23:47.098 seconds where the individuals in the

24   middle of the screen are a little bit closer to see.

25      Is that you, Deputy Giardina?

SA-236

9

P. Giardina - Examination by Mr. Modica

1

2     A.     Yes.

3     Q.     We'll continue to play the video.  I may stop

4  and ask you some questions along the way.

5     A.     Okay.

6     Q.     Thanks.

7  (Deposition Exhibit A played.)

8     Q.     Now, I want to direct you to the box on the

9  upper right entitled Attorney Visit Room A at

10  10:23:56.922 seconds.

11     Is that you toward the middle of the screen towards

12  the back?

13     We can see directly on and you're toward the back

14  of the group; is that fair?

15     A.     Yes.

16     Q.     All right.  I'm going to run the video again.

17  (Deposition Exhibit A played.)

18     Q.     So I stopped the video again.  In the same

19  box Attorney Visit Room A it appears someone was

20  escorting Mr. Dublino on his feet and you came to the

21  side.

22     First of all, do you remember anything about that

23  interaction?

24     A.     Not really other than just him being walked

25  out.

COMPUTER REPORTING SERVICE
(585) 325-3170

SA-237

10

1          P. Giardina - Examination by Mr. Modica

2      Q.    At the time that I paused the screen here do

3  you recognize the deputy who is escorting inmate

4  Dublino?

5      A.    I do.

6      Q.    Could you tell us who that is?

7      A.    That would be Deputy Frank Gelster.

8      Q.    And, again, in the screen shot that I've got

9  here at 10:24:04.029 seconds it looks like Deputy

10  Gelster has his back to us in the middle of the picture

11  with inmate Dublino on his left in the orange gear and

12  you to his -- in front of him slightly to his right; is

13  that correct?

14      A.    Correct.

15      Q.    At that point do you have -- do you know

16  where your hands are at that point?

17      A.    At that point they -- I believe they're at my

18  side.

19      Q.    I'm going to resume the video.

20  (Deposition Exhibit A was played.)

21      Q.    Okay.  I've paused the video.  I'd like you

22  to focus on the box that says Attorney Visit Sallyport

23  at the left bottom side of the screen.

24      I've paused it at 10:24:36.442 seconds.  It appears

25  to show inmate Dublino in the orange; is that correct?

COMPUTER REPORTING SERVICE
(585) 325-3170

SA-238

11

                    P. Giardina - Examination by Mr. Modica

1

2      A.      Correct.

3      Q.      And can you tell me if you know who is

4   immediately behind him?

5      A.      That would be me.

6      Q.      That would be you, okay.

7   And can you tell - I know it's not that easy to

8   see - if you have your hands on him in any way there?

9      A.      I believe at that point I have my left hand

10  on his elbow and my right hand on his hand.

11     Q.      And the gentleman here to inmate Dublino's

12  immediate right, does that continue to be Deputy

13  Gelster?

14     A.      Correct.

15     Q.      And the other gentleman in the picture at the

16  back of the picture so to speak to your right, do you

17  know who that is?

18     A.      I believe so, yes.

19     Q.      Okay.  Tell us who you believe it is.

20     A.      Deputy Scarpace.

21     Q.      And, again, any recollection as to where

22  you're going -- fair to say the video showed you in the

23  hallway outside the attorney conference room and then

24  you left that hallway with inmate Dublino and Deputy

25  Gelster and you're in the sallyport area?

COMPUTER REPORTING SERVICE
(585) 325-3170

SA-239

12

1          P. Giardina - Examination by Mr. Modica

2      Do you recall where you were headed?

3      A.     At that point we were headed up to medical

4  for evaluation.

5      Q.     And is that something -- after a physical

6  altercation is it standard operating procedure to have

7  a person involved evaluated by medical?

8      A.     Yes, it is.

9      Q.     All right.  I'm going to continue the video

10  and if anything you told me so far conflicts with what

11  you're seeing let me know and I will run it back as

12  well.

13  (Deposition Exhibit A was played.)

14      Q.     Same thing just to show you again if it helps

15  with your hands.

16      So I've stopped the video relative to the alpha

17  hallway top left at 10:23:39.756 seconds.  This is not

18  in color.

19      I think we can clearly see inmate Dublino and is it

20  fair to say on his left is where you continue to be?

21      A.     Correct.

22      Q.     And on inmate Dublino's right continues to be

23  Deputy Gelster?

24      A.     Correct.

25      Q.     And can you see whether you have your hands

SA-240

13

1       P. Giardina - Examination by Mr. Modica

2    on inmate Dublino?

3       A.    Yes.  My left hand, it looks like it's on his

4    elbow bicep area.

5       Q.    What was the purpose for having your hands on

6    him at that point?

7       A.    That would be standard procedure for

8    escorting to maintain control for walking through the

9    hallways especially after an incident where there's,

10   you know, an assault or whatever on somebody.

11      Q.    Sure.  And let me take you at least through

12   from the time you first arrived in the hallway and

13   through the attorney sallyport until this point at

14   least where we stopped the video.

15      Did you see inmate Dublino resist any orders of you

16   or anybody else?

17      A.    Not to my knowledge.  I --

18      Q.    Did you want to say something else?

19      A.    I'm trying to remember back.  I don't

20   remember any kind of real resistance or anything like

21   that at that point.

22      Q.    Okay.  I'm going to resume the video.

23   (Deposition Exhibit A played.)

24      Q.    Okay.  I've paused it again.

25      I'm focused on the alpha hallway box at

SA-241

14

1          P. Giardina - Examination by Mr. Modica

2      10:24:47.163 seconds.  It looks like you and inmate

3      Dublino and others have kind of exited toward the left.

4          There was some testimony there are elevators there.

5          A.    Correct, there is.

6          Q.    Is that the path that one would go if one

7      were going to medical?

8          A.    Yes, it is.

9          Q.    And do you recall whether you got in the

10     elevator with inmate Dublino and Deputy Gelster to go

11     to medical?

12         A.    I believe I did, yes.

13         Q.    Do you recall whether there was anyone else

14     in the elevator when you did that?

15         A.    I don't recall.

16         Q.    I'm going to resume the video.

17     (Deposition Exhibit A played.)

18         Q.    I'm going to let it play through, but my

19     understanding is you are not visible in any other part

20     of this video, but I'll play it out and if that's not

21     correct you let me know.

22     (Deposition Exhibit A played.)

23         Q.    Okay.  The video is complete.

24         Deputy Giardina, did you see yourself at any point

25     from the last point until now?

15

P. Giardina - Examination by Mr. Modica

1

2    A.    No, I did not.

3    Q.    Okay.  I appreciate your patience while we

4 went through that.

5    So is that the first time you've seen this video?

6    A.    Yes.

7    Q.    Do you have any reason to think it's not

8 complete or accurate?

9    A.    No.

10   Q.    Initially how is it that you came to respond

11 to the area of attorney conference room 3 on March 9th

12 of 2018?

13   A.    I came up I believe from the ground floor

14 into that attorney room.

15   Q.    And how did you know to go to that area?

16   A.    Because it was called over the radio 10-99

17 attorney -- I don't know if they called the actual

18 room, but I knew to go to the attorney area.

19   Q.    Generally, what is a 10-99 call?

20   A.    It would be an assault on any kind of staff

21 member or civilian that's in the building.

22   Q.    And at least at that point - again, March 9th

23 of 2018 - what was your understanding of your

24 responsibility if anyone -- if you heard a 10-99 call?

25   A.    My -- I was I believe immediate response.  So

COMPUTER REPORTING SERVICE
(585) 325-3170

SA-243

16

1          P. Giardina - Examination by Mr. Modica

2     I would go and secure the area that I have, to cover

3     the inmate at that point and make sure the area is safe

4     before more response came.

5          Q.     When you got to the area of the attorney

6     conference room as we show in the video do you recall

7     whether inmate Dublino said anything at that point?

8          A.     I do not recall him saying anything.

9          Q.     Any recollection as to whether he resisted

10    any orders by you or anyone else at that point?

11         A.     Not that I'm aware of.

12         I mean, obviously after an altercation like that, I

13    mean, there could be, you know, a little bit of him

14    just like pulling away from amped up-ness, something

15    like that, but nothing that I recall of real aggression

16    or anything like that.

17         Q.     Based on the video - and we can go back to it

18    if you want to look at it - it appeared to me inmate

19    Dublino was handcuffed before you got involved; is that

20    your recollection?

21         A.     Yes.

22         Q.     So it would be your testimony that you didn't

23    put handcuffs on him at least in the hallway outside

24    the attorney conference room area on March 9th of 2018?

25         A.     Not in the hallway.

COMPUTER REPORTING SERVICE
(585) 325-3170

SA-244

17

1        P. Giardina - Examination by Mr. Modica

2        Q.    Now, to your knowledge, Deputy, is there a

3    standard operating procedure as to how someone is

4    supposed to be handcuffed?

5        A.    I guess if you had all the time you would

6    want to cuff him with keyholes out and double locks up

7    so you can get easy access at him under normal

8    circumstances where everything is, you know, going

9    smooth.

10       Q.    All right.  Okay.  So let me make sure that I

11   understand that.

12       So first is it correct you would want the person to

13   have their hands behind their back?

14       A.    Correct.

15       Q.    And when they have their hands behind their

16   back are you describing a procedure where their palms

17   would be facing away from the center of their body or

18   towards the center of their body?

19       A.    It would be towards the center of their body.

20       Q.    So let me just clarify because we had a

21   little bit of different testimony on that.

22       So if you think about it -- I can't really show you

23   unfortunately, but if you put your hands behind your

24   back and your palms are facing out from the center that

25   means palms are facing away from your body.

18

P. Giardina - Examination by Mr. Modica

1

2      A.      Yes.  You would want your thumbs together

3  towards the center, palms facing -- I guess the most

4  comfortable way would be with the palms facing out.

5      Q.      Out.  Away from the center of the body as

6  opposed to inside?

7      A.      Correct.

8      Q.      Are there times when somebody is reversed

9  cuffed where the hands are behind the back and palms

10  are facing the center of the body?

11      A.      I'm sure there's been cases of that, yes.

12      Q.      Now, at any point when you arrived in the

13  hallway outside the conference room on March 9th of

14  2018 did you hear the alleged victim Attorney Terranova

15  say anything?

16      A.      No.

17      Q.      And other than what was depicted on the video

18  which was you having your hands on inmate Dublino's

19  left arm in the hallway, did you have any other

20  physical contact with him that wasn't shown in the

21  video?

22      A.      No.

23      Q.      We'll talk a little bit about the trip to the

24  infirmary in a moment, but there are a number of people

25  who were sued in this case and who were part of the

SA-246

19

```
 1          P. Giardina - Examination by Mr. Modica
 2    response team you probably saw in the video and I'm
 3    going to ask you about the allegations my client has
 4    made and whether you saw any of that.
 5         So fair to say that Deputy Brian Thompson was among
 6    the folks as part of that response team?
 7         A.   Yes.
 8         Q.   Okay.  And also fair to say that Deputy
 9    Thompson had K-9 responsibility on that day, that
10    morning?
11         A.   Correct, yes.
12         Q.   Do you recall whether you saw the K-9 he was
13    handling that morning?  I believe the dog's name is
14    Bili.
15         A.   I did not.
16         Q.   Did you see as part of the response team that
17    day Sergeant Justin Biegaj?
18         A.   I may have.  It's not like sticking out that
19    I had talked to him at all at any point in the matter.
20         I don't recall.
21         Q.   Nothing, again, stands out as to whether he
22    was there or what if anything he did?
23         A.   Right, yeah -- no.
24         Q.   How about Sergeant Robert Dee?
25         A.   No.  I don't remember having any talks with
```

SA-247

20

1          P. Giardina - Examination by Mr. Modica

2     Dee during that either.

3          Q.     How about Deputy Shawn Wilson?

4          A.     No.

5          Q.     No, he wasn't there or no, you just don't

6     recall whether he was or not?

7          A.     I don't recall if he was there or not.

8          Q.     Understood.

9          Can you tell me relative to handcuffing is there

10    for lack of a better word a typical time that it would

11    take to handcuff someone?

12         A.     I couldn't come up with an exact time.  I

13    mean, it could range from I guess, you know, somewhat

14    quick to -- if you're wrestling it could take, you

15    know, a minute, two minutes.

16         It all depends on the situation, what's going on.

17         Q.     Understood.  Tell me was Sergeant Matthew

18    Cross among the folks that were part of the response

19    team?

20         A.     I did see him in the video, yes.

21         Q.     And inmate Dublino has alleged that Sergeant

22    Cross stood directly over him and stomped with his legs

23    on inmate Dublino, on his legs and feet.

24         Did you see anything like that in the hallway?

25         A.     No.

21

1            P. Giardina - Examination by Mr. Modica

2       Q.     Do you recall whether Sergeant Jack Robinson

3   was part of the response team?

4       A.     I do.

5       Q.     Was he?

6       A.     Yes.

7       Q.     And then obviously you were as well and you

8   mentioned earlier Deputy Gelster as well, correct?

9       A.     Correct.

10      Q.     And tell me on the way to the infirmary

11  inmate Dublino alleges that Sergeant Robinson ordered

12  you and Deputy Gelster to wrench his arm.

13      Can you comment on that allegation?

14      A.     I've never heard that from Sergeant Robinson.

15      Q.     Do you recall Sergeant Robinson giving you

16  and/or Deputy Gelster any instructions as you were

17  walking with inmate Dublino to the infirmary after the

18  altercation in the attorney conference room?

19      A.     No.

20      Q.     Do you recall at any point while you were

21  walking to the infirmary adjusting or otherwise moving

22  inmate Dublino's arms from -- you know, from where they

23  started?

24      A.     No.

25      Q.     If you recall, other than yourself and Deputy

SA-249

22

1          P. Giardina - Examination by Mr. Modica

2     Gelster, did anyone else accompany inmate Dublino to

3     the infirmary?

4          A.    I do not recall who was in the infirmary.

5          Q.    And do you recall if inmate Dublino was

6     examined by anybody at the infirmary after you

7     accompanied him there?

8          A.    Yes.  He was examined.  I don't know who

9     examined him, but he was examined by the medical staff.

10         Q.    Do you know whether also he was photographed

11    in any way?

12         A.    I don't know, but it is pretty much pretty

13    standard procedure that they do take photos so I'm

14    assuming that they did.

15         Q.    Okay.  I've got some photos I want to show

16    you so just bear with me.

17         So I'm bringing up what we've previously marked as

18    Exhibit D.  Do you recognize that photograph?

19         A.    I do.

20         Q.    Tell us what it is.

21         A.    It's a photo of myself, Deputy Gelster and

22    inmate Dublino.  It looks to be in the medical room.

23         Q.    When you say "the medical room," that would

24    be the medical room of the Erie County Holding Center?

25         A.    Correct.  There's multiple rooms.  I don't

COMPUTER REPORTING SERVICE
(585) 325-3170

SA-250

23

P. Giardina - Examination by Mr. Modica

1     recall exactly what room we were in, but it's one of

2     the medical rooms.

3         Q.     Is it fair to say -- just to be clear, we

4     have inmate Dublino in the center of the photo?

5         A.     Correct.

6         Q.     And Deputy Gelster to the left of the photo

7     on the right side of inmate Dublino?

8         A.     Correct.

9         Q.     And fair to say that you're on the right side

10    of the photo, the left side of inmate Dublino?

11        A.     Correct.

12        Q.     And there appears to be a timestamp for the

13    photo on the bottom.  I don't know if you can see that.

14    It says 3/9/2018, 11:37.

15        A.     Right.

16        Q.     Does that help you indicate -- does that tell

17    you when this photo was taken?

18        A.     I'm assuming, yeah, at 11:37 on 3/9.

19        Q.     And this showing inmate Dublino, the front of

20    him, do you know at that point whether he's got

21    handcuffs on?

22        A.     I believe so.  I'm not a hundred percent

23    sure, but I would believe that they're on at that

24    point.

25

SA-251

24

1          P. Giardina - Examination by Mr. Modica

2     Q.     Certainly the photo doesn't tell us one way

3 or another, right?

4     Isn't that correct?

5     A.     Yes.

6     Q.     All right.  I want to show you what we've

7 marked as Deposition Exhibit E.  Do you recognize that

8 picture?

9     A.     I do.

10     Q.     Can you describe that picture to us please?

11     A.     It would be inmate Dublino in the center,

12 myself on the right hand side or behind him on the left

13 and Deputy Gelster on the left hand side.

14     Q.     It looks like it's a left hand side profile

15 of inmate Dublino.  Is that fair?

16     A.     Yes.

17     Q.     And I can't tell for sure, but it appears to

18 me at least he's wincing in some capacity.  Do you

19 remember any of the circumstances surrounding taking

20 this picture?

21     A.     I do not.

22     Q.     Do you remember whether he complained of pain

23 when these photos were taken?

24     A.     I don't recall him complaining of any -- you

25 know, any specific pain or --

COMPUTER REPORTING SERVICE
(585) 325-3170

SA-252

25

1          P. Giardina - Examination by Mr. Modica

2      Q.    My previous question was addressed to whether

3  he expressed pain at the time of the photos.

4      At any time during your interaction with inmate

5  Dublino on March 9th of 2018 did he complain of any

6  pain?

7      A.    I can't recall to be honest.

8      Q.    I'd like to show you another photo.  This one

9  has been previously marked as Deposition Exhibit F.  Do

10 you recognize that photo?

11     A.    I do.

12     Q.    Okay.  Would you describe it please?

13     A.    Inmate Dublino in the center, myself on the

14 ride hand side, Deputy Gelster on the left and it

15 appears to be like a right face profile picture.

16     Q.    And from this photo can you tell whether you

17 and/or Deputy Gelster have your hands on inmate

18 Dublino?

19     A.    It looks like I have my hand up on his --

20 towards his left elbow bicep area and Deputy Gelster

21 has around the right elbow area.

22     Q.    And, again, we can't tell from this picture

23 whether he was handcuffed; is that right?

24     A.    Correct.

25     Q.    Typically in circumstances where you have

SA-253

26

1          P. Giardina - Examination by Mr. Modica

2     accompanied someone to be handcuffed - I'm sorry -

3     accompanied someone to be photographed, do they

4     continue to be handcuffed or are the handcuffs taken

5     off or does it depend?

6          A.     It all depends on what they're examining at

7     that point.

8          They always start with handcuffs on.  If there was

9     hand pain or something where they need to get at the

10    wrist they may uncuff him so medical can do their

11    examination on them.

12         Q.     I understand.  All right.  Also I'm going to

13    show you what's been marked as Deposition Exhibit G.

14    Do you recognize that photo?

15         A.     Yes.

16         Q.     What does that photo show?

17         A.     I'm assuming that is inmate Dublino.  I can't

18    see a face shot, but it would be a picture of his hands

19    and the wristband saying it's inmate Dublino.

20         Q.     I know it's difficult for you to see.  I'll

21    represent to you that the band has a picture of inmate

22    Dublino and actually here it says Mark Dublino or at

23    least it says Mark, and this was a picture produced by

24    the County.  I'm not trying to be cute here.

25         If you see at the right hand there is a mark in the

COMPUTER REPORTING SERVICE
(585) 325-3170

SA-254

27

1          P. Giardina - Examination by Mr. Modica

2     center.  Do you remember anything about the condition

3     of his hands when you interacted with him on March 9th

4     of 2018?

5          A.    I do not.

6          Q.    Do you recall if you saw blood of any sort

7     whether it be from inmate Dublino or somebody else?

8          A.    I do not recall seeing blood.

9          Q.    And in this photograph Deposition Exhibit H

10    is it fair to say he does not have handcuffs on?

11         A.    Correct.

12         Q.    Do you recall who took the handcuffs off for

13    purposes of taking this picture?

14         A.    I don't recall.

15         Q.    Would that be something though typically that

16    either you or Deputy Gelster would have done?

17         A.    Yes.

18         Q.    So generally not the responsibility of

19    medical staff to do that I'm assuming?

20         A.    No.

21         Q.    And you may have answered this and I

22    apologize if I ask you again.

23         Do you recall Dublino saying -- Dublino saying

24    anything while these photos were being taken?

25         A.    I do not recall.

SA-255

28

1          P. Giardina - Examination by Mr. Modica

2              MR. MODICA:  Okay.  I believe that's all that

3      I have.

4              Erin, I don't know if you have anything for

5      the witness.

6              MS. MOLISANI:  No questions.

7              MR. MODICA:  Terrific.  So, Deputy Giardina,

8      I appreciate your cooperation.  Thank you very much.

9              MS. MOLISANI:  Thank you.  Have a good one.

10             THE WITNESS:  Thank you.

11

12

13

14              *          *          *

15

16

17

18

19

20

21

22

23

24

25

COMPUTER REPORTING SERVICE
(585) 325-3170

```
                                                              29
 1          P. Giardina - Examination by Mr. Modica

 2                   REPORTER CERTIFICATE

 3

 4       I, Shari L. Vitalone, do hereby certify that I did

 5   report in stenotype machine shorthand the proceedings

 6   held in the above-entitled matter;

 7       Further, that the foregoing transcript is a true

 8   and accurate transcription of my said stenographic

 9   notes taken at the time and place hereinbefore set

10   forth.

11

12   Dated 07/7/2021

13   at Rochester, New York

14

15

16                           s/ Shari L. Vitalone

17                           _____

18                             Shari L. Vitalone

19

20

21

22

23

24

25
```

COMPUTER REPORTING SERVICE
(585) 325-3170

30

P. Giardina - Examination by Mr. Modica

WITNESS CERTIFICATE

ORIGINAL

STATE OF                    )

COUNTY OF                   )


I, Peter Giardina, do hereby certify that I have

read the transcript of my testimony as taken under oath

on Friday, June 11, 2021, and that said transcript is a

true, complete and correct record of what was asked,

answered and said during said deposition, and that the

answers on record therein, and as may be modified in

conformity with the attached errata sheet, are true and

correct.

_____

Subscribed and sworn to before me

this _____ day of _____, 2021

Notary Public

COMPUTER REPORTING SERVICE
(585) 325-3170

31

1            P. Giardina - Examination by Mr. Modica

2    In the Matter of:

     MARK T. DUBLINO                    *ORIGINAL*

3         Plaintiff

          -vs-

4    SGT. JUSTIN BIEGAJ, SGT. ROBERT DEE,

     DEPUTY BRIAN THOMPSON, DEPUTY FRANK

5    GELSTER, SGT. MR. CROSS, SGT. MR. ROBINSON,

     DEPUTY MR. P. GIARDINA, DEPUTY SHAWN WILSON

6         Defendants

          Civil Action No. 6:19-cv-6269-DGL

7

8    Errata sheet for the deposition of Peter Giardina taken

9    on Friday, June 11, 2021

10   PAGE          LINE          REASON FOR CHANGE

11   _____         _____         _____

12   _____         _____         _____

13   _____         _____         _____

14   _____         _____         _____

15   _____         _____         _____

16   _____         _____         _____

17   _____         _____         _____

18   _____         _____         _____

19   _____         _____         _____

20   _____         _____         _____

21   _____         _____         _____

22   _____         _____         _____

23   _____         _____         _____

24   _____         _____         _____

25   _____         _____         _____

COMPUTER REPORTING SERVICE
(585) 325-3170

SA-259

# EXHIBIT G

1

2  UNITED STATES DISTRICT COURT                    ORIGINAL

3  WESTERN DISTRICT OF NEW YORK

4  - - - - - - - - - - - - - - - - - - - - - - x

   MARK T. DUBLINO

5       Plaintiff

        -vs-

6  SGT. JUSTIN BIEGAJ, SGT. ROBERT DEE,

   DEPUTY BRIAN THOMPSON, DEPUTY FRANK

7  GELSTER, SGT. MR. CROSS, SGT. MR. ROBINSON,

   DEPUTY MR. P. GIARDINA, DEPUTY SHAWN WILSON

8       Defendants

   - - - - - - - - - - - - - - - - - - - - - - X

9       Civil Action No. 6:19-cv-6269-DGL

10

11

12

13     Deposition of SHAWN WILSON taken pursuant to

14  notice via videoconference on Thursday, July 8, 2021

15  commencing at 8:48 a.m.

16

17

18

19

20

21  Reported by:

22  COMPUTER REPORTING SERVICE

23  John M. DiMartino, CSR, RPR

24  16 East Main Street, Suite 7

25  Rochester, New York  14614      (585) 325-3170

SA-261

2

2     APPEARANCES:

3          MODICA LAW FIRM

4          By:  STEVEN V. MODICA, Esq.

5          2430 Ridgeway Avenue

6          Rochester, New York  14626

7          Attorneys for plaintiff.

8

9

10         ERIE COUNTY DEPARTMENT OF LAW

11         By:  ERIN MOLISANI, Esq.

12         95 Franklin Street, Suite 1634

13         Buffalo, New York  14202

14         Attorneys for defendants.

15

16

17

18

19

20

21

22

23

24

25

```
                                                              3
2                         INDEX

3    Shawn Wilson

4        Examination by Mr. Modica              4 - 30

5

6

7    Reporter Certificate                          31

8    Witness Certificate                           32

9    Errata Sheet                                  33

10

11

12   (No exhibits marked.)

13

14

15

16

17

18

19

20

21

22

23

24

25
```

COMPUTER REPORTING SERVICE
(585) 325-3170

SA-263

4

1          S. Wilson - Examination by Mr. Modica
2                    SHAWN WILSON
3      called herein as a witness, being duly sworn,
4               testified as follows:
5    EXAMINATION BY MR. MODICA:
6        Q.    Good morning, Deputy Wilson.  Again, my name
7    is Steve Modica.  It's nice to meet you.
8        A.    Nice to meet you as well.
9        Q.    So I am pro bono counsel for Mark Thomas
10   Dublino.  As you know, he has brought an action against
11   you and seven of your colleagues.
12       I'm going to ask you a series of questions about
13   the incident at issue and I'd ask you to answer those
14   to the best of your ability.
15       A.    All right.
16       Q.    This process is a little more difficult on
17   Zoom.  So I ask that you be patient and let me finish
18   my question and I promise I'll be patient while you
19   finish your answer.  It makes Mr. DiMartino's job a lot
20   easier.
21       Okay?
22       A.    Yes, sir.
23       Q.    Thanks.  So are you currently employed by the
24   Erie County Sheriff's Department?
25       A.    Yes, sir.

COMPUTER REPORTING SERVICE
(585) 325-3170

SA-264

5

1          S. Wilson - Examination by Mr. Modica

2     Q.     And you're in the Jail Management Division,

3   correct?

4     A.     Correct.

5     Q.     And how long have you worked for them?

6     A.     Going on thirteen and a half years now.

7     Q.     And during 2018 were you also working for

8   them?

9     A.     Yes, sir.

10     Q.     And were you working at the Erie County

11   Holding Center?

12     A.     Yes, sir.

13     Q.     And were you working the morning of March 9th

14   of 2018 at the Erie County Holding Center?

15     A.     Yes, sir.

16     Q.     And what was your job assignment that day?

17     A.     I was a bravo medical escort.

18     Q.     Can you tell me what responsibilities -- what

19   are your duties in that job?

20     A.     My duties in that job are basically any new

21   inmates we receive from any courts, we basically get

22   those guys checked in, get them to see medical.

23     Any escorts on the bravo level I'll take the

24   inmates -- escort them any where.

25     Thirdly I'm a third response basically so -- a

COMPUTER REPORTING SERVICE
(585) 325-3170

SA-265

6

1          S. Wilson - Examination by Mr. Modica

2     secondary response I would say.

3          Q.    And when you use the term "bravo level," can

4     you explain that to me?

5          A.    Yes.  Bravo level is located within the jail.

6     It contains linear as well as podular units there, and

7     in there basically what I do -- there is a medical room

8     also in there as well.

9          So when we have inmates come up, we actually have

10    to sit them in a room and they have to see our medical

11    staff before they can be sent any where else in the

12    jail.

13         Q.    Terrific.  Now, do you recall, did you

14    interact with inmate Mark Thomas Dublino before March

15    9th of 2018?

16         A.    No, sir, not that I recall.

17         Q.    And certainly you interacted with him on

18    March 9th of 2018; is that correct?

19         A.    Correct.

20         Q.    Now, there's a video of at least part of your

21    interaction with Mr. Dublino.  Is that a video that

22    you've seen before?

23         A.    I have not, no, sir.

24         Q.    So I have it here and it's been marked as

25    Deposition Exhibit A and I'm going to show that to you.

SA-266

7

    1              S. Wilson - Examination by Mr. Modica
    2      It's only about three minutes long, but I'm going to
    3      take you through it.
    4          If at any point you want me to pause or stop let me
    5      know.  I'll ask you a series of questions, but don't
    6      hesitate.  I think you'll find it pretty easy.
    7          At this point if I could share the screen, I should
    8      be able to do this.
    9          Deputy Wilson, can you see the video screen?
   10      A.    Yes, sir.
   11      Q.    Okay.  And just for purposes of the record,
   12      it depicts four different views.  The one on the upper
   13      left is labeled Alpha Hallway.
   14          Do you see that right here?
   15      A.    Yes, sir.
   16      Q.    And the one on the lower left depicts or is
   17      labeled Attorney Visit Sally Port.  Do you see that?
   18      A.    Yes, sir.
   19      Q.    And on the upper right there is a label of
   20      Attorney Visit A.  Do you see that?
   21      A.    Yes, sir.
   22      Q.    And then below it on the bottom right you see
   23      it's also labeled Attorney Visit B.
   24          Is that all correct?
   25      A.    Yes, sir.

SA-267

8

1          S. Wilson - Examination by Mr. Modica

2      Q.     I'll represent to you this is video from

3  March 9th of 2018, and but if you look at any of the

4  four boxes at the bottom you'll see a time, a date and

5  time stamp in case you're wondering.

6      Okay?

7      A.     Okay.

8      Q.     All right.  Terrific.  What I'd like to do is

9  I'll start playing the video.  If you could tell me to

10 stop when you first come into vision I would be

11 grateful for that.

12     A.     Okay.  Stop.

13     Q.     Okay.  So, Deputy, you asked me to stop.  Let

14 me first ask you which window so to speak of the four

15 are you looking at?

16     A.     I'm looking at frame Alpha Hallway 301.

17     Q.     And just for purposes of the record I paused

18 it where the date and time stamp is 3/9/2018 at 10:22

19 and 44.135 in the a.m.; is that correct?

20     A.     Correct.

21     Q.     And would you describe for me, Deputy Wilson,

22 where do you see yourself?

23     A.     On the bottom left-hand corner with white

24 gloves on.

25     Q.     Okay.  So right here we're looking at this

SA-268

9

1          S. Wilson - Examination by Mr. Modica

2   paused screen and you would be the person closest to

3   the front of the screen so to speak furthest left; is

4   that correct?

5      A.    Correct, yes.

6      Q.    And do you recall how it is that you got in

7   this position at all?

8      A.    I do not, unfortunately.  I'm sorry.

9      Q.    We'll come back and I'll talk to you a little

10  bit later about the 10-99 calls, but I'll take you

11  through the video.

12      So I'm going to continue.

13  (Deposition Exhibit A played.)

14      Q.    All right.  I've stopped the video.  I want

15  to direct your attention to the box on the top right

16  labeled Attorney Visit A.

17      I've stopped it at 3/9/2018 at 10:22 and 50.051

18  seconds in the a.m.

19      Does that depict you, Deputy Wilson, I would say

20  the left side of the screen, the second person?

21      A.    Yes, sir.

22      Q.    Okay.  And at that point do you recall where

23  you headed?

24      A.    I was headed to -- it looks like to -- in the

25  hallway to -- we were going to cuff inmate Dublino and

COMPUTER REPORTING SERVICE
(585) 325-3170

SA-269

10

1              S. Wilson - Examination by Mr. Modica

2    he was on the ground.

3        I think if I'm not mistaken Officer Thompson was

4    struggling with him maybe.

5        Q.     Okay.  I'm going to continue with the tape.

6        A.     Okay.

7    (Deposition Exhibit A played.)

8        Q.     So I've stopped it again.  Let's look at

9    Attorney Visit A.  I've stopped it at 10:22 and 52.954

10   seconds in the a.m.

11       At that point is it correct that your body went

12   from a place we could see you to a place we could not

13   see you?

14       A.     Yes.

15       Q.     And can you tell me if you recall what were

16   you doing at that time that caused you to be out of the

17   view of the camera?

18       A.     I think I was attempting to secure inmate

19   Dublino's hands so we can cuff him.

20       Q.     And at that point if you recall where was

21   inmate Dublino at that time?

22       A.     He was laying on the ground as Officer

23   Thompson was struggling with him.

24       He was not cooperating - I do know that - and so

25   Officer Thompson was trying to hold him down, but he

COMPUTER REPORTING SERVICE
(585) 325-3170

SA-270

11

1            S. Wilson - Examination by Mr. Modica

2     was trying to get up from what I recall.

3         Q.    And as far as this camera is concerned, is

4     this camera if you know fixed or does it move in any

5     way?

6         A.    Unfortunately, I do not have the answer to

7     that.  I'm not sure.

8         Q.    Certainly.  All right.  I'm going to continue

9     with the video.

10        A.    Okay.

11    (Deposition Exhibit A played.)

12        Q.    Okay.  Deputy Wilson, I'd like to direct your

13    attention to the box at the lower right Attorney Visit

14    B.

15        A.    Okay.

16        Q.    I paused it at 10:23 and 42.321 seconds in

17    the a.m. and I'm circling what I believe is you which

18    would be toward the right-hand side, middle right of

19    the photo, a person who appears to be kneeling or

20    certainly below standing level.

21        Is that accurate?

22        A.    Yes.

23        Q.    And again, if you recall what were you doing

24    at that point?

25        A.    Still trying to get inmate Dublino's hands so

SA-271

12

1          S. Wilson - Examination by Mr. Modica

2    we can get him -- to get him cuffed because he was

3    still resisting.

4          Q.     I'm going to start the video again.

5    (Deposition Exhibit A played.)

6          Q.     I've paused the video again.  I'm going to

7    focus on the Attorney Visit B box and pause it at 10:24

8    and 3.242 seconds in the a.m.

9          It appears that inmate Dublino is now standing.  Is

10   that fair?

11         A.     Yes.

12         Q.     And can you identify this gentleman who is to

13   our left and to inmate Dublino's right?

14         A.     It looks like Deputy Gelster.

15         Q.     I'll represent to you that I believe that

16   that's Deputy Gelster as well, but it's not important

17   what I believe.  It's important what you believe.

18         Is it fair to say that behind who we believe is

19   Deputy Gelster is you standing there?

20         A.     Yes, sir.

21         Q.     And it looks like about half your face is

22   obscured by Deputy Gelster's head; is that correct?

23         A.     Yes, sir.

24         Q.     And at that point are you having any physical

25   contact with inmate Dublino by that point?

SA-272

13

1              S. Wilson - Examination by Mr. Modica

2         A.    No, sir.

3         Q.    I'll start the tape again.

4    (Deposition Exhibit A played.)

5         Q.    I've paused it again.  If you could focus on

6    Attorney Visit B box, I paused it at 10:24 and 14.253

7    seconds in the a.m.

8         Is that you kind of the third person of a group of

9    four?

10        A.    Yes, sir.

11        Q.    And it looks like you're looking into a room.

12   Can you tell me what room that is?

13        A.    That is Attorney Room 3 if I'm not mistaken.

14        Q.    All right.  And any recollection as you sit

15   here today as to what you were looking at or what you

16   saw?

17        A.    The lawyer -- actually Dublino's lawyer I

18   think Mr. Terranova - I think I was looking at him and

19   his injuries.

20        Q.    I'll start the tape again.

21   (Deposition Exhibit A played.)

22        Q.    Okay.  I've paused the tape again.  Again I'd

23   like you to focus on the box entitled Attorney Visit B.

24   I paused it at 10:24 and 41.080 seconds in the a.m.

25        It appears that someone is emerging from that room

SA-273

14

1           S. Wilson - Examination by Mr. Modica

2   that you described.  Do you know who that is?

3       A.    That would be his attorney - Mr. Dublino's

4   attorney, Mr. Terranova - if I'm not mistaken.

5       Q.    That's you to Mr. Terranova's immediate left,

6   correct?

7       A.    Yes, sir.

8       Q.    Can you identify the two other members of law

9   enforcement that are there?

10      A.    That would be Sergeant Robert Dee and Deputy

11  Joe Dispenza.

12      Q.    And would Sergeant Dee be next to you --

13  closest next to you in the middle of the picture so to

14  speak?

15      A.    Yes, sir.  Yes, to my left.

16      Q.    And then this would be the other gentleman?

17      A.    Correct, yes.

18      Q.    Okay.  Thank you.  I'll start the tape again.

19  (Deposition Exhibit A played.)

20      Q.    I've paused it again.  I'll ask you to focus

21  on the part of the box that's labeled Attorney Visit

22  Sally Port.

23      A.    Okay.

24      Q.    I paused it at 10:25 and 09.881 seconds in

25  the a.m.

COMPUTER REPORTING SERVICE
(585) 325-3170

SA-274

15

```
 1            S. Wilson - Examination by Mr. Modica

 2       Is that you depicted kind of the more right side of

 3   the photo closest to the person looking at it?

 4       A.     Yes.

 5       Q.     And at that point you've passed from the

 6   corridor in the attorney visit room into the attorney

 7   visit sallyport.

 8       Do you recall what you were doing at that time?

 9       A.     Probably just getting ready to head -- figure

10   out where I was heading back to to see if they needed

11   me to do anything else.

12       Q.     We saw earlier there were folks escorting

13   Attorney Terranova.  Do you know where they were taking

14   him?

15       A.     I would say to medical, but I don't think

16   they did.  They -- they may have taken him to central

17   control.

18       To be honest, I'm not a hundred percent sure what

19   they did with him.

20       Q.     Understood.  Okay.  I'm going to start the

21   tape again.

22   (Deposition Exhibit A played.)

23       Q.     I'll pause it.  It appears you continued

24   through the attorney sally port down the alpha hallway

25   and then you're out of sight; is that fair?
```

SA-275

16

1          S. Wilson - Examination by Mr. Modica

2     A.    I'm actually still -- if you look at the

3 left-hand side I'm still by the elevator right there.

4     Q.    Is that you right there?

5     A.    Yes, sir.

6     Q.    All right.  So for purposes of the record I'm

7 looking at the Alpha Hallway box paused at 10:25 and

8 25.401 seconds in the a.m. and the witness has

9 indicated that he is located facing the camera so to

10 speak on the left side near the elevator.

11     I'll start it again.

12 (Deposition Exhibit A played.)

13     Q.    And then that ends the video; is that

14 correct?

15     A.    Yes, sir.

16     Q.    Okay.  Now, having seen the video is there

17 anything about it that you think is incorrect or

18 incomplete?

19     A.    No.

20     Q.    Now, did you prepare a memorandum about this

21 incident?

22     A.    You know, I don't -- to be honest, I don't

23 remember.  I'm sure I must have written something -

24 probably a use of force maybe.

25     Q.    Sure.  Okay.  I'm going to show you what we

17

```
 1            S. Wilson - Examination by Mr. Modica
 2   have marked as Deposition Exhibit J.  I know it's a
 3   little bit large on my screen.  Are you able to see it?
 4       A.    Yes, sir.
 5       Q.    So do you recognize this document?
 6       A.    Yes.  So I was working elevator escort not
 7   bravo medical.
 8       Q.    First of all, just generally tell me what is
 9   this exhibit?
10       A.    This is our memorandum.  It's essentially
11   basically what we call a pink sheet.
12       Any time an incident happens we're involved in we
13   have to write a pink sheet basically - basically a
14   memorandum stating what transpired during that
15   incident.
16       Q.    And do you recall when you prepared this?
17       A.    It would have been the same exact date.
18       Q.    And again, that date being March 9th of 2018?
19       A.    March 9th, yes, sir.  I'm sorry.
20       Q.    That's okay.  And as indicated it's a memo
21   from you and it's to sergeant -- could you pronounce
22   his last name?
23       A.    Smaczniak.
24       Q.    Is that your immediate superior or --
25       A.    On that day he was, yes.
```

SA-277

18

1    S. Wilson - Examination by Mr. Modica

2  Q. The first sentence, "On the above date and

3 time at approximately 10:20 hours while working as

4 elevator escort 1 I did hear a 10-99 call on the radio

5 for Attorney Room 3 and responded to this call."

6  Did I read that correctly?

7  A. Yes.

8  Q. And to clarify, now you recall that day you

9 were working as an elevator escort, correct?

10  A. Yes, sir, yes.

11  Q. What were your responsibilities as an

12 elevator escort on that day?

13  A. Elevator escort, essentially we do -- inmates

14 that travel throughout the building, we have to ride

15 the elevator where ever they need to go.

16  Also my secondary job is respond to any what we

17 call 10 codes, any inmate disturbances, fires, 10-99s.

18 Any 10 code essentially I would be a response team to.

19  Q. And what is, Deputy Wilson, a 10-99?

20  A. 10-99 is officer in trouble.

21  Q. And what is your understanding of your

22 responsibility if there's a 10-99 call?

23  A. 10-99, any available officer in the building

24 who is assigned to any escort position, ground floor

25 position, any available -- any one who is not working a

COMPUTER REPORTING SERVICE
(585) 325-3170

SA-278

19

1          S. Wilson - Examination by Mr. Modica

2     unit - essentially is not essentially with an inmate -

3     are to respond to any 10-99s.

4          Q.     You mentioned 10-99 is typically a code for

5     an officer in trouble.

6          Is there a code if you know for an altercation

7     between an inmate and his lawyer?

8          A.     I do not know, unfortunately.  It's been my

9     first experience with it.  So we -- so no.

10         Q.     Was that actually your first 10-99 call in

11    your career to that point?

12         A.     Yes.

13         Q.     And when you say you got the call on the

14    radio, can you tell me was it your personal radio, was

15    it a facility radio or both?

16         A.     Facility radio.

17         So each -- we each carry a radio for each position

18    you have in the facility.  Any one has a radio for

19    where ever you work.  That was my elevator escort

20    radio.

21         Q.     And do you recall where you were at the time

22    you got that 10-99 call?

23         A.     I would have been on bravo.

24         Q.     And again, bravo is a medical unit?

25         A.     Yes, medical unit, yes.

SA-279

20

1              S. Wilson - Examination by Mr. Modica

2      Q.      And if you remember what did the 10-99 direct

3   you to do or go?

4      A.      To -- it directed me to Attorney Visit Room

5   3.

6      Q.      Did you go directly there --

7      A.      Yes.

8      Q.      -- once you got the call?

9      A.      Yes, sir.

10      Q.      Now, the next sentence of the report

11   Deposition Exhibit J reads, "Upon arrival I did observe

12   inmate Dublino Mark" - and it list his ICN - "on the

13   ground being given verbal commands by Deputy Thompson

14   to place his hands behind his back."

15      Did I read that correctly?

16      A.      Yes.

17      Q.      And when you saw inmate Dublino on the

18   ground, was he face up, face down, on the side or some

19   other position?

20      A.      He was laying -- he was laying down -- he was

21   on the ground.

22      Thompson pretty much was trying to grab his arms to

23   pull his arms behind his back and giving him verbal

24   commands at the same time.

25      Q.      So just to clarify, was inmate Dublino face

SA-280

21

1          S. Wilson - Examination by Mr. Modica

2     down on the ground?

3          A.     Yes.

4          Q.     Okay.  And do you recall whether inmate

5     Dublino complied with the verbal commands of Deputy

6     Thompson at that time?

7          A.     He did not.

8          Q.     What do you recall about that?

9          A.     I recall him just not -- I remember Deputy

10    Thompson saying, "Put your arms behind your back.  Put

11    your arms behind your back."

12         His arms were almost flailing.  I guess just

13    resisting -- I guess the best way to put it is

14    resisting.

15         He would not put his arms behind his back.

16         Q.     And Deputy Thompson, tell me, he is in part a

17    K-9 officer, correct?

18         A.     Correct, yes.

19         Q.     Do you recall whether he had the K-9 with him

20    at the time of the interaction with inmate Dublino?

21         A.     That I do not remember to be honest.

22         Q.     All right.  Going back to the report - the

23    memo I should say, Deposition Exhibit J - the next

24    sentence reads, "Deputy Gelster and I then took control

25    of inmate Dublino's right arm."

SA-281

22

1              S. Wilson - Examination by Mr. Modica

2        Did I read that correctly?

3        A.     Yes, sir.

4        Q.     And could you describe for me how you and

5    Deputy Gelster did that?

6        A.     I essentially grabbed the lower forearm and

7    Gelster -- Deputy Gelster grabbed the upper arm -- his

8    upper arm on the right side as I recall.

9        Q.     And for what purpose were you touching inmate

10   Dublino?

11       A.     So that we could restrain him and put him in

12   handcuffs.

13       Q.     And what did you understand happened prior to

14   that that would warrant inmate Dublino being put in

15   handcuffs?

16       A.     I was not -- to be honest, I was not sure.

17       It was a 10-99.  So it was an officer in trouble

18   call.

19       So what I -- I got there and I saw Deputy Thompson

20   and I thought it was him who was in trouble.

21       Q.     All right.  I'll read the next sentence -

22   again, it's Exhibit J - "While I continued to control

23   inmate Dublino's right arm, Deputy Gelster did place a

24   mechanical restraint upon his right wrist."

25       Did I read that correctly?

COMPUTER REPORTING SERVICE
(585) 325-3170

23

1          S. Wilson - Examination by Mr. Modica

2     A.    Yes.

3     Q.    And that's your recollection -- when you say

4  "mechanical restraint," do you mean handcuffs?

5     A.    Yes, sir.

6     Q.    And then the last sentence of that -- the

7  second last sentence of that memo reads, "Deputy

8  Gelster then placed a mechanical restraint upon inmate

9  Dublino's left wrist which was secured by Sergeant

10  Dee."

11     Did I read that correctly?

12     A.    Yes, sir.

13     Q.    And again, that mechanical restraint being

14  handcuffs?

15     A.    Yes.

16     Q.    Then it says "End of report."  Did I read

17  that correctly?

18     A.    Yes, sir.

19     Q.    Do you recall how inmate Dublino was

20  handcuffed?

21     What I mean is, were his arms in front of his body

22  or behind his body?

23     A.    Behind.

24     Q.    And with respect to his hands behind his

25  body, were the palms of his hands facing away from the

SA-283

24

S. Wilson - Examination by Mr. Modica

2  center of his body or toward the center of his body?

3      A.    I do not recall, to be honest with you.

4      Q.    Is there kind of a standard way so to speak

5  that someone is supposed to be handcuffed?

6      A.    Yes.

7      If the inmate -- typically we -- well, when we

8  handcuff an inmate we would put the palms facing

9  outwards thumbs up in a typical -- in a regular

10 situation.

11     If an inmate is restraining we have to do it the

12 best we can.  There's really no way to follow the

13 protocol if they're resisting.

14     Q.    So just to clarify, ordinarily without any

15 complication the inmate's hands would be handcuffed

16 behind their back with their palms facing away from the

17 center of their body thumbs up?

18     A.    Correct.

19     Q.    But there may be other circumstances when

20 doing it that way is not possible and so you may have

21 to cuff them some other way?

22     A.    Yes, sir.

23     Q.    Is that fair?

24     A.    Yes, sir.

25     Q.    From the time that you arrived -- before I do

SA-284

25

1              S. Wilson - Examination by Mr. Modica

2      that, I want to show you what we've marked as

3      Deposition Exhibit K.

4          Can you see that document on your screen?

5          A.    Yes, sir.

6          Q.    Can you just tell us what that is?

7          A.    That would be a use of force report.

8          Q.    And is that something that's also required in

9      addition to the pink sheet memo that you described a

10     few minutes ago?

11         A.    Yes, sir.

12         Q.    And again, do you recall approximately when

13     you prepared this document?

14         A.    That would have been the same day, so

15     March -- was it March 9th - I'm sorry - 2018.

16         Q.    Now, from the time that you -- so from the

17     time you arrived after the 10-99 call and saw inmate

18     Dublino until the time he left your presence did he say

19     anything that you could hear?

20         A.    I do not recall honestly.

21         Q.    Okay.  Best of your recollection, was there

22     anything that you said to him or anybody else at that

23     point?

24         A.    No.

25         Q.    You said you thought that inmate Dublino had

SA-285

26

            S. Wilson - Examination by Mr. Modica

1    resisted Deputy Thompson.  Do you believe -- or did he

2    resist you at any point?

3        A.    Yes, because he wouldn't put his arms behind

4    his back.  He was struggling with us, yes.

5        Q.    So from the time that you arrived until the

6    time that inmate Dublino was subdued, did you hear Mr.

7    Terranova say anything?

8        A.    No, no, sir.

9        Q.    Now, there are a number of other people that

10   were part of the response team after the 10-99 call.

11   So I'm going to ask you about them and what you know if

12   anything about their actions if at all.

13       We talked about Deputy Thompson.  What -- when you

14   first arrived what did you see Deputy Thompson doing?

15       A.    He was -- like I say, he was on the ground

16   trying to secure inmate Dublino.

17       As far as exactly his -- you know, his placement,

18   I -- to be honest I can't remember exactly how he was.

19       Q.    Okay.  And again, your recollection was that

20   when you first saw inmate Dublino he was face down on

21   the ground, correct?

22       A.    Yes.

23       Q.    And do you recall where Deputy Thompson had

24   his hands at that point when you first arrived?

SA-286

27

1          S. Wilson - Examination by Mr. Modica

2      A.    To be honest, I don't know.

3      Q.    I understand.  Let's talk about Sergeant

4  Justin Biegaj.  First of all, did I butcher his last

5  name or did I say it properly?

6      A.    You said it properly.  Very good.

7      Q.    Deputy Wilson, I've said it wrong about ten

8  times before this.  It goes to show you I'm able to

9  learn.

10     So inmate Dublino alleged that Sergeant Biegaj

11  stomped and stepped on him while he was on the ground

12  targeting his head and his back.

13     Did you see anything like that?

14     A.    No, sir, no.

15     Q.    He also alleged that Sergeant Biegaj put his

16  knee on inmate Dublino's back.  Did you see anything

17  like that?

18     A.    No, sir.

19     Q.    You mentioned earlier Sergeant Dee.  I want

20  to ask you a little bit about him.

21     My client alleged that he - Sergeant Dee - and you

22  grabbed his arms and his hands and bent and twisted

23  them in an abnormal position with extreme pressure.

24     What do you say to that allegation?

25     A.    That would be false, no.

COMPUTER REPORTING SERVICE
(585) 325-3170

SA-287

28

1          S. Wilson - Examination by Mr. Modica

2      Q.    And again, I think you testified you're not

3   sure today whether he was cuffed the normal way or some

4   other way; is that fair?

5      A.    That's fair, yes.

6      Q.    Now, we can go back and watch it again if

7   you'd like, but I'll represent to you that the video

8   shows Dublino on the ground out of sight of the camera

9   for about a minute and twenty seconds.

10      Can you tell us in your experience about how long

11   it would take to cuff an inmate?

12      A.    To be honest, I couldn't give you a fair

13   guesstimate.

14      If the inmate is not compliant it -- there's no --

15   there's no time frame to be honest with you,

16   unfortunately, that I could give you.

17      Q.    If the inmate was compliant would you expect

18   it to take that amount of time, more or less?

19      A.    Absolutely, no.  It would have been very --

20   fairly quick.

21      Q.    And again, your best recollection is that he

22   was resisting Deputy Thompson and you?

23      A.    Yes.

24      Q.    Let's talk about Sergeant Matthew Cross.  My

25   client alleges that Sergeant Cross stood directly over

COMPUTER REPORTING SERVICE
(585) 325-3170

SA-288

29

1       S. Wilson - Examination by Mr. Modica

2    him and began stomping on his legs, ankles and feet

3    while he was on the floor.

4        Did you see Sergeant Cross during this interaction?

5        A.    I don't remember seeing Sergeant Cross at

6    all - just in the video, but not when we were cuffing

7    him, no.

8        Q.    In any event, you don't recall him stomping

9    on or having physical contact with inmate Dublino?

10       A.    No, sir.

11       Q.    I want to ask you a little bit about Sergeant

12   Jack Robinson and Deputies Peter Giardina and Frank

13   Gelster.

14       So Dublino alleges that he was picked up off the

15   ground by his arm and shoulders and escorted to the

16   infirmary and that while on the way Sergeant Robinson

17   ordered Gelster and Giardina to wrench his arms.

18       First of all, the video did depict you at least

19   seen in part as inmate Dublino was leaving, but how far

20   did you get?

21       A.    I don't recall.  I didn't get far.

22       They pretty much pulled him out of the room.  I was

23   still there.  He was already gone by the time I came

24   out of the attorney visiting room.

25       Q.    And in any respect did you see Deputies

COMPUTER REPORTING SERVICE
(585) 325-3170

SA-289

30

1        S. Wilson - Examination by Mr. Modica

2   Giardina and Gelster wrenching inmate Dublino's arms at

3   any point?

4      A.    No, sir.

5          MR. MODICA:  Okay.  That's all I have.  Thank

6   you for coming in.  I appreciate it.  I know you're

7   coming off a shift and I appreciate your patience.

8          THE WITNESS:  You're welcome.  Thank you.

9

10

11

12            *         *         *

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                                                           31
 1          S. Wilson - Examination by Mr. Modica
 2                  REPORTER CERTIFICATE
 3
 4      I, John M. DiMartino, CSR, RPR, do hereby certify
 5   that I did report in stenotype machine shorthand the
 6   proceedings held in the above-entitled matter;
 7        Further, that the foregoing transcript is a true
 8   and accurate transcription of my said stenographic
 9   notes taken at the time and place hereinbefore set
10   forth.
11
12   Dated 7/12/2021
13   At Rochester, New York
14
15                        s/John M. DiMartino, CSR, RPR
16                        _____
17                        John M. DiMartino, CSR, RPR
18
19
20
21
22
23
24
25
```

COMPUTER REPORTING SERVICE
(585) 325-3170

SA-291

```
                                                                    32
 1           S. Wilson - Examination by Mr. Modica

 2                     WITNESS CERTIFICATE
                                                    ORIGINAL
 3

 4    STATE OF              )

 5    COUNTY OF             )

 6

 7       I, Shawn Wilson, do hereby certify that I have

 8    read the transcript of my testimony as taken under oath

 9    on Thursday, July 8, 2021, and that said transcript is

10    a true, complete and correct record of what was asked,

11    answered and said during said deposition, and that the

12    answers on record therein, and as may be modified in

13    conformity with the attached errata sheet, are true and

14    correct.

15

16

17

18                              _____

19

20

21    Subscribed and sworn to before me

22    this _____ day of _____, 2021

23    Notary Public

24

25
```

COMPUTER REPORTING SERVICE
(585) 325-3170

33

1         S. Wilson - Examination by Mr. Modica
2    In the Matter of:
     MARK T. DUBLINO                        **ORIGINAL**
3         Plaintiff
          -vs-
4    SGT. JUSTIN BIEGAJ, SGT. ROBERT DEE,
     DEPUTY BRIAN THOMPSON, DEPUTY FRANK
5    GELSTER, SGT. MR. CROSS, SGT. MR. ROBINSON,
     DEPUTY MR. P. GIARDINA, DEPUTY SHAWN WILSON
6         Defendants
          Civil Action No. 6:19-cv-6269-DGL
7
8    Errata sheet for the deposition of Shawn Wilson taken
9    on Thursday, July 8, 2021
10   PAGE        LINE          REASON FOR CHANGE
11   _____       _____         _____
12   _____       _____         _____
13   _____       _____         _____
14   _____       _____         _____
15   _____       _____         _____
16   _____       _____         _____
17   _____       _____         _____
18   _____       _____         _____
19   _____       _____         _____
20   _____       _____         _____
21   _____       _____         _____
22   _____       _____         _____
23   _____       _____         _____
24   _____       _____         _____
25

**COMPUTER REPORTING SERVICE**
**(585) 325-3170**