# 22-0198

# United States Court of Appeals

*for the*

# Second Circuit

━━━━━━◆━━━━━━

MARK THOMAS DUBLINO,

*Plaintiff-Appellant,*

– v. –

SGT. JUSTIN BIEGAJ, SGT. ROBERT DEE, DEP. BRIAN THOMPSON,
DEP. FRANK GELSTER, SGT. CROSS, SGT. ROBINSON,
DEPT. P. GIARDINA, DEPT. SHAWN WILSON,

*Defendants-Appellees,*

and

C.O. VINCENT TERRANA,

*Defendant.*

───────────────────

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

## SUPPLEMENTAL APPENDIX FOR
## DEFENDANTS-APPELLEES
## Volume 2 of 2 (Pages SA-293 – SA-425)

ERIE COUNTY DEPARTMENT OF LAW
Erin Molisani, Esq.
*Attorneys for Defendants-Appellees*
95 Franklin Street, Room 1634
Buffalo, New York 14202
(716) 858-2216

i

# TABLE OF CONTENTS

**Page**

District Court Docket Entries ..................................... SA-1

Amended Complaint, filed July 17, 2019 .................. SA-10

Order, filed September 3, 2019.................................. SA-27

Answer to Amended Complaint with Jury Trial
    Demand, filed October 2, 2019.............................. SA-32

Notice of Motion by Defendants, for an Order
    Granting Summary Judgment, filed October 8,
    2021 ......................................................................... SA-38

Supporting Declaration of Erin M. Molisani, Esq.,
    for Defendants, in Support of Motion, filed
    October 8, 2021 ..................................................... SA-40

Exhibit A to Molisani Supporting Declaration -
    Plaintiff's Deposition Testimony, dated June 7,
    2021 ....................................................................... SA-42

Exhibit B to Molisani Supporting Declaration -
    Video from March 9, 2018 and Affidavits of
    Deputy Brian Thompson and Sergeant Robert
    Dee ........................................................................ SA-105

Exhibit C to Molisani Supporting Declaration -
    Deputy Brian Thompson's Deposition Testimony,
    dated June 9, 2021 ................................................ SA-109

Exhibit D to Molisani Supporting Declaration -
    Deputy Frank Gelster's Deposition Testimony,
    dated June 9, 2021 ................................................ SA-146

Exhibit E to Molisani Supporting Declaration -
    Sergeant Jack Robinson's Deposition Testimony,
    dated June 10, 2021 .............................................. SA-184

ii

**Page**

Exhibit F to Molisani Supporting Declaration - Deputy Peter Giardina's Deposition Testimony, dated June 11, 2021 ................................................ SA-227

Exhibit G to Molisani Supporting Declaration - Deputy Shawn Wilson's Deposition Testimony, dated July 8, 2021 ................................................ SA-259

Exhibit H to Molisani Supporting Declaration - Sergeant Justin Biegaj's Deposition Testimony, dated July 8, 2021 ................................................ SA-293

Exhibit I to Molisani Supporting Declaration - Sergeant Matthew Cross' Deposition Testimony, dated July 9, 2021 ................................................ SA-331

Exhibit J to Molisani Supporting Declaration - Sergeant Robert Dee's Deposition Testimony, dated July 9, 2021 ................................................ SA-360

Exhibit K to Molisani Supporting Declaration - Request to Admit ................................................ SA-387

Exhibit L to Molisani Supporting Declaration - Plaintiff's Response to Request to Admit.............. SA-393

Movants' Statement of Material Facts, filed October 8, 2021 ................................................ SA-398

Certificate of Service, filed October 8, 2021 ............ SA-406

Plaintiff's Response to Defendants' Statement of Material Facts, filed December 15, 2021.............. SA-407

Certificate of Service, filed December 15, 2021 ....... SA-412

Attorney Declaration of Erin M. Molisani, Esq., for Defendants, in Further Support of Motion, filed December 20, 2021 ................................................ SA-413

iii

|  | Page |
|---|---|
| Decision and Order, filed January 18, 2022 | SA-416 |
| Judgment, filed January 19, 2022 | SA-422 |
| Notice of Appeal, filed January 31, 2022, with Affidavit of Service | SA-423 |

SA-293

# EXHIBIT H

SA-294

1

2    UNITED STATES DISTRICT COURT

3    WESTERN DISTRICT OF NEW YORK

4    - - - - - - - - - - - - - - - - - - - - - x

     MARK T. DUBLINO

5         Plaintiff

          -vs-

6    SGT. JUSTIN BIEGAJ, SGT. ROBERT DEE,

     DEPUTY BRIAN THOMPSON, DEPUTY FRANK

7    GELSTER, SGT. MR. CROSS, SGT. MR. ROBINSON,

     DEPUTY MR. P. GIARDINA, DEPUTY SHAWN WILSON

8         Defendants

     - - - - - - - - - - - - - - - - - - - - - X

9         Civil Action No. 6:19-cv-6269-DGL

10

11

12

13        Deposition of JUSTIN BIEGAJ taken pursuant to

14   notice via videoconference on Thursday, July 8, 2021

15   commencing at 9:25 a.m.

16

17

18

19

20

21   Reported by:

22   COMPUTER REPORTING SERVICE

23   John M. DiMartino, CSR, RPR

24   16 East Main Street, Suite 7

25   Rochester, New York  14614        (585) 325-3170

COMPUTER REPORTING SERVICE
(585) 325-3170

2

2    APPEARANCES:

3         MODICA LAW FIRM

4         By:  STEVEN V. MODICA, Esq.

5         2430 Ridgeway Avenue

6         Rochester, New York  14626

7         Attorneys for plaintiff.

8

9

10        ERIE COUNTY DEPARTMENT OF LAW

11        By:  ERIN MOLISANI, Esq.

12        95 Franklin Street, Suite 1634

13        Buffalo, New York  14202

14        Attorneys for defendants.

15

16

17

18

19

20

21

22

23

24

25

3

                                  INDEX

Justin Biegaj

       Examination by Mr. Modica                    4 - 34




Reporter Certificate                                35

Witness Certificate                                 36

Errata Sheet                                        37



(No exhibits marked.)

COMPUTER REPORTING SERVICE
(585) 325-3170

SA-297

4

1           J. Biegaj - Examination by Mr. Modica

2                    JUSTIN BIEGAJ

3       called herein as a witness, being duly sworn,

4               testified as follows:

5    EXAMINATION BY MR. MODICA:

6       Q.     Good morning, Sergeant.  My name is Steve

7    Modica.  I'm pro bono counsel for Mark Thomas Dublino.

8       I'm going to ask you a series of questions.  I'd

9    ask you to answer them to the best of your ability.

10      If you don't understand the question, feel free to

11   ask me to rephrase it.

12      Given that we're using Zoom it's particularly

13   important that we not talk over each other to make Mr.

14   DiMartino's job as easy as we can.

15      So I will certainly wait until you're done

16   answering my question and I hope you're able to wait

17   until I'm done asking my question.

18      Is that fair enough?

19      A.     Fair enough.

20      Q.     Are you currently employed by the Jail

21   Management Division of the Erie County Sheriff's

22   Department?

23      A.     Yes.

24      Q.     How long have you been employed by them?

25      A.     Approximately thirteen and a half years.

SA-298

5

1          J. Biegaj - Examination by Mr. Modica

2      Q.     And your current rank is as a sergeant,

3  correct?

4      A.     Yes.

5      Q.     And were you a sergeant during 2018?

6      A.     Yes.

7      Q.     And where were you performing your work as a

8  sergeant in 2018?

9      A.     I'm sorry.  I didn't prepare much for this

10  question.  I don't remember my exact assignment, but I

11  was a supervisor at the holding center at that time.

12      Q.     And that's the Erie County Holding Center,

13  correct?

14      A.     Correct.

15      Q.     And were you working on the morning of March

16  9th, 2018?

17      A.     Yes.

18      Q.     And I know it's some time ago, but if you

19  recall, what were your duties that day?

20      A.     To supervise deputies in my area, the floors,

21  just day to day operations, handle any unusual

22  incidents.

23      Q.     Do you recall, did you have any interactions

24  positive or negative with inmate Dublino before March

25  9th of 2018?

SA-299

6

1        J. Biegaj - Examination by Mr. Modica

2    A.    I'm sorry?

3    Q.    Did you have any --

4    A.    I'm sorry.  Can you repeat that?

5    Q.    Sure.  Did you have any interactions with

6    inmate Dublino positive or negative before March 9th of

7    2018?

8    A.    No irregular interactions I should say, but I

9    have dealt with him and we have -- our relationship I

10   guess from the jail point of view was fine.

11   Q.    And, of course, you did interact with inmate

12   Dublino on March 9th of 2018, correct?

13   A.    Yes.

14   Q.    Now, there's a video of at least part of your

15   interaction with him on that day.  Have you seen that

16   video before?

17   A.    Yes, I have.

18   Q.    So I've got that here and it's been marked as

19   Deposition Exhibit A, and as you may recall it's only

20   about three minutes long.

21        So what I would like to do is show you that video

22   and I may stop and ask you a series of questions while

23   we're going through the video.

24        Is that acceptable to you?

25   A.    Yes.

COMPUTER REPORTING SERVICE
(585) 325-3170

SA-300

7

1          J. Biegaj - Examination by Mr. Modica

2     Q.    For the record, I have pulled up Deposition

3  Exhibit A which is the video that we referred to there.

4     For purposes of the record it consists of four

5  boxes.  The top left box is labeled Alpha Hallway.

6     Do you see that, Sergeant?

7     A.    Yes.

8     Q.    And the box below it on the left-hand side is

9  labeled Attorney Visit Sally Port.  Do you see that?

10    A.    Yes.

11    Q.    And then on the right upper right side of the

12  screen is a box labeled Attorney Visit A.

13    Do you see that?

14    A.    Yes.

15    Q.    And then below that on the bottom right is a

16  box entitled Attorney Visit B.

17    Do you see that?

18    A.    Yes.

19    Q.    And you'll also notice there's a date stamp

20  on the video in each box.  Suffice it to say it shows

21  March 9th of 2018 beginning around 10:22 a.m.

22    A.    Yes.

23    Q.    So I'm going to start playing the video.  If

24  at any point you want me to stop it, please let me

25  know, and again, I may stop it -- I certainly am going

COMPUTER REPORTING SERVICE
(585) 325-3170

SA-301

8

1          J. Biegaj - Examination by Mr. Modica

2    to want to stop it when you first come into view.

3          A.    Okay.

4          Q.    Thank you.

5    (Deposition Exhibit A played.)

6          Q.    Okay.  I've paused the upper left box

7    entitled Alpha Hallway at 10:22 and 43.935 seconds in

8    the a.m.

9          Do you see yourself depicted in that frame?

10         A.    Yes.

11         Q.    Okay.  Where are you?

12         A.    I'm the one closest.

13         Q.    So in the middle of the screen?  Right now

14   I'm circling it.

15         A.    Yes.

16         Q.    Okay.  Do you recall how is it that you came

17   to be in the alpha hallway on that date at that time?

18         A.    I was in the supervisor's office on the

19   ground floor and I was the lucky one to get on the

20   elevator first and that's how I got off the floor

21   first.

22         Q.    And were you in the supervisor's office when

23   you got the 10-99 call?

24         A.    Yes, I was.

25         Q.    We'll talk about that in a bit.  I'm going to

SA-302

9

1          J. Biegaj - Examination by Mr. Modica

2    resume the video.

3    (Deposition Exhibit A played.)

4       Q.    I paused it again.  Is it fair to say you

5    came through the alpha hallway through the attorney

6    visit sally port and I paused it in the box where

7    you're depicted in Attorney Visit A at 10:22 and 48.649

8    seconds in the a.m.; is that correct?

9       A.    Correct.

10      Q.    And again, you're the first one in the middle

11   of the paused screen?

12      A.    Yes.

13      Q.    And again, best of your recollection where

14   are you headed?

15      A.    Towards inmate Dublino.

16      Q.    And if you look at the screen below in the

17   bottom right, Attorney Visit B, can you tell me what

18   you see there?

19      A.    I see Deputy Thompson.

20      Q.    And does he appear to be standing or does he

21   appear to be kneeling?

22      A.    He appears to be kneeling.

23      Q.    Do you know why he's kneeling at that point?

24      A.    I believe he's attempting to gain control of

25   inmate Dublino's hands.

SA-303

10

1          J. Biegaj - Examination by Mr. Modica

2      Q.     All right.  I'm going to continue the video.

3   (Deposition Exhibit A played.)

4      Q.     I'll pause it begin.  If you look at the

5   Attorney Visit B box at 10:22 and 51.766 seconds a.m.,

6   is it fair to say you went from a standing position to

7   either a kneeling or below standing position?

8      A.     Yes.

9      Q.     And why did you do that?

10      A.     I was attempting to gain control of

11   Dublino's I believe left hand or arm at that point, and

12   that's where I -- I struck my knee on the ground and

13   I -- eventually you'll see me take myself out of the

14   equation.

15      Q.     And when you first arrived and you went down

16   did you notice what position inmate Dublino was on the

17   floor?

18      A.     I believe he was on his belly.

19      Q.     So it would be face down, correct?

20      A.     Correct.

21      Q.     And did you notice whether he was resisting

22   any commands from Deputy Thompson?

23      A.     I don't recall.

24      Q.     I'm going to restart the video again.

25   (Deposition Exhibit A played.)

SA-304

11

```
 1          J. Biegaj - Examination by Mr. Modica
 2      Q.     Stop me when you feel like you jump out of
 3  the equation.  Okay?
 4      A.     Right at this point.
 5      Q.     So which frame are you looking at, Sergeant?
 6      A.     Lower right.
 7      Q.     That's Attorney Visit B?
 8      A.     Correct.
 9      Q.     Can you tell me where are you depicted in
10  that frame?
11      A.     I'm standing leaning over a group of deputies
12  and inmate Dublino.
13      Q.     Is that you right there that I'm circling?
14      A.     Yes.
15      Q.     So for purposes of the record, we've paused
16  the Attorney Visit B box frame at 10:22 and 59.874
17  seconds in the a.m. and the witness indicated that he
18  is essentially in the right center of the photo leaning
19  down or leaning over a bit.
20      Is that correct?
21      A.     Yes.
22      Q.     I'll start the video again.
23  (Deposition Exhibit A played.)
24      Q.     I've paused the video again.  Specifically
25  I'd like you to focus on the Attorney Visit B box.  I
```

COMPUTER REPORTING SERVICE
(585) 325-3170

SA-305

12

1          J. Biegaj - Examination by Mr. Modica

2     paused it at 10:23 and 13.78 seconds in the a.m.

3          Are you in the back of that frame in the center

4     leaning a bit?

5          A.    Yes.

6          Q.    Do you recall what you were doing at that

7     point?

8          A.    Probably wincing in pain.

9          Q.    And that's pain that you suffered when you

10    struck your knee on the ground?

11         A.    Correct.

12         Q.    And which knee did you strike on the ground?

13         A.    My right knee.

14         Q.    I'm going to start the video again.

15    (Deposition Exhibit A played.)

16         Q.    I've paused the video again.  If you could

17    focus on the box Attorney Visit B, I paused it at

18    10:23:27.907 seconds in the a.m.

19         Is it fair to say that in this still frame you are

20    the furthest away with your back to the camera?

21         A.    Yes.

22         Q.    And do you recall what you were doing at that

23    point?

24         A.    Trying to shake off my banged up knee.

25         Q.    I'm going to resume the video.

SA-306

13

1          J. Biegaj - Examination by Mr. Modica

2     (Deposition Exhibit A played.)

3          Q.    I'll note for the record that you walked back

4     toward where the rest of the group was and you appear

5     to be limping in some pain.

6          Is that a fair statement?

7          A.    Yes.

8          Q.    I'm going to resume the video.

9     (Deposition Exhibit A played.)

10         Q.    I've paused the video again.  If you could

11    look at the box Attorney Visit B, I paused it at 10:24

12    and 12.651 seconds in the a.m.

13         Is it fair to say that that is a group of five

14    members of law enforcement with you being essentially

15    the third one in the center of the photo?

16         A.    Yes.

17         Q.    And do you recall what you were doing at that

18    point?

19         A.    Just getting a look at Attorney Terranova.

20         Q.    What if anything do you remember about the

21    condition of Attorney Terranova when you looked in the

22    room?

23         A.    It was obvious he was in pretty rough shape.

24         Q.    What --

25         A.    He was bleeding from his face, both sides of

SA-307

14

 1          J. Biegaj - Examination by Mr. Modica

 2   his face near his eyes, and that's about all I recall.

 3       Q.    I'm going to resume the video.

 4   (Deposition Exhibit A played.)

 5       Q.    I've paused the video again.  I'd like you to

 6   focus on the box labeled Attorney Visit Sally Port.  I

 7   paused it at 10:24 and 39.245 seconds in the a.m.

 8       In this still are you the last person -- the person

 9   furthest right, is that you?

10       A.    Yes.

11       Q.    And again, your recollection -- is it fair to

12   say that you went from the hallway outside the attorney

13   conference room into the attorney visit sally port?

14       A.    Yes.

15       Q.    Do you recall why you did that, where you

16   were going?

17       A.    We were heading up to our infirmary on our

18   delta level just to have inmate Dublino evaluated.

19       Q.    And is that standard practice in any physical

20   altercation involving an inmate?

21       A.    Yes.

22       Q.    I'm going to resume the video.

23   (Deposition Exhibit A played.)

24       Q.    If you could look at the Alpha Hallway box,

25   I've paused it at 10:24 and 53.469 seconds in the a.m.

SA-308

15

1          J. Biegaj - Examination by Mr. Modica

2      It appears that several people have a moment or two

3  ago had gotten on an elevator.  Is that your

4  recollection of what happened?

5      A.    Yes.

6      Q.    I can't quite see you in this still, but are

7  you still in the photo or are you on the elevator?

8      A.    I believe I'm on the elevator at that point.

9      Q.    Do you recall, were you in the same elevator

10 as inmate Dublino was?

11     A.    I -- I don't recall.

12     Q.    I'll resume the video.

13 (Deposition Exhibit A played.)

14     Q.    Certainly stop me if at any point from now on

15 you see yourself.  I don't recall that you're seen in

16 any of this.

17     For purposes of the record, the video has

18 concluded.  Again, was I correct that once you appear

19 to exit on the elevator you were not seen at all after

20 that?

21     A.    That's correct.

22     Q.    Do you recall whether you had prepared a

23 memorandum about this incident?

24     A.    Yes, I did.

25     Q.    I want to show you what we have marked as

SA-309

16

1         J. Biegaj - Examination by Mr. Modica

2  Deposition Exhibit L.  Can you tell us if you recognize

3  that document?

4     A.   Yes.

5     Q.   And what is that document?

6     A.   That's my statement as to what happened from

7  my perspective.

8     Q.   And why did you prepare Deposition Exhibit L?

9     A.   That's part of our policy for unusual

10  incidents or critical incidents as this one was.

11     Q.   And do you recall when you prepared

12  Deposition Exhibit L?

13     A.   I don't recall.  Shortly thereafter, maybe an

14  hour or two.

15     Q.   And it's dated March 9th of 2018.  Do you

16  believe that's the day that you actually prepared it?

17     A.   Yes.

18     Q.   Let's look at some of the language that you

19  used here.

20     In the second sentence it says, "Upon my arrival I

21  witnessed inmate Dublino, Mark" - with his ICN number -

22  "lying face down on the floor."

23     Is that consistent with what you recall as far as

24  him being laying face down?

25     A.   Yes.

SA-310

17

1          J. Biegaj - Examination by Mr. Modica

2      Q.    And then the next sentence says, "I ordered

3  inmate Dublino to place his hands behind his back."

4      Did I read that correctly?

5      A.    Correct.

6      Q.    Do you recall whether he resisted or complied

7  with that instruction from you?

8      A.    He -- I don't believe he was complying.  I

9  believe with the -- with the actions that were taking

10  place it was just everything was happening very

11  quickly.

12     Q.    Okay.  The next sentence reads, "I then

13  attempted to secure inmate Dublino's upper body with my

14  left forearm and gain control of Dublino's left arm

15  with my right hand."

16     Did I read that correctly?

17     A.    Yes.

18     Q.    Do you recall what Deputy Thompson was doing

19  while you were engaged in that action?

20     A.    I know he was -- he had to keep his K-9

21  secure and I know he was trying to do that too as well

22  as trying to help with securing inmate Dublino, but as

23  far as what he was doing with his hands I don't know.

24     Q.    The next sentence reads, "While doing so my

25  right knee struck the floor causing sharp pain."

SA-311

18

1          J. Biegaj - Examination by Mr. Modica

2      The next sentence reads, "At this time Deputy

3   Gelster took over my position and applied handcuffs."

4      Did I read those two sentences correctly?

5      A.    Yes.

6      Q.    And is that an accurate reflection of what

7   happened at that point?

8      A.    Yes.

9      Q.    Did you also prepare a use of force report?

10      A.    I did.

11      Q.    I want to show you what we've marked as

12   Deposition Exhibit M.  Do you recognize that document?

13      A.    Yes.

14      Q.    What is it?

15      A.    It's our county use of force report.

16      Q.    And did you also prepare this on March 9th of

17   2018?

18      A.    Yes, I did.

19      Q.    As far as you know is the information in that

20   report accurate?

21      A.    Yes.

22      Q.    Did you also prepare an accident report for

23   the injury you suffered to your knee?

24      A.    Yes.

25      Q.    I want to show you what we've marked as

SA-312

19

1          J. Biegaj - Examination by Mr. Modica

2    Deposition Exhibit N.  Do you recognize that?

3        A.    Yes.

4        Q.    What is that?

5        A.    It's just a standard employee accident

6    report.

7        Q.    And is it correct that the report indicates

8    you suffered an injury to your right knee?

9        A.    Yes.

10        Q.    And again, that injury to your right knee was

11    sustained during the attempt to subdue inmate Dublino?

12        A.    Correct.

13        Q.    What is a 10-99?

14        A.    A 10-99 is an officer in trouble call.

15        Q.    And I believe you mentioned earlier you were

16    in the supervisor's office when you got that 10-99

17    call.

18        Is that your recollection?

19        A.    Yes.

20        Q.    And you went directly to the attorney

21    conference room area after you got the call?

22        A.    Yes.

23        Q.    Now, inmate Dublino made some allegations of

24    what he claims occurred outside the view of the camera.

25    If you recall, earlier there are certain times that the

20

1          J. Biegaj - Examination by Mr. Modica

2     camera does not show events that occurred below the

3     height of the camera.

4          Is it fair to say that the camera doesn't show

5     everything that happened in that hallway that day?

6          A.    Yes.

7          Q.    And specifically he alleges that you stomped

8     and stepped on him while he was on the ground targeting

9     his head and his back.

10          Did you do that?

11          A.    No.

12          Q.    Other than what you described as far as

13     trying to secure his arm and then you striking your

14     knee, did you have physical contact with any other

15     parts of inmate Dublino's body?

16          A.    No.

17          Q.    And you saw on the video and probably recall

18     that there was a response team of folks that arrived;

19     is that fair?

20          A.    Yes.

21          Q.    And from the time that you arrived until the

22     time that Dublino was subdued did you hear Mr.

23     Terranova say anything?

24          A.    I don't recall.

25          Q.    There was an allegation that Mr. Terranova

SA-314

21

1          J. Biegaj - Examination by Mr. Modica

2   was encouraging either you or some of your colleagues

3   to kick Dublino's ass.

4       Do you recall anything like that?

5       A.    No.

6       Q.    From the time that you arrived until the time

7   that Dublino was subdued, do you recall Dublino saying

8   anything?

9       A.    I don't recall.

10       Q.    You mentioned earlier that after the

11   altercation Dublino was removed and brought to the

12   infirmary.

13       Is that standard practice in a circumstance like

14   this?

15       A.    Yes.

16       Q.    The video certainly showed him going through

17   the alpha hallway and getting on the elevator.

18       What happened after he got on the elevator; how did

19   he get to the infirmary from there?

20       A.    Take the elevator to our delta level which is

21   our third floor, exit to your left and then make a

22   quick right through a hallway and you'll wind up in the

23   infirmary.

24       Q.    To your knowledge are there cameras in that

25   area once you exit the elevator on the delta level

SA-315

22

J. Biegaj - Examination by Mr. Modica

1          third floor?

2          A.    Yes.

3          Q.    As part of this litigation I believe that

4     there was either not footage available from inmate

5     Dublino or it wasn't secured.

6          What do you know about that?

7          A.    I don't know.

8          Q.    Did you go to the infirmary with the members

9     of the response team?

10          A.    I did.

11          Q.    And for what purpose did you do that?

12          A.    Just to be an additional supervisor

13     witnessing everything and then I --

14          Q.    Do you recall -- I'm sorry.

15          A.    No.  Go ahead.  Ask your question.

16          Q.    Do you recall who accompanied inmate Dublino

17     to the infirmary?

18          A.    I do not.

19          Q.    I'll represent to you that there was

20     testimony earlier in the case that it was Deputy

21     Gelster and Deputy Giardina who brought Dublino to the

22     infirmary.

23          A.    Okay.  Fair enough.

24          Q.    Is that possible at least?

25

COMPUTER REPORTING SERVICE
(585) 325-3170

SA-316

23

1                J. Biegaj - Examination by Mr. Modica

2          A.    Yes, because as I witnessed on the video they

3    were the escorts escorting him to the elevator.

4          Q.    Did you also at some point take photographs

5    of inmate Dublino's physical condition after the

6    altercation?

7          A.    Yes.

8          Q.    And how did that come to be?

9          A.    That's, again, standard practice for any

10   physical altercation.

11         Q.    Did someone ask you to do that or was that

12   something that you were expected to do as part of your

13   responsibilities?

14         A.    That's just something that I thought I would

15   do to speed things up a little bit.

16         Q.    We do have a series of photos.  I'm going to

17   show those to you.

18         I am going to show you what we have marked as

19   Deposition Exhibit D.  Are you able to see that photo?

20         A.    Yes.

21         Q.    Can you tell me what that photo depicts?

22         A.    That's a front view of inmate Dublino.

23         Q.    Is it fair to say that Deputy Gelster is on

24   the left of the photo, inmate Dublino's right?

25         A.    Yes.

SA-317

24

1                J. Biegaj - Examination by Mr. Modica

2        Q.     And is it also fair to say that Deputy

3    Giardina is on the right side of the photo, inmate

4    Dublino's left?

5        A.     Yes.

6        Q.     Is it your recollection that you took this

7    photograph?

8        A.     Yes.

9        Q.     At any point while you were taking this photo

10   and some others I'll show you did you ask Dublino

11   whether he was injured?

12       A.     I don't recall.

13       Q.     Do you recall whether he said anything to you

14   or the other deputies while you were taking the photos?

15       A.     No.

16       Q.     Do you recall whether Dublino made any noises

17   like a groan, anything like that?

18       A.     No.

19       Q.     Did you observe any injuries to inmate

20   Dublino while you were taking these photos?

21       A.     Just to his hands I believe.

22       Q.     I'll show you a photo on that.  This is again

23   Deposition Exhibit D.  I'm going to show you another

24   one now.

25            I'm showing you what has been marked as Deposition

SA-318

25

1        J. Biegaj - Examination by Mr. Modica

2   Exhibit E.  Do you see that photo in front of you?

3        A.    Yes.

4        Q.    Can you tell me what that depicts?

5        A.    That's a profile view of Dublino's left side.

6        Q.    Again, is that a photo that you took?

7        A.    Yes.

8        Q.    And is it also accurate like in the previous

9   photo that Deputy Gelster is depicted in part on the

10  left side of the photo, the right side of inmate

11  Dublino?

12       A.    Yes.

13       Q.    And is it also correct that Deputy Giardina

14  is depicted on the right side of the photo, the left

15  side of inmate Dublino?

16       A.    Yes.

17       Q.    Just for some context, what room is this

18  photo being taken in?

19       A.    I'd be wrong if I guessed, but I believe it's

20  exam room 1 maybe.

21       Q.    But that's part of the infirmary, correct?

22       A.    Yes, it is.

23       Q.    And again, I recognize that the picture isn't

24  broad enough to tell you so I appreciate at least the

25  effort.

SA-319

26

1          J. Biegaj - Examination by Mr. Modica

2     Is it fair to say in Deposition Exhibit E inmate

3 Dublino has his eyes closed?

4     A.    Yes.

5     Q.    Is that an indication or did he say why he

6 closed his eyes at that point?

7     A.    No.

8     Q.    I want to show you what we've marked as

9 Deposition Exhibit F.  Can you tell what that shows?

10     A.    That's a profile of inmate Dublino's right

11 side.

12     Q.    And again, that's a photo you took, correct?

13     A.    Yes.

14     Q.    Fair to say the positioning of Deputies

15 Gelster and Giardina are the same as described in the

16 earlier photos?

17     A.    Yes.

18     Q.    And had you taken photos of inmates involved

19 in altercations before March 9th of 2018?

20     A.    Yes.

21     Q.    And the practice of photographing them

22 straight on and then at least each profile, is that

23 something that you typically do or is that unusual in

24 this situation?

25     A.    No.  That's something we typically do.

COMPUTER REPORTING SERVICE
(585) 325-3170

SA-320

27

1          J. Biegaj - Examination by Mr. Modica

2     Q.     The last photo I want to show you is what

3 we've marked as Deposition Exhibit G.  Can you tell

4 what that photo depicts?

5     A.     It's a picture of inmate Dublino's left and

6 right hand.

7     Q.     And again, is that a picture that you took?

8     A.     Yes.

9     Q.     And how do you know that that's inmate

10 Dublino?

11     A.     Well, we were lucky enough to have his wrist

12 band showing.

13     Q.     And do you recall taking a picture of his

14 hands?

15     A.     Yes.

16     Q.     And why did you decide to take a picture of

17 his hands?

18     A.     To depict the injuries that were -- that were

19 on his hands.

20     Q.     And can you describe for me what you would

21 say are the injuries shown in this photo?

22     A.     It looks like he's got an injury to his

23 middle knuckle on the -- on his right hand.

24     Q.     Okay.  His right hand being the left side of

25 the photo, correct?

COMPUTER REPORTING SERVICE
(585) 325-3170

SA-321

28

1          J. Biegaj - Examination by Mr. Modica

2     A.    Correct.

3     On his left hand on the right side of the photo it

4     looks like he has some injuries to his first two

5     knuckles.

6     Q.    And again, to your recollection did he say,

7     "I hurt my hand in the altercation" or is that

8     something you observed or is there some other reason

9     you took a picture of his hands?

10    A.    No.

11    Q.    The photo Deposition Exhibit G shows a

12    bandage on the middle finger of inmate Dublino's right

13    hand.

14    Do you know whether that Band Aid was on his finger

15    before or after the altercation?

16    A.    It had to have been on before.

17    Q.    And why do you say that?

18    A.    At no point before I took the pictures was

19    inmate Dublino treated for anything.

20    Q.    I'll direct your attention to the area of the

21    wrist of inmate Dublino's right hand which is the left

22    side of the photo.

23    Tell me, does that indicate any injury to his right

24    wrist?

25    A.    It's possible.

SA-322

29

```
 1          J. Biegaj - Examination by Mr. Modica
 2      Q.    Did he to your recollection complain of any
 3   injury to his wrist?
 4      A.    No.
 5      Q.    Fair to say in Deposition Exhibit G there are
 6   no handcuffs shown?
 7      A.    That's fair to say.
 8      Q.    Do you recall whether in the other three
 9   photos you took - Exhibits D, E and F - whether inmate
10   Dublino was handcuffed when those photos were taken?
11      A.    I believe he was handcuffed.
12      Q.    Did you witness the removal of the handcuffs
13   so that the photo in Exhibit G could be taken?
14      A.    I don't recall.
15      Q.    Do you recall how inmate Dublino was
16   handcuffed?  Meaning was he -- were his hands in front
17   of his body or behind his body?
18      A.    His hands were behind his back when he was
19   originally cuffed.
20      Q.    Do you recall having him handcuffed with his
21   hands behind his back whether his palms were facing
22   away from the center of his body or toward the center
23   of his body?
24      A.    I don't recall.
25      Q.    Is there a standard way that deputies are
```

COMPUTER REPORTING SERVICE
(585) 325-3170

SA-323

30

1              J. Biegaj - Examination by Mr. Modica

2     ordinarily expected to handcuff inmates?

3         A.    Palms away.

4         Q.    When you say "palms away," again, from the

5     center of the body, palms away from the center of the

6     body?

7         A.    Correct.

8         Q.    Again, you can't really recall how he was

9     handcuffed that particular day?

10        A.    I do not recall.

11        Q.    There are a number of other folks who like

12    yourself were sued in this case.  I just want to ask

13    you about what if anything you know about their actions

14    on March 9th of 2018.

15        Let's start with Deputy Thompson.  I think you

16    indicated earlier that you believe he was accompanied

17    by his K-9 when he interacted with inmate Dublino on

18    March 9th of 2018.

19        Is that correct?

20        A.    Yes.

21        Q.    And did you actually see the K-9 at that

22    time?

23        A.    Yes.

24        Q.    If you recall how did the K-9 react during

25    this altercation?

COMPUTER REPORTING SERVICE
(585) 325-3170

SA-324

31

1        J. Biegaj - Examination by Mr. Modica

2    A.    I don't recall.

3    Q.    Do you recall the name of the K-9?

4    A.    I believe it was Billi.

5    Q.    And I know you don't -- you indicated you

6    don't recall how the dog reacted, but I want to ask you

7    some specific things about whether the dog did or

8    didn't do certain things.

9    Let's start with did you see Billi bite Dublino?

10   A.    No.

11   Q.    Did you see Billi scratch Dublino?

12   A.    No.

13   Q.    Did you see Billi having any physical contact

14   with Dublino at all?

15   A.    No.

16   Q.    Did you see Deputy Thompson lose control of

17   Billi during the altercation?

18   A.    No.

19   Q.    Did you see Deputy Thompson holding a leash

20   with Billi on it during the altercation?

21   A.    Yes.

22   Q.    And at any point did Deputy Thompson lose

23   control over Billi?

24   A.    No.

25   Q.    Had you had the opportunity to observe Billi

32

        J. Biegaj - Examination by Mr. Modica

1   before March 9th of 2018?

2       A.    Yes.

3       Q.    What can you tell me if anything about the

4   dog's demeanor?

5       A.    Quite honestly, if Deputy Thompson would have

6   let him, Billi probably would have licked inmate

7   Dublino.  So that goes to show you about his demeanor.

8       He was -- he was more of a family dog.

9       Q.    And what were Billi's responsibilities at the

10  jail?

11      A.    He was a really good drug detection dog.  So

12  those were his main responsibilities.

13      Q.    I want to ask you about Sergeant Dee and

14  Deputy Wilson.

15      My client alleges that Sergeant Dee and Deputy

16  Wilson grabbed his arms and hands and bent and twisted

17  them in an abnormal position with extreme pressure.

18      Did you see anything like that on March 9th of

19  2018?

20      A.    No.

21      Q.    I want to ask you about Sergeant Cross.  My

22  client alleges that Cross stood directly over him and

23  began stomping on his legs, ankles and feet while he

24  was on the floor.

33

1          J. Biegaj - Examination by Mr. Modica

2      Did you see any physical contact between Sergeant

3  Cross and inmate Dublino?

4      A.    No.

5      Q.    I'm going to ask you a little bit about

6  Deputies Gelster, Giardina and Sergeant Jack Robinson.

7      My client alleged that after he was picked up off

8  the ground and escorted to the infirmary that while

9  outside the vision of the cameras that Robinson ordered

10  Gelster and Giardina to wrench his arms.

11      First of all, I believe your testimony was that you

12  didn't accompany them to the infirmary, but went later;

13  is that correct?

14      A.    I may have been on the same elevator, but at

15  that time I was busy and -- and I don't recall seeing

16  anything like that.

17      Q.    Do you recall whether once you got off the

18  elevator did you go directly to the infirmary or did

19  you do something before you took the photos?

20      A.    I went directly to the infirmary before I

21  took the photos.

22      Q.    So it's fair to say though at no point did

23  you observe Deputies Gelster, Giardina or Robinson be

24  directed or wrenching the arms of inmate Dublino at any

25  point?

SA-327

34

```
 1          J. Biegaj - Examination by Mr. Modica

 2     A.     No.

 3          MR. MODICA:  Okay.  That's all I have.  I

 4  appreciate your cooperation.

 5          THE WITNESS:  You're welcome.

 6          MS. MOLISANI:  We're all set.  Thank you so

 7  much for coming in.

 8

 9

10

11            *          *          *

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

COMPUTER REPORTING SERVICE
(585) 325-3170

35

J. Biegaj - Examination by Mr. Modica

REPORTER CERTIFICATE


I, John M. DiMartino, CSR, RPR, do hereby certify that I did report in stenotype machine shorthand the proceedings held in the above-entitled matter;

Further, that the foregoing transcript is a true and accurate transcription of my said stenographic notes taken at the time and place hereinbefore set forth.


Dated 7/12/2021

At Rochester, New York


                        s/John M. DiMartino, CSR, RPR

                        _____

                        John M. DiMartino, CSR, RPR

COMPUTER REPORTING SERVICE
(585) 325-3170

36

```
1           J. Biegaj - Examination by Mr. Modica
2                    WITNESS CERTIFICATE
3                                              ORIGINAL
4    STATE OF              )
5    COUNTY OF             )
6
7       I, Justin Biegaj, do hereby certify that I have
8    read the transcript of my testimony as taken under oath
9    on Thursday, July 8, 2021, and that said transcript is
10   a true, complete and correct record of what was asked,
11   answered and said during said deposition, and that the
12   answers on record therein, and as may be modified in
13   conformity with the attached errata sheet, are true and
14   correct.
15
16
17
18                          _____
19
20
21   Subscribed and sworn to before me
22   this _____ day of _____, 2021
23   Notary Public
24
25
```

COMPUTER REPORTING SERVICE
(585) 325-3170

SA-330

37

1          J. Biegaj - Examination by Mr. Modica

2   In the Matter of:

    MARK T. DUBLINO                    ORIGINAL

3        Plaintiff

         -vs-

4   SGT. JUSTIN BIEGAJ, SGT. ROBERT DEE,

    DEPUTY BRIAN THOMPSON, DEPUTY FRANK

5   GELSTER, SGT. MR. CROSS, SGT. MR. ROBINSON,

    DEPUTY MR. P. GIARDINA, DEPUTY SHAWN WILSON

6        Defendants

         Civil Action No. 6:19-cv-6269-DGL

7

8   Errata sheet for the deposition of Justin Biegaj taken

9   on Thursday, July 8, 2021

10  PAGE      LINE       REASON FOR CHANGE

11  _____    _____      _____

12  _____    _____      _____

13  _____    _____      _____

14  _____    _____      _____

15  _____    _____      _____

16  _____    _____      _____

17  _____    _____      _____

18  _____    _____      _____

19  _____    _____      _____

20  _____    _____      _____

21  _____    _____      _____

22  _____    _____      _____

23  _____    _____      _____

24  _____    _____      _____

25

COMPUTER REPORTING SERVICE
(585) 325-3170

SA-331

# EXHIBIT I

1

2   UNITED STATES DISTRICT COURT

3   WESTERN DISTRICT OF NEW YORK

4   - - - - - - - - - - - - - - - - - - - - - - x

    MARK T. DUBLINO

5       Plaintiff

        -vs-

6   SGT. JUSTIN BIEGAJ, SGT. ROBERT DEE,

    DEPUTY BRIAN THOMPSON, DEPUTY FRANK

7   GELSTER, SGT. MR. CROSS, SGT. MR. ROBINSON,

    DEPUTY MR. P. GIARDINA, DEPUTY SHAWN WILSON

8       Defendants

    - - - - - - - - - - - - - - - - - - - - - - x

9          Civil Action No. 6:19-cv-6269-DGL

10

11

12

13      Deposition of MATTHEW L. CROSS taken pursuant to

14   notice via videoconference on Friday, July 9, 2021

15   commencing at 10:08 a.m.

16

17

18

19

20

21   Reported by:

22   COMPUTER REPORTING SERVICE

23   Shari L. Vitalone

24   16 East Main Street, Suite 7

25   Rochester, New York  14614      (585) 325-3170

SA-333

2

2    APPEARANCES:

3        MODICA LAW FIRM

4        By:  STEVEN V. MODICA, Esq.

5        2430 Ridgeway Avenue

6        Rochester, New York  14626

7        Attorneys for plaintiff.

8

9

10       ERIE COUNTY DEPARTMENT OF LAW

11       By:  ERIN MOLISANI, Esq.

12       95 Franklin Street, Suite 1634

13       Buffalo, New York  14202

14       Attorneys for defendants.

15

16

17

18

19

20

21

22

23

24

25

COMPUTER REPORTING SERVICE
(585) 325-3170

SA-334

```
                                                              3
 2                        INDEX

 3    Matthew L. Cross

 4         Examination by Mr. Modica              4 - 25

 5

 6

 7    Reporter Certificate                           26

 8    Witness Certificate                            27

 9    Errata Sheet                                   28

10

11

12    (No exhibits marked.)

13

14

15

16

17

18

19

20

21

22

23

24

25
```

COMPUTER REPORTING SERVICE
(585) 325-3170

SA-335

4

1        M. Cross - Examination by Mr. Modica

2              MATTHEW L. CROSS

3     called herein as a witness, being duly sworn,

4              testified as follows:

5   EXAMINATION BY MR. MODICA:

6      Q.    Good morning, Mr. Cross.  Nice to meet you.

7    Again, my name is Steve Modica.  I am the pro bono

8   counsel for Mark Thomas Dublino.

9    I'm going to ask you some questions.  Please answer

10  those questions to the best of your ability.

11   If you have any difficulty understanding them,

12  please let me know, but it should be relatively simple

13  and I hope you're able to answer them as well as you

14  can.

15   We're using the Zoom conferencing platform so it's

16  very important that you let me finish my question and I

17  let you finish your answer so we don't talk over each

18  other.

19   Is that acceptable?

20   A.    Yes.

21   Q.    Thank you.  Were you formerly an employee of

22  the Jail Management Division?

23   A.    Yes.

24   Q.    And how long did you work for them?

25   A.    Approximately twelve years.

COMPUTER REPORTING SERVICE
(585) 325-3170

SA-336

5

1          M. Cross - Examination by Mr. Modica

2      Q.      And when did you stop working for them?

3      A.      January of 2019.

4      Q.      And at the time you stopped working for them

5   what was your rank?

6      A.      Sheriff - I'm sorry - sergeant.

7      Q.      Sergeant, okay.  And were you working for the

8   Jail Management Division of the Erie County Sheriff's

9   Office in 2018?

10      A.      Yes, I was.

11      Q.      And were you performing your work at that

12   time at the Erie County Holding Center?

13      A.      Yes.

14      Q.      And were you working at the Erie County

15   Holding Center on the morning of March 9th of 2018?

16      A.      Yes.

17      Q.      And what was your job assignment that day?

18      A.      I was a supervisor role.  I believe I was

19   working on the ground floor supervising deputies.

20      Q.      And did you have any interactions that you

21   can recall with Mark Dublino before March 9th of 2018?

22      A.      I recall handling some complaints that he had

23   been making on housing units throughout his stay.  I

24   don't remember exact dates.

25      Q.      Anything as you sit here now that stands out

COMPUTER REPORTING SERVICE
(585) 325-3170

SA-337

6

```
 1          M. Cross - Examination by Mr. Modica

 2     about the nature of his complaints?

 3          A.    I don't recall what they were.

 4          Q.    You certainly interacted with him on March

 5     9th of 2018; is that correct?

 6          A.    Yes.

 7          Q.    And are you aware that there's a video that

 8     depicts at least part of your interaction with him on

 9     that day?

10          A.    Yes.

11          Q.    Have you seen that video before?

12          A.    I have.

13          Q.    I've got that marked here as Deposition

14     Exhibit A and it's only about three minutes long.  So

15     I'm going to play it and give you the opportunity to

16     take a look at it.

17          I may ask you some questions about it and certainly

18     if there's any point in the video you want me to pause,

19     feel free to tell me to do that.

20          A.    Okay.

21          Q.    So just give me a moment.

22          Okay.  Mr. Cross, I'm showing you -- first of all,

23     can you see the screen and what's depicted on it?

24          A.    Yes.

25          Q.    And for purposes of the record is it fair to
```

COMPUTER REPORTING SERVICE
(585) 325-3170

SA-338

7

M. Cross - Examination by Mr. Modica

2  say that it's divided into four boxes and that the

3  upper left-hand box is labeled Alpha Hallway; is that

4  correct?

5      A.    Yes.

6      Q.    The box below that on the left-hand side is

7  labeled Attorney Visit Sallyport; is that correct?

8      A.    That's correct.

9      Q.    And on the top right-hand side of the screen

10 there's a box labeled Attorney Visit A; is that

11 correct?

12     A.    Yes.

13     Q.    And below it is a box labeled Attorney Visit

14 B; is that correct?

15     A.    That's correct.

16     Q.    Is it also accurate that each box has a

17 timestamp indicating the time on March 9th, 2018 that

18 the video shows?

19     A.    That's correct.

20     Q.    The best that you know is the video that

21 we're going to see complete?

22     A.    Complete?

23     Q.    Correct.

24 I mean, was it edited in any way or altered in any

25 way as far as you know?

SA-339

8

1          M. Cross - Examination by Mr. Modica

2      A.     As far as I know it's complete.

3      Q.     All right.  So I'm going to start the video.

4   If you could please kindly let me know when you first

5   see yourself come into view and I will be sure to pause

6   it at that point.

7      So I'm going to start the video now.

8   (Deposition Exhibit A played.)

9      Q.     Okay.  I've paused the video at -- in the

10  alpha hallway box from, again, March 9th, 2018 at 10:22

11  and 44.936 seconds a.m.

12     Do you see yourself depicted at all in that box?

13     A.     Not yet.

14     Q.     All right.  I'll continue and please let me

15  know when you see yourself.

16  (Deposition Exhibit A played.)

17     A.     Right there.

18     Q.     Okay.  I've stopped the video.  Again, we're

19  in the alpha hallway box.  I paused it at 10:22 and

20  49.641 seconds a.m.

21     Can you tell me, sir, where you see yourself in

22  that picture?

23     A.     I see I'm in the lower box in the visit

24  sallyport holding the door open.

25     Q.     Okay.  So for the record, the witness is

SA-340

9

1          M. Cross - Examination by Mr. Modica

2     referring to a different box, the Attorney Visit

3     Sallyport box, which was paused at 10:22 and 49.636

4     seconds a.m. and the witness indicates that it is him

5     shown in that still with his hand on the door.

6          Is that correct?

7          A.    That's correct.

8          Q.    I'm going to continue.

9     (Deposition Exhibit A played.)

10          Q.    I'm going to pause the video again.  I'd like

11     to direct your attention to the box labeled Attorney

12     Visit A and ask whether you see yourself in that still

13     which again is at 10:22 and 54.956 seconds a.m.?

14          A.    I'm standing next to the pillar in the

15     hallway below the fire detector.

16          Q.    And just for the record that would be the

17     left-hand most side of the photo and you're looking I

18     guess for lack of a better term toward the camera?

19          A.    Correct.

20          Q.    And tell me if you know what are you looking

21     at at that time?

22          A.    At this time I'm attempting to observe the

23     deputies that are actually, again, attempting to put

24     restraints on the defendant.

25          Q.    And by "defendant," you're referring to

COMPUTER REPORTING SERVICE
(585) 325-3170

SA-341

10

1        M. Cross - Examination by Mr. Modica

2    Mr. Dublino?

3        A.    That's correct.

4        Q.    And let's back up for a minute.  How is it

5    that you originally came to come though the alpha

6    hallway through the sallyport and to the area where

7    we've stopped the video?

8        A.    I would have been responding to an activated

9    body alarm or a broadcast over the PA system in the

10   jail that there's an emergency in the attorney visit

11   area.

12       Q.    Is that commonly known as a 10-99 call?

13       A.    That's correct.

14       Q.    And what's your understanding of what a 10-99

15   call means?

16       A.    It means there's someone in trouble, someone

17   has been assaulted, someone has been attacked and

18   response is necessary.

19       Q.    And what was your responsibility if any as

20   someone in the building at the time you got a 10-99

21   call?

22       A.    It would have been part of the response team

23   to emergencies.

24       Q.    Do you recall where you were at the time you

25   got the 10-99 call?

SA-342

11

1          M. Cross - Examination by Mr. Modica

2      A.    I do not recall.

3      Q.    And do you recall where the 10-99 call told

4  you to respond?

5      A.    It would have been to the attorney visit

6  area.

7      Q.    And this video depicts you headed toward that

8  area; is that fair to say?

9      A.    Yes, sir.

10      Q.    All right.  I'm going to continue the video

11  again focusing on kind of yourself.

12  (Deposition Exhibit A played.)

13      Q.    Okay.  I paused the video.

14      Again, I'd like to focus your attention on the box

15  labeled Attorney Visit A at 10:23 and 12.974 seconds

16  a.m.

17      Is that you on the left side of the still?

18      A.    Yes, it is.

19      Q.    And it appears that you're looking down.  Do

20  you recall kind of what you were doing at that point?

21      A.    Yes.  I was looking down, again, attempting

22  to observe restraints being placed on to Mr. Dublino.

23      Q.    When you first arrived in the hallway outside

24  the attorney conference area was Mr. Dublino already on

25  the ground at that point?

SA-343

12

1            M. Cross - Examination by Mr. Modica

2        A.    Yes.

3        Q.    Do you recall whether he was face down, face

4     up or in some other way?

5        A.    I don't recall the exact positioning.  There

6     was many bodies in front of me.

7        Q.    Do you recall whether he was handcuffed by

8     the time that you got into the hallway?

9        A.    No, he was not.

10        Q.    All right.  I'm going to continue the video.

11     (Deposition Exhibit A played.)

12        Q.    I will pause it for a moment.

13        I didn't see where you went.  Are you -- do you

14     know where you are at the time I paused this video?

15        A.    I'll be honest.  I was kind of going back and

16     forth between boxes.  I don't know if you can back this

17     up at all.

18        Q.    I sure can.  Let me do that.

19        Let's back up.  Tell me when I should stop.

20     (Deposition Exhibit A played.)

21        A.    Right there.

22        Q.    So just for purposes of the record I backed

23     it up where the witness is depicted in the box Attorney

24     Visit A at 10:23 and 13.474 seconds a.m.

25        And, again, just for clarity you're on the

**COMPUTER REPORTING SERVICE**
**(585) 325-3170**

13

1          M. Cross - Examination by Mr. Modica

2   left-hand side of the box, correct?

3       A.    That's correct.

4       Q.    And you're looking down.  All right.

5   If you could simply trace your movement from

6   there -- I'll try to pause it a little quicker, but if

7   you could let me know what you do from there I'd

8   appreciate it.

9       A.    Okay.

10  (Deposition Exhibit A played.)

11      Q.    So did you see -- it looked like you stepped

12  outside of the view of the camera.  Do you recall what

13  you were doing at that point?

14      A.    Yes.  I would have been bending down to speak

15  to a deputy and making sure that restraints were

16  secured probably - just again doing supervisor duties.

17      Q.    Do you recall whether any of the folks in the

18  hallway had physical contact with inmate Dublino while

19  you were looking?

20      A.    Describe physical contact for me.

21      Q.    Was anybody touching him in any way?

22      A.    Yes.  He would have been under control by

23  deputies until we were ready to have him brought to his

24  feet.

25      Q.    Do you recall which deputies were attempting

SA-345

14

1          M. Cross - Examination by Mr. Modica

2     to control him?

3          A.    I do not at this time.

4          Q.    And at least as of this moment where we've

5     paused the video did you have any physical contact with

6     inmate Dublino?

7          A.    No.

8          Q.    At any point did you have any physical

9     contact with inmate Dublino?

10         A.    Brief.  When he stood to his feet as we

11    continue the video I do recall just guiding him with my

12    hand as they were escorting him.  That was it.

13         Q.    Okay.  We'll continue the video and

14    certainly, again, tell me when to pause it so we can

15    see what you're doing.

16         A.    Okay.

17    (Deposition Exhibit A played.)

18         Q.    Okay.  I've paused the video.  I want to

19    focus your attention on the box labeled Attorney Visit

20    B.  I've paused it at 10:23 and 53.332 seconds a.m.

21    Do you see yourself in that still?

22         A.    I do.

23         Q.    Where do you see yourself?

24         A.    It would be off to the right-hand side

25    against the wall.

SA-346

15

1          M. Cross - Examination by Mr. Modica

2      Q.    All right.  And that would be with your back

3   to the camera, correct?

4      A.    That's correct.

5      Q.    And there's another gentleman to your left

6   who also appears to be kind of clean shaven.  You're

7   the gentleman on the right who's clean shaven as well;

8   is that correct?

9      A.    That's correct.

10      Q.    Can you tell me who is that that is

11   immediately in front of you that's facing the camera

12   right here?

13      A.    That's Sergeant Justin Biegaj.

14      Q.    Right now we can't see inmate Dublino.  Can

15   you tell me where he is and what's happening at that

16   point?

17      A.    He's on the floor.  I'm not sure if he was --

18   it looked like to me he was restrained at that point

19   and they were getting ready to assist him to his feet.

20      Q.    All right.  And I'll continue the video.

21   (Deposition Exhibit A played.)

22      Q.    Okay.  So I've paused the video again

23   focusing on the box labeled Attorney Visit B.  I've

24   paused it at 10:24 and 01.440 seconds a.m.

25      Do you see yourself in the video?

SA-347

16

1           M. Cross - Examination by Mr. Modica

2      A.     I do.

3      Q.     Can you tell us where you're located?

4      A.     I'm to the right of Mr. Dublino.

5      Q.     And that would be to the left of Sergeant

6   Biegaj?

7      A.     As he's facing the camera I'd be to his left.

8      Q.     All right.  And at this point can you tell me

9   if -- you know, there appears to be a deputy here who

10  has his hands on inmate Dublino.  Is that Deputy

11  Gelster?

12     A.     It is.

13     Q.     At any point as inmate Dublino was rising

14  from the floor did you have your hands on him?

15     A.     Rising from the floor, no.

16     Q.     Okay.  Or being assisted up like -- because I

17  couldn't tell from the video whether you were touching

18  him or not.

19     A.     Not while he was on his way up, no.

20     Q.     All right.  I'm going to continue the video.

21  (Deposition Exhibit A played.)

22     Q.     Okay.  I've paused the video again.  So is it

23  fair to say in general you are part of a group that was

24  headed from the attorney conference room area to --

25  through the attorney visit sallyport?

SA-348

17

M. Cross - Examination by Mr. Modica

1

2     A.    That's correct.

3     Q.    Can you tell me if you recall what you were

4  doing on that path at that time?

5     A.    At this point we would be removing Mr.

6  Dublino from the scene and taking him to a more secure

7  location.

8     Q.    And were you going to take him to the

9  location or were others going to do that or both?

10    A.    I would have been part of the escort process.

11    Q.    All right.  I paused the attorney visit

12 sallyport box at 10:24 and 40.446 seconds a.m.

13    Do you see yourself in the box?

14    A.    I do.

15    Q.    And can you tell me where you see yourself?

16    A.    Right at the bottom.

17    Nope, that's not me.

18    Q.    This one is you?

19    A.    Yeah.

20    Q.    So for purposes of the record, just to be

21 clear I'll say that we see the back of your head in the

22 center of the box and that you are not the person to

23 the right of that person who's also clean shaven.

24    Fair enough?

25    A.    That's correct.

COMPUTER REPORTING SERVICE
(585) 325-3170

SA-349

18

1          M. Cross - Examination by Mr. Modica

2      Q.    I'm going to resume the video.

3  (Deposition Exhibit A played.)

4      Q.    I've paused the video again.  Is it fair to

5  say it shows you going through the attorney visit

6  sallyport into the alpha hallway and toward what other

7  witnesses have identified as elevators; is that

8  correct?

9      A.    That's correct.

10      Q.    And, again, your recollection is that you

11  were part of the group of folks that would be

12  transporting inmate Dublino to the infirmary; is that

13  right?

14      A.    Yes.

15      Q.    And why would he be transferred to the

16  infirmary at that point?

17      A.    Any inmate that's involved in any altercation

18  is immediately evaluated by medical personnel after.

19      Q.    And there are multiple elevators on the alpha

20  hallway; is that right?

21      A.    That's fair.

22      Q.    Do you recall whether you went up in the

23  elevator also occupied by inmate Dublino or another

24  elevator?

25      A.    I honestly don't recall.

SA-350

19

1        M. Cross - Examination by Mr. Modica

2        Q.    I'll continue the video.  Again, please let

3   me know if that let's you one way or another.

4   (Deposition Exhibit A played.)

5        Q.    For the record I'll let the tape continue,

6   but my recollection is once you get on the elevator we

7   don't see you on the video any more.

8        If that's not the case please let me know.

9        A.    That's correct.  I'm done.

10       Q.    Okay.  And the video is complete so -- okay.

11  Thanks for your patience as I did that.

12       Okay.  Describe for me how inmates are supposed to

13  be handcuffed.

14       A.    The ideal position for inmates to be

15  handcuffed is with the top of his hands placed

16  together, handcuff keys, the holes are to be up, double

17  locked and secured behind their back.

18       Q.    Okay.  And just so that I make sure I

19  understand, you're saying the inmate should be

20  handcuffed behind his back, and would his palms be

21  facing away from the center of his body or towards the

22  center of his body?

23       A.    The ideal position would be facing away when

24  permissible.

25       Q.    Do you recall observing how inmate Dublino

COMPUTER REPORTING SERVICE
(585) 325-3170

SA-351

20

```
 1          M. Cross - Examination by Mr. Modica
 2    was cuffed after the events on March 9th of 2018?
 3        A.     I don't recall at this time.
 4        Q.     Do you recall whether inmate Dublino resisted
 5    the efforts of any of your colleagues to handcuff him?
 6        A.     I do recall he was resistant to that.
 7        Q.     Can you tell me what you saw or what you
 8    heard that makes you believe he was resistant?
 9        A.     Verbal commands being ignored to relax, to
10    place his hands behind his back to rolling body
11    posture.
12        Q.     From the time you arrived to the outside of
13    the attorney conference room and when Mr. Dublino was
14    subdued did you hear Mr. Terranova say anything?
15        A.     I don't recall speaking directly to
16    Mr. Terranova, and from my standpoint I was in the
17    hallway with Mr. Dublino.  So I wouldn't have had
18    immediate contact with him.
19        Q.     Do you recall, again, from the time you
20    arrived until the time inmate Dublino was subdued
21    hearing him - meaning Mr. Dublino - say anything to you
22    or anybody else?
23        A.     Just a lot of vulgar language and nothing
24    specific that I recall outside of just being upset.
25        Q.     Do you recall whether you accompanied inmate
```

SA-352

21

1          M. Cross - Examination by Mr. Modica

2   Dublino to the infirmary?

3          A.    I honestly don't recall, sir.  Just what was

4   on the tape is my recollection.

5          Q.    I can represent to you that there was some

6   photographs taken of inmate Dublino in the infirmary

7   after the altercation.

8          Were you present when those photographs were taken?

9          A.    I don't recall.

10         Q.    Would it help for you to look at them?  If

11  you looked at them would that help you know if you were

12  present or not?

13         A.    Not unless there was something that

14  identified myself in them.

15         Q.    I'll represent to you that they have been

16  identified, and basically in those photos what we see

17  are Deputies Gelster and Giardina and that there was

18  testimony that Sergeant Biegaj was the one who took the

19  photographs.

20         A.    Okay.

21         Q.    Does that information help you recall one way

22  or another whether you were present when the photos

23  were taken?

24         A.    No, sir.

25         Q.    At any point did you or anyone ask inmate

**COMPUTER REPORTING SERVICE**
**(585) 325-3170**

SA-353

22

1          M. Cross - Examination by Mr. Modica

2    Dublino whether he was injured in the altercation?

3          A.    I don't recall any specific security staff in

4    my general direction doing that.

5          Q.    Did you observe inmate Dublino sustain any

6    injuries?

7          A.    Not to my recollection.

8          Q.    I'm going to ask you about some of the other

9    folks that responded to the 10-99 call; specifically,

10   about some allegations my client is making about their

11   behavior.

12         Let's start with Sergeant Biegaj.  My client

13   alleges that Sergeant Biegaj stomped and stepped on his

14   head and neck while he was on the ground outside the

15   view of the camera.

16         Did you see any interactions between Sergeant

17   Biegaj and inmate Dublino?

18         A.    No, sir.

19         Q.    Did you see any interactions like that, any

20   stomping, any contact like that?

21         A.    Absolutely not.

22         Q.    Let's talk about Deputy Brian Thompson.

23         First of all, is it correct that he at that time

24   was a K-9 officer?

25         A.    Yes, sir.

SA-354

23

```
 1        M. Cross - Examination by Mr. Modica
 2        Q.    Do you know whether the K-9 was present at
 3    the time he interacted with inmate Dublino on March 9th
 4    of 2018?
 5        A.    Yes.
 6        Q.    Did you actually see the dog?
 7        A.    I did.
 8        Q.    And is it correct the dog's name at that
 9    time - probably still now - is Bili?
10        A.    That's correct.
11        Q.    Now, is Deputy Thompson holding Bili during
12    the encounter with Dublino?
13        A.    Yes.
14        Q.    How was he holding him?
15        A.    Initially by the leash and then I believe he
16    went to the collar for a more secure hold.
17        Q.    At any point did -- well, strike that.
18        How did Bili react during this altercation if you
19    know?
20        A.    I didn't see anything other than just a dog
21    being present.
22        Q.    Were you familiar with Bili's general
23    demeanor on or about March 9th of 2018?
24        A.    Yes, sir.
25        Q.    What can you tell me about his demeanor
```

COMPUTER REPORTING SERVICE
(585) 325-3170

SA-355

24

1          M. Cross - Examination by Mr. Modica

2     generally?

3          A.     He was an extremely friendly, drug specific

4     searching dog.  I don't even believe he had any type of

5     bite training, but a very friendly dog.

6          Q.     My client alleges that Bili bit him.  Did you

7     see Bili have any physical contact with inmate Dublino?

8          A.     No, sir.

9          Q.     My client alleges Bili scratched him.  Did

10    you see Bili at any point scratching my client?

11         A.     No, sir.

12         Q.     At any point did you see Deputy Thompson lose

13    control over Bili?

14         A.     No, sir.

15         Q.     I want to ask you a little bit about Sergeant

16    Robinson and Deputy Wilson.

17         My client alleges that Deputy Wilson grabbed his

18    arms and hands and bent them and twisted them in

19    abnormal positions with extreme pressure.

20         Did you observe any contact by Sergeant Robinson or

21    Deputy Wilson of that nature?

22         A.     No, sir.

23         Q.     As you saw in the video, inmate Dublino was

24    escorted to the infirmary after the incident.  He

25    contends that Sergeant Robinson directed Deputies

COMPUTER REPORTING SERVICE
(585) 325-3170

SA-356

25

1      M. Cross - Examination by Mr. Modica

2    Gelster and Giardina to wrench his hands and his arms

3    and that they did so with extreme pressure.

4         How far if you recall did you make it from the

5    alpha hallway to the infirmary with inmate Dublino?

6         A.    I don't recall.  I don't want to speculate,

7    sir.

8         Q.    In any event, is it fair to say you didn't

9    observe any behavior like that that might have been

10   outside the view of the camera?

11        A.    Yeah.  I didn't observe anything like that.

12             MR. MODICA:  All right.  I have nothing else.

13   I appreciate your time.

14             Thank you.

15             THE WITNESS:  Thank you.

16             MR. MODICA:  You're welcome.

17

18

19              *         *         *

20

21

22

23

24

25

COMPUTER REPORTING SERVICE
(585) 325-3170

26

1          M. Cross - Examination by Mr. Modica

2               REPORTER CERTIFICATE

3

4     I, Shari L. Vitalone, do hereby certify that I did

5  report in stenotype machine shorthand the proceedings

6  held in the above-entitled matter;

7     Further, that the foregoing transcript is a true

8  and accurate transcription of my said stenographic

9  notes taken at the time and place hereinbefore set

10 forth.

11

12 Dated 7/23/2021

13 at Rochester, New York

14

15                              s/ Shari L. Vitalone

16                         _____

17                              Shari L. Vitalone

18

19

20

21

22

23

24

25

COMPUTER REPORTING SERVICE
(585) 325-3170

SA-358

27

1           M. Cross - Examination by Mr. Modica

2                    WITNESS CERTIFICATE

3                                            ORIGINAL

4     STATE OF              )

5     COUNTY OF             )

6

7        I, Matthew L. Cross, do hereby certify that I have

8    read the transcript of my testimony as taken under oath

9    on Friday, July 9, 2021, and that said transcript is a

10   true, complete and correct record of what was asked,

11   answered and said during said deposition, and that the

12   answers on record therein, and as may be modified in

13   conformity with the attached errata sheet, are true and

14   correct.

15

16

17

18                        _____

19

20

21   Subscribed and sworn to before me

22   this _____ day of _____, 2021

23   Notary Public

24

25

COMPUTER REPORTING SERVICE
(585) 325-3170

SA-359

28

1          M. Cross - Examination by Mr. Modica

2    In the Matter of:

MARK T. DUBLINO                    ORIGINAL

3          Plaintiff

     -vs-

4    SGT. JUSTIN BIEGAJ, SGT. ROBERT DEE,

DEPUTY BRIAN THOMPSON, DEPUTY FRANK

5    GELSTER, SGT. MR. CROSS, SGT. MR. ROBINSON,

DEPUTY MR. P. GIARDINA, DEPUTY SHAWN WILSON

6          Defendants

          Civil Action No. 6:19-cv-6269-DGL

7

8    Errata sheet for the deposition of Matthew L. Cross

9    taken on Friday, July 9, 2021

10   PAGE        LINE        REASON FOR CHANGE

11   ____        ____        _____

12   ____        ____        _____

13   ____        ____        _____

14   ____        ____        _____

15   ____        ____        _____

16   ____        ____        _____

17   ____        ____        _____

18   ____        ____        _____

19   ____        ____        _____

20   ____        ____        _____

21   ____        ____        _____

22   ____        ____        _____

23   ____        ____        _____

24   ____        ____        _____

25   ____        ____        _____

COMPUTER REPORTING SERVICE
(585) 325-3170

SA-360

# EXHIBIT J

1

2   UNITED STATES DISTRICT COURT    *ORIGINAL*

3   WESTERN DISTRICT OF NEW YORK

4   - - - - - - - - - - - - - - - - - - - - - - x

    MARK T. DUBLINO

5        Plaintiff

         -vs-

6   SGT. JUSTIN BIEGAJ, SGT. ROBERT DEE,

    DEPUTY BRIAN THOMPSON, DEPUTY FRANK

7   GELSTER, SGT. MR. CROSS, SGT. MR. ROBINSON,

    DEPUTY MR. P. GIARDINA, DEPUTY SHAWN WILSON

8        Defendants

    - - - - - - - - - - - - - - - - - - - - - - x

9        Civil Action No. 6:19-cv-6269-DGL

10

11

12

13       Deposition of ROBERT DEE taken pursuant to notice

14   via videoconference on Friday, July 9, 2021 commencing

15   at 11:01 a.m.

16

17

18

19

20

21   Reported by:

22   COMPUTER REPORTING SERVICE

23   Shari L. Vitalone

24   16 East Main Street, Suite 7

25   Rochester, New York  14614      (585) 325-3170

SA-362

2

2    APPEARANCES:

3        MODICA LAW FIRM

4        By:  STEVEN V. MODICA, Esq.

5        2430 Ridgeway Avenue

6        Rochester, New York  14626

7        Attorneys for plaintiff.

8

9


10        ERIE COUNTY DEPARTMENT OF LAW

11        By:  ERIN MOLISANI, Esq.

12        95 Franklin Street, Suite 1634

13        Buffalo, New York  14202

14        Attorneys for defendants.

15

16

17

18

19

20

21

22

23

24

25

**COMPUTER REPORTING SERVICE**
**(585) 325-3170**

3

2                           INDEX

3    Robert Dee

4        Examination by Mr. Modica              4 - 23

5

6

7    Reporter Certificate                         24

8    Witness Certificate                          25

9    Errata Sheet                                 26

10

11

12    (No exhibits marked.)

13

14

15

16

17

18

19

20

21

22

23

24

25

SA-364

4

```
 1            R. Dee - Examination by Mr. Modica

 2                    ROBERT DEE

 3      called herein as a witness, being duly sworn,

 4                 testified as follows:

 5   EXAMINATION BY MR. MODICA:

 6      Q.    Good morning, Sergeant.  My name is Steve

 7   Modica.  I'm pro bono counsel for Mark Thomas Dublino

 8   who as you know commenced a lawsuit against you and

 9   several of your colleagues for an incident that

10   occurred on March 9th of 2018.

11      I'm going to ask you a series of questions.  If you

12   don't understand them, feel free to ask me to rephrase

13   them.

14      We are doing this virtually so it's important that

15   you wait until I'm done with my question before you

16   answer and it's just as important for me to wait until

17   your answer is complete before I ask another question.

18      So is that acceptable to you?

19      A.    Acceptable.

20      Q.    Terrific.  Sir, are you currently employed by

21   the Jail Management Division of the Erie County

22   Sheriff's Office?

23      A.    Yes.

24      Q.    How long have you been employed by them?

25      A.    Since 2004.
```

COMPUTER REPORTING SERVICE
(585) 325-3170

SA-365

5

1             R. Dee - Examination by Mr. Modica

2      Q.    And it's correct that your current rank is a

3 sergeant?

4      A.    Yes.

5      Q.    And were you a sergeant during 2018?

6      A.    I'm sorry.  You broke up, sir.

7      Q.    I'm sorry.  Were you a sergeant during 2018?

8      A.    Yes.

9      Q.    And were you performing your work in 2018 at

10 the Erie County Holding Center?

11     A.    Yes.

12     Q.    Were you working at the Erie County Holding

13 Center on March 9th of 2018?

14     A.    I believe so.

15     Q.    If you recall what was your job assignment

16 that day?

17     A.    I do not recall.

18     Q.    Okay.  To your recollection did you ever

19 interact with Mark Thomas Dublino before March 9th of

20 2018?

21     A.    I don't recall.

22     Q.    And this case is about interactions between

23 you and others with Mark Dublino on March 9th of 2018.

24     Are you aware that there's a video that shows at

25 least some of those interactions?

SA-366

6

1          R. Dee - Examination by Mr. Modica

2     A.    When I talked to Ms. Molisani she did state

3  there was a video.

4     Q.    Have you seen the video before?

5     A.    No.

6     Q.    All right.  I've got that video here.  It's

7  about three minutes long.  So I'm going to show it to

8  you and ask you a series of questions about it.  Just

9  give me a second.

10    Okay.  Sergeant Dee, first of all, can you see on

11 your screen what appears to be a video with four boxes

12 on it?

13    A.    Yes.

14    Q.    Okay.  And just for purposes of the record so

15 it's clear, in the upper left-hand box is a box labeled

16 Alpha Hallway.

17    Do you see that?

18    A.    Yes.

19    Q.    And below that on the left-hand side of the

20 screen there's a box labeled Attorney Visit Sallyport.

21    Do you see that?

22    A.    Correct.

23    Q.    And in the upper right side do you see a box

24 labeled Attorney Visit A; do you see that?

25    A.    Yes.

SA-367

7

1              R. Dee - Examination by Mr. Modica

2       Q.     And finally at the bottom right a box labeled

3  Attorney Visit B.  Do you see that?

4       A.     I do.

5       Q.     And do you also see that the video is

6  timestamped to be on March 9th of 2018 starting at

7  around 10:22 a.m.; do you see that?

8       A.     I do.

9       Q.     All right.  I'm going to start the video.  If

10  you could, please tell me to pause as soon as you see

11  yourself or if you see yourself.

12       A.     Mr. Modica, just one thing.  Just so you're

13  aware, the Skype box -- the Zoom box is on the

14  right-hand side of my computer screen and does cover

15  the right side upper and lower.

16       Q.     So you are not seeing this as well as you'd

17  like to; is that what you're telling me?

18       A.     I don't know where I can move the picture

19  where all of us come up.  It's on the right-hand side

20  of my monitor here and it blocks off maybe a corner of

21  the pictures you're presenting.

22              MR. MODICA:  Why don't we go off the record

23  for a second.

24  (Discussion held off the record.)

25       Q.     Okay.  At this point I'm going to begin the

COMPUTER REPORTING SERVICE
(585) 325-3170

SA-368

8

1           R. Dee - Examination by Mr. Modica

2    video which, again, has been marked as Deposition

3    Exhibit A, and again, Sergeant, if you could let me

4    know if and when you can see yourself come into any of

5    the boxes I'd appreciate it.

6    (Deposition Exhibit A played.)

7         A.    I see myself coming up right now.

8         Q.    Okay.  Just for purpose of the record are you

9    looking at the alpha hallway box?

10        A.    That's correct.  Labeled 294.

11        Q.    Terrific.  And for the record I paused it at

12   that box at 10:22 and 43.435 seconds a.m.

13        Can you identify yourself in that box, sir?

14        A.    I believe I'm the second person in uniform

15   coming through.

16        Q.    And just for purposes of the record it would

17   appear like -- first of all, the first person I believe

18   is Sergeant Biegaj; is that correct?

19        A.    I don't know yet.  I can't tell enough.

20        Q.    Okay.  But in any event, you believe you are

21   behind the first person whose face is on the camera, on

22   that person's left side behind on -- on their left; is

23   that fair?

24        A.    Yes, sir.

25        Q.    All right.  I'm going to continue the

COMPUTER REPORTING SERVICE
(585) 325-3170

SA-369

9

1           R. Dee - Examination by Mr. Modica

2    video -- well, let me ask you this:  How is it you came

3    to be in the alpha hallway on March 9th of 2018 at

4    about 10:22 a.m.?

5        A.    I was responding to something.

6        Q.    Do you recall what you were responding to?

7        A.    I don't recall the exact radio broadcast.

8        Q.    Let me represent to you that there was a

9    10-99 call that morning.  Do you recall whether you

10   received that call?

11       A.    I did receive a call.  I don't remember the

12   exact terminology they used when they broadcast it or

13   the 10 code.

14       Q.    Are you familiar with the concept of a 10-99

15   call?

16       A.    Yes.

17       Q.    What is a 10-99 call?

18       A.    An officer in distress.

19       Q.    Do you recall where you were located in the

20   facility at the time you got that call on March 9th of

21   2018?

22       A.    No, I don't.

23       Q.    Do you recall where the call directed you to

24   go?

25       A.    I don't recall what the call was at all.

COMPUTER REPORTING SERVICE
(585) 325-3170

10

```
 1          R. Dee - Examination by Mr. Modica
 2   Obviously I'm going towards visits, but I don't recall
 3   how they broadcast it.
 4      Q.    All right.  So I'm going to continue with the
 5   video, and again, we'll just continue to try to trace
 6   what we can see about you there.
 7      Okay?
 8      A.    Yes, sir.
 9   (Deposition Exhibit A played.)
10      Q.    All right.  I've paused it.
11      Just for purposes of the record are you present in
12   the box entitled Attorney Visit Sallyport paused at
13   10:22 and 46.533 seconds a.m.?
14      A.    Yes, I am.
15      Q.    And where are you located, sir?
16      A.    I'm the second one in the box with my left
17   hand in the air.
18      Q.    And, again, you're in the attorney visit
19   sallyport at that point headed through the door into
20   the area near the attorney visit conference room; is
21   that correct?
22      A.    That's correct.  On the inmate side.
23      Q.    All right.  I'm going to continue with the
24   video.
25   (Deposition Exhibit A played.)
```

SA-371

11

```
 1          R. Dee - Examination by Mr. Modica
 2      Q.    I paused the video again.  I would like to
 3 focus your attention on the box Attorney Visit A, 10:22
 4 50.051 seconds a.m.
 5      Do you see yourself there?
 6      A.    I do.
 7      Q.    Where are you located?
 8      A.    Number two in that picture.
 9      Q.    Would that be toward the right side of the
10 still?
11      A.    That's correct.
12      Q.    Do you remember what if anything you saw at
13 that time?
14      A.    Not exactly, no.
15      Q.    Is it fair to say you appear to be looking
16 down at least where we've paused the video?
17      A.    Yes, that would be fair.
18      Q.    Do you recall what you were looking at?
19      A.    I know ultimately there was an inmate placed
20 on the ground, but I don't know what I was looking at,
21 no.
22      Q.    I understand.  Okay.  I'm going to continue.
23 (Deposition Exhibit A played.)
24      Q.    I'm going to pause for a second.  I don't see
25 you currently in the view where I paused it.
```

COMPUTER REPORTING SERVICE
(585) 325-3170

SA-372

12

1          R. Dee - Examination by Mr. Modica

2      Did you go to the ground at any point?

3      A.    I don't recall.

4      Q.    Let me back it up a little bit and maybe we

5  can trace it a little more carefully.

6  (Deposition Exhibit A played.)

7      Q.    Okay.  Again, I paused the Attorney Visit A

8  box at 10:22 and 49.951 seconds a.m. and, again, you're

9  depicted on the right side of the screen facing so to

10  speak the camera; is that fair?

11      A.    Yes, sir.

12      Q.    Okay.  And can you please just watch yourself

13  carefully and see where you go from there?

14      A.    Okay.

15  (Deposition Exhibit A played.)

16      Q.    Is it fair to say within a second or two

17  you're out of site of the camera at least?

18      A.    Correct.

19      Q.    And, again, at least at this point you don't

20  recall exactly what you were doing?

21      A.    Correct.

22      Q.    Is it possible that you were going down to

23  the ground to assist the others in securing inmate

24  Dublino?

25      A.    I would imagine so, but I don't recall.

SA-373

13

```
 1          R. Dee - Examination by Mr. Modica
 2      Q.    All right.  And, again, I'm going to continue
 3  the video.  If you see yourself emerge would you let me
 4  know?
 5      A.    Yes, sir.
 6      Q.    Okay.
 7  (Deposition Exhibit A played.)
 8      A.    I see myself there.
 9      Q.    Okay.  And for the record I paused in the box
10  labeled Attorney Visit B.  I paused it at 10:23 and
11  07.081 seconds a.m.
12      Can you identify for us where you're located?
13      A.    I appear to be on the right side of the image
14  far away towards the wall.
15      Q.    Would it be fair to say it appears that
16  you're not standing at that time?
17      A.    Correct.
18      Q.    And, again, any recollection as to what you
19  were doing at that moment?
20      A.    No, sir.
21      Q.    I'll continue.
22  (Deposition Exhibit A played.)
23      A.    Okay.  I stand up there.
24      Q.    Okay.  So I paused the box labeled Attorney
25  Visit B at 10:24 and 00.439 seconds a.m.
```

SA-374

14

```
1            R. Dee - Examination by Mr. Modica

2       Where do you see yourself?

3       A.    I believe I'm to the left of Mr. Dublino.

4       Q.    Is it fair to say that inmate Dublino is on

5   his feet?

6       A.    Correct.

7       Q.    Also fair to say that you're on your feet at

8   that point?

9       A.    Yes, sir.

10      Q.    And can you tell me who is on -- who's

11  holding inmate Dublino on inmate Dublino's immediate

12  right; who is that?

13      A.    I cannot tell from the picture.

14      Q.    If I said to you that I thought that was

15  Deputy Gelster, does that help you one way or another?

16      A.    I believe Gelster does not have hair, but I

17  don't know.  I can't see his face from there.

18      Q.    Understood.  Okay.  I'm going to continue --

19  let me ask you this:  At the point that I paused the

20  box of Attorney Visit B as indicated earlier, do you

21  know whether you have your hands on inmate Dublino in

22  any way?

23      A.    It appears to me that I do and it appears

24  that we're helping him to his feet, because I believe

25  he's actually taller than me if I recall and in this
```

SA-375

15

1          R. Dee - Examination by Mr. Modica

2     image it looks like he's shorter than me.  So it looks

3     like we're assisting him to his feet.

4          Q.    Other than assisting him to his feet do you

5     recall any -- having any other physical contact with

6     inmate Dublino on March 9th of 2018?

7          A.    I don't recall.

8          Q.    At the time that he was being lifted as shown

9     in the photo do you know whether he was handcuffed at

10    that point?

11         A.    I'm sure he was, yes.

12         Q.    Did you observe him being handcuffed prior to

13    that moment?

14         A.    Before he was lifted?

15         Q.    Yes, sir.

16         A.    He would have been handcuffed before he was

17    stood up.

18         Q.    But did you observe the process of

19    handcuffing him?

20         A.    I don't recall.

21         Q.    Do you recall how the cuffs were on his body?

22    First of all, were they in front of him or behind

23    his back?

24         A.    Everyone is cuffed behind their back.

25         Q.    And is there a typical way that a person

COMPUTER REPORTING SERVICE
(585) 325-3170

SA-376

16

1           R. Dee - Examination by Mr. Modica

2    should be handcuffed behind their back?

3        For example, is it typical to handcuff someone with

4    their palms facing away from the center of their body

5    or towards the center of their body?

6        A.    It would depend on the situation.

7        Q.    Do you recall specifically how the palms of

8    inmate Dublino were handcuffed behind his back on

9    March 9th of 2018?

10       A.    No, sir.

11       Q.    All right.  I'm going to continue the video.

12   Again, we'll focus on you and what is shown.

13   (Deposition Exhibit A played.)

14       Q.    Now, I may have missed it.  Did I see you

15   walk from the hallway into the attorney conference

16   room?

17       A.    That's correct.

18       Q.    And do you recall doing that?

19       A.    Yes, sir.

20       Q.    Why did you do that?

21       A.    Because Mr. Terranova was injured and he was

22   inside the attorney visit room.

23       Q.    Do you recall when you first walked in

24   whether there was anyone other than Mr. Terranova in

25   that room?

SA-377

17

          R. Dee - Examination by Mr. Modica

1

2      A.    As far as staff or inmates I don't believe

3  anybody was at all.

4      Q.    Did Mr. Terranova say anything to you?

5      A.    I don't recall.

6      Q.    Do you recall whether you said anything to

7  Mr. Terranova?

8      A.    I don't think I did right then.  I don't

9  recall, and if I did I don't know what I said.

10      Q.    Did you observe Mr. Terranova's physical

11  condition when you walked in the room?

12      A.    Yes, I did.

13      Q.    What did you observe?

14      A.    He was bleeding from both of his eyes and I

15  think someplace else on his face if I recall.

16      Q.    All right.  I'm going to continue with the

17  video.

18  (Deposition Exhibit A played.)

19      Q.    I'm pausing the video.

20      Again, if you look at the box labeled Attorney

21  Visit B, I paused it at 10:24 and 34.273 seconds a.m.

22      Does that show you having just emerged from the

23  attorney conference room?

24      A.    Yes, counsel.

25      Q.    And you're the person facing the camera on

COMPUTER REPORTING SERVICE
(585) 325-3170

SA-378

18

1          R. Dee - Examination by Mr. Modica

2     the left-hand side, the left most person so to speak?

3          A.    Yes.

4          Q.    I'm going to continue the video.

5     (Deposition Exhibit A played.)

6          Q.    Just for purposes of the record there appears

7     to be two other of your colleagues with you at the time

8     as you're waiting outside the attorney conference room.

9          Is the gentleman to the left of the photo Deputy

10    Wilson?

11         A.    Yes.

12         Q.    And can you identify the gentleman to the

13    right of the photo?

14         A.    Not with certainty.

15    (Deposition Exhibit A played.)

16         Q.    Okay.  I've paused the video at the Attorney

17    Visit B box at 10:24 and 53.692 seconds a.m.

18         Is it fair to say you were escorting Mr. Terranova

19    someplace?

20         A.    That is correct.

21         Q.    Where were you escorting Mr. Terranova?

22         A.    To the closest bathroom in the facility that

23    he could access.

24         Q.    I'm going to resume the video.

25    (Deposition Exhibit A played.)

COMPUTER REPORTING SERVICE
(585) 325-3170

SA-379

19

1           R. Dee - Examination by Mr. Modica

2      Q.     So I paused the video.  I'd like you to focus

3   on the box labeled Attorney Visit Sallyport.  I paused

4   it at 10:25 and 07.383 seconds a.m.

5      Is it fair to say you're depicted in that still?

6      A.     Correct.

7      Q.     And can you identify yourself please?

8      A.     I'm in the front right side.

9      Q.     And it looks like your hand is either close

10  to or on the back of Mr. Terranova; is that correct?

11     A.     Absolutely.

12     Q.     And, again, your testimony is that you're

13  escorting him to the closest bathroom?

14     A.     That's correct.  And making sure he's stable

15  while he walks.

16     Q.     Was the closest bathroom off the alpha

17  hallway or someplace else?

18     A.     It was off the alpha hallway.

19     Q.     I'm going to resume the video.

20  (Deposition Exhibit A played.)

21     Q.     I'm going to pause it.  In looking at the

22  alpha hallway it appears you're now out of sight.  I

23  paused it at 10:25 and 22.298 seconds a.m.

24     Did you see yourself walk down the alpha hallway

25  and pretty much outside the area of the camera?

SA-380

20

1           R. Dee - Examination by Mr. Modica

2      A.    That's correct.

3      Q.    I'm going to continue the video.  My

4   recollection is we don't see you at any point through

5   the end of the video, but I'm going to run it and you

6   tell me if you see you at any point.  Okay?

7      A.    Okay.

8   (Deposition Exhibit A played.)

9      Q.    Okay.  The video is over.

10     Is it correct you were not depicted from the last

11  time I paused the video?

12     A.    Yes, sir.

13     Q.    At any point that you observed inmate Dublino

14  was he resisting any of the commands of any of the

15  officers?

16     A.    I don't recall.

17     Q.    At any point did you ask inmate Dublino

18  whether he was injured in the altercation?

19     A.    No, sir.

20     Q.    At any point did inmate Dublino offer that he

21  was injured in the altercation?

22     A.    Not that I recall.

23     Q.    Did you observe any injuries to inmate

24  Dublino?

25     A.    No, sir.

SA-381

21

1          R. Dee - Examination by Mr. Modica

2      Q.     There are a number of folks as you saw on the

3   video that responded.  I want to ask you a little bit

4   about some of those folks and the allegations my client

5   has made.

6      I'll start with Sergeant Justin Biegaj.  My client

7   alleges that Sergeant Biegaj stomped and stepped on his

8   head and neck while he was on the ground.

9      Did you observe any physical contact between

10  Sergeant Biegaj and my client?

11     A.     No, sir.

12     Q.     Did you see Deputy Brian Thompson in the

13  area?

14     A.     Yes, sir.

15     Q.     Do you recall whether he was with his K-9 at

16  the time?

17     A.     He was with his first K-9, yes, sir.

18     Q.     And do you recall whether he was holding the

19  K-9 during the altercation?

20     A.     I believe that he did have the K-9 and then I

21  took the K-9.  I'm pretty sure I took the leash from

22  him as he finished handcuffing.

23     Q.     At any point did you observe the K-9 -- who's

24  name I believe is Bili; is that right?

25     A.     Yes, sir.

COMPUTER REPORTING SERVICE
(585) 325-3170

SA-382

22

1          R. Dee - Examination by Mr. Modica

2      Q.     At any point did you observe Bili having any

3  physical contact with inmate Dublino?

4      A.     Absolutely not.

5      Q.     That would include no indication that Bili

6  bit or scratched inmate Dublino?

7      A.     Or licked or kissed.

8      Q.     All right.  Was there any moment during the

9  altercation when Bili was not secured either by you or

10 Deputy Thompson or anybody else?

11     A.     No, sir.

12     Q.     You saw Deputy Wilson as part of the response

13 team.  My client alleges that Deputy Wilson grabbed his

14 arms and hands and bent them and twisted them in

15 abnormal positions with extreme pressure.

16     Did you see any behavior like that by Deputy

17 Wilson?

18     A.     No, sir.

19     Q.     I'm going to ask you about Sergeant Matthew

20 Cross.  My client alleges Sergeant Cross stood directly

21 over him and stomped on his legs, ankles and feet while

22 he was on the floor.

23     Did you see any behavior like that by Sergeant

24 Cross?

25     A.     No, sir.

SA-383

23

1          R. Dee - Examination by Mr. Modica

2     Q.    Ultimately inmate Dublino was transferred to

3     the infirmary for evaluation.  Is that standard

4     practice when there's been an altercation?

5     A.    It's standard practice any time there's

6     anything unusual with an inmate.

7     Q.    Did you accompany inmate Dublino to the

8     infirmary on March 9th of 2018 after this altercation?

9     A.    I don't recall.

10    Q.    Do you recall whether there were any

11    photographs taken of inmate Dublino after the

12    altercation?

13    A.    No, sir, I don't recall.

14    Q.    I'll represent to you that there were some

15    photographs taken.

16        Do you recall whether you were present when those

17    photographs were taken?

18    A.    No.

19         MR. MODICA:  Okay.  I have nothing else.  I

20    appreciate your time and your cooperation.

21         THE WITNESS:  No problem.  Thank you, sir.

22         MS. MOLISANI:  Thank you, Sergeant.

23         THE WITNESS:  You're welcome.  Have a good

24    day.

25              *         *         *

**COMPUTER REPORTING SERVICE**
**(585) 325-3170**

SA-384

24

1          R. Dee - Examination by Mr. Modica

2                REPORTER CERTIFICATE

3

4      I, Shari L. Vitalone, do hereby certify that I did

5   report in stenotype machine shorthand the proceedings

6   held in the above-entitled matter;

7        Further, that the foregoing transcript is a true

8   and accurate transcription of my said stenographic

9   notes taken at the time and place hereinbefore set

10  forth.

11

12  Dated 7/23/2021

13  at Rochester, New York

14

15                              s/ Shari L. Vitalone

16                        _____

17                             Shari L. Vitalone

18

19

20

21

22

23

24

25

COMPUTER REPORTING SERVICE
(585) 325-3170

SA-385

25

```
 1              R. Dee - Examination by Mr. Modica
 2                    WITNESS CERTIFICATE
 3                                            ORIGINAL
 4     STATE OF            )
 5     COUNTY OF           )
 6
 7        I, Robert Dee, do hereby certify that I have read
 8     the transcript of my testimony as taken under oath on
 9     Friday, July 9, 2021, and that said transcript is a
10     true, complete and correct record of what was asked,
11     answered and said during said deposition, and that the
12     answers on record therein, and as may be modified in
13     conformity with the attached errata sheet, are true and
14     correct.
15
16
17
18                              _____
19
20
21     Subscribed and sworn to before me
22     this _____ day of _____, 2021
23     Notary Public
24
25
```

COMPUTER REPORTING SERVICE
(585) 325-3170

SA-386

```
                                                              26
 1            R. Dee - Examination by Mr. Modica
 2    In the Matter of:
      MARK T. DUBLINO                    ORIGINAL
 3         Plaintiff
           -vs-
 4    SGT. JUSTIN BIEGAJ, SGT. ROBERT DEE,
      DEPUTY BRIAN THOMPSON, DEPUTY FRANK
 5    GELSTER, SGT. MR. CROSS, SGT. MR. ROBINSON,
      DEPUTY MR. P. GIARDINA, DEPUTY SHAWN WILSON
 6         Defendants
           Civil Action No. 6:19-cv-6269-DGL
 7
 8    Errata sheet for the deposition of Robert Dee taken on
 9    Friday, July 9, 2021
10    PAGE        LINE        REASON FOR CHANGE
11    ____        ____        _____
12    ____        ____        _____
13    ____        ____        _____
14    ____        ____        _____
15    ____        ____        _____
16    ____        ____        _____
17    ____        ____        _____
18    ____        ____        _____
19    ____        ____        _____
20    ____        ____        _____
21    ____        ____        _____
22    ____        ____        _____
23    ____        ____        _____
24    ____        ____        _____
25    ____        ____        _____
```

COMPUTER REPORTING SERVICE
(585) 325-3170

SA-387

# EXHIBIT K

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

MARK DUBLINO,

<em>Plaintiff,</em>

vs.

SGT. JUSTIN BIEGAJ, SGT. ROBERT DEE, DEPUTY
BRIAN THOMPSON, DEPUTY FRANK GELSTER,
SGT. MR. CROSS, SGT. MR. ROBINSON, DEPUTY
MR. P. GIARDINA, DEPUTY SHAWN WILSON,

<em>Defendants.</em>

**REQUEST TO ADMIT**

Case No. 6:19-cv-6269-DGL

Pursuant to F.R.C.P. 36, defendants request that plaintiff respond within 30 days to these requests by admitting, for purposes of this action only, and subject to admissibility at trial:

1.　The genuineness of the document attached as **Exhibit A**, entitled New York State Commission of Correction Inmate Grievance Form.

2.　That each of the following statements is true:

 a.　Exhibit A is a grievance written by plaintiff Mark Dublino.

 b.　Exhibit A was submitted to Erie County Holding Center staff on March 11, 2018 at 3:00 p.m.

 c.　Exhibit A concerns issues with mail and postage.

 d.　Exhibit A was sent from Gulf East, cell 33.

 e.　Gulf East, cell 33 was plaintiff Mark Dublino's cell as of March 11, 2018.

 f.　As of March 11, 2018, the grievance process was available to plaintiff Mark Dublino.

 g.　Plaintiff Mark Dublino did not submit any other grievances to Erie County Holding Center staff after March 9, 2018.

Dated:     Buffalo, New York
           June 15, 2021

                                    MICHAEL A. SIRAGUSA
                                      *Erie County Attorney*
                                      *Attorney for defendants*

                                    Erin E. Molisani
                                    Assistant County Attorney
                                    95 Franklin Street, Room 1634
                                    Buffalo, New York 14202
                                    Telephone: (716) 858-2216
                                    Email: erin.molisani@erie.gov

SA-390

# EXHIBIT A

**New York State Commission of Correction**
**Inmate Grievance Form**
Form SCOC 7032-1 (11/2015)

Facility: Erie County Holding Center                    Housing Location: Gulf East 33

Name of Inmate: Dublino, Mark  (ICN: 147472)           Grievance #: 18G-

Brief Description of the Grievance *(Submitted by the grievant within 5 days of occurrence)*
Number of Sheets Attached ( )

ON 12/11/18 I PURCHASED A U.S POSTAL PREPAID BOX. I FILLED IT WITH LEGAL
PAPERWORK AND THEN SEALED IT, DEB HARVEY TOOK THE PARCEL TO BE MAILED. AS OF 3/9/18
THE PARCEL DID NOT REACH THE DESTINATION 153 TOELSING RD. CHEEKTOWAGA NY 14225.
I ALSO SENT A PARCEL 8X11 MANILLA ENVELOPE ON 3/7/18 WITH AN OVERNIGHT
CHARGE OF $4.92, MY CONCERN IS IF BOTH PARCELS WERE MAILED.

Action requested by the grievant *(Submitted by the grievant within 5 days of occurrence)*:
Number of Additional Sheets Attached  ( )

I PAY EXTRA FOR NEXT DAY SERVICE, SO MY LEGAL DOCUMENTS GET TO
THE DESTINATION IN A TIMELY BASIS, THIS IS INFRINGING ON MY CIVIL RIGHTS
TO PROCESS U.S. MAIL, I NEED CONFIRMATION THAT BOTH PARCELS HAVE BEEN
FORWARDED TO THE U.S POSTAL SERVICE BOX OR POST OFFICE. 2018

Grievant Signature: _____        Date/Time Submitted: MARCH 11TH 3:00 PM

Receiving Staff Signature: _____ #1558   Date/Time Received: 03/11/18 / 1530

Investigation Completed by: _____        Date Completed: _____

Decision of the Grievance Coordinator                    Number of Sheets Attached ( )
*Written decision shall be issued within 5 business days of receipt of grievance and shall include specific facts and reasons underlying the determination*

☐  **Non-grievable issue as per 9 NYCRR §7032.4(h) (may not be appealed to CAO)**
☐  **Grievance Accepted**
☐  **Grievance Denied on Merits**
☐  **Grievance Denied due to submitted beyond 5 days of act or occurrence (can be appealed to CAO)**
☐  **Grievance Accepted in part/ Denied in part (Note specific Acceptance/Denial parts below)**

_____

_____
_____
_____
_____
_____
_____

Signature of the Grievance Coordinator: _____        Date: _____

**CERTIFICATE OF SERVICE**

I hereby certify that on June 15, 2021, I mailed the foregoing Request to Admit by United States Postal Service, to the following individual:

> Steven V. Modica, Esq.
> Modica Law Firm
> 2430 Ridgeway Avenue
> Rochester, New York 14626

DATED:   Buffalo, New York
         June 15, 2021                      **MICHAEL A. SIRAGUSA, ESQ.**
                                            *Erie County Attorney*
                                            *Attorney for defendants*

                                            By: */s/ Erin Molisani*
                                            Erin E. Molisani, Esq.
                                            Assistant County Attorney
                                            95 Franklin Street, Room 1634
                                            Buffalo, New York 14202
                                            Telephone: (716) 858-2216
                                            Email: Erin.Molisani@erie.gov

SA-393

# EXHIBIT L

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

MARK T. DUBLINO,

                    *Plaintiff,*

v.                                                               **Case # 19-CV-6269-DGL**

SGT. JUSTIN BIEGAJ, SGT. ROBERT DEE,
DEPUTY BRIAN THOMPSON, DEPUTY FRANK
GELSTER, SGT. MR. CROSS, SGT. MR. ROBINSON,
DEPUTY MR. P. GIARDINA, DEPUTY SHAWN WILSON,

                    *Defendants.*

### PLAINTIFF'S RESPONSE TO DEFENDANTS' REQUEST TO ADMIT

Plaintiff, by and through his *pro bono* counsel Modica Law Firm, hereby responds to

Defendants' Request to Admit made pursuant to Federal Rule of Civil Procedure 36 as described

below.  Please also see the enclosed sworn statement prepared by Plaintiff.

**Request 1.**     *The genuineness of the document attached as Exhibit A, entitled New York State
                   Commission of Correction Inmate Grievance Form.*

                   **RESPONSE:** ADMIT.

**Request 2a.**   *Exhibit A is a grievance written by plaintiff Mark Dublino.*

                   **RESPONSE:** ADMIT; however, Plaintiff clarifies that Exhibit A is the second part
                   of a formal grievance that he started before March 9, 2018.  He submitted an
                   informal form first.

**Request 2b.**   *Exhibit A was submitted to Erie County Holding Center staff on March 11, 2018 at
                   3:00 p.m.*

                   **RESPONSE:** ADMIT.

**Request 2c.**   *Exhibit A concerns issues with mail and postage.*

                   **RESPONSE:** ADMIT.

1

**Request 2d.**    *Exhibit A was sent from Gulf East, cell 33.*

    **RESPONSE:** ADMIT.

**Request 2e.**    *Gulf East, cell 33 was plaintiff Mark Dublino's cell as of March 11, 2018.*

    **RESPONSE:** ADMIT.

**Request 2f.**    *As of March 11, 2018, the grievance process was available to plaintiff Mark Dublino.*

    **RESPONSE:** ADMIT; however, Plaintiff maintains that the grievance process was available for the issue grieved in Exhibit A only and NOT for the alleged incident that occurred on March 9, 2018.

**Request 2g.**    *Plaintiff Mark Dublino did not submit any other grievances to Erie County Holding Center staff after March 9, 2018.*

    **RESPONSE:** ADMIT; however, Plaintiff clarifies that this is because Erie County Holding Center staff would not give him a grievance form, pen, or paper.


Dated:  August 17, 2021

                **MODICA LAW FIRM**
                *Pro Bono Attorneys for Plaintiff*

                *s/Steven V. Modica, Esq.*
                Steven V. Modica, Esq.
                2430 Ridgeway Avenue
                Rochester, New York 14626
                Tel.: (585) 368-1111
                Steve@ModicaLawFirm.com


TO:  Erin E. Molisani, Esq.
    Assistant Erie County Attorney
    Attorney for Defendants
    95 Franklin Street, Room 1634
    Buffalo, New York 14202
    Tel.: (716) 858-2216
    Erin.Molisani@erie.gov

2

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

MARK DUBLINO;        PLAINTIFF

v.

SERGEANT JUSTIN BIEGAJ; ET. AL

DEFENDANTS

PLAINTIFF RESPONSE TO
REQUEST TO ADMIT PURSUANT
FRCP 36

CASE # 19-cv-6269DGL

STATE OF NEW YORK  )
COUNTY OF ERIE     ) ss:

I MARK DUBLINO BEING DULY SWORN; DEPOSES AND SAYS:

REQUEST 1. CORRECT ABOUT THE GENUINENESS OF THE DOCUMENT AS EXIBIT A

REQUEST 2A EXIBIT A IS THE SECOND PART OF THE INFORMAL GRIEVANCE THAT WAS STARTED
        BEFORE MARCH 9th 2018. THE INFORMAL FORM WAS SUBMITTED FIRST

REQUEST 2b. IS CORRECT

REQUEST 2c. IS CORRECT

REQUEST 2d. IS CORRECT

REQUEST 2e. IS CORRECT

REQUEST 2F WAS AVAILABLE FOR THE ISSUE GRIEVED IN THE EXIBIT A; ONLY. NOT
        FOR THE ALLEGED INCIDENT ON MARCH 9th 2018

REQUEST 2g. IS CORRECT; BECAUSE THE ERIE COUNTY HOLDING CENTER STAFF OFFICERS
        WOULD NOT PROVIDE ANY GRIEVANCE FORM OR PEN OR PAPER

UNDER 28 USCA § 1746 : I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING
IS TRUE AND CORRECT.

AUGUST 7th 2021

                                    SIGNATURE              DATE

SA-397

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

MARK DUBLINO,

                          Plaintiff,                    **CERTIFICATE OF SERVICE**

v.                                                      Case # 19-CV-6269-DGL

SGT. JUSTIN BIEGAJ, et al.,

                          Defendants.

_____

        I hereby certify that on August 17, 2021, I mailed Plaintiff's Response to Defendants'

Request to Admit by United States Postal Service to:

        Erin E. Molisani, Esq.
        **Assistant Erie County Attorney**
        *Attorney for Defendants*
        95 Franklin Street, Room 1634
        Buffalo, NY 14202

        I also emailed a courtesy copy to her on that date.

                                        *s/ Steven V. Modica*_____
                                        STEVEN V. MODICA, ESQ.

                                        Modica Law Firm
                                        *Pro Bono Attorneys for Plaintiff*
                                        2430 Ridgeway Avenue
                                        Rochester, NY 14626
                                        (585) 368-1111
                                        Steve@ModicaLawFirm.com

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

MARK T. DUBLINO,

                        *Plaintiff,*

    v.

SGT. JUSTIN BIEGAJ, SGT. ROBERT DEE,
DEPUTY BRIAN THOMPSON,
DEPUTY FRANK GELSTER,
SGT. MR. CROSS, SGT. MR. ROBINSON,
DEPUTY MR. P. GIARDINA, and
DEPUTY SHAWN WILSON,

                      *Defendants.*

_____

**MOVANTS' STATEMENT OF
MATERIAL FACTS**
Case No.:  19-CV-6269

        Pursuant to Local Rule 56, defendants submit this Movants' Statement of Material Facts pursuant to Local Rule 56 as to which defendants claim there are no genuine issue to be tried:

        1.      In April 2021, plaintiff was convicted of assault in a correctional facility (Exhibit A, p. 10, ll. 13-23, p. 11, ll. 1).

        2.      The conviction arose out of an assault on Joe Terranova on March 9, 2018 (Exhibit A, p. 11, ll. 15-18).

        3.      Mr. Terranova was plaintiff's attorney at that time (Exhibit A, p. 16, ll. 7-16).

        4.      The incident which is the subject of this lawsuit occurred on March 9, 2018 at 10:20 a.m. (Exhibit A, p. 13, ll. 6-10).

        5.      As of March 9, 2018, plaintiff had been convicted of crimes for which Mr. Terranova was his attorney (Exhibit A, p. 16, ll. 7-21).

        6.      The incident occurred in and around attorney conference room 3 of the Erie County Holding Center (Exhibit A, p. 13, ll. 11-15).

7.      Plaintiff testified that while in the attorney conference room, he pushed Mr. Terranova up against the wall and put his fingers into his eyes to defend himself from Mr. Terranova jabbing his pen at him (Exhibit A, p. 22, ll. 21-23; p. 23, ll. 1-7).

8.      A 10-99 call is an "officer needs assistance" call (Exhibit C, p. 14, ll. 12-13).

9.      Available deputies are to respond to the location of the 10-99 (Exhibit C, p. 14, ll. 14-17).

10.     On March 9, 2018, Deputy Thompson heard the 10-99 call over the PA system and radio (Exhibit C, p. 14, ll. 24-25; p. 15, ll. 2-4).

11.     Deputy Thompson had just let his K-9 dog, Billi, out and was nearby, so he and the dog responded (Exhibit C, p. 15, ll. 12-21).

12.     Deputy Thompson was the first to respond to the incident (Exhibit A, p. 23, ll. 19-23).

13.     When Deputy Thompson arrived at conference room three, he saw Mr. Terranova, who had visible injuries to his face. Mr. Terranova said that plaintiff had just assaulted him and he wanted to press charges (Exhibit C, p. 16, ll. 19-25).

14.     Mr. Terranova was in "pretty rough shape" and was bleeding from his face near his eyes (Exhibit H, p. 13, ll. 20-25; p. 14, ll. 2).

15.     Deputy Thompson ordered plaintiff to sit down, and then to lay face down on the ground, which plaintiff complied with (Exhibit C, p. 18, ll. 10-19).

16.     Deputy Thompson applied pressure to plaintiff's back until the response team arrived (Exhibit C, p. 18., ll. 20-23).

17.     Deputy Thompson used force on plaintiff because it appeared an assault on Mr. Terranova had occurred and he was trying to prevent something else from happening (Exhibit C, p. 21, ll. 11-18).

18.     Deputy Thompson held plaintiff down because he knew a response team was coming, and he had only one hand, as his other hand was holding the dog's leash (Exhibit C, p. 21, ll. 19-25; p. 22, ll. 2-4).

19.     Deputy Thompson does not carry handcuffs (Exhibit C, p. 20, ll. 2-3).

20.     When asked if defendant Thompson used force against him, plaintiff testified that defendant Thompson lost control of the dog and the dog bit his right hand (Exhibit A, p. 25, ll. 5-19).

21.     Plaintiff does not claim that the dog was not instructed to bite plaintiff (Exhibit A, p. 29, ll. 13-15).

22.     The dog is a narcotics-detection dog and is not trained to attack someone attacking his handler (Exhibit C, p. 22, ll. 9-17).

23.     Plaintiff stated that, "Where the excessive force is, is that Deputy Thompson had control of me down on the ground. He could have called off the dog, no pun intended, off the dogs that were running down on me, which was about six, six or seven deputies and he didn't do any of that." (Exhibit A, p. 30, ll. 3-8).

24.     When a 10-99 code (officer needs assistance) is called, a sergeant must radio central control to advise either of a false alarm or that the scene is cleared; a deputy cannot make that call (Exhibit C, p. 24, ll. 8-19; p. 14, ll.12-13).

25.     After the response team arrived, Deputy Thompson left the area within 20 to 30 seconds (Exhibit C, p. 25, ll. 6-12).

26.     Plaintiff testified that defendant Biegaj went down on his knee on plaintiff's back (Exhibit A, p. 31, ll. 2-10).

SA-401

27.     Sergeant Biegaj went from a standing to a kneeling position to attempt to gain control of plaintiff's left hand, and in doing so, struck his right knee on the ground (Exhibit H, p. 10, ll. 4-14).

28.     Plaintiff was not complying with Sergeant Biegaj when instructed to place his hands behind his back (Exhibit H, p. 17, ll. 2-8).

29.     Sergeant Biegaj did not stomp or step on plaintiff (Exhibit H, p. 20, ll. 7-11; Exhibit I, p. 22, ll. 12-21).

30.     In the Amended Complaint, plaintiff alleges that Sergeant Dee and Deputy Wilson grabbed plaintiff's arms and hands and bent and twisted them in an abnormal position with extreme pressure (Dkt. No. 8, p. 4, para. 3).

31.     Upon questioning, plaintiff testified that Sergeant Dee and Deputy Wilson took longer than plaintiff thought it should to handcuff him (Exhibit A, p. 33, ll. 15-23; p. 34, ll. 1-2).

32.     There is no typical amount of time it takes to handcuff someone, especially in an emergency situation or if someone is resisting (Exhibit D, p. 20, ll. 18-25; Exhibit E, p. 34, ll. 10-16; Exhibit G, p. 28, ll. 10-16).

33.     Plaintiff was asked what Deputy Wilson and Sergeant Dee did to him and he stated, "The officers that were in the screen that were on top of me and then disappear, were Deputy Thompson, Deputy Biegaj, Sergeant Dee, Deputy Wilson, Sergeant Robinson and Deputy Scarpace, which should have been listed, but I didn't have his name at the time. Those people were -- there were six individuals on top of me." (Exhibit A, p. 38, ll. 22-23; p. 39, ll. 1-7).

34.     Plaintiff used a process of elimination by watching the video of this encounter to determine who must have been handcuffing him based on who was in the camera and then off the camera (Exhibit A, p. 39, ll. 8-23; p. 40, ll. 1).

35.    When asked about the bending his arms in abnormal positions, he testified that he was handcuffed with his palms facing outward, and then the handcuffs were removed and his hands turned inward toward his body (Exhibit A, p. 34, ll. 21-23; p. 35, ll. 1-23; p. 36, ll. 1-18).

36.    Defendant Gelster took control of plaintiff's right arm because plaintiff would not voluntarily put his hands behind his back (Exhibit D, p. 15, ll. 3-7).

37.    Deputy Gelster used force on plaintiff because he was not complying with orders (Exhibit D, p. 16, ll. 14-17).

38.    Plaintiff is "almost very, very certain" the person who instructed the handcuffs be removed and reapplied was Sergeant Robinson (Exhibit A, p. 37, ll. 12-18).

39.    Plaintiff does not know who removed the handcuffs and put them on the other way (Exhibit A, p. 37, ll. 23; p. 38, ll. 1-3).

40.    Plaintiff's handcuffs were not removed and reapplied the other way as he described (Exhibit D, p. 26, ll. 19-25; p. 26, ll. 2-3; Exhibit E, p. 39, ll. 4-7).

41.    In an emergency situation or when an inmate is resisting, an inmate may be handcuffed with his hands facing inward (rather than outward from the body) (Exhibit D, p. 16, ll. 5-10; Exhibit G, p. 24; ll. 4-13).

42.    Neither Sergeant Dee nor Deputy Wilson grabbed plaintiff's arms and hands and bent and twisted them in an abnormal position with extreme pressure (Exhibit H, p. 32, ll. 16-21).

43.    Plaintiff alleges defendant Cross was stomping on plaintiff's feet based on seeing him rocking back and forth in the video (Exhibit A, p. 40, ll. 2-15).

44.    Sergeant Cross did not stomp on plaintiff (Exhibit G, p. 29, ll. 8-10; Exhibit H, p. 33, ll. 2-4; Exhibit J, p. 22, ll. 19-25).

45.    Sergeant Cross' only physical contact with plaintiff was to guide him with his hand as plaintiff was being escorted (Exhibit I, p. 14, ll. 8-12).

46.     Plaintiff testified that he heard Sergeant Robinson say "wrench him" throughout the corridors and in the infirmary (Exhibit A, p. 43, ll. 10-23).

47.     Plaintiff claims that defendants Gelster and Giardina wrenched him (Exhibit A, p. 44, ll. 23-23; p. 45, ll. 1-18).

48.     Deputy Gelster did not recall anyone stomping, hitting, punching, or anything like that (Exhibit D, p. 25, ll. 22-25; p. 26, ll. 2).

49.     Sergeant Robinson did not touch plaintiff (Exhibit E, p. 26, ll. 10-11).

50.     Sergeant Robinson did not order anyone to "wrench" plaintiff (Exhibit D, p. 27, ll. 20-22; Exhibit E, p. 35, ll. 17-23; Exhibit F, p. 21, ll. 10-14; Exhibit H, p. 33, ll. 22-25; p. 34, ll. 2).

51.     Deputies Gelster and Giardina did not wrench plaintiff's arms (Exhibit H, p. 33, ll. 22-25; p. 34, ll. 2; Exhibit I, p. 25, ll. 8-11).

52.     Plaintiff was already handcuffed by the time Deputy Giardina responded to the scene (Exhibit F, p. 16, ll. 17-21).

53.     Plaintiff was resisting Deputy Wilson as he attempted to handcuff him (Exhibit G, p. 11, ll. 23-25; p. 12, ll. 2-3; p. 21, ll. 8-15; Exhibit I, p. 20, ll. 4-6).

54.     The dog did not have physical contact with plaintiff (Exhibit C, p. 23, ll. 8-16; Exhibit D, p. 24, ll. 23-25; p. 25, ll. 2-3; Exhibit E, p. 31, ll. 13-15; Exhibit F, p. 19, ll. 12-15; Exhibit H, p. 31, ll. 5-15; Exhibit I, p. 24, ll. 6-8; Exhibit J, p. 22, ll. 2-4).

55.     Plaintiff was escorted to medical after the incident because any inmate who is involved in any sort of altercation is evaluated by medical immediately after (Exhibit I, p. 18, ll. 10-18).

56.     Plaintiff was examined by RN Grace Moka on March 9, 2018 at 11:27 a.m., with non-specific complaints of pain, he was able to wiggle his fingers and raise his arms, and there

was no active bleeding noted (Dkt. No. 32-6, pp. 3-4).

57.    An assessment performed on March 9, 2018 at 7:52 p.m. showed plaintiff was complaining of pain to both hands (Dkt. No. 32-6, pp. 19-20).

58.    That assessment showed swelling and redness to his hands and no physical signs of injury to his back, sides, or chest. Plaintiff offered no other complaints (Dkt. No. 32-6, pp. 19-20).

59.    He refused medical care the day after the incident (Dkt. No. 32-6, p. 25).

60.    An assessment performed on March 12, 2018 showed no signs of injury to his right lower back or ribs. His hands were free of deformity and moving freely without swelling (Dkt. No. 32-6, pp. 42-43).

61.    Although x-rays were ordered after the March 12, 2018 assessment, he refused them (Dkt. No. 32-6, p. 73).

62.    Plaintiff has been incarcerated at three different facilities since this incident and has never received medical care for his claimed injuries (Exhibit A, p. 48, ll. 22-23; p. 49, ll. 1-14).

63.    In March 2018, plaintiff was aware of the grievance process (Exhibit A, p. 60, ll. 1-3).

64.    Plaintiff was asked if he filed a grievance relative to this incident and he stated that "they would never give me a grievance form" (Exhibit A, p. 59, ll. 9-12).

65.    Plaintiff testified that in the two weeks after this incident but before he was transferred to another facility, "they" would not give him a grievance form to file a grievance for any other issue (Exhibit A, p. 60, ll. 4-13).

66.    Plaintiff admitted to the genuineness of Exhibit A to defendants' Notice to Admit (Exhibit K and Exhibit L, no. 1).

67.    Plaintiff admitted to filing a grievance on March 11, 2018 relating to issues with mail and postage (Exhibit L, no. 2a-c).

SA-405

68.     Plaintiff admitted that as of March 11, 2018, the grievance process was available,

but claims it was only available for the issue grieved in Exhibit A of defendants' Notice to Admit

(Exhibit K and Exhibit L, no. 2f).

Dated:        Buffalo, New York
              October 8, 2021                    **MICHAEL A. SIRAGUSA**
                                                 *Erie County Attorney*

                                                 By: */s/ Erin Molisani*
                                                 Erin E. Molisani, Esq.
                                                 Assistant County Attorney
                                                 95 Franklin Street, Room 1634
                                                 Buffalo, New York 14202
                                                 Telephone: (716) 858-2216
                                                 Email: erin.molisani@erie.gov

Sworn before me this 8th
day of October, 2021

*s/ Carol Gruber*
Notary Public, State of New York

Reg. 01GR6036976
Qualified in Erie County/Niagara County
My commission expires
February 14, 2022

SA-406

## CERTIFICATE OF SERVICE

I hereby certify that on October 8, 2021, I electronically filed the foregoing Notice of Motion, Supporting Declaration with Exhibits A through L, Movants' Statement of Material Facts, and Certificate of Service with the clerk of the District Court using its CM/ECF system, which would then notify the following CM/ECF participant at the following address, which is his or her last known address:

Steven V. Modica, Esq.
**MODICA LAW FIRM**
2430 Ridgeway Avenue
Rochester, New York 14626
Telephone: (585) 368-1111
Email: steve@modicalawfirm.com

DATED:       Buffalo, New York
             October 8, 2021                **MICHAEL A. SIRAGUSA**
                                            *Erie County Attorney*

                                            By: */s/ Erin Molisani*
                                            Erin E. Molisani, Esq.
                                            Assistant County Attorney
                                            95 Franklin Street, Room 1634
                                            Buffalo, New York 14202
                                            Telephone: (716) 858-2216
                                            Email: erin.molisani@erie.gov

SA-407

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

MARK T. DUBLINO,

                        Plaintiff,                        Case # 19-CV-6269-DGL-MJP

v.

SGT. JUSTIN BIEGAJ, et al.,

                        Defendants.

## PLAINTIFF'S RESPONSE TO DEFENDANTS'
## STATEMENT OF MATERIAL FACTS

Pursuant to Federal and Local Rule of Civil Procedure 56, Plaintiff Mark T. Dublino submits this statement in response to Defendants' Statement of Undisputed Facts.

1.      Dublino **ADMITS** the content of Defendants' Statement of Undisputed Facts ("SUF") ¶ 1.

2.      Dublino **ADMITS** the content of Defendants' SUF ¶ 2.

3.      Dublino **ADMITS** the content of Defendants' SUF ¶ 3.

4.      Dublino **ADMITS** the content of Defendants' SUF ¶ 4.

5.      Dublino **ADMITS** the content of Defendants' SUF ¶ 5.

6.      Dublino **ADMITS** the content of Defendants' SUF ¶ 6.

7.      Dublino **ADMITS** the content of Defendants' SUF ¶ 7.

8.      Dublino **ADMITS** the content of Defendants' SUF ¶ 8.

9.      Dublino **ADMITS** the content of Defendants' SUF ¶ 9.

10.      Dublino **ADMITS** the content of Defendants' SUF ¶ 10.

11.      Dublino **ADMITS** the content of Defendants' SUF ¶ 11.

12.      Dublino **ADMITS** the content of Defendants' SUF ¶ 12.

SA-408

13.     Dublino **ADMITS** the content of Defendants' SUF ¶ 13.

14.     Dublino **ADMITS** the content of Defendants' SUF ¶ 14.

15.     Dublino **ADMITS** the content of Defendants' SUF ¶ 15.

16.     Dublino **ADMITS** the content of Defendants' SUF ¶ 16.

17.     Dublino **ADMITS** the content of Defendants' SUF ¶ 17.

18.     Dublino **ADMITS** the content of Defendants' SUF ¶ 18.

19.     Dublino **ADMITS** the content of Defendants' SUF ¶ 19.

20.     Dublino **ADMITS** the content of Defendants' SUF ¶ 20.

21.     Dublino **DISPUTES** the content of Defendants' SUF ¶ 21; he testified that the dog was *not* instructed to bite him (*see Defendants' Exhibit A at 29, lines 13-15*).[1]

22.     Dublino **ADMITS** the content of Defendants' SUF ¶ 22.

23.     Dublino **ADMITS** the content of Defendants' SUF ¶ 23.

24.     Dublino **ADMITS** the content of Defendants' SUF ¶ 24.

25.     Dublino **ADMITS** the content of Defendants' SUF ¶ 25.

26.     Dublino **ADMITS** the content of Defendants' SUF ¶ 26.

27.     Dublino **ADMITS** the content of Defendants' SUF ¶ 27.

28.     Dublino **DISPUTES** the content of Defendants' SUF ¶ 28; Defendant Biegaj testified only that he did not *believe* Dublino complied with his instructions and that "everything was happening very quickly" (*see Defendant's Exhibit H at 17, lines 6-11*).

29.     Dublino **DISPUTES** the content of Defendants' SUF ¶ 29; as Dublino testified, Sergeant Biegaj had his knees on Dublino's back and was jumping (*see Defendants' Exhibit A at 31, lines 6-23*).

---

[1] It appears that Defendants' ¶ 21 was merely a typo based on the deposition testimony cited.

2

SA-409

30.     Dublino **ADMITS** the content of Defendants' SUF ¶ 30.

31.     Dublino **ADMITS** the content of Defendants' SUF ¶ 31.

32.     Dublino **ADMITS** the content of Defendants' SUF ¶ 32.

33.     Dublino **ADMITS** the content of Defendants' SUF ¶ 33.

34.     Dublino **ADMITS** the content of Defendants' SUF ¶ 34.

35.     Dublino **ADMITS** the content of Defendants' SUF ¶ 35.

36.     Dublino **DISPUTES** the content of Defendants' SUF ¶ 36 and maintains that he complied with orders throughout his interactions with Defendants (*see Defendants' Exhibit A at 24, lines 17-23; 25, lines 1-2*).

37.     Dublino **DISPUTES** the content of Defendants' SUF ¶ 37 and maintains that he complied with orders throughout his interactions with Defendants (*see Defendants' Exhibit A at 24, lines 17-23; 25, lines 1-2*).

38.     Dublino **ADMITS** the content of Defendants' SUF ¶ 38.

39.     Dublino **ADMITS** the content of Defendants' SUF ¶ 39.

40.     Dublino **DISPUTES** the content of Defendants' SUF ¶ 40 and maintains that the handcuffs were removed and reapplied with his hands facing outward as described in ¶¶ 38-39. Defendants Gelster and Robinson testified only that they could not recall whether Dublino's handcuffs were adjusted (*see Defendants' Exhibit D at 26, lines 15-25 & at 27, lines 1-3; Exhibit E at 39, lines 4-7*).

41.     Dublino **ADMITS** the content of Defendants' SUF ¶ 41.

42.     Dublino **DISPUTES** the content of Defendants SUF ¶ 42 and maintains that Defendants Dee and Wilson grabbed his arms and hands and bent and twist them in an abnormal fashion (*see Defendants' Exhibit A at 34 (lines 22-23) thru 39*).

3

SA-410

43.     Dublino **ADMITS** the content of Defendants' SUF ¶ 43.

44.     Dublino **DISPUTES** the content of Defendants SUF ¶ 44 and maintains that Sergeant Cross stomped on him as set forth in ¶ 43.

45.     Dublino **DISPUTES** the content of Defendants SUF ¶ 45 and maintains that Sergeant Cross stomped on him as set forth in ¶ 43.

46.     Dublino **ADMITS** the content of Defendants' SUF ¶ 46.

47.     Dublino **ADMITS** the content of Defendants' SUF ¶ 47.

48.     Dublino **ADMITS** the content of Defendants' SUF ¶ 48.

49.     Dublino **ADMITS** the content of Defendants' SUF ¶ 49.

50.     Dublino **DISPUTES** the content of Defendants' SUF ¶ 50 and maintains that Sergeant Robinson ordered Defendants Gelster and Giardina to "wrench him" as set forth in ¶ 46.

51.     Dublino **DISPUTES** the content of SUF ¶ 51 and maintains that Defendants Gelster and Giardina wrenched his arms as set forth in ¶ 47.

52.     Dublino **ADMITS** the content of Defendants' SUF ¶ 52.

53.     Dublino **DISPUTES** the content of Defendants' SUF ¶ 53 and maintains that he complied with orders throughout his interactions with Defendants (*see Defendants' Exhibit A at 24, lines 17-23; 25, lines 1-2*).

54.     Dublino **DISPUTES** the content of Defendants' SUF ¶ 54 and maintains that the dog bit his right hand while going after his leg, upper thigh, and buttocks (*see Defendants' Exhibit A at 25 lines 9-23; 26, lines 1-3*).

55.     Dublino **ADMITS** the content of Defendants' SUF ¶ 55.

56.     Dublino **ADMITS** that the report exists but maintains that he was not actually examined (*see Defendants' Exhibit A at 47, lines 17-20*).

57.     Dublino **ADMITS** the content of Defendants' SUF ¶ 57.

58.     Dublino **ADMITS** that the report exists but maintains that he was not actually examined (*see Defendants' Exhibit A at 50-53*).

59.     Dublino **DISPUTES** the content of Defendants' SUF ¶ 59; as he clearly wrote at the top of the form, he was not refusing medical care and was denied the opportunity to go to the hospital (*ECF No. 32-6 at 25*).

60.     Dublino **ADMITS** the content of Defendants' SUF ¶ 60.

61.     Dublino **DISPUTES** the content of Defendants' SUF ¶ 61 and maintains that he was not offered x-rays (*see Defendants' Exhibit A at 47, line 8; 48, line 6; 55, line 22*).

62.     Dublino **ADMITS** the content of Defendants' SUF ¶ 62.

63.     Dublino **ADMITS** the content of Defendants' SUF ¶ 63.

64.     Dublino **ADMITS** the content of Defendants' SUF ¶ 64.

65.     Dublino **ADMITS** the content of Defendants' SUF ¶ 65.

66.     Dublino **ADMITS** the content of Defendants' SUF ¶ 66.

67.     Dublino **ADMITS** the content of Defendants' SUF ¶ 67.

68.     Dublino **ADMITS** the content of Defendants' SUF ¶ 68.


Dated: December 15, 2021
       Rochester, New York


                    BY:     *s/ Steven V. Modica*
                            STEVEN V. MODICA, ESQ.

                            *Pro Bono Attorney for Plaintiff*
                            Modica Law Firm
                            2430 Ridgeway Avenue
                            Rochester, NY 14626
                            (585) 368-1111
                            Steve@ModicaLawFirm.com

SA-412

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

MARK T. DUBLINO,

<table>
<tr><td></td><td>Plaintiff,</td><td><strong>CERTIFICATE OF SERVICE</strong></td></tr>
<tr><td>v.</td><td></td><td><strong>Case # 19-CV-6269-DGL-MJP</strong></td></tr>
<tr><td>SGT. JUSTIN BIEGAJ, et al.,</td><td></td><td></td></tr>
<tr><td></td><td>Defendants.</td><td></td></tr>
</table>

STEVEN V. MODICA, ESQ., attorney for Plaintiff MARK T. DUBLINO, hereby certifies that, on December 15, 2021, I electronically filed Mr. Dublino's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment and Response to Defendants' Statement of Material Facts with the Clerk of the District Court using its CM/ECF system, which would then electronically notify the following CM/ECF participants on this case:

Erin E. Molisani, Esq.
**ASSISTANT ERIE COUNTY ATTORNEY**
*Attorney for Defendants*
95 Franklin Street, Room 1634
Buffalo, NY 14202

*s/ Steven V. Modica*
STEVEN V. MODICA, ESQ.

SA-413

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

MARK T. DUBLINO,

                *Plaintiff,*

    v.

SGT. JUSTIN BIEGAJ, SGT. ROBERT DEE,
DEPUTY BRIAN THOMPSON,
DEPUTY FRANK GELSTER,
SGT. MR. CROSS, SGT. MR. ROBINSON,
DEPUTY MR. P. GIARDINA, and
DEPUTY SHAWN WILSON,

                *Defendants.*

**ATTORNEY
DECLARATION**

C.A. No. 19-cv-6269-DGL-MJP

---

STATE OF NEW YORK    )
COUNTY OF ERIE       ) ss
CITY OF BUFFALO      )

      Erin E. Molisani, being first duly sworn, deposes and says under penalty of perjury and pursuant to 28 U.S.C. § 1746 that the following is true and correct:

      1.     I am an attorney at law admitted to practice before this Court and am an Assistant County Attorney to Michael A. Siragusa, Esq., Erie County Attorney and counsel for defendants herein. In this capacity, I am fully familiar with the facts and circumstances of this litigation.

      2.     I submit this Attorney Declaration and accompanying Reply Memorandum of Law in further reply to plaintiff's opposition (Dkt. No. 81) to defendants' pending motion for summary judgment (Dkt. No. 77).

      3.     Defendants respectfully request that the Court grant defendants' motion in its entirety for the reasons set out in the accompanying Reply Memorandum of Law.

Dated:          Buffalo, New York
                December 20, 2021                    **MICHAEL A. SIRAGUSA**
                                                     *Erie County Attorney*

                                                     *s/ Erin E. Molisani*
                                                     Erin E. Molisani
                                                     Assistant County Attorney
                                                     95 Franklin Street, Room 1634
                                                     Buffalo, New York 14202
                                                     Telephone: (716) 858-2216
                                                     Email: Erin.Molisani@erie.gov

Sworn before me this 20th
day of December, 2021

*s/ Carol Gruber*
Notary Public, State of New York
Reg. 01GR6036976
Qualified in Erie County/Niagara County
My commission expires
February 14, 2022

SA-415

## CERTIFICATE OF SERVICE

I hereby certify that on December 20, 2021, I electronically filed the foregoing Attorney Declaration and Reply Memorandum of Law with the Clerk of the District Court for the Western District of New York, using its CM/ECF system, which would then electronically notify the following CM/ECF participants on this case:

Steven V. Modica, Esq.
**MODICA LAW FIRM**
*Pro Bono attorney for plaintiff*
2430 Ridgeway Avenue
Rochester, New York 14626
Telephone (585) 368-1111
Email: steve@modicalawfirm.com

Dated:          Buffalo, New York
                December 20, 2021                   **MICHAEL A. SIRAGUSA**
                                                    *Erie County Attorney*

                                                    *s/ Erin E. Molisani*
                                                    Erin E. Molisani
                                                    Assistant County Attorney
                                                    95 Franklin Street, Room 1634
                                                    Buffalo, New York 14202
                                                    Telephone: (716) 858-2216
                                                    Email: Erin.Molisani@erie.gov

SA-416

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

MARK THOMAS DUBLINO,

                                   Plaintiff,                    DECISION AND ORDER

                                                                19-CV-6269L

            v.

SGT. JUSTIN BIEGAJ, et al.,

                                   Defendants.

_____

**INTRODUCTION**

Plaintiff Mark Dublino filed a *pro se* complaint in this action on April 10, 2019, asserting

civil rights claims pursuant to 42 U.S.C. § 1983, arising out of an incident that occurred on

March 9, 2018, while plaintiff was confined at the Erie County (N.Y.) Holding Center

("ECHC"). Plaintiff filed an amended complaint (Dkt. #8) on July 17, 2019. On October 7,

2020, the Court appointed *pro bono* counsel to represent plaintiff.

In the amended complaint, plaintiff sues eight individuals, all of whom are alleged to

have been employed at the ECHC on March 9, 2018. Plaintiff alleges that he was subjected to

excessive force, in violation of his constitutional rights, as explained below.

Defendants have moved for summary judgment. Plaintiff, through counsel, has filed a

response to the motion.

## FACTUAL BACKGROUND

Many of the relevant facts are undisputed, and need not be set out in great detail here.  At the time of the underlying incident, plaintiff was housed in the ECHC, pursuant to his recent conviction on certain criminal charges.  The attorney representing him on those charges, Joseph Terranova, came to ECHC on March 9 to meet with plaintiff.  They met in an attorney conference room at the facility.

At some point during their meeting, plaintiff and Terranova got into an argument, which escalated into a physical confrontation.  Plaintiff admits that he was later convicted on an assault charge stemming from this incident.

Soon after the altercation began, several deputies rushed to the conference room in response.  In short, plaintiff alleges in this action that they used unnecessary and excessive force against him, and that he was subsequently denied adequate medical treatment for his injuries.

At his deposition, plaintiff testified that he never filed a grievance concerning this incident.  *See* Def. Ex. A (Dkt. #77-2) at 60.  He stated that he asked for a grievance form "immediately" after the incident, but "[t]hey never would give me a grievance form."  *Id.*  He also testified that he did not file any grievances about anything in the two weeks after the March 9 incident.[1]

Plaintiff filed the complaint in this action on April 10, 2019.  In his amended complaint, plaintiff names eight defendants:  Sergeants Justin Biegaj, Robert Dee, Cross and Robinson; and Deputies Brian Thompson, P. Giardina, Frank Gelster, and Shawn Wilson.  He states that the

---

[1] It appears that plaintiff was transferred out of ECHC about two weeks after March 9.

SA-418

constitutional basis for his claim under 42 U.S.C. § 1983 is the Fifth and Fourteenth

Amendments, and he alleges "deliberate indifference" and "violating the 'Due Process Clause.'"

(Dkt. #8 at 4.)  The parties agree, however–and a fair reading of his complaint shows–that

plaintiff alleges a violation of his rights under the Eighth Amendment, by virtue of defendant's

excessive use of force against him and their denial of adequate medical treatment for his injuries.


**DISCUSSION**


**I.  Plaintiff's Failure to Exhaust Administrative Remedies**

In support of their motion for summary judgment, defendants contend that the complaint

should be dismissed on the ground that plaintiff has not exhausted his administrative remedies as

required by the Prison Litigation Reform Act ("PLRA"). The PLRA requires inmate litigants to

exhaust their administrative remedies before filing suit under § 1983.  *See* 42 U.S.C. § 1997e(a).

"[T]o properly exhaust administrative remedies, an inmate must comply with the facility

grievance 'system's critical procedural rules[.]'"  *Brooks v. Mullen*, No. 14-CV-6690, 2020 WL

2512868, at *2 (W.D.N.Y. May 15, 2020) (quoting *Woodford v. Ngo*, 548 U.S. 81, 95 (2006)).

Under New York regulations, an inmate at a "local correctional facility" such as the ECHC must

be provided access to, and comply with, that program's procedural requirements.  9 N.Y.C.R.R.

§§ 7032.4.  *See also* N.Y. Corr. L. § 40(2) (defining "local correctional facility" as "any jail,

penitentiary, state, county or municipal lockup, court detention pen, hospital prison ward or

specialized secure juvenile detention facility for older youth").

SA-419

Defendants in this case have not described in detail the grievance process that was in place at ECHC at the time of these events, but the parties agree that one did exist.  Recent cases from this district have outlined the basics of the grievance program at ECHC.  *See, e.g.*, *Savage v. Acquino*, No. 13-CV-6376, 2016 WL 5793422, at *6 (W.D.N.Y. Sept. 29, 2016); *Collins v. Gruen*, No. 12-CV-6022, 2014 WL 4923586, at *8 (W.D.N.Y. Sept. 30, 2014).

The parties also agree that plaintiff did not file a grievance about the March 9 incident. He says he was unable to do so because defendants would not give him any pens or grievance forms.

But despite his deposition testimony that he did not file any grievances at all in the two weeks following the March 9 incident, plaintiff has admitted, in response to defendants' written request to admit, that as of March 11, 2018, the grievance process was available to him, as evidenced by a different grievance that he submitted on that date, concerning alleged interference with his outgoing legal mail.  *See* Def. Ex. K (Dkt. #77-12), Ex. L (Dkt. #77-13). Clearly, then, plaintiff had a grievance form, and the means to fill it out and submit it, just two days after the March 9 incident giving rise to this suit.

In his response to defendants' request to admit, plaintiff states that the grievance process "was available" for the matter concerning his outgoing legal mail, but that it was not available as to the March 9 incident.  He has not offered any explanation or evidence for that conclusory assertion, other than to repeat that he was not provided a grievance form or paper.  Def. Ex. L at 4.  But that assertion is flatly contradicted by his submission of a grievance on March 11, only two days after the March 9 incident.

-4-

When a prisoner plaintiff asserts that he was prevented from filing a grievance because the defendants withheld pens, forms, or other writing materials, courts have considered "whether the inmate was drafting other documents during the same time period, or whether [he was] able to access materials from other sources." *Tillman v. Phillips*, No. 19-CV-1597, 2021 WL 5233308, at *8 (N.D.N.Y. Nov. 10, 2021) (quoting *Rodriguez v. Cross*, No. 15-CV-1079, 2017 WL 2791063, at *7 (N.D.N.Y. May 9, 2017), *R&R adopted*, 2017 WL 2790530 (N.D.N.Y. June 27, 2017)). *See also Miller v. Annucci*, No. 17-CV-4698, 2021 WL 4392305, at *14 n.13 (S.D.N.Y. Sept. 24, 2021) (rejecting plaintiff's statement that he was "not able to access [any] [p]aper, [p]en[s], or [e]nvelopes, much less any grievance forms," where he filed other grievances during the same time period); *Louis-Charles v. Barker*, No. 16-cv-1417, 2018 WL 4299982, at *3 (N.D.N.Y. Sept. 10, 2018) (plaintiff's claim that he was denied access to the tools needed to draft a written grievance was contradicted by his own testimony and evidence that he drafted protest letters during the time in question).

Since the undisputed evidence directly contradicts and rebuts plaintiff's assertion that the grievance process was "unavailable" to him, his complaint must be dismissed. *See Ross v. Blake*, 136 S.Ct. 1850, 1857 (2016) ("mandatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion"). The Court's conclusions on the exhaustion issue also renders it unnecessary for me to address defendants' arguments concerning the merits of plaintiff's claims. *See Adams v. Annucci*, 537 F.Supp.3d 475, 478 (W.D.N.Y. 2021); *Allah v. Ryan*, 436 F.Supp.3d 621, 630-31 (W.D.N.Y. 2020).

SA-421

## CONCLUSION

Defendants' motion for summary judgment (Dkt. #77) is granted, and the complaint is dismissed.

IT IS SO ORDERED.

_____
DAVID G. LARIMER
United States District Judge

Dated: Rochester, New York
        January 18, 2022.

SA-422

Judgment in a Civil Case

United States District Court
WESTERN DISTRICT OF NEW YORK

MARK THOMAS DUBLINO,

                    Plaintiff,

      v.

SGT. JUSTIN BIEGAJ, et al.,

                    Defendants.

**JUDGMENT IN A CIVIL CASE**
CASE NUMBER: 19-CV-6269

☐ **Jury Verdict**.  This action came before the Court for a trial by jury.  The issues have been tried and the jury has rendered its verdict.

☒ **Decision by Court**.  This action came to trial or hearing before the Court.  The issues have been tried or heard and a decision has been rendered.

IT IS ORDERED AND ADJUDGED that the complaint is dismissed.

Date: January 19, 2022

MARY C. LOEWENGUTH
CLERK OF COURT

By: s/Rosemarie M. Eby-Collom
    Deputy Clerk

SA-423

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

MARK DUBLINO;

PLAINTIFF

v.

JUSTIN BIEGAJ; ET. AL. DEFENDANTS

NOTICE OF APPEAL

6:19- cv_06269-DGL-MJP

NOTICE IS HEREBY GIVEN THAT MARK DUBLINO; THE PLAINTIFF IN
THE DISTRICT COURT ACTION IN THE ABOVE-NAMED CASE; HEREBY APPEALS
TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUT FROM
ALL DECISIONS OF THIS COURT ENTERED ON JANUARY 22nd 2022.

DATED: JANUARY 25th 2022

SIGNATURE

MARK DUBLINO ; DIN. 18-B-0793

APPEARING "PRO SE"

WENDE CORRECTIONAL FACILITY

3040 WENDE ROAD

ALDEN; NEW YORK  14004

SA-424

## AFFIDAVIT OF SERVICE

STATE OF NEW YORK   )

                                        )ss.:

COUNTY OF    ERIE      )

I, _____ MARK DUBLINO _____ , swear under the penalty of perjury that:

On the 25th day of _____ JANUARY _____ , 20 22 , I placed and submitted a true and exact copy of

the following documents:

1. NOTICE OF APPEAL FOR 6:19-cv-06269-DGL-MJP;DUBLINO v. BIEGAJ

2. MOTION FOR AN EXTENTION OF TIME TO FILE

3. NOTICE OF APPEAL FOR 6:19-cv-06354-DGL-MJP;
   DUBLINO v. WENDE CORRECTIONAL FACILITY

4. MOTION FOR AN EXTENTION OF TIME TO FILE.

in a properly sealed post-paid wrapper, and deposited same in an official depository, designated for outgoing

mail at the Wende Correctional Facility, to be delivered by the United States Postal Service to the following

parties:

UNITED STATES DISTRICT COURT

HON. DAVID LARIMER

500 UNITED STATES COURTHOUSE

ROCHESTER; NEW YORK 14614

RYAN ADAM STAUFENBERGER
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01ST6402487
Qualified in Erie County
My Commission Expires January 06, 2024

Sworn to before me this

25u day of January , 20 22

Respectfully submitted,

MARK DUBLINO    Pro se  18-B-0793

Wende Correctional Facility

3040 Wende Road

Alden, New York 14004-1187

NOTARY PUBLIC

SA-425

**WENDE CORRECTIONAL FACILITY**
Wende Rd., P.O. Box 1187
Alden, New York 14004-1187

NAME: Mark Ojalvo    DIN: 18-B-0793

LEGAL MAIL

UNITED STATE DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
HON. DAVID LARIMER
2500 UNITED STATES COURTHOUSE
ROCHESTER, NEW YORK 14614

NEOPOST
01/28/2022
US POSTAGE $000.53⁰
ZIP 14004
041M11281621

WENDE
CORRECTIONAL FACILITY